IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)



DEPOSITION OF ZELMER HYDEN

THURSDAY, APRIL 27, 2006, 9:28 a.m.

Anchorage, Alaska



Page 1

Page 6

1  be happy to rephrase it.
2         It's not a test of your endurance, by any
3  means. If you needed a break, bathroom, coffee,
4  cigarette, walk around the block, anything like that,
5  just let me know and we'll be happy to accommodate
6  you. Hopefully, get you out of here before lunchtime
7  and back on your way to Sutton.
8      A. Works for me.
9      Q. Okay. In 2002 were you employed by the
10 State of Alaska?
11     A. That is correct. I believe at that time I
12 was the acting superintendent, Palmer Correctional
13 Center.
14     Q. Maybe you could give me, just to make it
15 easy on us, sort of a thumbnail sketch of your
16 employment history.
17     A. History of my employment?
18     Q. If you would.
19     A. Okay. I started with the State in 1978 as a
20 psychiatric assistant at Alaska Psychiatric Institute.
21 Worked there for about five years. And then I moved
22 to the Department of Corrections, oh, probably about
23 '83, '82, something like that. Worked at Cook Inlet,
24 Mat-Su Pretrial, Third Avenue Jail and Palmer
25 Correctional Center.

Page 7

1      Q. How long did you stay employed by the State?
2      A. About 26 years all together.
3      Q. So you left State employment in what, 2004?
4      A. 2004. I believe June of '04 for retirement.
5      Q. And are you actively employed now?
6      A. No. Except housecleaning and things like
7  that. You know how that goes.
8      Q. Not working for pay, anyway.
9      A. No. It's all free now. Slave labor.
10     Q. And Sutton is where you make your home?
11     A. Yes.
12     Q. Tell me a little bit about your educational
13 background.
14     A. I graduated from Roswell High School in
15 Roswell, New Mexico in 1970. Attended Eastern
16 New Mexico University for a couple of years. And then
17 continued with more education while I was in the
18 United States Air Force. Ended up with a total of
19 about 91 semester hours, no degree.
20     Q. What years were you in the Air Force?
21     A. 1973 for five years.
22     Q. Highest rank?
23     A. E-4, sergeant.
24     Q. Where were you stationed?
25     A. Holloman Air Force Base -- that's in

Page 8

1  Alamogordo, New Mexico -- and Elmendorf Air Force
2  Base.
3      Q. Is it fair to say the military brought you
4  up to Alaska?
5      A. That is true.
6      Q. And when you left the military in '78, you
7  had been stationed at Elmendorf?
8      A. That's correct.
9      Q. And went promptly to work for the State of
10 Alaska?
11     A. That is correct.
12     Q. What training did you have to be a
13 psychiatric assistant?
14     A. At that particular time at API, it was all
15 on-the-job training.
16     Q. How did you get into the field of
17 corrections?
18     A. Briefly, it was after the Charles Meech
19 incident. And they kind of reshuffled everything at
20 API. And a lot of the -- and they moved a unit to
21 Hiland Mountain to do E&Os out there. And I went out
22 there. And then from that when they did move it back
23 to API, I went ahead and stayed with the Department.
24     Q. I'm going to ask you to break down a couple
25 of things in that last answer for me.

Page 9

1      A. That would be fine.
2      Q. First of all, what was the Charles Meech
3  incident?
4      A. The Charles Meech incident was an individual
5  who killed four teenagers in Russian Jack Park. No,
6  no. That was the other one. I'm getting them all
7  together.
8         Charles Meech killed two people. He killed
9  one one-armed kid. And that's the reason he was in
10 API. And then he was -- if I remember correctly, he
11 was on a pass from API working at Sears and he
12 killed -- I'm not sure. There's so many of those guys
13 right in there that we dealt with that it kind of runs
14 together.
15     Q. Not looking to get you off on a long tangent
16 here. It's just when you use a term, I may ask you to
17 explain it, just so we understand.
18     A. That's fine.
19     Q. So Charles Meech, I take it, was a patient
20 at API.
21     A. Yes. He was a Title 12.
22     Q. And that means?
23     A. He was incarcerated at API because he was
24 found to be incompetent.
25     Q. And at some point then he went out and

Page 14

1  Q. So there was no superintendent above you
2  during that time period?
3  A. No.
4  Q. During all of 2002?
5  A. Probably during 2002 at some time I actually
6  became the -- the superintendent.
7  Q. Okay. Who did you report to then?
8  A. The director, Central Office. At that time
9  would have been Allen Cooper.
10 Q. Is it fair to say, then, that during 2002
11 the rest of the staff at PCC all reported to you?
12 A. No.
13 Q. Okay. Explain the chain of command for me.
14 A. Chain of command, all security staff,
15 kitchen staff, all of the staff reported to me.
16 Medical staff was -- the medical staff, the nurses,
17 the PAs and the psychiatric people, mental health
18 conditions, et cetera, actually, they were assigned to
19 my building. And, you know, of course, their offices
20 and everything was in my building. But they actually
21 reported to the people in Central. I didn't write
22 their evaluations or anything like that, no. And if I
23 had an issue with these folks, I would go to Central
24 and talk to them about it.
25 Q. And Central is located physically where?

Page 15

1  A. Diplomacy Drive.
2  Q. In Anchorage?
3  A. Yeah, in Anchorage.
4  Q. During the time that you were -- strike
5  that.
6      Let's talk about 2002. It's a little bit
7  easier time period. Who would the most senior medical
8  person have been who was assigned to PCC?
9  A. That was actually assigned there?
10 Q. Yes.
11 A. Would probably have been Roger Hale.
12 Q. And Mr. Hale was a PA?
13 A. He was a PA. And I think when you say
14 assigned there, there were medical doctors on
15 contract, but Mr. Hale actually worked there.
16 Q. Okay. And Mr. Hale, then, as a medical
17 person would not have reported directly to you.
18 A. He would -- he would report to me. And, for
19 example, we'd have a meeting. And if there was
20 something significant, he would make the staff aware
21 at that particular time. But other than that, as far
22 as him working for me, no, he did not.
23 Q. Did you have regular meetings with the
24 medical staff?
25 A. There were morning meetings at 9:30. And --

Page 16

1  and all the staff would assemble at that time.
2  Q. And that's a daily meeting?
3  A. And it was daily meeting. And medical would
4  be there most of the time, unless something was going
5  on in which they could not.
6  Q. Were there records kept of those meetings --
7  A. (Witness nods head.)
8  Q. -- regular minutes or something like that?
9  A. Yes, there was.
10 Q. I should have told you at the beginning, the
11 nods of the head, the shaking the head doesn't work
12 very well. We can't pick them up for the court
13 reporter.
14 A. I'm old. I'm tired.
15    MS. KAMM: I hear you.
16 BY MR. MATTHEWS:
17 Q. Occasionally, I may jump in and prod you for
18 a verbal answer. So that's the reason.
19 A. Okay.
20 Q. So there were written minutes kept of each
21 of those daily meetings?
22 A. Yes.
23 Q. And what are those minutes called?
24 A. Morning meeting minutes, I would assume.
25 Q. Who was responsible for keeping those?

Page 17

1  A. My -- my clerk.
2  Q. Who would that person have been during 2002?
3  A. I can't -- I don't know for sure, because
4  there was -- there was two or three clerks coming and
5  going. And I'm not sure of the time frames that they
6  were actually there. People that did keep the
7  meetings -- the minutes were Sharon Wesson (phonetic),
8  I believe was her name.
9  Q. Spell the last name.
10 A. I'm not sure. What is her last name?
11 Sharon. Starts with a W. I'm not even going to try
12 to remember. It's been too far back.
13    Melody Chowoniec was another one.
14 Q. Can you spell that last name?
15 A. Oh, wow. C-h-o-w-o-n-i-a-c, I believe.
16 Q. I wasn't going to come even close to that.
17 A. And then there was one more. I can't
18 remember her name. And she's probably the one that
19 was there at that particular time. It may come to me
20 later.
21 Q. Would that help you?
22 A. That might.
23    MR. MATTHEWS: Would you mark that as
24 Exhibit 1?
25    (Exhibit 1 was marked.)

Page 46

1  thus we're here. It goes to court. He can go to
2  court with it.
3      Q. So your involvement in the process would be
4  after the grievance is filed, beyond the cop-out
5  stage, right?
6      A. Uh-huh.
7      Q. So if the cop-out resolves it, you don't get
8  involved at all.
9      A. Exactly. If the prisoner is happy and
10 something was wrong, it's fixed, all is good.
11     Q. If it goes to the grievance, you review
12 every grievance that's filed.
13     A. I review every grievance that's filed, yes.
14     Q. And the compliance officer would be the one
15 who would assign it in the initial instance for
16 investigation.
17     A. Right.
18     Q. Right? Do you remember, as you sit here
19 today, your involvement in Mr. Davis' grievance?
20     A. I -- I -- I remember, you know, when I seen
21 the grievance, I -- I remember the grievance. And,
22 you know, a lot of times, you'll deal with the
23 grievance or whatever, the responses are made, it's
24 all resolved and you've never seen the inmate. You're
25 dealing with a piece of paper.

Page 47

1      Q. So in terms of your specific memory today,
2  you remember that there was a grievance. Do you
3  remember the specifics of it at all?
4      A. Well, I've looked at the grievance recently.
5  That could cloud my -- but I think I do remember the
6  grievance.
7      Q. Okay. When did you look at the grievance
8  recently?
9      A. Actually, when I received this to sign, I
10 started looking to find out what in the world have I
11 done, you know. And I probably looked at it then.
12 And then -- and then I thought this was resolved. And
13 so then I've looked at it again recently in the last
14 couple days, because we're here.
15     Q. Just so that I'm clear, you were pointing at
16 some papers. So you looked at the grievance, it looks
17 like, around the time that you signed the
18 interrogatory responses in January of 2005.
19     A. Correct.
20     Q. And then more recently, just in getting
21 ready for the deposition.
22     A. Uh-huh.
23     Q. Is that right?
24     A. That is correct.
25        (Exhibit 4 was marked.)

Page 48

1        MR. MATTHEWS: Let me show you what we've
2  marked as Exhibit 4.
3        THE WITNESS: Can we take a short break
4  before we go on to Exhibit 4?
5        MR. MATTHEWS: Sure. Off record.
6        MS. KAMM: I could use a break, too.
7        (Brief recess.)
8  BY MR. MATTHEWS:
9      Q. We've put in front of you, Mr. Hyden,
10 Exhibit 4. Ask you if you recognize that document.
11     A. Okay. Yeah. Exhibit 4 is the grievance
12 filed by Charlie Davis.
13     Q. And this exhibit consists of four pages,
14 which I think is taken from the entire grievance
15 packet. What I want to see if I can understand is
16 what your part in that grievance was.
17     A. Okay. Briefly, the prisoner writes down his
18 grievance, which he -- he has done so. And then he
19 requests what his relief is. And he has done so.
20 It's dated and it's signed. And then Mr. -- or the
21 compliance sergeant would assign it to someone to
22 investigate.
23        In this case, it appears it had been
24 assigned to Mr. Hale. And Roger Hale had -- what it
25 states is "The issue of manning/staffing cannot be

Page 49

1  addressed at this level. I spent about 20 minutes
2  explaining how he can access medical (that is not
3  (sic) available at PCC)." And that was Mr. Hale's
4  response.
5        After Mr. Hale would have responded, the
6  compliance sergeant would get the grievance and bring
7  it to me for my review. And I would review the
8  grievance, look at Mr. Hale's response and then write
9  down my findings.
10       I'm not a medical person. I have to depend
11 heavily on what medical tells me. So thus, I wrote
12 "The above investigation does not address the
13 prisoner's grievance. Perhaps prisoner should be
14 transferred to facility with full time medical staff
15 to accommodate 'life threatening' condition." That
16 was my response.
17       And then after that, the prisoner would
18 review it. Now, this grievance has some alter- -- is
19 altered to the one that I had. Whether he was
20 satisfied, et cetera, is not on the one I have. And
21 the last block where it says I am satisfied with
22 response or not, this one is not completed at all.
23    Q. And you're looking at the second page of
24 Exhibit --
25    A. The second page, right.

Page 50

1   Q. -- of Exhibit 4, the bottom block that says
2   "Prisoner's Response"?
3   A. Right.
4   MR. MATTHEWS: I don't have the original of
5   this, so --
6   MS. KAMM: I think I've got the original.
7   I'll take a look at it when I get back to the office.
8   MR. MATTHEWS: Okay.
9   MS. KAMM: I'll fax it to you if we've
10  got --
11  THE WITNESS: And I would have to assume the
12  original is going to be checked, I do intend to appeal
13  to the Director of Institutions or Medical Director,
14  which that was done. And then page three of what
15  we're looking at here is the Prisoner Grievance Appeal
16  Statement. And this would be what the prisoner wrote
17  to the medical director. And then the medical
18  director's response is the last page.
19  BY MR. MATTHEWS:
20  Q. Okay. Is it fair for me to conclude that
21  your involvement, your specific involvement in this
22  grievance, would have been to review Mr. Hale's
23  findings and determination and to sign off on the
24  grievance as you did on the second page?
25  A. That is correct.

Page 51

1   Q. You made the comments that the investigation
2   did not address the grievance and perhaps he should be
3   transferred to a different facility, right?
4   A. Correct.
5   Q. Beyond that, did you have any involvement in
6   this grievance?
7   A. None. Now, there could have been a time
8   when in one of these meetings, Mr. Davis' issues, I
9   would have been made aware of his issues. Probably --
10  I don't know when the time frame was when I was made
11  aware of his -- if I receive a prisoner at medium, I'm
12  not aware that he has a bypass or a defibrillator or
13  anything of this nature until someone makes me aware
14  of it. And I would assume that probably about the
15  time this grievance was filed is when I would have
16  been made aware of Mr. Davis' issues with medical.
17  Q. Is it fair to say that Mr. Davis' grievance
18  was for inadequate medical care?
19  A. I -- I disagree with that.
20  Q. You disagree that that's what he was
21  complaining about?
22  A. Say the question again. Maybe I
23  misunderstood you.
24  Q. Is it fair to say that Mr. Davis' grievance
25  was essentially that he didn't like the medical care

Page 52

1   he was getting at Palmer, didn't think it was
2   adequate?
3   A. He -- he probably thought that, yes.
4   Q. Okay. I'm not asking whether you agree that
5   the care --
6   A. Okay. Yes.
7   Q. -- was inadequate.
8   A. Because in my opinion, the grievance is very
9   confusing. Okay?
10  Q. All right. Let me ask you this then: How
11  did you interpret Mr. Davis' grievance when you
12  received it?
13  A. Well, I read it and I was like -- I
14  really -- you know, because there's a number of things
15  you could read into this. And I read it. And then I
16  read what Mr. Hale had -- you know, who had talked to
17  him for several minutes. And I -- I thought -- I
18  thought Mr. Hale should have been a little more
19  specific in these times, actually put something
20  specific down here. This is the reason that I wrote
21  what I wrote.
22  To me as a superintendent, to say I spent 20
23  minutes how he could access medical in a document like
24  this, I would like to see written out, you do this,
25  you do this, you do this and you do this. Okay? And

Page 53

1   that wasn't done. So that was thus part of my
2   response.
3   Q. Your conclusion was that the -- that
4   Mr. Hale's response was inadequate.
5   A. Yes. I wanted him to give -- because if a
6   prisoner files a grievance -- and I might add here, I
7   was the compliance sergeant at Mat-Su Pretrial and
8   dealt with these regularly. So I'm very familiar with
9   the grievance process.
10  I just really like -- when an inmate is
11  upset enough to file a grievance, address his issues.
12  If they're frivolous, they're frivolous. But address
13  his issues in that grievance. And I just would like
14  to have seen specific things written out, you know,
15  rather than I spent 20 minutes talking to him.
16  Q. You didn't feel Mr. Hale's response
17  addressed the grievance; is that true?
18  A. That's what I felt at the time, yes.
19  Q. And your suggestion was that perhaps
20  Mr. Davis should be transferred to a different
21  facility that had full-time medical care to
22  accommodate his life-threatening condition.
23  A. Possibly. And I put life-threatening
24  because -- and I'm going to assume here that at that
25  time I wasn't totally aware of Mr. Davis' issue,

Page 54

1  because I put life-threatening in parentheses -- or
2  quotation marks.
3      But actually, basically, I'm probably
4  inviting medical to look at this. And if this inmate
5  really feels this strongly, does he need to go to the
6  Anc Jail where there's a medical unit or something.
7  And if they feel he does not, they're the medical
8  staff. I'm not. It's their call.
9      Q. So once you make the suggestion that the
10 investigation that had been done to that point was
11 inadequate, does it go back to Mr. Hale for further
12 findings?
13     A. No.
14     Q. Why not?
15     A. Because in the process, it goes to
16 Mr. Hale's boss, the medical director. If what you
17 just asked, grievances would be bouncing around all
18 the time and we'd never get anywhere. So there has to
19 be a click, click, click, you know, the grievance
20 process is this. So, you know, it goes to Mr. Mel
21 Henry in this particular case. And then he gets the
22 final medical word on it.
23     Q. So whose decision is it to -- as to whether
24 or not Mr. Davis stays at Palmer or is transferred to
25 another facility?

Page 55

1      A. Okay. It would be my decision if it was a
2  security issue. Okay? If -- for example, if
3  Mr. Davis is beating up other inmates or doing
4  whatever and we find that in that particular
5  environment he cannot be controlled adequately, that
6  would be a security issue. And that would -- I
7  would -- you know, we need to look at classifying him
8  to a more secure setting.
9      In an issue with medical, I'm not a medical
10 person. I can't set here and say, well, I think his
11 medical issues are whatever. Transfer him. He would
12 be transferred by the medical people and it would be a
13 medical transfer.
14     Q. So essentially, once you're done with this
15 grievance, you're done.
16     A. I'm done.
17     Q. Because it's a medical grievance.
18     A. I'm done. And I wanted them to look at it
19 carefully. Make sure you make the right decision.
20 And I'm done.
21     Q. Did you ever follow up to see what action
22 had been taken?
23     A. I was too busy.
24     Q. So I take it that's a no.
25     A. That's a no.

Page 56

1      Q. Did you know what response was made to
2  Mr. Davis' grievance after you signed off on it on
3  June 27th, '02?
4      A. To be honest with you, I can't tell you
5  whether I reviewed this when it came back or not. I
6  do not know.
7      Q. And you're talking about the appeal portion.
8      A. The appeal from Mr. Mel Henry.
9      Q. So once Mr. Davis files his grievance, you
10 make your findings and recommendation, off it goes to
11 medical and you're done with it; is that fair?
12     A. In a medical situation, yes.
13     Q. You don't have any practice of following up
14 to see whether or not your recommendations or
15 suggestions were followed.
16     A. If I -- I would have a practice of doing so
17 if I felt it was warranted.
18     Q. Do you know --
19     A. If I feel medical has this under control --
20 because they're the medical professionals. I'm not.
21 I have to trust them. If they tell me everything is
22 okay, inmate's needs are being met, they are the
23 medical professionals. I'm not. I can't second guess
24 them.
25     Q. Did you get a report back from medical on

Page 57

1  Mr. Davis after that?
2      A. I don't recall.
3      Q. Do you know whether or not Mr. Davis felt
4  that his medical needs were being met after this
5  grievance was filed?
6      A. I didn't hear anything else about it, to my
7  recollection. So I have to assume that he was okay.
8      Q. Mr. Davis was 70 years old at the time this
9  grievance was filed?
10     A. Okay.
11     Q. Do you know?
12     A. I don't have a clue.
13     Q. Any idea how old he was?
14     A. I thought he was about 45.
15     Q. The individual that you described earlier
16 with the cane in the yard appeared to you to be about
17 45?
18     A. It's so long ago. He didn't seem to be 70
19 years old, if it's the person I'm thinking of.
20     Q. When Mr. Davis arrived in Palmer, at PCC, he
21 had an implanted defibrillator. Were you aware of
22 that?
23     A. No. There would be a point in time when I
24 would be aware, but it wouldn't be at his arrival, no.
25     Q. Were you aware of that at the time he filed

Page 58

1  his grievance?
2     A. Seems like it states so in the grievance.
3  And what kind of briefing I could have had from
4  medical regarding this, you know -- because I feel
5  certain that medical talked to someone, probably in
6  one of these meetings, about this individual and
7  closely monitoring him. But I can't -- it's been too
8  far back. I can't recall.
9     Q. When you say "these meetings," are you
10 talking about your daily briefings?
11    A. Correct.
12    Q. Prior to Mr. Davis' grievance, did you know
13 what an implanted defibrillator was?
14    A. Uh-huh.
15    Q. And how did you have that knowledge?
16    A. My ex-wife was a nurse. I knew quite a bit
17 about that.
18    Q. Did you understand that a person with an
19 implanted defibrillator by definition had a serious
20 heart condition?
21    A. Well, I would say my medical knowledge, I
22 have no formal training in medical. I -- I can't say
23 that I would understand anything about medical. I
24 haven't been trained in any medical other than CPR and
25 whatever. But vaguely, yeah, you'd have to assume if

Page 59

1  someone has something placed in their chest, yeah,
2  it's serious.
3     Q. Fair to say they would not have had the
4  implant if it weren't serious?
5     A. But also, I know people that have implants
6  and they're out working jobs and stuff and everything
7  is hunkey dorey. And they're doing whatever. So once
8  again, I'm not a medical staff. I don't know what
9  limitations a defibrillator could have. There's --
10 because I know a couple people with these kind of
11 things and they're living pretty much normal lives.
12 So I can't second guess that, no.
13    Q. Let me ask you this: At the time Mr. Davis
14 filed his grievance, did you have any personal
15 knowledge of what his medical condition was?
16    A. At the time he filed the grievance, probably
17 not.
18    Q. In your response to his grievance, did you
19 review any of his medical records to see what his
20 condition was?
21    A. I did not look at a medical record. What I
22 would probably do if I did so, something of that
23 nature, would be to call a PA, ask specific questions
24 for specific answers, you know. And I would be much
25 clearer on what I understood rather than go look at a

Page 60

1  medical record.
2     Q. Do you know whether or not you called PA
3  Hale --
4     A. Don't recall.
5     Q. -- in response to this greivance?
6     A. I feel that we probably had some
7  conversations regarding this individual, strictly
8  because of the grievance and it's medical. But I
9  can't recall those. It's been too long and too many
10 inmates. And I mean, I can't -- I can't specifically
11 remember.
12    Q. Would your actions or conversations with
13 Mr. Hale have been documented in any way?
14    A. Probably the only documented thing would be
15 the morning meetings. I can't -- every time I talk to
16 someone about an inmate's hangnail, I don't go
17 document that. That's just not real. I know what
18 you're asking, you know, but it's -- no, it wouldn't
19 have been documented other than what I would have
20 wrote here. You know, if I called him prior to
21 writing this -- and I don't remember a conversation.
22 I'm sure there probably could have been one, but it's
23 just too long ago and too much has happened.
24    Q. So you just don't remember at this point.
25    A. I don't remember at this point.

Page 61

1     Q. Is it fair to say, Mr. Hyden, that after
2  your written response to this grievance, you don't
3  have any memory of taking any other action with regard
4  to Charlie Davis?
5     A. None.
6     Q. Do you remember having any further contact
7  with a PA to inquire about Mr. Davis' status?
8     A. I don't recall anything.
9     Q. Do you remember contacting anyone else on
10 the medical staff to find out how Mr. Davis was doing?
11    A. No. That's something that if there's a
12 problem, they would come to me, you know. I can't --
13    Q. Is it fair to say that unless a problem is
14 brought to your attention, it's not something you're
15 going to go seek out?
16    A. Exactly.
17    Q. So follow-up would not have been part of
18 your routine.
19    A. No. If they was having a problem or
20 something, they would probably get ahold of me,
21 et cetera. But to sit there and think, I wonder if
22 this is working out, I should go check on this, you
23 know, you may have all kinds of things going. No, I
24 don't think I would have -- I would have waited for
25 them, you know, to give me some kind of indication