IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)



DEPOSITION OF MELBOURNE HENRY

FRIDAY, APRIL 28, 2006, 10:27 a.m.

Anchorage, Alaska



Page 1

EXHIBIT C
PAGE 1 OF 7

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF ALASKA
 3
 4   CHARLIE J. DAVIS, JR.,
 5        Plaintiff,
 6   vs.
 7   ZELMER HYDEN, et al.,
 8        Defendants.
                                          )
 9   NO: A02-0214 CV (JKS)
10
11
12
13        DEPOSITION OF MELBOURNE HENRY, taken on
14   behalf of Plaintiff, Pursuant to Notice, at MATTHEWS &
15   ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16   before Susan Campbell, Certified Shorthand Reporter
17   for Alaska Stenotype Reporters and Notary Public for
18   the State of Alaska.
19
20
21
22
23
24
25
```

Page 3

```
 1             A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:   MATTHEWS & ZAHARE
                      BY: THOMAS A. MATTHEWS
 4                    431 West Seventh Avenue
                      Suite 207
 5                    Anchorage, AK 99501
 6
     For Defendants:  STATE OF ALASKA
 7                    ATTORNEY GENERAL'S OFFICE
                      Department of Law
 8                    Criminal Division
                      BY: MARILYN J. KAMM
 9                    P.O. Box 110300
                      Juneau, AK 99811
10
     Reported By:     Susan Campbell
11                    Certified Shorthand Reporter
12
```

Page 4

```
 1                    I N D E X
 2   EXAMINATION BY:                         PAGE
 3      Mr. Matthews                           5
 4
 5                   E X H I B I T S
 6   NUMBER                                  PAGE
 7   1  Memorandum and Prisoner Grievance -   20
        4 pages
 8
     2  Memo and attachments - 6 pages        52
 9
     3  Document entitled "Access to Health   53
10      Care Services" - 6 pages
11   4  Document entitled "Health Care        55
        Organization and Administration" -
12      5 pages
13   5  Excerpt from DOC Policies and         55
        Procedures - 32 pages
```

Page 5

```
 1   ANCHORAGE, AK, FRIDAY, APRIL 28, 2006, 10:27 a.m.
 2                MELBOURNE HENRY,
 3   called as a witness on behalf of the
 4   Plaintiff, having been duly sworn upon
 5   oath by Susan Campbell, Notary Public,
 6   was examined and testified as follows:
 7                  EXAMINATION
 8   BY MR. MATTHEWS:
 9        Q.  Would you state your name for the record,
10   sir?
11        A.  Melbourne Walder Henry.
12        Q.  If you'd spell all of them for me.
13        A.  M-e-l-b-o-u-r-n-e, W-a-l-d-e-r, H-e-n-r-y.
14        Q.  Do you use the title of doctor?
15        A.  No.
16        Q.  Are you a doctor by training?
17        A.  I am.
18        Q.  A medical doctor?
19        A.  No.
20        Q.  Let me tell you right to begin with, I ask
21   questions sometimes simply because we need to get
22   answers in a written form that we can use later for
23   trial.
24        A.  Yeah.
25        Q.  Sometimes I ask questions because I simply
```

Page 6

1  don't know the answer.
2  A. Yes.
3  Q. And I will ask you to help me through the
4  process.
5  A. And I'll be happy to do that.
6  Q. If I ask questions which you don't
7  understand for any reason, please let me know and I'll
8  be happy to rephrase them.
9  A. I will.
10  Q. Okay. Have you ever had a deposition taken
11  before?
12  A. Once before.
13  Q. In what kind of a context?
14  A. Within the context of the Department of
15  Corrections.
16  Q. Okay. Some years ago?
17  A. Yes, some years ago. We -- oh, we were
18  being sued by a physician who stated that we had
19  breached his contract.
20  Q. A contracted physician with the
21  Department --
22  A. With the Department --
23  Q. -- of Corrections?
24  A. -- of Corrections, yes.
25  Q. Let me ask you one favor, if I can, as we're

Page 7

1  going through. You're going to be very good, I can
2  tell, at anticipating my question. But if you'd let
3  me get it out, it will make it much easier on our
4  court reporter, so we're not talking over the top of
5  each other. Okay?
6  A. Excellent.
7  Q. What is an address where we can reach you?
8  A. 8651 Kushtaka, K-u-s-h-t-a-k-a, Circle,
9  Anchorage, 99504.
10  Q. And a good telephone number?
11  A. (907) 333-2835.
12  Q. Are you currently employed?
13  A. I am.
14  Q. By whom?
15  A. University of Alaska Anchorage.
16  Q. What is your position there?
17  A. I'm a professor of social work.
18  Q. How long have you held that position?
19  A. One year.
20  Q. Is that a full-time position?
21  A. It is.
22  Q. How long have you been with the university
23  total?
24  A. One year.
25  Q. Prior to your work at the university, where

Page 8

1  did you work?
2  A. For the Department of Corrections.
3  Q. How long did you work for Department of
4  Corrections?
5  A. From '98 to '03, about five years.
6  Q. What was your position with Department of
7  Corrections?
8  A. Health care administrator.
9  Q. Maybe you could help me work our way back
10  just through your basic educational training,
11  background, that kind of thing, kind of a resume
12  format. Employment history first.
13  A. I mentioned Department of Corrections.
14  Q. Yes, sir.
15  A. Prior to that, I was a professor of social
16  work at Alabama Agricultural and Mechanical University
17  in Huntsville, Alabama. I was there for five years.
18  Before that, the University of Nevada at Reno for
19  three years. Prior to that, the Department of Health
20  and Social Services as director of mental health and
21  developmental disabilities.
22  Q. Is that the Alaska Department of Health and
23  Social Services?
24  A. Yes, the Alaska Department.
25  Q. And before that?

Page 9

1  A. Before that, I was health care administrator
2  for the Hargraves Memorial Hospital,
3  H-a-r-g-r-a-v-e-s, in Mandeville, Jamaica. And before
4  that, I was medical social worker and an associate
5  hospital administrator for the Appalachian Regional
6  Hospital, A-p-p-a-l-a-c-h-i-a-n, in Beckley,
7  West Virginia.
8      And before that -- oh, I think I just got
9  one out of sequence. I was director of community
10  health services for the Department of Health in West
11  Virginia, and then the Appalachian Regional Hospital.
12  Yes. I'm sorry about that.
13  Q. That's all right.
14  A. All right. And I was, I guess, a social
15  worker, child welfare worker for the Welfare
16  Commission for the State of Oregon. And I think
17  that's about it.
18  Q. Where did you attend university?
19  A. I have a Bachelor's degree in Economics and
20  Sociology from Warner Pacific College in Portland,
21  Oregon. I have a Master's in Social Work, MSW, from
22  Portland State University, Portland, Oregon. I have a
23  Master's in Public Administration, MPA, from the
24  University of Southern California. And I have a
25  doctorate in the field of social work and social

### Page 10

```
 1   gerontology from the University of Southern
 2   California.
 3       Q.  What year did you get your Ph.D.?
 4       A.  In 1975.
 5       Q.  Okay.  Let me see if I can put a few years
 6   with some of the rest of this.
 7       A.  Yes.
 8       Q.  Your work at Alabama Agricultural
 9   University --
10       A.  Yes.
11       Q.  -- five years, that would have been
12   approximately '93 to '97, '98?
13       A.  '98.  I left there directly and came up here
14   in '98.
15       Q.  Okay.  And then the University of Nevada at
16   Reno was the three years before that?
17       A.  Yes.
18       Q.  Which would have been '90 to '92?
19       A.  I started there in -- it's '89 to '92.
20       Q.  So your work for the Alaska Department of
21   Health and Social Services would have been what years?
22       A.  From '84 to '88.  And I was a consultant
23   just on my own for -- until '89 for about a year.
24   Then I left -- I left in '89 to go to Nevada.
25       Q.  Your work at Hargraves then would have been
```

### Page 11

```
 1   what years?
 2       A.  Hargraves would be '80 -- let's see.  '80 --
 3   well, let me --
 4       Q.  Just approximately.
 5       A.  Yeah.  Approximately '80, '81.  And the work
 6   with the State of West Virginia with the Health
 7   Department there would be from '78 to '80, right.
 8   Because I left there and went to Jamaica.  So reverse
 9   those.
10       Q.  And the Appalachian Regional Hospital would
11   have been --
12       A.  '68 to '72.
13       Q.  Okay.  You got your Ph.D. at USC in 1975?
14       A.  Yes.
15       Q.  And your Master's also from USC?
16       A.  Yes.
17       Q.  What year was that?
18       A.  The same year.
19       Q.  1975?
20       A.  Yes.
21       Q.  And the MSW from Portland?
22       A.  '66.
23       Q.  And the Bachelor's also in Oregon?
24       A.  '64.
25       Q.  '64.  Quite an illustrious career.
```

### Page 12

```
 1       A.  Thank you.
 2       Q.  Let me focus you, if I can, on your work
 3   with the Department of Corrections in Alaska, 1998 to
 4   2003.  That's really the focus of my inquiry today.
 5   You were the health care administrator?
 6       A.  I was.
 7       Q.  Tell me in your words, what does that job
 8   entail?
 9       A.  The job entails reporting to the
10   Commissioner.  I was responsible to the Commissioner
11   for the health, physical health and mental health, of
12   the prisoners within the system.  I did planning,
13   organizing, coordinating, the budgeting, hiring,
14   reporting and decision-making in that area.
15       Q.  Are you -- strike that.
16           Were you involved as health care
17   administrator in the supervision of health care at
18   individual prison facilities within the State of
19   Alaska?
20       A.  No.
21       Q.  Did you have any oversight responsibilities
22   for the Palmer Correctional Center?
23       A.  Yes.
24       Q.  Explain, please.
25       A.  The health personnel at Palmer ultimately
```

### Page 13

```
 1   reported to me.
 2       Q.  Could you explain the chain of command to
 3   me?
 4       A.  Each facility --
 5       Q.  Focussing just on the medical side.
 6       A.  On the medical side of it.
 7       Q.  Right.
 8       A.  We had a medical director.  The medical
 9   director reported to me.  The medical director was
10   responsible for the medical staff in each facility.
11   At Palmer, we would have physician assistants, nurses,
12   aides and so on.  And the PA was in charge.  And the
13   PA reported to the physician, medical director.  And
14   that person reported to me.
15       Q.  Okay.  During the years that you were
16   health care administrator, who was the medical
17   director?
18       A.  Oh, what's his name?  I can't think of it
19   now.
20       Q.  Was there more than one medical director
21   during that time period?
22       A.  Yes.  One was Robertson.  And before
23   Robertson, there was another.  I -- I can't recall his
24   name.  I'm getting old.  I'm sorry.
25           MS. KAMM:  I can't either.
```

## Page 14

BY MR. MATTHEWS:
Q. I should have asked you this at the outset, and I apologize. What is your date of birth?
A. April 2nd, 1938. That makes me 68 years old.
Q. Do you know whether or not -- is it Dr. Robertson?
A. Yes. Dr. Robertson.
Q. Was he the medical director in 2002?
A. I think so.
Q. And is Dr. Robertson an M.D.?
A. He is. His first name is John.
Q. If I understand the chain of command then from Palmer, there would have been a PA in charge for medical services reporting to Dr. John Robertson, an M.D., who would then report directly to you as the health care administrator.
A. Yes.
Q. That's basically the levels of command, if you will?
A. And I reported to the Commissioner.
Q. And was that chain of command true in 2002?
A. Yes. But I cannot be certain if John Robertson was the person at the time.
Q. If it wasn't Dr. Robertson, it would have

## Page 15

been another M.D.?
A. It would have been another M.D., yes. And if we were between M.D.s, that is, we're recruiting or hiring a new M.D., we had two M.D.s who were consultants. And they were always there.
Q. When you say always there, meaning always at Palmer?
A. No. Always on contract with us and were available for services. And, in fact, they were on the payroll on a monthly basis.
Q. In interrogatory responses that I understand you signed this morning, we asked for a number of names about medical personnel involved at Palmer. And several names were provided. Dr. Scott Kiester?
A. Yes.
Q. Is that a name that's familiar to you?
A. He was one of the consultants.
Q. And Dr. Jim Billman?
A. Yes.
Q. Also a consultant?
A. He was a consultant.
Q. Dr. David Holladay?
A. Yes.
Q. Also a consultant?
A. Yes.

## Page 16

Q. And Dr. Ron Christensen?
A. Yes.
Q. Also a consultant.
A. (Witness nods head.)
Q. Happy to show you this question and the answer, if it helps you. Really, what I want to get at is whether any of those individuals was in the position of medical director during that time period or whether they were just consultants.
A. All those persons were seen as consultants, yeah.
Q. Okay. Is it fair to say that for medical staff at Palmer, you had final oversight responsibility?
A. Yes.
Q. I assume -- tell me if I'm wrong -- that in your position as health care administrator, you had final oversight authority over medical staff at all Department of Corrections' institutions; is that true?
A. Not exactly, in the sense that I had oversight, but since I was not an M.D., I couldn't really have oversight for clinical work.
Q. Okay. The medical director then reporting to you --
A. Yes.

## Page 17

Q. -- would that person have oversight for clinical work?
A. Yes. That would be the person responsible for clinical work.
Q. Was there a single medical director, say, during 2002?
A. As I said, I can't recall. But we -- I know John -- we'll have to get back to the records to see when John Robertson was hired. But he was medical director.
Q. Let me see if I can try it this way: Just in terms of the chain of command, you as the health care administrator would have had oversight responsibility for all institutions within the State.
A. Yes.
Q. Was there a single medical director who then reported to you having oversight responsibility from a clinical standpoint over all institutions within the State?
A. That's correct.
Q. So whoever that medical director was --
A. Yes.
Q. -- if the position was filled at the time --
A. Yes.
Q. -- it would have been a single individual

## Page 18

1  with oversight responsibility?
2      A.  It would have been a single individual.
3      Q.  Okay.
4      A.  And if the position were not filled, we
5  would have used any of those consultants to be the
6  medical -- to make the medical decisions that had to
7  be made.
8      Q.  What involvement would you have had directly
9  in making medical decisions?
10     A.  None.
11     Q.  I mean no disrespect by this question. But
12 do you have the training or the ability from a medical
13 standpoint to make medical decisions?
14     A.  Absolutely not.
15     Q.  So that wasn't part of your responsibility.
16     A.  It was not.
17     Q.  It was not something you undertook.
18     A.  No.
19     Q.  If there were a question about the medical
20 care of an inmate at one of the institutions, how
21 would you as the health care administrator address
22 that?
23     A.  We would -- if I were not satisfied that the
24 prisoner was getting services, although a medical
25 person said he was, we would use one of our

## Page 19

1  consultants as a referee. And usually, that worked
2  through the Medical Advisory Committee.
3      Q.  And explain for me, if you would, what the
4  Medical Advisory Committee was.
5      A.  Medical Advisory Committee comprised a group
6  of medical persons, including two contract physicians
7  and physician assistants, nurses, who met once weekly
8  to go over cases that were not resolved at the local
9  level.
10     Q.  Was that a clinical meeting, so to speak?
11     A.  It was a clinical meeting.
12     Q.  Are there records kept of the Medical
13 Advisory Committee?
14     A.  Oh, yes.
15     Q.  Are they kept in the form of minutes?
16     A.  Yes. And usually whatever decisions were
17 made there, I would -- I acted as sort of secretary to
18 this thing. I signed off on them. So a prisoner
19 would get a response from -- from the Medical Advisory
20 council through my signature.
21     Q.  Okay. That helps. Let me focus you, if I
22 can, on an inmate at Palmer, Charlie Davis. Is that a
23 name that's known to you?
24     A.  No.
25     Q.  Do you know who he is?

## Page 20

1      A.  No.
2      Q.  Know anything about him?
3      A.  No.
4      Q.  Know anything about his medical condition?
5      A.  Well, just what I've read.
6      Q.  And that would include materials that you've
7  been provided in this case?
8      A.  Yes. That was provided to me in this case.
9  That's the first time I heard about him.
10         MR. MATTHEWS: Mark that as number 1,
11 please.
12         (Exhibit 1 was marked.)
13 BY MR. MATTHEWS:
14     Q.  Take a look at the documents that we have
15 marked as Exhibit 1, if you would, please.
16     A.  Yes.
17     Q.  Do you recognize that packet of materials?
18     A.  Yes. I recognize this as coming from the
19 Department.
20     Q.  You recognize the cover sheet?
21     A.  I recognize my signature.
22     Q.  Okay. Tell us what this is, to the extent
23 you remember it.
24     A.  This would have come before the Medical
25 Advisory Committee meeting on -- its regular weekly

## Page 21

1  meeting, in which the medical staff would go over the
2  grievance and would make a decision. And this
3  decision was conveyed back to the grievant.
4      Q.  This cover sheet is dated September 5th,
5  2002, correct?
6      A.  Yes, it is.
7      Q.  And that bears your signature on the left
8  next to your name?
9      A.  It does.
10     Q.  You mentioned a little while ago in your
11 testimony about the Medical Advisory Committee --
12     A.  Yes.
13     Q.  -- that you would act as secretary for the
14 group --
15     A.  Yes.
16     Q.  -- convey the decision, if you will, of the
17 Advisory Committee back to the grievant.
18     A.  Yes.
19     Q.  Is what we're looking at in Exhibit 1, this
20 top page, is that what you were talking about earlier?
21     A.  Yes.
22     Q.  So this page, if you will, represents the
23 decision of the Medical Advisory Committee concerning
24 a particular grievance.
25     A.  Yes.

Page 22

1  Q. Not just your individual decision; is that
2  true?
3  A. Oh, absolutely true, yes. And when you say
4  my decision, this is the medical staff decision. And
5  this response was prepared by a medical person. But
6  matters going out of the Department would go under my
7  signature, the administrator.
8  Q. Can you tell me then what involvement you
9  had specifically in the decision to deny this
10 grievance?
11 A. The only decision I would have in these is
12 to determine whether or not agency policy was being
13 followed. But in terms of the medical aspect of the
14 decision-making, I would have no say so.
15 Q. Let me make sure I understand this cover
16 sheet, at least.
17 A. Yes.
18 Q. Is it fair to say that this is a document
19 which is prepared by medical staff simply for your
20 signature?
21 A. Yes.
22 Q. In effect, you are simply the scrivener?
23 A. Except if there were some matters that would
24 be contrary to policy, then I would say something
25 about that.

Page 23

1  Q. Was a portion of this particular grievance
2  directed to medical policy, in your view?
3  A. I imagine all grievances would pertain to
4  medical policy, one way or the other.
5  Q. I guess what I'm trying to figure out is
6  whether you had a specific role in the denial of this
7  grievance or were simply signing off on the medical
8  decision.
9  A. I was simply signing off on this.
10 Q. Do you have any memory as you sit here today
11 of this particular grievance?
12 A. No, sir.
13 Q. Any idea what the underlying beef was?
14 A. No. I -- as I said, I didn't even know this
15 guy. I never -- you know, in any given meeting, we
16 probably look at 20 of these things. And probably
17 some outstanding one would jump out at you. But
18 ordinarily, no.
19 Q. Do you know, for instance, how old Mr. Davis
20 was?
21 A. No, sir.
22 Q. Do you know what his medical condition was?
23 A. No, sir.
24 Q. Do you know why he was complaining about his
25 medical care?

Page 24

1  A. No, sir.
2  Q. Do you know whether or not he had a serious
3  medical condition?
4  A. No, sir.
5  Q. Do you know whether or not Mr. Davis was
6  receiving adequate medical care at Palmer Correctional
7  Center?
8  A. I do not know that.
9  Q. Are you in a position to say one way or the
10 other whether or not the medical care Mr. Davis
11 received at Palmer was adequate?
12 A. No, sir.
13 Q. Are you in a position to say one way or the
14 other whether the medical care that Mr. Davis received
15 at Palmer was in compliance with Department
16 guidelines?
17 A. I'd say yes.
18 Q. How is it that you know that?
19 A. Because we hired qualified people to deliver
20 the services. And we assumed that if they are doing
21 their job -- but the medical director would be
22 supervising those people. And if they were not doing
23 their job, sooner or later, I would have heard of it.
24 And we have the grievance process. So if a person
25 believes he or she is not receiving services, then

Page 25

1  they would go up the chain of the grievance.
2  Q. Isn't that what happened here?
3  A. Yes. That's what -- I imagine that's what
4  he said. But the substance of that, I would not know
5  if he were or were not receiving, since I'm not a
6  physician. If some -- if a physician or medical
7  person told me that, I would then know.
8  Q. So you would have to rely upon a medical
9  person to tell you that Mr. Davis' care was adequate
10 or inadequate, true?
11 A. Yes.
12 Q. Do you know whether or not you did that in
13 this case?
14 A. No, sir. I don't. I don't know.
15 Q. In looking at this packet, the grievance
16 that was appealed was dated June the 27th, 2002, if
17 you look at the last page.
18 A. Yes.
19 Q. And the decision which you sent back is
20 dated September 5th, 2002, correct?
21 A. Yes.
22 Q. Are you able to tell me what happens to that
23 grievance in the intervening time?
24 A. The 6/27/02 decision?
25 Q. Yes.