Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


CHARLIE J. DAVIS, JR.,

          Plaintiff,

vs.

ZELMER HYDEN, et al.,

          Defendants.
_____ )

NO: A02-0214 CV (JKS)




DEPOSITION OF ZELMER HYDEN

THURSDAY, APRIL 27, 2006, 9:28 a.m.

Anchorage, Alaska

Exhibit 8
Page 1 of 10

c31aa512-7018-49b1-a9a1-a5a55499721c

Page 2

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF ALASKA
3
4   CHARLIE J. DAVIS, JR.,
5          Plaintiff,
6   vs.
7   ZELMER HYDEN, et al.,
8          Defendants.
9                                                    )
    NO: A02-0214 CV (JKS)
10
11
12
13          DEPOSITION OF ZELMER HYDEN, taken on behalf
14  of Plaintiff, Pursuant to Notice, at MATTHEWS &
15  ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16  before Susan Campbell, Certified Shorthand Reporter
17  for Alaska Stenotype Reporters and Notary Public for
18  the State of Alaska.
19
20
21
22
23
24
25

Page 3

1              A-P-P-E-A-R-A-N-C-E-S
2
3   For Plaintiff:   MATTHEWS & ZAHARE
                     BY: THOMAS A. MATTHEWS
4                    431 West Seventh Avenue
                     Suite 207
5                    Anchorage, AK  99501
6
    For Defendants:  STATE OF ALASKA
7                    ATTORNEY GENERAL'S OFFICE
                     Department of Law
8                    Criminal Division
                     BY: MARILYN J. KAMM
9                    P.O. Box 110300
                     Juneau, AK  99811
10
    Reported By:     Susan Campbell
11                   Certified Shorthand Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                    I N D E X
2   EXAMINATION BY:                          PAGE
3      Mr. Matthews                5
4
5                 E X H I B I T S
6   NUMBER                              PAGE
7   1  Palmer Correctional Center Staffing -  17
       1 page
8
    2  Responses to Discovery Requests - 16   27
9      pages
10  3  Verification - 1 page           29
11  4  Prisoner Grievance - 4 pages            47
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   ANCHORAGE, AK, THURSDAY, APRIL 27, 2006, 9:28 a.m.
2           ZELMER HYDEN,
3       called as a witness on behalf of the
4       Plaintiff, having been duly sworn upon
5       oath by Susan Campbell, Notary Public,
6       was examined and testified as follows:
7               EXAMINATION
8   BY MR. MATTHEWS:
9       Q.  Would you state your name for the record,
10  please?
11      A.  Okay.  First name is Zelmer, Z-e-l-m-e-r.
12  Last name is Hyden, H-y-d-e-n.
13      Q.  Could you give us an address, please?
14      A.  P. O. Box 536, Sutton, Alaska 99674.
15      Q.  Do you have telephone number out there?
16      A.  746-0336.
17      Q.  How long have you lived in Sutton?
18      A.  Oh, about seven, eight years.
19      Q.  Ever had a deposition taken before?
20      A.  Negative.
21      Q.  Let me tell you briefly then just a couple
22  of the ground rules.  I'm going to try and ask
23  questions clearly and intelligently.  Sometimes I do.
24  Sometimes I don't.  If you don't understand my
25  question for any reason, please let me know and I'll



Exhibit 8
Page 2 of 10

**Page 6**

1  be happy to rephrase it.
2      It's not a test of your endurance, by any
3  means. If you needed a break, bathroom, coffee,
4  cigarette, walk around the block, anything like that,
5  just let me know and we'll be happy to accommodate
6  you. Hopefully, get you out of here before lunchtime
7  and back on your way to Sutton.
8      A. Works for me.
9      Q. Okay. In 2002 were you employed by the
10  State of Alaska?
11      A. That is correct. I believe at that time I
12  was the acting superintendent, Palmer Correctional
13  Center.
14      Q. Maybe you could give me, just to make it
15  easy on us, sort of a thumbnail sketch of your
16  employment history.
17      A. History of my employment?
18      Q. If you would.
19      A. Okay. I started with the State in 1978 as a
20  psychiatric assistant at Alaska Psychiatric Institute.
21  Worked there for about five years. And then I moved
22  to the Department of Corrections, oh, probably about
23  '83, '82, something like that. Worked at Cook Inlet,
24  Mat-Su Pretrial, Third Avenue Jail and Palmer
25  Correctional Center.

**Page 7**

1      Q. How long did you stay employed by the State?
2      A. About 26 years all together.
3      Q. So you left State employment in what, 2004?
4      A. 2004. I believe June of '04 for retirement.
5      Q. And are you actively employed now?
6      A. No. Except housecleaning and things like
7  that. You know how that goes.
8      Q. Not working for pay, anyway.
9      A. No. It's all free now. Slave labor.
10      Q. And Sutton is where you make your home?
11      A. Yes.
12      Q. Tell me a little bit about your educational
13  background.
14      A. I graduated from Roswell High School in
15  Roswell, New Mexico in 1970. Attended Eastern
16  New Mexico University for a couple of years. And then
17  continued with more education while I was in the
18  United States Air Force. Ended up with a total of
19  about 91 semester hours, no degree.
20      Q. What years were you in the Air Force?
21      A. 1973 for five years.
22      Q. Highest rank?
23      A. E-4, sergeant.
24      Q. Where were you stationed?
25      A. Holloman Air Force Base -- that's in

**Page 8**

1  Alamogordo, New Mexico -- and Elmendorf Air Force
2  Base.
3      Q. Is it fair to say the military brought you
4  up to Alaska?
5      A. That is true.
6      Q. And when you left the military in '78, you
7  had been stationed at Elmendorf?
8      A. That's correct.
9      Q. And went promptly to work for the State of
10  Alaska?
11      A. That is correct.
12      Q. What training did you have to be a
13  psychiatric assistant?
14      A. At that particular time at API, it was all
15  on-the-job training.
16      Q. How did you get into the field of
17  corrections?
18      A. Briefly, it was after the Charles Meech
19  incident. And they kind of reshuffled everything at
20  API. And a lot of the -- and they moved a unit to
21  Hiland Mountain to do E&Os out there. And I went out
22  there. And then from that when they did move it back
23  to API, I went ahead and stayed with the Department.
24      Q. I'm going to ask you to break down a couple
25  of things in that last answer for me.

**Page 9**

1      A. That would be fine.
2      Q. First of all, what was the Charles Meech
3  incident?
4      A. The Charles Meech incident was an individual
5  who killed four teenagers in Russian Jack Park. No,
6  no. That was the other one. I'm getting them all
7  together.
8      Charles Meech killed two people. He killed
9  one one-armed kid. And that's the reason he was in
10  API. And then he was -- if I remember correctly, he
11  was on a pass from API working at Sears and he
12  killed -- I'm not sure. There's so many of those guys
13  right in there that we dealt with that it kind of runs
14  together.
15      Q. Not looking to get you off on a long tangent
16  here. It's just when you use a term, I may ask you to
17  explain it, just so we understand.
18      A. That's fine.
19      Q. So Charles Meech, I take it, was a patient
20  at API.
21      A. Yes. He was a Title 12.
22      Q. And that means?
23      A. He was incarcerated at API because he was
24  found to be incompetent.
25      Q. And at some point then he went out and

3 (Pages 6 to 9)



Zelmer Hyden                     deposition                     April 27, 2006

---

Page 14

1   Q.   So there was no superintendent above you
2   during that time period?
3       A.   No.
4       Q.   During all of 2002?
5       A.   Probably during 2002 at some time I actually
6   became the -- the superintendent.
7       Q.   Okay.  Who did you report to then?
8       A.   The director, Central Office.  At that time
9   would have been Allen Cooper.
10      Q.   Is it fair to say, then, that during 2002
11  the rest of the staff at PCC all reported to you?
12      A.   No.
13      Q.   Okay.  Explain the chain of command for me.
14      A.   Chain of command, all security staff,
15  kitchen staff, all of the staff reported to me.
16  Medical staff was -- the medical staff, the nurses,
17  the PAs and the psychiatric people, mental health
18  conditions, et cetera, actually, they were assigned to
19  my building.  And, you know, of course, their offices
20  and everything was in my building.  But they actually
21  reported to the people in Central.  I didn't write
22  their evaluations or anything like that, no.  And if I
23  had an issue with these folks, I would go to Central
24  and talk to them about it.
25      Q.   And Central is located physically where?

---

Page 15

1       A.   Diplomacy Drive.
2       Q.   In Anchorage?
3       A.   Yeah, in Anchorage.
4       Q.   During the time that you were -- strike
5   that.
6            Let's talk about 2002.  It's a little bit
7   easier time period.  Who would the most senior medical
8   person have been who was assigned to PCC?
9       A.   That was actually assigned there?
10      Q.   Yes.
11      A.   Would probably have been Roger Hale.
12      Q.   And Mr. Hale was a PA?
13      A.   He was a PA.  And I think when you say
14  assigned there, there were medical doctors on
15  contract, but Mr. Hale actually worked there.
16      Q.   Okay.  And Mr. Hale, then, as a medical
17  person would not have reported directly to you.
18      A.   He would -- he would report to me.  And, for
19  example, we'd have a meeting.  And if there was
20  something significant, he would make the staff aware
21  at that particular time.  But other than that, as far
22  as him working for me, no, he did not.
23      Q.   Did you have regular meetings with the
24  medical staff?
25      A.   There were morning meetings at 9:30.  And --

---

Page 16

1   and all the staff would assemble at that time.
2       Q.   And that's a daily meeting?
3       A.   And it was daily meeting.  And medical would
4   be there most of the time, unless something was going
5   on in which they could not.
6       Q.   Were there records kept of those meetings --
7       A.   (Witness nods head.)
8       Q.   -- regular minutes or something like that?
9       A.   Yes, there was.
10      Q.   I should have told you at the beginning, the
11  nods of the head, the shaking the head doesn't work
12  very well.  We can't pick them up for the court
13  reporter.
14      A.   I'm old.  I'm tired.
15           MS. KAMM:  I hear you.
16  BY MR. MATTHEWS:
17      Q.   Occasionally, I may jump in and prod you for
18  a verbal answer.  So that's the reason.
19      A.   Okay.
20      Q.   So there were written minutes kept of each
21  of those daily meetings?
22      A.   Yes.
23      Q.   And what are those minutes called?
24      A.   Morning meeting minutes, I would assume.
25      Q.   Who was responsible for keeping those?

---

Page 17

1       A.   My -- my clerk.
2       Q.   Who would that person have been during 2002?
3       A.   I can't -- I don't know for sure, because
4   there was -- there was two or three clerks coming and
5   going.  And I'm not sure of the time frames that they
6   were actually there.  People that did keep the
7   meetings -- the minutes were Sharon Wesson (phonetic),
8   I believe was her name.
9       Q.   Spell the last name.
10      A.   I'm not sure.  What is her last name?
11  Sharon.  Starts with a W.  I'm not even going to try
12  to remember.  It's been too far back.
13           Melody Chowoniec was another one.
14      Q.   Can you spell that last name?
15      A.   Oh, wow.  C-h-o-w-o-n-i-a-c, I believe.
16      Q.   I wasn't going to come even close to that.
17      A.   And then there was one more.  I can't
18  remember her name.  And she's probably the one that
19  was there at that particular time.  It may come to me
20  later.
21      Q.   Would that help you?
22      A.   That might.
23           MR. MATTHEWS:  Would you mark that as
24  Exhibit 1?
25           (Exhibit 1 was marked.)

---

Exhibit  8
Page  4  of  10

Alaska Stenotype Reporters (907) 276-1680

c31aa512-7018-49b1-a9a1-a5a55499721c

Zelmer Hyden                    deposition                    April 27, 2006

Page 26

1  one of these nurses was gone and another one was
2  there, you know. I really couldn't tell you. It's
3  been too long.
4      Q. Are these -- are the old org charts kept in
5  some fashion as part of the records?
6      A. I don't know the answer to that. Possibly,
7  but I don't know for sure.
8      Q. Okay. This is the only one I've seen.
9  That's why I asked the question.
10     Let me ask you this, if I can: During 2002,
11 during the time that Charlie Davis was at Palmer, are
12 you aware of any other medical personnel other than
13 those listed on this org chart who were assigned to
14 Palmer on a daily basis?
15     A. Assigned on a daily basis?
16     Q. Yes.
17     A. Other than the doctors that come in two,
18 three times a week, no.
19     Q. Do you know in 2002 who the doctors were
20 that were coming in on a regular basis?
21     A. I'd have to look at -- I know Holloway.
22 There was a Lupan. There was -- I don't know. There
23 was like four or five different doctors. And then
24 another thing that would frequently occur -- and this
25 would happen several times a week -- inmates would be

Page 27

1  transferred -- or not transferred -- but taken to
2  doctors' offices.
3      So if an inmate had a particular issue, say
4  it's an ear, nose and throat issue, an appointment
5  will be made. The transportation staff will take him
6  to his appointment and bring him back. So in addition
7  to care at the facility and doctors coming into the
8  facility, it was not -- it was very common for inmates
9  to leave on a daily basis to go to medical
10 appointments all the way to Anchorage.
11     MS. KAMM: Can you tell me who the doctors
12 are that he identified?
13     (Record read.)
14     THE WITNESS: Kiester. There's a Kiester,
15 Dr. Kiester. K-e-i-s-t-e-r.
16     MR. MATTHEWS: Try it this way. Mark that
17 the next one.
18     (Exhibit 2 was marked.)
19 BY MR. MATTHEWS:
20     Q. If you would take a look at the second page
21 of what we've marked as Exhibit 2, there's an
22 interrogatory there, number three, asking about
23 doctors.
24     A. Uh-huh.
25     Q. And there's a list of names there --

Page 28

1      A. Right.
2      Q. -- including Scott Kiester.
3      A. Yes. Billman.
4      Q. Holladay?
5      A. Holladay and Christensen, right.
6      Q. Are you aware of any other physicians?
7      A. There were, but I couldn't recall. It
8  was --
9      Q. While we're on these discovery requests
10 we've marked as Exhibit 2, is that a document you're
11 familiar with?
12     A. This document here?
13     Q. Yes.
14     A. Yes.
15     Q. This is an unsigned copy that we were
16 provided. Housekeeping matter, have you signed --
17     A. I believe I did some time back.
18     Q. Did you? Maybe I just did not locate the
19 signature page when I was looking.
20     A. My copy, is it signed? Was that a question?
21     Q. My question is, did you ever sign that
22 document at any point?
23     You've got the signature page?
24     MS. KAMM: Yes.
25     THE WITNESS: You do have it?

Page 29

1      MR. MATTHEWS: May I take a look at yours?
2      MS. KAMM: Sure.
3      MR. MATTHEWS: Why don't we just go off the
4  record for a minute?
5      (Brief recess.)
6      (Exhibit 3 was marked.)
7  BY MR. MATTHEWS:
8      Q. While we were off the record, we've located
9  the signature page that appears to be for you. And
10 we've now marked that as Exhibit 3; is that right?
11     A. That is correct.
12     Q. And that bears your signature?
13     A. That sure looks like it to me.
14     Q. And it looks like you signed that page on
15 the 28th day of January 2005, right?
16     A. Correct.
17     Q. And to the best of your knowledge, does that
18 signature page go with the interrogatories which we've
19 marked as Exhibit 2?
20     A. To the best of my knowledge, that is
21 correct.
22     Q. Turning back to the org chart for just a
23 moment, in terms of the medical side of the staff, who
24 would be responsible on a daily basis for overall
25 medical care of the inmates? Is there any one

8  (Pages 26 to 29)

Zelmer Hyden                  deposition                  April 27, 2006

---

Page 30

1  individual who would be in charge?
2      A.  I really don't know how to answer that. I
3  know that Hughes and Hale were the two PAs. I would
4  have to say those two. Now, they work a week on and a
5  week off, because they cover 12 hours. And so I
6  couldn't answer specifically. Maybe Mel Henry or the
7  people -- but I would say if I had to give you an
8  answer, it would be Hale and Hughes and not one or the
9  other. They were equals, as I understood.
10     Q.  They didn't work at the same time, right?
11     A.  No.
12     Q.  So Hale and Hughes were working 12-hour
13 shifts what, seven days a week?
14     A.  Yes.
15     Q.  And that shift would have run during the
16 daytime?
17     A.  They would have been there daytime hours,
18 correct. And I don't know what the specific hours
19 were.
20     Q.  7:00 to 7:00 or something like that?
21     A.  Yeah, something like that.
22     Q.  And how about the nurses that are listed
23 underneath there, do you know what kind of shifts they
24 would have run?
25     A.  You know, medical staff changed a couple of

Page 31

1  times. And I'm not sure. But as what I remember is
2  they also worked a week on and a week off. So there
3  was a nurse there for 12 hours. And there was --
4  there were -- and I don't know exactly what their
5  hours were.
6      Q.  During 2002 can you tell me how many medical
7  staff would typically be on duty during the daytime?
8      A.  During the daytime? That building was a
9  good ways from my office. Usually when I would go
10 over there, you would always see a PA during the day,
11 at least one nurse. And, of course, the dental people
12 was right adjacent to them. There would usually be
13 two dental people there.
14     Q.  So a PA and a nurse --
15     A.  So you'd see -- as a rule, you'd see a nurse
16 and a PA.
17     Q.  How about during the nighttime hours?
18     A.  During the nighttime hours, it was my
19 understanding that they had their shifts set to where
20 they could do the last med pass; however, there were
21 some inmates that might have had meds later in the
22 evening. And it's my understanding that in some
23 cases, inmates were allowed to carry these meds and do
24 self-administration of their own drugs.
25        And probably in some cases -- and I don't

Page 32

1  know which ones -- the officers might pass out already
2  packaged and -- you know, this inmate gets this out of
3  this packet at this time. And those officers had some
4  training to do that. Every officers didn't do it.
5  There was only a few that had that specific training
6  to handle that in the times when medical wasn't there.
7      Q.  Are you talking about correctional officers?
8      A.  Correct.
9      Q.  Do you know who the correctional officers
10 were that had that training during 2002?
11     A.  I wouldn't try to guess. It's too far.
12     Q.  Were those officers who reported to you?
13     A.  They reported to their shift supervisor who
14 reported to the assistant superintendent who reported
15 to me.
16     Q.  So typically, then, during 2002, was there a
17 medical person on duty during the evening hours,
18 nighttime hours?
19        MS. KAMM:  And what are the nighttime hours?
20 BY MR. MATTHEWS:
21     Q.  7:00 p.m. to 7:00 a.m.
22     A.  There was a period of time when there was
23 not medical people on-site. Okay. I don't know what
24 time that was. I don't know what their hours were.
25 Couldn't even begin to guess. But there was a period

Page 33

1  of time where if there's an emergency, you need to
2  call the ambulance or the PAs were on-call, you know,
3  they -- they had a State car and were to, boom, here
4  we come. So that was how it was done.
5      Q.  Who set those shifts?
6      A.  I'm -- I have to assume. And I do not know
7  the answer to that. I assume Mel Henry. It certainly
8  wasn't me.
9      Q.  Is it fair to say then that during a 24-hour
10 day, typically, during 2002, there was a period of
11 time where there was no medical person physically
12 on-site?
13     A.  Physically on-site?
14     Q.  Physically on-site.
15     A.  That is probably correct.
16     Q.  The daytime hours would be predominantly
17 covered, but not the night?
18     A.  The daytime hours, there would be somebody
19 there, yes.
20     Q.  But during the nighttime hours --
21     A.  And I do know that even through that last
22 pill pass at like 6:00, you know, around meal time,
23 they were there. What time that they left, I do not
24 know.
25     Q.  And that was -- that would be a better

9  (Pages 30 to 33)

Zelmer Hyden                   deposition                   April 27, 2006

Page 46

1  thus we're here. It goes to court. He can go to
2  court with it.
3      Q.  So your involvement in the process would be
4  after the grievance is filed, beyond the cop-out
5  stage, right?
6      A.  Uh-huh.
7      Q.  So if the cop-out resolves it, you don't get
8  involved at all.
9      A.  Exactly. If the prisoner is happy and
10 something was wrong, it's fixed, all is good.
11     Q.  If it goes to the grievance, you review
12 every grievance that's filed.
13     A.  I review every grievance that's filed, yes.
14     Q.  And the compliance officer would be the one
15 who would assign it in the initial instance for
16 investigation.
17     A.  Right.
18     Q.  Right? Do you remember, as you sit here
19 today, your involvement in Mr. Davis' grievance?
20     A.  I -- I -- I remember, you know, when I seen
21 the grievance, I -- I remember the grievance. And,
22 you know, a lot of times, you'll deal with the
23 grievance or whatever, the responses are made, it's
24 all resolved and you've never seen the inmate. You're
25 dealing with a piece of paper.

Page 47

1      Q.  So in terms of your specific memory today,
2  you remember that there was a grievance. Do you
3  remember the specifics of it at all?
4      A.  Well, I've looked at the grievance recently.
5  That could cloud my -- but I think I do remember the
6  grievance.
7      Q.  Okay. When did you look at the grievance
8  recently?
9      A.  Actually, when I received this to sign, I
10 started looking to find out what in the world have I
11 done, you know. And I probably looked at it then.
12 And then -- and then I thought this was resolved. And
13 so then I've looked at it again recently in the last
14 couple days, because we're here.
15     Q.  Just so that I'm clear, you were pointing at
16 some papers. So you looked at the grievance, it looks
17 like, around the time that you signed the
18 interrogatory responses in January of 2005.
19     A.  Correct.
20     Q.  And then more recently, just in getting
21 ready for the deposition.
22     A.  Uh-huh.
23     Q.  Is that right?
24     A.  That is correct.
25         (Exhibit 4 was marked.)

Page 48

1      MR. MATTHEWS: Let me show you what we've
2  marked as Exhibit 4.
3      THE WITNESS: Can we take a short break
4  before we go on to Exhibit 4?
5      MR. MATTHEWS: Sure. Off record.
6      MS. KAMM: I could use a break, too.
7      (Brief recess.)
8  BY MR. MATTHEWS:
9      Q.  We've put in front of you, Mr. Hyden,
10 Exhibit 4. Ask you if you recognize that document.
11     A.  Okay. Yeah. Exhibit 4 is the grievance
12 filed by Charlie Davis.
13     Q.  And this exhibit consists of four pages,
14 which I think is taken from the entire grievance
15 packet. What I want to see if I can understand is
16 what your part in that grievance was.
17     A.  Okay. Briefly, the prisoner writes down his
18 grievance, which he -- he has done so. And then he
19 requests what his relief is. And he has done so.
20 It's dated and it's signed. And then Mr. -- or the
21 compliance sergeant would assign it to someone to
22 investigate.
23         In this case, it appears it had been
24 assigned to Mr. Hale. And Roger Hale had -- what it
25 states is "The issue of manning/staffing cannot be

Page 49

1  addressed at this level. I spent about 20 minutes
2  explaining how he can access medical (that is not
3  (sic) available at PCC)." And that was Mr. Hale's
4  response.
5          After Mr. Hale would have responded, the
6  compliance sergeant would get the grievance and bring
7  it to me for my review. And I would review the
8  grievance, look at Mr. Hale's response and then write
9  down my findings.
10         I'm not a medical person. I have to depend
11 heavily on what medical tells me. So thus, I wrote
12 "The above investigation does not address the
13 prisoner's grievance. Perhaps prisoner should be
14 transferred to facility with full time medical staff
15 to accommodate 'life threatening' condition." That
16 was my response.
17         And then after that, the prisoner would
18 review it. Now, this grievance has some alter- -- is
19 altered to the one that I had. Whether he was
20 satisfied, et cetera, is not on the one I have. And
21 the last block where it says I am satisfied with
22 response or not, this one is not completed at all.
23     Q.  And you're looking at the second page of
24 Exhibit --
25     A.  The second page, right.

13  (Pages 46 to 49)

Zelmer Hyden                    deposition                    April 27, 2006

---

Page 50

1    Q. -- of Exhibit 4, the bottom block that says
2  "Prisoner's Response"?
3    A. Right.
4    MR. MATTHEWS: I don't have the original of
5  this, so --
6    MS. KAMM: I think I've got the original.
7  I'll take a look at it when I get back to the office.
8    MR. MATTHEWS: Okay.
9    MS. KAMM: I'll fax it to you if we've
10 got --
11    THE WITNESS: And I would have to assume the
12 original is going to be checked, I do intend to appeal
13 to the Director of Institutions or Medical Director,
14 which that was done. And then page three of what
15 we're looking at here is the Prisoner Grievance Appeal
16 Statement. And this would be what the prisoner wrote
17 to the medical director. And then the medical
18 director's response is the last page.
19 BY MR. MATTHEWS:
20    Q. Okay. Is it fair for me to conclude that
21 your involvement, your specific involvement in this
22 grievance, would have been to review Mr. Hale's
23 findings and determination and to sign off on the
24 grievance as you did on the second page?
25    A. That is correct.

---

Page 51

1    Q. You made the comments that the investigation
2  did not address the grievance and perhaps he should be
3  transferred to a different facility, right?
4    A. Correct.
5    Q. Beyond that, did you have any involvement in
6  this grievance?
7    A. None. Now, there could have been a time
8  when in one of these meetings, Mr. Davis' issues, I
9  would have been made aware of his issues. Probably --
10 I don't know when the time frame was when I was made
11 aware of his -- if I receive a prisoner at medium, I'm
12 not aware that he has a bypass or a defibrillator or
13 anything of this nature until someone makes me aware
14 of it. And I would assume that probably about the
15 time this grievance was filed is when I would have
16 been made aware of Mr. Davis' issues with medical.
17    Q. Is it fair to say that Mr. Davis' grievance
18 was for inadequate medical care?
19    A. I -- I disagree with that.
20    Q. You disagree that that's what he was
21 complaining about?
22    A. Say the question again. Maybe I
23 misunderstood you.
24    Q. Is it fair to say that Mr. Davis' grievance
25 was essentially that he didn't like the medical care

---

Page 52

1  he was getting at Palmer, didn't think it was
2  adequate?
3    A. He -- he probably thought that, yes.
4    Q. Okay. I'm not asking whether you agree that
5  the care --
6    A. Okay. Yes.
7    Q. -- was inadequate.
8    A. Because in my opinion, the grievance is very
9  confusing. Okay?
10    Q. All right. Let me ask you this then: How
11 did you interpret Mr. Davis' grievance when you
12 received it?
13    A. Well, I read it and I was like -- I
14 really -- you know, because there's a number of things
15 you could read into this. And I read it. And then I
16 read what Mr. Hale had -- you know, who had talked to
17 him for several minutes. And I -- I thought -- I
18 thought Mr. Hale should have been a little more
19 specific in these times, actually put something
20 specific down here. This is the reason that I wrote
21 what I wrote.
22    To me as a superintendent, to say I spent 20
23 minutes how he could access medical in a document like
24 this, I would like to see written out, you do this,
25 you do this, you do this and you do this. Okay? And

---

Page 53

1  that wasn't done. So that was thus part of my
2  response.
3    Q. Your conclusion was that the -- that
4  Mr. Hale's response was inadequate.
5    A. Yes. I wanted him to give -- because if a
6  prisoner files a grievance -- and I might add here, I
7  was the compliance sergeant at Mat-Su Pretrial and
8  dealt with these regularly. So I'm very familiar with
9  the grievance process.
10    I just really like -- when an inmate is
11 upset enough to file a grievance, address his issues.
12 If they're frivolous, they're frivolous. But address
13 his issues in that grievance. And I just would like
14 to have seen specific things written out, you know,
15 rather than I spent 20 minutes talking to him.
16    Q. You didn't feel Mr. Hale's response
17 addressed the grievance; is that true?
18    A. That's what I felt at the time, yes.
19    Q. And your suggestion was that perhaps
20 Mr. Davis should be transferred to a different
21 facility that had full-time medical care to
22 accommodate his life-threatening condition.
23    A. Possibly. And I put life-threatening
24 because -- and I'm going to assume here that at that
25 time I wasn't totally aware of Mr. Davis' issue,

---

14  (Pages 50 to 53)

Zelmer Hyden                         deposition                         April 27, 2006

Page 58

1  his grievance?
2      A.   Seems like it states so in the grievance.
3  And what kind of briefing I could have had from
4  medical regarding this, you know -- because I feel
5  certain that medical talked to someone, probably in
6  one of these meetings, about this individual and
7  closely monitoring him. But I can't -- it's been too
8  far back. I can't recall.
9      Q.   When you say "these meetings," are you
10 talking about your daily briefings?
11     A.   Correct.
12     Q.   Prior to Mr. Davis' grievance, did you know
13 what an implanted defibrillator was?
14     A.   Uh-huh.
15     Q.   And how did you have that knowledge?
16     A.   My ex-wife was a nurse. I knew quite a bit
17 about that.
18     Q.   Did you understand that a person with an
19 implanted defibrillator by definition had a serious
20 heart condition?
21     A.   Well, I would say my medical knowledge, I
22 have no formal training in medical. I -- I can't say
23 that I would understand anything about medical. I
24 haven't been trained in any medical other than CPR and
25 whatever. But vaguely, yeah, you'd have to assume if

Page 59

1  someone has something placed in their chest, yeah,
2  it's serious.
3      Q.   Fair to say they would not have had the
4  implant if it weren't serious?
5      A.   But also, I know people that have implants
6  and they're out working jobs and stuff and everything
7  is hunkey dorey. And they're doing whatever. So once
8  again, I'm not a medical staff. I don't know what
9  limitations a defibrillator could have. There's --
10 because I know a couple people with these kind of
11 things and they're living pretty much normal lives.
12 So I can't second guess that, no.
13     Q.   Let me ask you this: At the time Mr. Davis
14 filed his grievance, did you have any personal
15 knowledge of what his medical condition was?
16     A.   At the time he filed the grievance, probably
17 not.
18     Q.   In your response to his grievance, did you
19 review any of his medical records to see what his
20 condition was?
21     A.   I did not look at a medical record. What I
22 would probably do if I did so, something of that
23 nature, would be to call a PA, ask specific questions
24 for specific answers, you know. And I would be much
25 clearer on what I understood rather than go look at a

Page 60

1  medical record.
2      Q.   Do you know whether or not you called PA
3  Hale --
4      A.   Don't recall.
5      Q.   -- in response to this greivance?
6      A.   I feel that we probably had some
7  conversations regarding this individual, strictly
8  because of the grievance and it's medical. But I
9  can't recall those. It's been too long and too many
10 inmates. And I mean, I can't -- I can't specifically
11 remember.
12     Q.   Would your actions or conversations with
13 Mr. Hale have been documented in any way?
14     A.   Probably the only documented thing would be
15 the morning meetings. I can't -- every time I talk to
16 someone about an inmate's hangnail, I don't go
17 document that. That's just not real. I know what
18 you're asking, you know, but it's -- no, it wouldn't
19 have been documented other than what I would have
20 wrote here. You know, if I called him prior to
21 writing this -- and I don't remember a conversation.
22 I'm sure there probably could have been one, but it's
23 just too long ago and too much has happened.
24     Q.   So you just don't remember at this point.
25     A.   I don't remember at this point.

Page 61

1      Q.   Is it fair to say, Mr. Hyden, that after
2  your written response to this grievance, you don't
3  have any memory of taking any other action with regard
4  to Charlie Davis?
5      A.   None.
6      Q.   Do you remember having any further contact
7  with a PA to inquire about Mr. Davis' status?
8      A.   I don't recall anything.
9      Q.   Do you remember contacting anyone else on
10 the medical staff to find out how Mr. Davis was doing?
11     A.   No. That's something that if there's a
12 problem, that would come to me, you know. I can't --
13     Q.   Is it fair to say that unless a problem is
14 brought to your attention, it's not something you're
15 going to go seek out?
16     A.   Exactly.
17     Q.   So follow-up would not have been part of
18 your routine.
19     A.   No. If they was having a problem or
20 something, they would probably get ahold of me,
21 et cetera. But to sit there and think, I wonder if
22 this is working out, I should go check on this, you
23 know, you may have all kinds of things going. No, I
24 don't think I would have -- I would have waited for
25 them, you know, to give me some kind of indication

16  (Pages 58 to 61)

Zelmer Hyden                    deposition                    April 27, 2006

Page 70

1  you know at 10:00 o'clock, I have to get my meds,
2  there's also what we call the boombox where master
3  control, you get on the big speaker and, you
4  know, meds are being passed at this time. And I mean,
5  everybody can hear it.
6        Now, if the prisoner doesn't show up, he
7  doesn't get his meds. Now, if it's something that's
8  life-threatening that he needs to have -- and I have
9  seen this happen -- medical would put him into medical
10 seg to assure that they could monitor him and he'd get
11 his meds.
12 Q.  Okay.
13 A.  Now, if you -- you know, if it was your
14 stomach medicine or something, you know, whatever -- I
15 mean, this would be something, you know, it's
16 important you get this. This is life-threatening.
17 And they would take those steps to make sure he got
18 his meds. And I would sign off on the seg admission
19 as superintendent.
20 Q.  And just so that I'm clear, when you're
21 talking about a seg admission, segregation?
22 A.  Yes. And that's not the proper term. It
23 would be actually placed in the infirmary. You know,
24 it's just old habit. You'd call it medical seg.
25       And to my knowledge, Mr. Davis was never

Page 71

1  placed in medical seg. So I was not aware that there
2  was any issues beyond these.
3  Q.  And I take it you're not aware of any
4  situation where Mr. Davis showed up for med line and
5  was denied his medication.
6  A.  I would fire the officer. Or if I couldn't
7  fire him, I'd do my best.
8  Q.  That would be a very serious issue to you?
9  A.  Absolutely.
10 Q.  Do you know how long Mr. Davis was actually
11 at Palmer?
12 A.  Haven't got a clue.
13 Q.  Do you know whether or not Mr. Davis'
14 medical condition was ever mentioned in one of your
15 daily briefings?
16 A.  I would -- I would assume and feel certain
17 that it would be mentioned. You know, staff need to
18 be made aware -- if you have a prisoner like this in
19 the population, there needs to be an awareness that
20 that person exists. And I feel certain that if you
21 look at those records, you'll see that somewhere.
22 Q.  When you say "a person like this," a person
23 with Mr. Davis' medical condition, is that what you
24 mean?
25 A.  Somebody with a defibrillator, yes.

Page 72

1  Q.  That's a unique situation, right?
2  A.  Yes, that's unique.
3  Q.  You'd want to make sure --
4  A.  We've had -- I mean, it's not the first one.
5  There's been people through there with pacemakers,
6  et cetera. So -- but, you know, the staff need to be
7  aware there's special needs here.
8        And I can't recall specifics, but I do
9  recall that in these morning meetings, medical -- I do
10 recall them, you know, frequently telling us about,
11 you know, specific inmates and specific problems,
12 et cetera. The exact context regarding Mr. Davis, I
13 can't recall.
14 Q.  You would agree, Mr. Hyden, that an inmate
15 that comes into your facility with an implanted
16 defibrillator has special needs?
17 A.  Uh-huh.
18 Q.  That's what you just said, right? I need
19 you to answer out loud. Sorry.
20 A.  Oh, yes. It's unusual and it should -- it's
21 special, yes.
22 Q.  You would also agree, I take it, that PCC
23 had an obligation to make sure his necessary medical
24 care was taken care of.
25 A.  Oh, I don't know that it wasn't. He feels

Page 73

1  it wasn't. Mr. Davis -- you know, I'm not being smart
2  here. He's still doing fine, to my knowledge. I
3  don't know that anything was done there that was
4  detriment to his health. I don't know that as a
5  non-medical person.
6  Q.  You would agree that he -- his medical care
7  needed to be attended to while he was at Palmer,
8  correct?
9  A.  Yes.
10 Q.  And because of the fact that he had an
11 implanted defibrillator, his medical needs were
12 different than the average population up there, true?
13 A.  Absolutely.
14 Q.  It would be essential to make sure that any
15 prescribed medications were given to him, right?
16 Correct? You need to answer out loud.
17 A.  Once again, that depends on the medicine. I
18 have inmates that come in, hey, I had a doctor that
19 ordered me OxyContin ten years ago. And the thing
20 still goes. I want this. Then the inmate files a
21 grievance, I'm not getting my OxyContin. And the
22 medical staff we had, no, you don't need that. You're
23 not getting that.
24       So it's not an exact answer. You'd have to
25 be more specific. Which medications, you know? And

19  (Pages 70 to 73)