Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)


DEPOSITION OF MELBOURNE HENRY

FRIDAY, APRIL 28, 2006, 10:27 a.m.

Anchorage, Alaska


Exhibit 9
Page 1 of 9

### Page 2

```
 1      IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF ALASKA
 3
 4   CHARLIE J. DAVIS, JR.,
 5        Plaintiff,
 6   vs.
 7   ZELMER HYDEN, et al.,
 8        Defendants.
     _____)
 9
     NO: A02-0214 CV (JKS)
10
11
12
13       DEPOSITION OF MELBOURNE HENRY, taken on
14   behalf of Plaintiff, Pursuant to Notice, at MATTHEWS &
15   ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16   before Susan Campbell, Certified Shorthand Reporter
17   for Alaska Stenotype Reporters and Notary Public for
18   the State of Alaska.
19
20
21
22
23
24
25
```

### Page 3

```
 1           A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:    MATTHEWS & ZAHARE
                       BY: THOMAS A. MATTHEWS
 4                     431 West Seventh Avenue
                       Suite 207
 5                     Anchorage, AK  99501
 6
     For Defendants:   STATE OF ALASKA
 7                     ATTORNEY GENERAL'S OFFICE
                       Department of Law
 8                     Criminal Division
                       BY: MARILYN J. KAMM
 9                     P.O. Box 110300
                       Juneau, AK  99811
10
     Reported By:      Susan Campbell
11                     Certified Shorthand Reporter
```

### Page 4

```
 1                I N D E X
 2   EXAMINATION BY:                        PAGE
 3     Mr. Matthews                           5
 4
 5               E X H I B I T S
 6   NUMBER                                 PAGE
 7   1  Memorandum and Prisoner Grievance -   20
        4 pages
 8
        2  Memo and attachments - 6 pages     52
 9
        3  Document entitled "Access to Health  53
10         Care Services" - 6 pages
11      4  Document entitled "Health Care       55
           Organization and Administration" -
12         5 pages
13      5  Excerpt from DOC Policies and       55
           Procedures - 32 pages
```

### Page 5

```
 1   ANCHORAGE, AK, FRIDAY, APRIL 28, 2006, 10:27 a.m.
 2               MELBOURNE HENRY,
 3      called as a witness on behalf of the
 4      Plaintiff, having been duly sworn upon
 5      oath by Susan Campbell, Notary Public,
 6      was examined and testified as follows:
 7              EXAMINATION
 8   BY MR. MATTHEWS:
 9      Q.  Would you state your name for the record,
10   sir?
11      A.  Melbourne Walder Henry.
12      Q.  If you'd spell all of them for me.
13      A.  M-e-l-b-o-u-r-n-e, W-a-l-d-e-r, H-e-n-r-y.
14      Q.  Do you use the title of doctor?
15      A.  No.
16      Q.  Are you a doctor by training?
17      A.  I am.
18      Q.  A medical doctor?
19      A.  No.
20      Q.  Let me tell you right to begin with, I ask
21   questions sometimes simply because we need to get
22   answers in a written form that we can use later for
23   trial.
24      A.  Yeah.
25      Q.  Sometimes I ask questions because I simply
```

Page 6

1  don't know the answer.
2      A.  Yes.
3      Q.  And I will ask you to help me through the
4  process.
5      A.  And I'll be happy to do that.
6      Q.  If I ask questions which you don't
7  understand for any reason, please let me know and I'll
8  be happy to rephrase them.
9      A.  I will.
10     Q.  Okay.  Have you ever had a deposition taken
11 before?
12     A.  Once before.
13     Q.  In what kind of a context?
14     A.  Within the context of the Department of
15 Corrections.
16     Q.  Okay.  Some years ago?
17     A.  Yes, some years ago.  We -- oh, we were
18 being sued by a physician who stated that we had
19 breached his contract.
20     Q.  A contracted physician with the
21 Department --
22     A.  With the Department --
23     Q.  -- of Corrections?
24     A.  -- of Corrections, yes.
25     Q.  Let me ask you one favor, if I can, as we're

Page 7

1  going through.  You're going to be very good, I can
2  tell, at anticipating my question.  But if you'd let
3  me get it out, it will make it much easier on our
4  court reporter, so we're not talking over the top of
5  each other.  Okay?
6      A.  Excellent.
7      Q.  What is an address where we can reach you?
8      A.  8651 Kushtaka, K-u-s-h-t-a-k-a, Circle,
9  Anchorage, 99504.
10     Q.  And a good telephone number?
11     A.  (907) 333-2835.
12     Q.  Are you currently employed?
13     A.  I am.
14     Q.  By whom?
15     A.  University of Alaska Anchorage.
16     Q.  What is your position there?
17     A.  I'm a professor of social work.
18     Q.  How long have you held that position?
19     A.  One year.
20     Q.  Is that a full-time position?
21     A.  It is.
22     Q.  How long have you been with the university
23 total?
24     A.  One year.
25     Q.  Prior to your work at the university, where

Page 8

1  did you work?
2      A.  For the Department of Corrections.
3      Q.  How long did you work for Department of
4  Corrections?
5      A.  From '98 to '03, about five years.
6      Q.  What was your position with Department of
7  Corrections?
8      A.  Health care administrator.
9      Q.  Maybe you could help me work our way back
10 just through your basic educational training,
11 background, that kind of thing, kind of a resume
12 format.  Employment history first.
13     A.  I mentioned Department of Corrections.
14     Q.  Yes, sir.
15     A.  Prior to that, I was a professor of social
16 work at Alabama Agricultural and Mechanical University
17 in Huntsville, Alabama.  I was there for five years.
18 Before that, the University of Nevada at Reno for
19 three years.  Prior to that, the Department of Health
20 and Social Services as director of mental health and
21 developmental disabilities.
22     Q.  Is that the Alaska Department of Health and
23 Social Services?
24     A.  Yes, the Alaska Department.
25     Q.  And before that?

Page 9

1      A.  Before that, I was health care administrator
2  for the Hargraves Memorial Hospital,
3  H-a-r-g-r-a-v-e-s, in Mandeville, Jamaica.  And before
4  that, I was medical social worker and an associate
5  hospital administrator for the Appalachian Regional
6  Hospital, A-p-p-a-l-a-c-h-i-a-n, in Beckley,
7  West Virginia.
8          And before that -- oh, I think I just got
9  one out of sequence.  I was director of community
10 health services for the Department of Health in West
11 Virginia, and then the Appalachian Regional Hospital.
12 Yes.  I'm sorry about that.
13     Q.  That's all right.
14     A.  All right.  And I was, I guess, a social
15 worker, child welfare worker for the Welfare
16 Commission for the State of Oregon.  And I think
17 that's about it.
18     Q.  Where did you attend university?
19     A.  I have a Bachelor's degree in Economics and
20 Sociology from Warner Pacific College in Portland,
21 Oregon.  I have a Master's in Social Work, MSW, from
22 Portland State University, Portland, Oregon.  I have a
23 Master's in Public Administration, MPA, from the
24 University of Southern California.  And I have a
25 doctorate in the field of social work and social

Page 10

1  gerontology from the University of Southern
2  California.
3     Q. What year did you get your Ph.D.?
4     A. In 1975.
5     Q. Okay. Let me see if I can put a few years
6  with some of the rest of this.
7     A. Yes.
8     Q. Your work at Alabama Agricultural
9  University --
10    A. Yes.
11    Q. -- five years, that would have been
12 approximately '93 to '97, '98?
13    A. '98. I left there directly and came up here
14 in '98.
15    Q. Okay. And then the University of Nevada at
16 Reno was the three years before that?
17    A. Yes.
18    Q. Which would have been '90 to '92?
19    A. I started there in -- it's '89 to '92.
20    Q. So your work for the Alaska Department of
21 Health and Social Services would have been what years?
22    A. From '84 to '88. And I was a consultant
23 just on my own for -- until '89 for about a year.
24 Then I left -- I left in '89 to go to Nevada.
25    Q. Your work at Hargraves then would have been

Page 11

1  what years?
2     A. Hargraves would be '80 -- let's see. '80 --
3  well, let me --
4     Q. Just approximately.
5     A. Yeah. Approximately '80, '81. And the work
6  with the State of West Virginia with the Health
7  Department there would be from '78 to '80, right.
8  Because I left there and went to Jamaica. So reverse
9  those.
10    Q. And the Appalachian Regional Hospital would
11 have been --
12    A. '68 to '72.
13    Q. Okay. You got your Ph.D. at USC in 1975?
14    A. Yes.
15    Q. And your Master's also from USC?
16    A. Yes.
17    Q. What year was that?
18    A. The same year.
19    Q. 1975?
20    A. Yes.
21    Q. And the MSW from Portland?
22    A. '66.
23    Q. And the Bachelor's also in Oregon?
24    A. '64.
25    Q. '64. Quite an illustrious career.

Page 12

1     A. Thank you.
2     Q. Let me focus you, if I can, on your work
3  with the Department of Corrections in Alaska, 1998 to
4  2003. That's really the focus of my inquiry today.
5  You were the health care administrator?
6     A. I was.
7     Q. Tell me in your words, what does that job
8  entail?
9     A. The job entails reporting to the
10 Commissioner. I was responsible to the Commissioner
11 for the health, physical health and mental health, of
12 the prisoners within the system. I did planning,
13 organizing, coordinating, the budgeting, hiring,
14 reporting and decision-making in that area.
15    Q. Are you -- strike that.
16       Were you involved as health care
17 administrator in the supervision of health care at
18 individual prison facilities within the State of
19 Alaska?
20    A. No.
21    Q. Did you have any oversight responsibilities
22 for the Palmer Correctional Center?
23    A. Yes.
24    Q. Explain, please.
25    A. The health personnel at Palmer ultimately

Page 13

1  reported to me.
2     Q. Could you explain the chain of command to
3  me?
4     A. Each facility --
5     Q. Focussing just on the medical side.
6     A. On the medical side of it.
7     Q. Right.
8     A. We had a medical director. The medical
9  director reported to me. The medical director was
10 responsible for the medical staff in each facility.
11 At Palmer, we would have physician assistants, nurses,
12 aides and so on. And the PA was in charge. And the
13 PA reported to the physician, medical director. And
14 that person reported to me.
15    Q. Okay. During the years that you were
16 health care administrator, who was the medical
17 director?
18    A. Oh, what's his name? I can't think of it
19 now.
20    Q. Was there more than one medical director
21 during that time period?
22    A. Yes. One was Robertson. And before
23 Robertson, there was another. I -- I can't recall his
24 name. I'm getting old. I'm sorry.
25       MS. KAMM: I can't either.

Page 14

1  BY MR. MATTHEWS:
2  Q. I should have asked you this at the outset,
3  and I apologize. What is your date of birth?
4  A. **April 2nd, 1938. That makes me 68 years**
5  **old.**
6  Q. Do you know whether or not -- is it
7  Dr. Robertson?
8  A. **Yes. Dr. Robertson.**
9  Q. Was he the medical director in 2002?
10 A. **I think so.**
11 Q. And is Dr. Robertson an M.D.?
12 A. **He is. His first name is John.**
13 Q. If I understand the chain of command then
14 from Palmer, there would have been a PA in charge for
15 medical services reporting to Dr. John Robertson, an
16 M.D., who would then report directly to you as the
17 health care administrator.
18 A. **Yes.**
19 Q. That's basically the levels of command, if
20 you will?
21 A. **And I reported to the Commissioner.**
22 Q. And was that chain of command true in 2002?
23 A. **Yes. But I cannot be certain if John**
24 **Robertson was the person at the time.**
25 Q. If it wasn't Dr. Robertson, it would have

Page 15

1  been another M.D.?
2  A. **It would have been another M.D., yes. And**
3  **if we were between M.D.s, that is, we're recruiting or**
4  **hiring a new M.D., we had two M.D.s who were**
5  **consultants. And they were always there.**
6  Q. When you say always there, meaning always at
7  Palmer?
8  A. **No. Always on contract with us and were**
9  **available for services. And, in fact, they were on**
10 **the payroll on a monthly basis.**
11 Q. In interrogatory responses that I understand
12 you signed this morning, we asked for a number of
13 names about medical personnel involved at Palmer. And
14 several names were provided. Dr. Scott Kiester?
15 A. **Yes.**
16 Q. Is that a name that's familiar to you?
17 A. **He was one of the consultants.**
18 Q. And Dr. Jim Billman?
19 A. **Yes.**
20 Q. Also a consultant?
21 A. **He was a consultant.**
22 Q. Dr. David Holladay?
23 A. **Yes.**
24 Q. Also a consultant?
25 A. **Yes.**

Page 16

1  Q. And Dr. Ron Christensen?
2  A. **Yes.**
3  Q. Also a consultant.
4  A. **(Witness nods head.)**
5  Q. Happy to show you this question and the
6  answer, if it helps you. Really, what I want to get
7  at is whether any of those individuals was in the
8  position of medical director during that time period
9  or whether they were just consultants.
10 A. **All those persons were seen as consultants,**
11 **yeah.**
12 Q. Okay. Is it fair to say that for medical
13 staff at Palmer, you had final oversight
14 responsibility?
15 A. **Yes.**
16 Q. I assume -- tell me if I'm wrong -- that in
17 your position as health care administrator, you had
18 final oversight authority over medical staff at all
19 Department of Corrections' institutions; is that true?
20 A. **Not exactly, in the sense that I had**
21 **oversight, but since I was not an M.D., I couldn't**
22 **really have oversight for clinical work.**
23 Q. Okay. The medical director then reporting
24 to you --
25 A. **Yes.**

Page 17

1  Q. -- would that person have oversight for
2  clinical work?
3  A. **Yes. That would be the person responsible**
4  **for clinical work.**
5  Q. Was there a single medical director, say,
6  during 2002?
7  A. **As I said, I can't recall. But we -- I know**
8  **John -- we'll have to get back to the records to see**
9  **when John Robertson was hired. But he was medical**
10 **director.**
11 Q. Let me see if I can try it this way: Just
12 in terms of the chain of command, you as the health
13 care administrator would have had oversight
14 responsibility for all institutions within the State.
15 A. **Yes.**
16 Q. Was there a single medical director who then
17 reported to you having oversight responsibility from a
18 clinical standpoint over all institutions within the
19 State?
20 A. **That's correct.**
21 Q. So whoever that medical director was --
22 A. **Yes.**
23 Q. -- if the position was filled at the time --
24 A. **Yes.**
25 Q. -- it would have been a single individual

Page 18

1  with oversight responsibility?
2    A. It would have been a single individual.
3    Q. Okay.
4    A. And if the position were not filled, we
5  would have used any of those consultants to be the
6  medical -- to make the medical decisions that had to
7  be made.
8    Q. What involvement would you have had directly
9  in making medical decisions?
10   A. None.
11   Q. I mean no disrespect by this question. But
12 do you have the training or the ability from a medical
13 standpoint to make medical decisions?
14   A. Absolutely not.
15   Q. So that wasn't part of your responsibility.
16   A. It was not.
17   Q. It was not something you undertook.
18   A. No.
19   Q. If there were a question about the medical
20 care of an inmate at one of the institutions, how
21 would you as the health care administrator address
22 that?
23   A. We would -- if I were not satisfied that the
24 prisoner was getting services, although a medical
25 person said he was, we would use one of our

Page 19

1  consultants as a referee. And usually, that worked
2  through the Medical Advisory Committee.
3    Q. And explain for me, if you would, what the
4  Medical Advisory Committee was.
5    A. Medical Advisory Committee comprised a group
6  of medical persons, including two contract physicians
7  and physician assistants, nurses, who met once weekly
8  to go over cases that were not resolved at the local
9  level.
10   Q. Was that a clinical meeting, so to speak?
11   A. It was a clinical meeting.
12   Q. Are there records kept of the Medical
13 Advisory Committee?
14   A. Oh, yes.
15   Q. Are they kept in the form of minutes?
16   A. Yes. And usually whatever decisions were
17 made there, I would -- I acted as sort of secretary to
18 this thing. I signed off on them. So a prisoner
19 would get a response from -- from the Medical Advisory
20 council through my signature.
21   Q. Okay. That helps. Let me focus you, if I
22 can, on an inmate at Palmer, Charlie Davis. Is that a
23 name that's known to you?
24   A. No.
25   Q. Do you know who he is?

Page 20

1    A. No.
2    Q. Know anything about him?
3    A. No.
4    Q. Know anything about his medical condition?
5    A. Well, just what I've read.
6    Q. And that would include materials that you've
7  been provided in this case?
8    A. Yes. That was provided to me in this case.
9  That's the first time I heard about him.
10       MR. MATTHEWS: Mark that as number 1,
11 please.
12       (Exhibit 1 was marked.)
13 BY MR. MATTHEWS:
14   Q. Take a look at the documents that we have
15 marked as Exhibit 1, if you would, please.
16   A. Yes.
17   Q. Do you recognize that packet of materials?
18   A. Yes. I recognize this as coming from the
19 Department.
20   Q. You recognize the cover sheet?
21   A. I recognize my signature.
22   Q. Okay. Tell us what this is, to the extent
23 you remember it.
24   A. This would have come before the Medical
25 Advisory Committee meeting on -- its regular weekly

Page 21

1  meeting, in which the medical staff would go over the
2  grievance and would make a decision. And this
3  decision was conveyed back to the grievant.
4    Q. This cover sheet is dated September 5th,
5  2002, correct?
6    A. Yes, it is.
7    Q. And that bears your signature on the left
8  next to your name?
9    A. It does.
10   Q. You mentioned a little while ago in your
11 testimony about the Medical Advisory Committee --
12   A. Yes.
13   Q. -- that you would act as secretary for the
14 group --
15   A. Yes.
16   Q. -- convey the decision, if you will, of the
17 Advisory Committee back to the grievant.
18   A. Yes.
19   Q. Is what we're looking at in Exhibit 1, this
20 top page, is that what you were talking about earlier?
21   A. Yes.
22   Q. So this page, if you will, represents the
23 decision of the Medical Advisory Committee concerning
24 a particular grievance.
25   A. Yes.

Page 22

1  Q. Not just your individual decision; is that
2  true?
3  A. Oh, absolutely true, yes. And when you say
4  my decision, this is the medical staff decision. And
5  this response was prepared by a medical person. But
6  matters going out of the Department would go under my
7  signature, the administrator.
8  Q. Can you tell me then what involvement you
9  had specifically in the decision to deny this
10 grievance?
11 A. The only decision I would have in these is
12 to determine whether or not agency policy was being
13 followed. But in terms of the medical aspect of the
14 decision-making, I would have no say so.
15 Q. Let me make sure I understand this cover
16 sheet, at least.
17 A. Yes.
18 Q. Is it fair to say that this is a document
19 which is prepared by medical staff simply for your
20 signature?
21 A. Yes.
22 Q. In effect, you are simply the scrivener?
23 A. Except if there were some matters that would
24 be contrary to policy, then I would say something
25 about that.

Page 23

1  Q. Was a portion of this particular grievance
2  directed to medical policy, in your view?
3  A. I imagine all grievances would pertain to
4  medical policy, one way or the other.
5  Q. I guess what I'm trying to figure out is
6  whether you had a specific role in the denial of this
7  grievance or were simply signing off on the medical
8  decision.
9  A. I was simply signing off on this.
10 Q. Do you have any memory as you sit here today
11 of this particular grievance?
12 A. No, sir.
13 Q. Any idea what the underlying beef was?
14 A. No. I -- as I said, I didn't even know this
15 guy. I never -- you know, in any given meeting, we
16 probably look at 20 of these things. And probably
17 some outstanding one would jump out at you. But
18 ordinarily, no.
19 Q. Do you know, for instance, how old Mr. Davis
20 was?
21 A. No, sir.
22 Q. Do you know what his medical condition was?
23 A. No, sir.
24 Q. Do you know why he was complaining about his
25 medical care?

Page 24

1  A. No, sir.
2  Q. Do you know whether or not he had a serious
3  medical condition?
4  A. No, sir.
5  Q. Do you know whether or not Mr. Davis was
6  receiving adequate medical care at Palmer Correctional
7  Center?
8  A. I do not know that.
9  Q. Are you in a position to say one way or the
10 other whether or not the medical care Mr. Davis
11 received at Palmer was adequate?
12 A. No, sir.
13 Q. Are you in a position to say one way or the
14 other whether the medical care that Mr. Davis received
15 at Palmer was in compliance with Department
16 guidelines?
17 A. I'd say yes.
18 Q. How is it that you know that?
19 A. Because we hired qualified people to deliver
20 the services. And we assumed that if they are doing
21 their job -- but the medical director would be
22 supervising those people. And if they were not doing
23 their job, sooner or later, I would have heard of it.
24 And we have the grievance process. So if a person
25 believes he or she is not receiving services, then

Page 25

1  they would go up the chain of the grievance.
2  Q. Isn't that what happened here?
3  A. Yes. That's what -- I imagine that's what
4  he said. But the substance of that, I would not know
5  if he were or were not receiving, since I'm not a
6  physician. If some -- if a physician or medical
7  person told me that, I would then know.
8  Q. So you would have to rely upon a medical
9  person to tell you that Mr. Davis' care was adequate
10 or inadequate, true?
11 A. Yes.
12 Q. Do you know whether or not you did that in
13 this case?
14 A. No, sir. I don't. I don't know.
15 Q. In looking at this packet, the grievance
16 that was appealed was dated June the 27th, 2002, if
17 you look at the last page.
18 A. Yes.
19 Q. And the decision which you sent back is
20 dated September 5th, 2002, correct?
21 A. Yes.
22 Q. Are you able to tell me what happens to that
23 grievance in the intervening time?
24 A. The 6/27/02 decision?
25 Q. Yes.

Page 26

1  A. So June, July, August, September. So there
2  is probably like a three-month delay here you're
3  asking.
4  Q. That's -- that's what it appears from the
5  paperwork that I've seen. What I'm trying to
6  understand is what happens in that time period.
7  A. I -- I cannot say.
8  Q. Okay. Is there some record of decision
9  concerning a grievance appeal, like the first page,
10 other than this letter back to the inmate?
11 A. Yes. When -- when a decision comes in to my
12 office, it is recorded and the secretary sets a
13 meeting with this committee. And usually, it's done
14 within a certain number of days. So --
15 Q. In fact, the policy sets a certain number of
16 days for --
17 A. Indeed. So I cannot say what happened from
18 the 27th until, you know, my letter of this date. One
19 would have to go back and see when it was logged in
20 and when the decision was made.
21 Q. Would there be paperwork documenting the
22 steps along the way?
23 A. Yes. There would be.
24 Q. And what paperwork would we expect to see?
25 A. The grievance and the grievance response.

Page 27

1  And we have -- I believe there was a person who was in
2  charge of grievances. And that person would
3  prioritize these things or send them through the
4  system at -- to the appropriate persons within the
5  system. And I guess at each of those stages, it would
6  be documented.
7  Q. Would all of that documentation eventually
8  make its way to the Medical Advisory Committee for its
9  review in making a final determination?
10 A. Yes. There was a chart that we prepared
11 with all of this stuff.
12 Q. In this response to the grievance appeal
13 that you have in front of you, second sentence says
14 "Your grievance is for the facility where you are
15 housed not having adequate medical staff to meet your
16 medical needs," correct?
17 A. I didn't understand the question, please.
18 Q. I'm just trying to make sure -- the second
19 sentence of that letter --
20 A. Yes.
21 Q. -- it reads "Your grievance is for the
22 facility where you are housed not having adequate
23 medical staff to meet your medical needs," correct?
24 A. Yes. That's what it says.
25 Q. And the findings in the first sentence say

Page 28

1  "Your grievance states that you have a heart condition
2  and serious medical condition that the officers are
3  not trained to recognize and properly manage during
4  the hours that the medical department is not open."
5  A. Yes.
6  Q. Correct?
7  A. Yes.
8  Q. Do you know what medical staff there was
9  available to treat someone with a heart condition and
10 serious medical condition during the hours that the
11 medical department was not open?
12 A. I guess this individual -- this statement
13 refers to what was contained in the grievance. I
14 don't -- I don't know that this statement is saying
15 that we, the medical committee, have found that you
16 have a serious medical condition, et cetera. I don't
17 know that is what we're saying. We're responding to
18 his words in his grievance.
19 Q. You don't know whether he had a serious
20 medical condition or not?
21 A. I don't know, no.
22 Q. That's outside your area of expertise?
23 A. Yes, it is. I could have learned about it.
24 But in -- in this instance, if the medical folks had
25 determined that his condition were serious enough to

Page 29

1  warrant a higher level of care facility, he would have
2  been transferred to a place where there was 24-hour
3  care.
4  Q. Was such a facility available within the
5  Department of Corrections?
6  A. Yes. In Anchorage, you'd have 24-hour care.
7  Q. If we look at the third page of this
8  grievance, there's a section entitled Superintendent's
9  Findings and Determination.
10 A. Uh-huh.
11 Q. Is that a portion of the grievance that you
12 recognize?
13 A. It's here, but I don't recognize it as such.
14 Q. Does each grievance require the
15 superintendent of the facility to essentially sign off
16 on --
17 A. Yes.
18 Q. -- the grievance before it can get to your
19 level, correct?
20 A. Yes, yes.
21 Q. In this case, didn't the superintendent of
22 that facility suggest that Mr. Davis be transferred to
23 a facility with a full-time medical staff?
24 A. Yeah. He's saying that. But, you know, I
25 think this is an inappropriate response of the

Page 30

1  superintendent.
2      Q.  Why?
3      A.  Because he's not a medical person.
4      Q.  So is it fair for me to assume that if the
5  superintendent makes a recommendation based upon a
6  perceived medical suggestion, that the Medical
7  Advisory Committee will ignore that?
8      A.  Not necessarily. If a superintendent called
9  and said I have somebody here who is, quote, "in a
10 life-threatening condition," which he says here, then
11 probably the response would be has he seen the nurse
12 or the PA. What do they have to say about that? But
13 we would hear that. And if he said no, then we would
14 send somebody out to make the determination if indeed
15 this is a life-threatening situation and the person
16 needs to be in a different facility.
17     Q.  Do you know whether or not the inmate, in
18 this case, Mr. Davis, was ever seen by a physician
19 while he was at Palmer Correctional Center?
20     A.  I don't know. But I'd say that it would be
21 unusual if he did not.
22     Q.  You would have expected --
23     A.  I would have expected, yes.
24         On the -- on the other hand, we depend on
25 the PAs to make the referral. We expect everybody

Page 31

1  who's in the facility to be seen within a certain
2  period. And after seen, the PA determines through
3  whatever triage system they use if this person needs
4  to go on further. But --
5      Q.  So you're going to rely upon the on-site
6  medical staff to make a recommendation.
7      A.  Of course. Of course.
8      Q.  When a prisoner makes a grievance such as
9  the one we have here stating that medical care has not
10 been adequate, is there a procedure within your office
11 to have that person examined by a medical doctor?
12     A.  I can't quote chapter and verse, but I'd say
13 yes.
14     Q.  That's what you would expect to happen.
15     A.  Again, we would begin -- we have different
16 levels of care. And so if a person requests to be
17 seen, we would hope that the physician assistant --
18 the nurse or the physician assistant would make the
19 determination. And once the determination is made,
20 the person would be seen. If the person could not be
21 seen within our own system, we would refer the person
22 out to a contract facility.
23     Q.  Do you know whether or not Mr. Davis was
24 ever seen by a medical doctor after filing this
25 grievance?

Page 32

1      A.  I have no idea, sir. I don't know. But
2  based on this response, the last sentence said "At the
3  present time there is no indication that the medical
4  and security staff at Palmer Correctional Center can
5  not meet your essential health care needs per DOC
6  policy..."
7          So at this point, I think what they were
8  saying is that the level of care in the facility is
9  sufficient for your needs. And if the medical people
10 are saying that, then I would imagine that's so.
11     Q.  This is the medical people on the Advisory
12 Committee.
13     A.  On the Medical Advisory Committee.
14     Q.  Do you know whether any of those medical
15 people on the Advisory Committee ever examined
16 Mr. Davis?
17     A.  I do not know, but it's very possible.
18 Because usually, the physician assistants -- we have
19 at least one physician assistant in these meetings.
20     Q.  Okay. Is that a rotating position,
21 physician's assistant?
22     A.  Usually when someone has a patient that is
23 going to be seen, that person -- if he's out in the
24 Valley, the person is sure to come on in. Usually,
25 the physician assistants who are there are the ones

Page 33

1  from the Anchorage area. Because the meeting is held
2  in Anchorage and they just come on routine.
3      Q.  Maybe I'm unclear about the process. So let
4  me make sure that --
5      A.  Okay.
6      Q.  -- we work it through. In a situation where
7  a medical grievance is filed from Palmer, you have a
8  PA who is in charge on a day-to-day basis out there.
9      A.  Yes.
10     Q.  Right? So the PA in charge in Palmer would
11 then be brought in as part of the medical review that
12 is done as part of the grievance appeal?
13     A.  Yes.
14     Q.  Okay.
15     A.  And depending what is happening, the person
16 may or may not be there. But --
17     Q.  In the ideal world --
18     A.  In the ideal world, he's there.
19     Q.  Okay. Is it fair to assume that the
20 identities of all people participating in the medical
21 appeal would be noted somewhere in the records?
22     A.  Yes, it is.
23         (Discussion off the record.)
24         MR. MATTHEWS: If you don't mind, can we
25 take a two-minute break?