Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)


DEPOSITION OF HENRY LUBAN, M.D.

THURSDAY, APRIL 27, 2006, 2:02 p.m.

Anchorage, Alaska


Exhibit 12
Page 1 of 8

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF ALASKA
 3
 4   CHARLIE J. DAVIS, JR.,
 5        Plaintiff,
 6   vs.
 7   ZELMER HYDEN, et al.,
 8        Defendants.
     _____)
 9
     NO: A02-0214 CV (JKS)
10
11
12
13        DEPOSITION OF HENRY LUBAN, M.D., taken on
14   behalf of Plaintiff, Pursuant to Notice, at MATTHEWS &
15   ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16   before Susan Campbell, Certified Shorthand Reporter
17   for Alaska Stenotype Reporters and Notary Public for
18   the State of Alaska.
19
20
21
22
23
24
25
```

Page 3

```
 1            A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:    MATTHEWS & ZAHARE
                       BY: THOMAS A. MATTHEWS
 4                     431 West Seventh Avenue
                       Suite 207
 5                     Anchorage, AK 99501
 6
     For Defendants:   STATE OF ALASKA
 7                     ATTORNEY GENERAL'S OFFICE
                       Department of Law
 8                     Criminal Division
                       BY: MARILYN J. KAMM
 9                     P.O. Box 110300
                       Juneau, AK 99811
10
     Reported By:  Susan Campbell
11                 Certified Shorthand Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2   EXAMINATION BY:                          PAGE
 3     Mr. Matthews                             5
 4
 5                   E X H I B I T S
 6   NUMBER                                   PAGE
 7   1  Affidavit - 5 pages                    16
 8   2  Vital Signs Flow Sheet - 1 page        20
 9   3  Health Care Progress Notes - 12 pages  22
10
```

Page 5

```
 1   ANCHORAGE, AK, THURSDAY, APRIL 27, 2006, 2;02 p.m.
 2                   HENRY LUBAN, M.D.,
 3        called as a witness on behalf of the
 4        Plaintiff, having been duly sworn upon
 5        oath by Susan Campbell, Notary Public,
 6        was examined and testified as follows:
 7                     EXAMINATION
 8   BY MS. KAMM:
 9     Q.  Could you state your name for the record,
10   please?
11     A.  Henry Luban.
12     Q.  Spell your last.
13     A.  L-u-b-a-n.
14     Q.  And you are a medical doctor?
15     A.  Correct.
16     Q.  Can you give us an address where the court
17   reporter can reach you?
18     A.  I gave her my card.
19     Q.  Oh, okay.
20     A.  4500 Diplomacy, Suite 207, 99508. Thanks.
21     Q.  Ever had a deposition taken before?
22     A.  Yes.
23     Q.  Few in your profession survive many years
24   without it, I'm afraid.
25     A.  Quite a few, yes.
```

Page 6

1  Q. I'll try to make it as painless as possible.
2  I don't expect to be here all that long, but I do have
3  a number of questions for you today.
4  A. Sure.
5  Q. So could you give me just a thumbnail sketch
6  of your basic background, training, just so I
7  understand?
8  A. I'm a Board certified internist. And
9  started practicing medicine in 1985. And have had a
10 variety of positions, both clinical and administrative
11 since then.
12 Q. As I understand it, you came to Alaska first
13 in 2004?
14 A. Correct.
15 Q. July or something like that?
16 A. Yeah.
17 Q. What brought you north?
18 A. Well, we moved here from upstate New York.
19 Alaska was a place we'd talked about living,
20 periodically. And actually, this job came available.
21 So I expressed an interest, and one thing led to
22 another.
23 Q. Had you had any experience with treating
24 patients on either a temporary or occasional basis
25 prior to 2004?

Page 7

1  A. Treating patients?
2  Q. Yes.
3  A. I'm not sure what you mean.
4  Q. Any medical practice that you'd done in
5  Alaska --
6  A. Oh, in Alaska?
7  Q. Yes. (Continuing) -- prior to 2004.
8  A. Not in Alaska, no.
9  Q. Sorry. My question wasn't very clear. You
10 had treated many patients prior to 2004.
11 A. Oh, yeah.
12 Q. Your current position then is what
13 specifically?
14 A. Medical Director, Health Services
15 Administrator. It's kind of two positions combined
16 into one.
17 Q. And that's for the Department of
18 Corrections?
19 A. Yes.
20 Q. Is there a split in your duties between the
21 two positions?
22 A. I don't look at it like that. At one time
23 it was two separate positions. And I believe a year
24 or two before I got here, it was combined into one.
25 And so since I've been here, it's just been one

Page 8

1  position.
2  Q. So you got two jobs for the price of one?
3  A. I guess you could look at it that way.
4  Q. Is it fair for me to conclude that you are
5  the chief medical person for the Department of
6  Corrections?
7  A. Yes.
8  Q. And that's the position you've held
9  basically for the last two years?
10 A. Yes.
11 Q. And others who have medical issues to
12 address all report to you?
13 A. Well, yes. We do have some contract
14 positions. They're not part of the hierarchy. But in
15 a sense, they do report to me, yeah.
16 Q. Okay. Since 2000 and -- well, strike that.
17    Since you began in 2004, have you made
18 changes to the hierarchy that was then in place?
19 A. Yeah. There have been some personnel
20 changes and reporting changes, yes.
21 Q. Okay. I want to focus specifically on an
22 institution, the Palmer Correctional Center, that I'm
23 focussed on in this case.
24 A. Okay.
25 Q. And have there been changes in the medical

Page 9

1  hierarchy in Palmer since you arrived?
2  A. No.
3  Q. Okay. Are you the sort of physician in
4  charge, if you will, for the Palmer Correctional
5  Center at this point?
6  A. Well, we have a clinical director,
7  Dr. Bingham, who clinically oversees our mid-level
8  providers.
9  Q. When you say "mid-level provider," what does
10 that mean?
11 A. PAs, physician's assistant. For clinical
12 issues, she's really the person that has more
13 day-to-day contact with them than I do.
14 Q. Yours would be more of a supervisory role?
15 A. Well, I supervise her. But I usually --
16 it's -- it's not that clearcut. The way we've set it
17 up, I take care more of the administrative issues, but
18 I get involved in the clinical issues also. There's
19 no exact line of demarcation.
20 Q. Is there currently a medical doctor on staff
21 at Palmer Correctional Center?
22 A. Well, I wouldn't use the term "on staff."
23 We have a contract physician who goes out there three
24 times a month. And then, of course, Dr. Bingham goes
25 out there once a month and consults. So we provide

Page 10

1  physician oversight four -- basically four times a
2  month.
3      Q. And who's the contract doctor?
4      A. Dr. Billman, Jim Billman.
5      Q. Just so I can understand, what type of a
6  doctor is Dr. Billman?
7      A. He's an internist.
8      Q. And Dr. Bingham?
9      A. Family practitioner.
10     Q. Are you familiar with the medical care that
11 was provided at Palmer prior to 2004?
12     A. I'm not sure I understand your question.
13     Q. I just want to make sure I understand what
14 you can and cannot talk about, really, as a witness.
15 So I'm just trying to understand, have you as part of
16 your job as the current medical director gone back to
17 review medical care that was provided during the
18 past --
19     A. Only on a case-by-case basis, if a case like
20 this comes up.
21     Q. Where you might be asked to review --
22     A. Right.
23     Q. -- the specific care that was given to an
24 inmate --
25     A. Right.

Page 11

1      Q. -- or patient? But other than that --
2      A. No.
3      Q. -- you haven't been through a systemic
4  review?
5      A. No, I haven't.
6      Q. Is it still the case today that day-to-day
7  medical care for inmates in Palmer is provided
8  primarily by PAs?
9      A. Yes. Nurses and PAs.
10     Q. Can you tell me what the hierarchy is out
11 there?
12     A. Well, that's an interesting question. The
13 PAs are the -- well, we have -- at Palmer, we have --
14 one of the PAs is called the institutional health care
15 officer. And he provides clinical oversight and also
16 direct clinical care to the staff and patient
17 population, inmate population. So he's the
18 supervising medical person.
19     Q. And who is that person currently?
20     A. Roger Hale.
21     Q. Okay. And then there's another PA?
22     A. He's -- they rotate clinical duties. But
23 the other PA is the institutional health care officer
24 at Mat-Su and, I believe, Point MacKenzie. They've
25 kind of split up their administrative assignments.

Page 12

1      Q. Who is that person?
2      A. Roger Hughes.
3      Q. Same two PAs that we had in 2002 then.
4      A. Yes.
5      Q. Do you happen to know, was Mr. Hughes the
6  institutional health care officer for Mat-Su and
7  Point MacKenzie back in 2002?
8      A. Don't know.
9      Q. And in addition to the PAs, you also have
10 nurses on staff, correct?
11     A. Yes.
12     Q. And how many are out there now?
13     A. I don't remember.
14     Q. Do you know whether it's increased since
15 2002?
16     A. I don't think it's changed.
17     Q. Is it fair to say that Roger Hale is the
18 senior-most medical officer on full-time staff at
19 Palmer?
20     A. You mean he's been there the longest or
21 he's -- administratively he's in charge?
22     Q. I was thinking of the latter,
23 administratively he's in charge.
24     A. Yeah, yeah.
25     Q. Is there currently a period of time during

Page 13

1  the day, 24-hour day, at Palmer Correctional Center
2  where there is no medical staff at Palmer?
3      A. Yes.
4      Q. And what are those hours, do you know?
5      A. I think the nurse -- I'm just guessing,
6  10:00 -- 10:00 or 11:00 at night, perhaps, somewhere
7  around there. Maybe a little earlier. I don't know
8  exact hours. But they work until sometime in the
9  evening and then come back the next morning.
10     Q. So during the sleeping hours, if I can call
11 it that, there may be no medical staff there.
12     A. There is no medical staff.
13     Q. Is that true throughout the correctional
14 system?
15     A. No.
16     Q. Are there other centers where there is
17 full-time medical staff?
18     A. Yes.
19     Q. And what other places have full-time medical
20 staff?
21     A. Well, the Anchorage Correctional Complex
22 does. Our Hiland facility does. I think that's it.
23 That's it. Just those two facilities. Oh, Fairbanks
24 sometimes does, not always.
25     Q. And how about Juneau?

Page 14

1  A. No, they don't.
2  Q. Can you explain for me why certain
3  facilities have full-time coverage and others do not?
4  A. Well, certainly, the ones that are -- that
5  are busier at night, a lot of times we -- the
6  Anchorage Correctional Complex is the -- is our big
7  remand facility so, of course, we have a lot of people
8  coming in at all hours. Hiland tends to have a -- I
9  would say a sicker clientele, perhaps, than Palmer.
10 And Fairbanks is a big remand facility as well.
11 Q. You're familiar with Mr. Davis' medical
12 care?
13 A. Yes.
14 Q. When did you first become familiar with
15 that?
16 A. I don't remember.
17 Q. You were asked at some point in time as part
18 of this litigation, I take it --
19 A. Yes.
20 Q. -- to review the care that he received?
21 A. Yes.
22 Q. And you did that?
23 A. Yes.
24 Q. Can you tell me what you did?
25 A. I reviewed the chart.

Page 15

1  Q. Okay. Do you have the chart there in front
2  of you? Is that what you brought?
3  A. Yes.
4  Q. Mind if I take a quick look?
5  A. Help yourself.
6     MR. MATTHEWS: Is this the numbered set, do
7  we know?
8     MS. KAMM: Doesn't look like it.
9     MR. MATTHEWS: I'm assuming it's the same
10 set that I got.
11    MS. KAMM: I'm assuming it is, too. I
12 brought the numbered set with me. So I'm hoping it's
13 the same set.
14    MR. MATTHEWS: The little details that we
15 lawyers get to worry about. Looks like the same set.
16 Q. You've never met Mr. Davis, right?
17 A. No.
18 Q. Never had any contact with him?
19 A. No.
20 Q. Never examined him in any clinical setting,
21 right?
22 A. No.
23 Q. And your purpose in reviewing this chart was
24 simply to ascertain whether his care was good, bad or
25 otherwise?

Page 16

1  A. I think I was asked to do an affidavit, if
2  I'm not mistaken, regarding his medical care.
3  Q. You did submit an affidavit. And I'm happy
4  to show you that.
5  A. I believe I did, yes. When did I write
6  that?
7     MR. MATTHEWS: I'll ask you that. It says
8  October of 2004, which I think is -- let's mark it.
9     (Exhibit 1 was marked.)
10    MR. MATTHEWS: Take a look at Exhibit 1.
11    (Discussion off the record.)
12 BY MR. MATTHEWS:
13 Q. Is that a copy of an affidavit which you
14 signed in this case?
15 A. That I signed?
16 Q. On the last page.
17 A. Yes.
18 Q. Is that your signature?
19 A. Yes.
20 Q. It says that it was dated October the 4th,
21 2004. Does that jog your memory as to when you might
22 have prepared it?
23 A. No.
24 Q. Do you recall that you prepared this
25 affidavit a year and a half or so ago?

Page 17

1  A. I have -- I have no recollection of when I
2  did it. Obviously, it's been a while since I don't
3  remember.
4  Q. Okay. Do you have any memory of this
5  affidavit at all?
6  A. Little bit, yeah. I mean, I do now that I
7  read it, yeah.
8  Q. If I can draw your attention to page three,
9  beginning of your narrative summary, will you take a
10 look at that for me, please?
11 A. I don't have a summary -- oh, yes. Okay.
12 Q. Do you see that section, paragraph five?
13 A. Uh-huh, yes.
14 Q. Beginning on page four about midway through
15 that paragraph at the line marked number two, it says
16 while at Palmer, do you see that?
17 A. Yes.
18 Q. Sentence reads "While he was at Palmer,
19 there were no reports he suffered from chest pain,
20 dizziness or other cardiovascular symptoms."
21 A. Uh-huh.
22 Q. And that was your opinion based upon your
23 review of Mr. Davis' chart?
24 A. Yes.
25 Q. Do you know whether there were reports of

**Page 18**

1  chest pain, dizziness or other cardiovascular symptoms
2  prior to Mr. Davis' arrival at Palmer?
3     A. I think on one or two occasions when he was
4  in Juneau, he complained of dizziness.
5     Q. And you didn't see any reports of dizziness
6  in the Palmer records.
7     A. No.
8     Q. Did you see any reports of high blood
9  pressure in the Palmer records?
10    A. Any reports of high blood --
11    Q. Yes.
12    A. He had a few readings that were mildly
13 elevated.
14    Q. And do you recall -- when you say "mildly
15 elevated," what do you mean?
16    A. That's a good question. I think he had a
17 couple of readings, 150 systolic, perhaps, maybe as
18 high as 160 systolic.
19    Q. So we're clear for everybody reading this
20 later, when you say "systolic," which part --
21    A. Systolic blood pressure, the upper number.
22    Q. Diastolic is the lower number.
23    A. Correct.
24    Q. So something 150 or higher would be an
25 elevated number on the systolic?

**Page 19**

1     A. That's not an easy question to answer. It
2  depends on the particular patient, what their other
3  medical problems are. I think in this fellow, 150 was
4  mildly elevated, yes.
5     Q. How about a blood pressure, a systolic
6  number in the 190s?
7     A. That's high.
8     Q. That would be dangerously high?
9     A. Long term, yes.
10    Q. Okay.
11    A. Short term, I don't know.
12    Q. Do you recall seeing in the records that you
13 were provided a blood pressure chart --
14    A. Yes.
15    Q. -- for Mr. Davis?
16    A. Yes.
17    Q. Was one kept while he was at Palmer?
18    A. Yes. Would you like to see it?
19    Q. Maybe you could point it out to me.
20    A. I put a paperclip on it. I'll find it.
21       MS. KAMM: If we could go off the record for
22 a moment.
23       THE WITNESS: Here.
24       MS. KAMM: Or maybe you want this on the
25 record. I think these are what I gave him yesterday,

**Page 20**

1  not what he had when he did the affidavit.
2        MR. MATTHEWS: Oh, okay. Okay. Hold on to
3  that page for just a minute.
4        (Exhibit 2 was marked.)
5  BY MR. MATTHEWS:
6     Q. Let me ask you, if I can, Dr. Luban, is the
7  document we've now marked as Exhibit 2 the blood
8  pressure sheet that you were referring to?
9     A. Yes.
10    Q. That's the only one you've seen, correct?
11    A. Yes.
12    Q. It's the only one I had seen, so I just
13 wanted to make sure we were clear.
14    A. Yeah.
15    Q. This shows blood pressure -- actually, Vital
16 Sign Flow Sheet for Mr. Davis from the dates April 25,
17 2002 through June 11, 2002, right?
18    A. Yes.
19    Q. Are you aware of any vital sign flow sheet
20 after June 11, 2002?
21    A. No, I'm not.
22    Q. Does that surprise you?
23    A. No.
24    Q. Should there be one?
25    A. I don't know that they need to have a flow

**Page 21**

1  sheet. They could put the blood pressure in the chart
2  with the progress notes. That's what I would do. I
3  don't believe a flow sheet's necessary.
4     Q. Having started a flow sheet like this,
5  wouldn't it be easier to locate blood pressure
6  readings on a continuity basis if they were all kept
7  in one place?
8     A. Might be.
9     Q. Did you see regular checks of Mr. Davis'
10 blood pressure after June 11th, 2002 in the records
11 that you were provided?
12    A. I don't recall how many there were after
13 June, to be honest with you.
14    Q. In the blood pressure readings that you have
15 in front of you, Exhibit 2, there are some systolic
16 readings that are at least mildly elevated, correct?
17    A. Yes.
18    Q. Mr. Davis was taking medication for --
19 taking a bunch of medication -- but blood pressure
20 medication?
21    A. Yes.
22    Q. So these would be controlled readings of his
23 blood pressure; is that true?
24    A. Well, there's a couple that are a little
25 higher than you'd like to see. But in general, I

Page 22

1  wouldn't say it's too bad. Could be a little better.
2         MR. MATTHEWS: Let's mark that as the next
3  one.
4         (Exhibit 3 was marked.)
5  BY MR. MATTHEWS:
6     Q. If you'd take a look at Exhibit 3, as well.
7     A. Yeah.
8     Q. Initially, my question to you, you mentioned
9  that you could put the blood pressure readings in
10 either a flow sheet, such as Exhibit 2, or in the
11 progress reports, right?
12    A. Yes.
13    Q. Is what we've marked here the progress
14 reports for Mr. Davis?
15    A. Yes.
16    Q. Does it appear to be a complete copy of the
17 progress reports that you're aware of?
18    A. Yes.
19    Q. Is it fair for me to conclude that any
20 readings of Mr. Davis' blood pressure while he was at
21 Palmer should have been listed in one or the other of
22 these two documents?
23    A. Well, they may have another place they put
24 blood pressure readings that I'm not aware of.
25    Q. These are the two places you would be aware

Page 23

1  of?
2     A. Yeah. I think sometimes in some facilities,
3  they put them on the medication log. But I would say
4  these are the two main places.
5     Q. As the physician in charge of medical care,
6  these are the two places you would expect to find
7  them, true?
8     A. I suppose.
9     Q. If I can draw your attention to the sixth
10 page of that exhibit --
11    A. Okay.
12    Q. -- specifically the entries that begin
13 "5/8/02."
14    A. Yes.
15    Q. And there's a reference about midway through
16 the page, it says "5/8/02," I think it's "addendum."
17 And "BP, 148/90," and it's circled.
18    A. Yes.
19    Q. Do you see that?
20    A. Yes.
21    Q. And the note immediately below that appears
22 to read "Recommend tightening BP control"?
23    A. Yeah.
24    Q. Is the note that follows an expression of
25 concern about Mr. Davis' elevated blood pressure?

Page 24

1     A. He's recommending it be tightened. I
2  don't -- he says need to be concerned about decreased
3  blood pressure and light-headedness. So he's
4  actually -- I'm not sure exactly what he's saying
5  there. He's recommending a range of blood pressure, I
6  think is what he's doing.
7     Q. He'd like to see the blood pressure go down
8  into that range.
9     A. That's what he's saying, yes.
10    Q. Is it fair to conclude that at least as of
11 May 8th, 2002, Mr. Davis was reporting
12 light-headedness to the physician's assistant in
13 Palmer?
14    A. I don't believe he was -- I don't believe
15 it's fair to say that, no.
16    Q. Well, then why does it say need to be
17 concerned about lowering BP, light-headedness?
18    A. I don't know why he says that. He may have
19 noticed in Juneau that the patient had had some
20 light-headedness.
21    Q. Is light-headedness a potential symptom of
22 cardiac trouble?
23    A. It's possible.
24    Q. Is dizziness a potential symptom of cardiac
25 trouble?

Page 25

1     A. It's possible.
2     Q. Elevated blood pressure a potential
3  symptom of cardiac trouble?
4     A. Elevated blood pressure is not a symptom.
5     Q. What would you describe it?
6     A. It's a sign.
7     Q. A sign. Okay. How do you distinguish
8  between a sign and a symptom?
9     A. A symptom is something the patient reports.
10 A sign is some objective data.
11    Q. Okay. And since you can't measure
12 objectively light-headedness, you don't consider that
13 to be a sign?
14    A. Correct.
15    Q. You call it a symptom.
16    A. (Witness nods head.)
17    Q. So the report of light-headedness here, does
18 that indicate to you that Mr. Davis was reporting
19 light-headedness?
20    A. What Dr. Billman wrote?
21    Q. Is that Dr. Billman's writing?
22    A. Yes. I don't know why he wrote that. He's
23 not stating the patient has light-headedness. He's
24 just saying he's concerned about decreased blood
25 pressure, and he puts an arrow to light-headedness.

Page 26

1  But I'm not sure what he means by that.
2     Q.  Dr. Billman is an internist like yourself?
3     A.  Correct, correct.
4     Q.  Do you think that's a term he would use
5  lightly?
6     A.  I don't think he'd put anything in the chart
7  that he would use lightly.
8     Q.  So if Dr. Billman, in your experience, would
9  have made a note about light-headedness in the chart
10 at this point, it was significant to him, at least.
11    A.  Perhaps.
12    Q.  In your experience since coming to Alaska,
13 is Dr. Billman a careful practitioner?
14    A.  Yes.
15    Q.  Is he given to making inaccurate notes in
16 medical charts?
17    A.  Not that I'm aware of.
18    Q.  In your experience with Dr. Billman, if he
19 were recommending a tightening of Mr. Davis' blood
20 pressure control, is that a recommendation to take
21 seriously?
22    A.  Yes.
23    Q.  Between Exhibits 2 and 3, it appears that
24 Mr. Davis' blood pressure was checked again in Palmer
25 up through June 11th, 2002.

Page 27

1     A.  Yes.
2     Q.  Correct?  And it was monitored fairly
3  regularly during that period of time?
4         You need to answer out loud.  Sorry.
5     A.  I forgot the question.
6         (Record read.)
7         THE WITNESS:  Yes.
8  BY MR. MATTHEWS:
9     Q.  And fluctuated somewhat?
10    A.  Fluctuated mildly.
11    Q.  It looked like the systolic number actually
12 was a little higher, a little lower, depending upon
13 when it was measured?
14    A.  Blood pressure will change quite often.
15    Q.  Daily, right?
16    A.  Correct.
17    Q.  Do you see any indication in the charts that
18 you have between Exhibits 2 and 3 that Mr. Davis'
19 blood pressure was measured again after June 11th,
20 2002?
21    A.  In Palmer or at another place?
22    Q.  In Palmer.  I'm sorry.
23    A.  I don't -- I don't see anything in the
24 chart, no.
25    Q.  Mr. Davis remained in Palmer until the

Page 28

1  latter part of October of 2002, right?
2     A.  He was transferred in October, yes.
3     Q.  Is it fair to say, then, for a period of
4  four months, there's no indication that Mr. Davis'
5  blood pressure was checked in Palmer, at least in the
6  chart?
7     A.  In the chart that we have, no.
8     Q.  Do you think that's good care?
9     A.  I think he received essential health care.
10    Q.  Do you think it would be good care for a
11 70-year-old man with an implanted defibrillator to go
12 four months without having his blood pressure checked?
13    A.  I would say the average 70-year-old man
14 would be at home and might get his blood pressure
15 checked every three to four months at a doctor's
16 office, perhaps.  So it's certainly within reason.
17    Q.  If you were treating a 70-year-old patient
18 with an implanted defibrillator, Dr. Luban, who was
19 not at home but was institutionalized, would you check
20 his blood pressure more than every four months?
21    A.  I might.  I think it all depends how he was
22 doing, how it's been up to then.
23    Q.  There were expressions in the chart of
24 concern about his blood pressure, right?
25    A.  There was one expression that we just went

Page 29

1  over, yes.  But subsequent readings were pretty close
2  to that target level for the next month.
3     Q.  Are COs in Palmer trained to measure blood
4  pressure?
5     A.  I don't know.
6     Q.  Are they allowed to measure blood pressure?
7     A.  I don't know.
8     Q.  Is there anybody other than medical staff at
9  Palmer who is authorized to make notes in a medical
10 chart?
11    A.  Anybody other than who?
12    Q.  Medical staff.
13    A.  I don't believe so.
14    Q.  Which would include the PAs and the nurses
15 or a visiting M.D., correct?
16    A.  Correct, yeah.
17    Q.  In your experience, Dr. Luban, is dizziness
18 a common symptom for somebody with elevated blood
19 pressure?
20    A.  No.
21    Q.  Is it a symptom which would concern you for
22 somebody with elevated blood pressure?
23    A.  All symptoms need to be -- need to be looked
24 into.
25    Q.  If a patient with a history of cardiac