Thomas A. Matthews, ABA No. 8511179
Matthews & Zahare, P.C.
431 West 7th Ave., Suite 207
Anchorage, Alaska 99501
Phone:  (907) 276-1516
Facsimile:  (907) 276-8955
tom.matthews@matthewszahare.com

Counsel for Plaintiff Davis

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLIE J. DAVIS, JR.,            )
                                  )
          Plaintiff,              )
     vs.                          )          Case No. A02-0214 CV (JKS)
                                  )
ZELMER HYDEN, et al.,             )
                                  )
          Defendants.             )
_____     )

**OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

On April 3, 2002, at the age of 70 years old, Plaintiff Charlie Davis was taken into

State custody for misdemeanor possession of marijuana.  At the time, he had a host of

medical problems, and was taking multiple medications.   Mr. Davis had suffered a heart

attack three months before entering State custody, and had implanted defibrillator in his

chest.  Suffice it to say, he was not the usual prisoner.  After being transferred to Palmer

Correctional Center (PCC), Davis' medical needs were essentially ignored.

Defendants have now moved for summary judgment asserting there is no

evidence of deliberate indifference, and that Plaintiff has failed to produce expert

testimony to support his claim.  Each point fails.  While it is true that Davis does not

have an independent expert to support his claim, he is entitled to rely upon the

testimony of Defendants' witnesses.  Plaintiff also has now before the Court a motion for

additional discovery.  For this reason, Plaintiff also seeks Rule 56(f) relief to complete

the additional requested discovery and then supplement this opposition.

## II. STATEMENT OF FACTS[1]

### A.  Background – Davis' Heart Condition

Plaintiff Charlie Davis was born on May 17, 1932.[2]  At the time he entered state custody

in April, 2002, Davis was nearly seventy (70) years old.  Shortly before, Davis suffered a

heart attack.[3]  Because of the severity of his condition, and prior heart trouble, Davis'

doctors recommended implant of a cardioverter defibrillator.[4]  A defibrillator is different

than a pacemaker.[5]  A heart surgeon at Virginia Mason Hospital in Seattle performed

the surgery to implant the defibrillator on January 15, 2002.[6]  Davis was discharged on

---

[1] Documents in support of Plaintiff's Opposition are contained within the records produced by the State of Alaska during the course of this litigation, (Bates Nos. 1-284).  Plaintiff Davis' records have been labeled with the designation DAV and Bates Nos. 1-482).  All of the Exhibits referenced to are admissible pursuant to Evidence Rules 803(4) and 803(8).  Exhibits 1-9 records were submitted with Plaintiff's Opposition to Defendant's Motion to Dismiss (Docket 47) which is incorporated by reference.  Exhibits 10 - 14 are attached hereto.

[2] *See* Exhibit 1, Affidavit of Charlie Davis, dated October 3, 2005 at ¶ 2.

[3] *Id.*

[4] *Id.; see also* Exhibit 2 (Virginia Mason Medical Records).

[5] Exhibit 3 (Medtronic Defibrillator manual).

[6] Exhibit 2.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 2 of  21

January 17, 2002, but with strict instructions for medication.[7]  Dr. Belz prescribed an

anti-coagulant, Coumadin Crystalline.[8]

 For individuals like Davis, Coumadin is an essential part of the management of

his heart disease.  This is particularly true of heart patients with implanted heart

devices.  Because of the implanted defibrillator, and the underlying heart disease, Davis

must take Coumadin to regulate the clotting in his blood.[9]  If he fails to take his

medication, he runs a substantially greater risk of serious illness or injury.[10]

 In January 2002, Davis had just suffered a heart attack, and had an implanted

defibrillator.[11]  He was facing charges relating to controlled substances that stemmed

from an incident more than two years earlier.[12]  Because of his recent heart attack, the

new defibrillator implant, and his perceived need to keep his stress level reduced, Davis

agreed to plead guilty to misdemeanor drug charges.[13]  He went to prison, having made

the choice not to fight charges against him because he was in poor health, and was

concerned about the physical toll a trial would entail.[14]  Davis also assumed he would

---

[7] *Id.*

[8] *Id.* Coumadin is a blood thinner.  In a normal healthy person, clotting is what stops the bleeding when one suffers a cut.  Without a clotting agent, one runs the risk of bleeding to death from a simple cut.  However, for someone with coronary artery disease, like Davis, a blood clot can be deadly.  The clot may stick in a clogged artery, or it may become lodged in the heart muscle itself.  The result can be fatal.  *See generally* Exhibit 4 (Coumadin Booklet).

[9] *See* Exhibit 1 (Affidavit of Charlie Davis)

[10] *Id.*

[11] *Id., see also* Exhibit 1.

[12] *See* Exhibit 1.

[13] *Id.*

[14] *Id.*

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                              Page 3 of  21

receive adequate medical care during the expected one year stay.[15]  Just before his

incarceration, Davis' treating physician ordered that he should continue his Coumadin

therapy and have a PT/INR test done twice monthly.[16]

### B.  Davis Enters State Custody

 Davis entered State custody on April 3, 2002 at Lemon Creek Correctional

Center in Juneau, Alaska.[17]  Upon presentation to LCCC, Davis was given an initial

"pre-remand" medical screen.  A "post-remand" screen was apparently completed at the

same time.[18]  The screen showed that Davis had "obvious medical . . . problems that

require medical attention" and that Davis reported that he was "on prescription

medication that must be taken within the next several hours."[19]

He took a copy of his medical records, including the handbook for his defibrillator,

and a copy of the Coumadin handbook.[20]  In addition, Davis signed medical releases

allowing the State medical staff access to his medical records directly from the

providers.[21]

As part of his initial screening, an assessment was also completed by Nurse

Shirley Hawkins.[22]  The vital sign notes by Ms. Hawkins indicate that Mr. Davis had

elevated blood pressure (150/84), along with a history of heart trouble and high blood

---

[15] *Id.*

[16] *See* Exhibit 5 (SEARHC Prescription).

[17] *See* Exhibit 6 (DOC Remand Screen).

[18] *Id.*

[19] *Id.*

[20] *See* Exhibits 3-4.

[21] *See* Exhibit 7 (Authorization for Medical Records).

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 4 of  21

pressure.[23]  Under "current conditions" Nurse Hawkins noted that Davis had suffered a

heart attack three months earlier ("MI 1/12/02").   Seven different medications were

noted.  Finally, Nurse Hawkins incorrectly noted that Davis had a "pacemaker

1/15/02."[24]

### C.  Davis Is Transferred to Palmer

Approximately three weeks after his initial intake at LCCC in Juneau, Davis was

identified for transfer to Palmer Correctional Center.[25]  Nurse Hawkins again examined

Davis before the transfer, and noted that he had history of heart attack in January,

2002, had a defibrillator implant, was on numerous medications, and that he required a

PT/INR test in approximately two weeks.[26]  Nurse Hawkins notation was consistent with

the prescription note by Mr. Davis' physician prior to his incarceration that his

medication levels were to be monitored, and that he should have a PT/INR test every

two weeks.[27]

Davis was transferred to Palmer on approximately May 1, 2002.[28]  No intake

assessment appears in the records.  PT/INR testing was done initially, but then slacked

off.  In addition, on May 2, 2002 Davis' blood pressure was noted to be elevated

---

[22] *See* Exhibit 6.
[23] *Id.*
[24] *See* Exhibit 6.
[25] *See* Exhibit 8 (Health Care Progress Notes, at p. 4).
[26] *See* Exhibit 8, at p. 4.
[27] *See* Exhibit 5.
[28] *See* Exhibit 1.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                        Page 5 of  21

(164/77).[29]   A few days later, Davis' blood pressure was still elevated (148/90), and

medical staff recommended tightening blood pressure control in light of Davis' history of

heart attack.  They also noted the need to be concerned possible lightheadness, and

possible fall since he was taking Coumadin.[30]

### D.  Davis Files a Grievance

At first, Davis tried to work through informal interviews to educate the floor

officers and "medical staff' about his heart condition and need for improved care.[31]  On

June 13, 2002, Davis filed a formal grievance.[32]  He complained because the floor

officers were unaware of the medications he was to take for his heart condition.  Davis

also complained because he had not timely received a PT/INR test for twenty seven

days.[33]  He was concerned because the "institution (PCC) and its medical staff is well

aware that my present medical condition is a life threatening one and has failed to

provide sufficient continuity of care, monitoring and follow-up medical treatment."[34]

Davis requested that PCC have a full time nurse, especially at night, to attend to

medical care.

Davis' grievance was acknowledged by the grievance coordinator on June 14,

2002.  PA Roger Hale was assigned to investigate Davis' grievance.  On June 27, 2002,

---

[29] *See* Exhibit 8.

[30] *See* Exhibit 8.

[31] *See* Exhibit 9 (Requests for Interview)

[32] *See* Exhibit 10 (attached hereto).

[33] *Id.* As it turns out, Davis' statement in the grievance undercounted.  In fact, Davis went 45 days without a PT/INR test (May 10-June 27).

[34] *Id.*

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 6 of  21

Mr. Hale noted in his written response that staffing was not an issue to be addressed in the grievance process, and that he "counseled" Mr. Davis on access to medical care.[35] According to Mr. Davis, however, Mr. Hale was uninterested in resolving issues surrounding medical care, and really didn't seem to understand the nature of his condition at all.  Mr. Davis says the meeting was spent with Davis educating Hale about his defibrillator implant.[36]

Superintendent Hyden reviewed the investigation and made his own findings on June 27.  He concluded that the investigation by PA Hale did not address the prisoner's grievance.[37]   He further suggested that perhaps Davis should be transferred to a facility with full time medical staff.[38]

Davis immediately filed an appeal of the Superintendent's ruling.  Davis again noted that PCC medical staff was not providing proper medical attention, and was not following their own policies and procedures.[39]  No action was taken on the grievance appeal for more than sixty days.  Consequently, Davis initiated this suit on August 28,

---

[35] *Id  (See also* Affidavit of Roger Hale, submitted in support of Defendant's Motion for Summary Judgment).  *See* Docket 78.
[36] *See* Exhibit 1 (Affidavit of Charlie Davis).  Of course Mr. Hale in his affidavit has a different recollection.  *See* Hale Affidavit, Docket 78.
[37] *See* Exhibit 10, at p. 2.
[38] *Id.*
[39] *Id.* at p. 3.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 7 of  21

2002.[40]  On September 5, 2002, Davis' grievance appeal was formally denied by Mel

Henry, Health Care Administrator.[41]

### E.  Medical Staffing at Palmer Correctional Center

Palmer Correctional Center did not have a doctor on regular staff during the time

that Davis was incarcerated.  Contract physicians would come through periodically to

examine inmates, but Davis was never seen.[42]  In fact, although there were roughly 450

prisoners at PCC in 2002, medical attention was provided primarily by two physicians'

assistances, and various nurses.[43]  During the night time hours, there was no medical

staff of any kind on the premises at PCC.  Instead, in the event of a medical emergency,

outside help would have to be called in.[44]

Defendant Zelmer Hyden was the acting superintendent at PCC during Davis'

incarceration.  He was made aware of Davis' serious medical condition by no later than

June 27, 2002.[45]  He even suggested that perhaps Davis should be transferred to

another facility with better medical care to address Davis' "life-threatening" conditions.[46]

Having recognized the significance of Davis' medical condition, Hyden did nothing

more.

---

[40] *See* Complaint, Docket No. 2, dated August 16, 2002.  The Complaint is date file-stamped August 28, but signed by Davis on August 16, 2002.

[41] *See* Exhibit 10, at p. 4.

[42] *See* Exhibit 11, Luban Depo. at pp. 9-10.

[43] *See* Exhibit 12, Hyden Depo. at pp. 41, 43.

[44] *See* Exhibit 12, Hyden Depo at pp. 32-33.

[45] *See* Exhibit 10.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                        Page 8 of  21

### F.  Medical Monitoring of Davis

Shortly after his arrival at PCC, Davis was given a brief exam by a physician's assistant.  His blood pressure was 174 over 88.  Yet, he was not examined by a doctor. For the next several weeks, Davis' blood pressure was measured on a regular basis. He suffered a nose bleed, light headedness and dizziness.  On May 8, 2002, Davis medical chart was reviewed by a contract physician with the Department of Corrections, James Billman.[47]  Dr. Billman concluded that Mr. Davis' blood pressure was too high, that it needed to be better controlled because of his history of heart trouble.  Moreover, Dr. Billman concluded the medical staff needed to be concerned about lowering Mr. Davis' blood pressure because of his complaints of light headedness.  Davis was at a substantially increased risk if he fell since he was taken Coumadin.  Despite the apparent concern about Mr. Davis' condition, and his elevated blood pressure, he was never seen by a physician while he was at Palmer Correctional Center.[48]

In fact, Dr. Luban, Defendants' expert witness, danced around in his deposition, but agreed that Mr. Davis had symptoms consistent with cardiac trouble.

> Q.    And the note immediately below that appears to read 'recommend tightening BP controlled'?
> A.    Yea.
> Q.    Is the note that follows an expression of concern about Mr. Davis' elevated blood pressure?
> A.    He's recommending it be tightened.  I don't – he says need to be concerned about decreased blood pressure and light headedness. So he's actually – I'm not sure exactly what he is saying there.  He

---

[46] *See* Exhibit 10.

[47] Exhibit 8 (*SOA* 024).

[48] *See* Exhibit 11, Luban Depo. at p. 34.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 9 of  21

is recommending a range of blood pressure, I think is what he's
doing.

Q.    He'd like to see the blood pressure go down into that range.
A.    That's what he is saying, yes.

. . . .

Q.    Is light headedness a potential symptom of cardiac trouble?
A.    It's possible.
Q.    Is dizziness a potential symptom of cardiac trouble?
A.    It's possible.[49]

After Dr. Billman's expression of concern in Mr. Davis' medical chart, his

blood pressure appears to have been monitored for a time, but never consistently

reached the target range suggested by Dr. Billman's chart note.  In fact, after

June 11, it appears that Mr. Davis' blood pressure was either not monitored, or

not recorded in his medical chart.  From June 11, 2002 until Mr. Davis was

transferred in late October, 2002, there is no indication of a blood pressure

measurement at all.[50]

   **G.  PT/INR Testing**

Before entering state custody, Mr. Davis' personal physician provided him

with a prescription for PT/INR testing to be done twice monthly.[51]  After his

transfer to PCC, Davis did receive a PT/INR test on occasion, but not with the

frequency that it had been recommended by his private physician.  Because he

was taking Coumadin (a blood thinner) Davis required specific monitoring

---

[49] *See* Exhibit 11, Depo of Luban, at pp. 23-25.
[50] *See* Exhibit 11, Depo. of Luban, at pp. 26-27.
[51] *See* Exhibit 5 (SEARHC Prescription).

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                        Page 10 of  21

through a blood clotting test, sometimes called a PT/INR test.[52]   When Davis

initially had a PT/INR test done at PCC, the readings were found outside the

therapeutic range.[53]   Roger Hale recommended a repeat blood draw in ten days.

Mr. Davis had another blood draw taken on May 10 while the INR portion of the

test was within range, the PT was substantially out of range.  Despite that fact,

PA Hale recommended that Mr. Davis be checked again in 30 days.[54]

    Instead of checking Mr. Davis' blood in 30 days, medical officials at PCC

waited approximately 45 days before conducting another PT/INR test.[55]   Mr.

Davis was not given another blood draw until June 24, 2002 – two weeks after he

filed a "cop-out" indicating that PCC had failed to provide adequate continuity of

care.

    Each time officials at PCC took a PT/INR test from Mr. Davis, the results

came back out of range.[56]

## III.  ARGUMENT

    Plaintiff Charlie Davis, a former state prisoner, alleges in this lawsuit that

corrections officers at Palmer Correctional Center ("PCC") failed to provide him with

adequate medical care.   In his Amended Complaint, he alleges that this incident

violated his federally protected rights, and seeks various remedies.  It is undisputed that

---

[52] *See* Exhibit 11, Depo. of Luban, at pp. 38-39.
[53] *See* Exhibit 8, at p. 5.
[54] *See* Exhibit 8, at p. 6.
[55] *See* Exhibit 13 (page 41 of Def's documentation).
[56] *See* Exhibit 13 (PT/INR Test Reports).

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 11 of  21

plaintiff filed a grievance about the incidents with the prison grievance system, and appealed them through the Medical Advisory Committee level of that system.[57] However, the defendants nonetheless argue that plaintiff has nevertheless failed to produce evidence giving rise to an inference of willful or deliberate indifference to his serious medical needs.  Defendants further argue that expert testimony is required.

### A.  Standard For Summary Judgment

Summary Judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[58]  The moving party bears the initial burden of proof for showing that no fact is in dispute.[59]  If the moving party meets that burden, then it falls upon the non-moving party to come forward with facts which would indicate a genuine issue for trial.[60] A genuine issue of fact affecting the outcome of the litigation requires a trial to resolve the parties' differing versions of the truth.  All the evidence and the factual inferences drawn from the evidence, must be construed in the light most favorable to the party opposing the motion.[61]

---

[57] *See* Exhibit 10.
[58] Fed. R. Civ. Pro. 56(c).
[59] *Celotex Corp. v. Catrett,* 477 US 317, 325 (1986).
[60] *Anderson v. Liberty Lobby, Inc.,* 470 US 242, 250 (1986).
[61] *Braxton-Secret v. A.H. Robins Co.,* 769 F.2d 528, 530 (9th Cir. 1985).

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                            Page 12 of  21

### B.  Disputed Issues of Material Fact Preclude Summary Judgment as to Whether Defendants Acted With Deliberate Indifference to Mr. Davis' Serious Medical Needs

#### 1.  Zelmer Hyden

Defendant Zelmer Hyden was the acting superintendent at Palmer Correctional Center during Mr. Davis' incarceration.  It is undisputed that Mr. Hyden became aware of Mr. Davis and his serious medical needs no later than the time he filed his grievance.[62]   Mr. Davis was a unique prisoner, with unique medical needs.[63]  Unfortunately, after having been made aware of Mr. Davis' condition, Mr. Hyden's only action was to recommend that Mr. Davis be considered for transfer to a different facility which had better or more extensive medical care.[64]  In fact, Superintendent Hyden concluded that Mr. Davis' grievance had not been addressed.  Still, Hyden did nothing about it.

"Deliberate indifference to serious medical needs of prisons constitutes the 'unnecessary and wanton infliction of pain' prescribed by the Eighth Amendment."[65]  In *Farmer vs. Brennon,*[66] the Supreme Court held that an official acts with deliberate indifference when he "knows that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable

---

[62] *See* Exhibit 12, Depo of Zelmer Hyden at pp. 35, 38, 43-46.
[63] *See* Exhibit 12, Depo of Zelmer Hyden at p. 72.
[64] *See* Exhibit 10, Grievance.
[65] *Estelle vs. Gamble* 429 U.S. 97, 104 (1976).
[66] 511 U.S. 825 (1997).

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                                      Page 13 of  21

measures to abate it."[67]  The fact that lack of care or a particular condition was "long-standing, pervasive, well documented, or expressly noted" by prison officials in the past, can prove, by inference, that the official in question actually knew about the risk.[68]

Once an official has actual knowledge of a substantial risk of serious harm, he must <u>respond reasonably</u> to it.  In deciding whether an official's response is reasonable, the court looks to whether the official made a good faith effort to investigate the problem and then fix it.[69]  In the medical care context, this means that an inmate should be promptly examined by qualified medical personnel, prescribed or order the necessary treatment, administer the treatment properly, and then provided follow-up treatment as necessary.[70]

In this case, Defendant Hyden recognized the serious nature of Mr. Davis' medical need by no later than June 27, 2002 – the day he denied Mr. Davis' grievance (after finding the response inadequate).  Mr. Hyden testified that he would have absolutely expected Mr. Davis to be seen by a doctor (not just a PA) while he was incarcerated at Palmer.[71]  That never happened.  Mr. Hyden testified that once he made his suggestion to the medical staff that Mr. Davis be

---

[67] *Id.* at 847.
[68] *Farmer*, 511 U.S. at 842.
[69] *Vance vs. Peters*, 97 F.3rd 987, 998 (7th Cir. 1996).
[70] Toone, Robert E. *"*Protecting Your Health and Safety:  A Litigation Guide for Inmates" at 72 (2002).
[71] *See* Exhibit 12, Depo of Zelmer Hyden at pp. 77.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                            Page 14 of  21

considered for a transfer to a different facility, he did nothing to follow up, or determine whether Mr. Davis' continued medical care was in fact adequate.[72]

Unfortunately, after Mr. Hyden denied Davis' grievance appeal, his medical care went into a proverbial black hole. Mr. Davis was not given a PT/INR test for a total of 45 days. This was contrary even to the orders of PA Roger Hale. In addition, there is no indication that Mr. Davis' blood pressure was monitored with any regularity. In fact, the medical records are devoid of any indication that Davis' blood pressure was monitored after the time he filed his grievance.[73]

Having recognized the seriousness of Davis' condition, Hyden may not simply ignore it. Having washed his hands of it, Mr. Hyden acted with deliberate indifference to Mr. Davis' medical needs.

### 2. Mel Henry

Mel Henry was the health care administrator while Mr. Davis was incarcerated at PCC.[74] As such, he was responsible for the physical health and welfare of all prisoners within the Department of Corrections system.[75] He had oversight responsibility for the health care of prisoners at PCC.[76] After Mr. Davis' grievance was denied and appealed, it eventually made its way to Dr. Henry's

---

[72] *See* Exhibit 12, Depo of Hyden, at pp. 51-61.
[73] *See* Exhibit 11, Depo of Luban, at pp. 21, 27.
[74] *See* Exhibit 14, Depo of Henry at 12.
[75] *Id.*
[76] *Id.*

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.: A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                        Page 15 of 21

desk.[77]  According to DOC policy, Mr. Davis' grievance appeal should have been decided within thirty days.  It was not.  Instead, it took more than two months for Mr. Henry to reject the appeal.[78]

Faced with a prisoner grievance suggesting that his "life-threatening" health conditions were not being adequately cared for, and a recommendation from the superintendent of PCC that Mr. Davis be considered for transfer to a 24 hour care facility, Dr. Henry took more than two months to respond to Mr. Davis' grievance.[79]  In the interim as already noted, Mr. Davis' condition was poorly monitored, if at all.  His blood pressure was apparently not checked, and his blood tests were not done regularly.  In the end, Dr. Henry simply responds that Mr. Davis' medical care has been adequate.[80]  However, Dr. Henry took absolutely no steps – which we know of – to truly determine whether Mr. Davis' medical care was, in fact, adequate.[81]

According to Dr. Henry, detailed records of decision would have been kept documenting the review by the Medical Advisory Committee of Mr. Davis' care.[82] These records have not been made available, but are the subject of a separate motion before this Court.

---

[77]  *See* Exhibit 14, Depo. of Henry, at pp. 20-22.
[78]  *See* Exhibit 14, Depo of Henry, at p. 35.
[79]  *See* Exhibit 14, Depo of Henry, at pp. 29-30.
[80]  *See* Exhibit 10.
[81]  *See* Exhibit 14, Depo of Henry, at pp. 22-23.
[82]  *See* Exhibit 14, Depo of Henry, at pp. 25-27.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                          Page 16 of  21

The courts have recognized that delay in providing adequate medical care may give rise to an inference of deliberate of indifference.[83]  Here, Dr. Henry took no action to assess the adequacy of Mr. Davis' medical care for more than sixty days.  Under the circumstances, questions of material fact preclude summary judgment for Dr. Henry.

### C.  Expert Testimony – Plaintiff May Satisfy The Requirement for Expert Testimony on The Standard of Care Through the Testimony of Defense Witnesses

Defendants have argued, and this Court has suggested, that in order to prevail in this matter, Plaintiff must provide proof through expert testimony, that the Defendants breached the standard of medical care.[84]  Plaintiff submits that based upon the facts set forth above, the inadequacy of Plaintiff's medical care while he was in state custody at PCC would be obvious to a lay juror.  Mr. Davis submits the following facts are sufficient to preclude summary judgment on this point:

➢ Davis arrived at Palmer Correctional Center with an implanted defibrillator taking six different medications.

➢ Four days before his transfer to PCC, Davis' blood pressure was measured at 187 over 87, and he was complaining of nose bleeds and dizziness.

---

[83] *See Estelle vs. Gamble*, 429 U.S. at 105 to 106; *Lancaster vs. Monroe County,* 116 F.3d 1419, 1425 (11th Cir. 1997).
[84] Order (Docket 85) at p. 2.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 17 of  21

➢ Davis' blood pressure was monitored for the first six weeks that he arrived at PCC, with substantial fluctuations.

➢ Davis' chart was reviewed by one medical doctor while he was at Palmer; he was never examined by a physician.

➢ Based upon his chart review, Dr. Billman recommended that Mr. Davis' blood pressure be brought under control, and expressed concern about light headedness, and potential harm if he fell due to his Coumadin prescription.

➢ After arriving in Palmer, Davis had his blood drawn for a PT/INR test on six occasions from April 23 until October 30; at each draw, at least one of the two tests showed a result outside the therapeutic or reference range. On one occasion, Davis went 45 days between PT/INR tests.

➢ After Davis filed his grievance on June 12, 2002, there is no indication in his medical records that his blood pressure was ever checked again while he was a PCC.

Based upon these facts, Plaintiff submits that expert testimony is unnecessary to establish that his care was inadequate. A lay jury will understand, without the need for expert testimony.

However, if the Court concludes that expert testimony is still necessary, Plaintiff submits that it may be obtained from the Defendants' own witnesses. In fact, the Alaska Supreme Court has expressly recognized that the required "expert" testimony may

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.: A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                      Page 18 of  21

come from the Defendant health care providers themselves in a medical malpractice case.[85]

Here, Plaintiff has deposed Henry Luban, M.D., the current medical director for the State Department of Corrections.  Although he has offered self-serving affidavits indicating that department official provided "adequate" medical care to Mr. Davis, he also admitted that Davis' medical conditions were serious, and some of the symptoms and signs observed were consistent with a serious heart problem.[86]

Defendants initially identified Henry Luban as the most knowledgeable person regarding Mr. Davis' medical care.[87]  That designation now appears incorrect.  In fact, the most knowledgeable person regarding Mr. Davis' medical care is a different medical witness, Roger Hale, PA.  Plaintiff has asked for an opportunity to depose Mr. Hale, but thus far has been refused.   As noted in the following section, Plaintiff seeks an opportunity to depose Mr. Hale in order to bolster its opposition to the present motion.

**D.  If The Existence of Genuine Issues of Material Fact Has Not Been Adequately Supported At Present, Then Plaintiff Seeks a Rule 56(f) Continuance.**

Although Plaintiff believes that he has adequately established the existence of genuine issues of material fact, should the Court disagree and

---

[85] *See Trombly vs. Star-Wood Cardiac Group, P.C.*, 3 P.3d 916, 920 (Alaska 2000) (testimony of defendant medical provider may be used to establish that if a mistake was made, it would have been negligent).

[86] *See* Exhibit 11, Depo. of Luban, at pp. 29-34, 49-50.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 19 of  21

consider granting Defendant's motion, than Plaintiff seeks a continuance to provide the additional time to conduct the deposition of Mr. Hale, and obtain the records of Defendant.  Plaintiff has previously filed a motion to reopen or extend discovery and compel production of documents in attendance of witness. Plaintiff incorporates that motion by reference in support of its request for a Rule 56(f) continuance.

## IV.  CONCLUSION

Plaintiff received inadequate medical care while he was incarcerated at Palmer Correctional Center.  Defendants recognize the significance and seriousness of Plaintiff's medical condition, yet did nothing to assure proper treatment.  Plaintiff was suffering from spikes in his blood pressure, dizziness, light headedness, and nose bleeds, and Defendants failed to take his condition seriously.  Genuine issues of material fact preclude summary judgment in favor of Defendants.  Defendants' motion should therefore be denied.

---

[87] *See* Defendants' Interrogatory Responses, Exhibit 3-4 to Plaintiff's Motion to Re-Open or Extend Discovery (Docket 81)

Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 20 of  21

DATED this 19th day of June 2006, at Anchorage, Alaska.

MATTHEWS & ZAHARE, P.C.
Counsel for Plaintiff Davis


By:   s/ Thomas A. Matthews
      Thomas A. Matthews, ABA No. 8511179
      431 West 7th Ave., Suite 207
      Anchorage, Alaska 99501
      Phone:  (907) 276-1516
      Facsimile:  (907) 276-8955
      tom.matthews@matthewszahare.com


CERTIFICATE OF SERVICE

I certify that on 19th day of June 2006
a copy of the foregoing document was
served by electronic mailing to:

Marilyn J. Kamm, Esq.
Assistant Attorney General
State of Alaska, Dept. of Law
Criminal Division Central Office
P.O. Box 110300
Juneau, AK 99811


s/Thomas A. Matthews


Plaintiff's Opposition to Defendant's Motion for Summary Judgment
*Davis v. Hyden, et. al.*, Case No.:  A02-0214 CV (JKS)
TAM:jlw\103-2\OppMSJ                                    Page 21 of  21