Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)


DEPOSITION OF HENRY LUBAN, M.D.

THURSDAY, APRIL 27, 2006, 2:02 p.m.

Anchorage, Alaska


Exhibit  11
Page  1  of  14

Page 2

1  IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF ALASKA
3
4  CHARLIE J. DAVIS, JR.,
5      Plaintiff,
6  vs.
7  ZELMER HYDEN, et al.,
8      Defendants.
   _____)
9
   NO: A02-0214 CV (JKS)
10
11
12
13       DEPOSITION OF HENRY LUBAN, M.D., taken on
14  behalf of Plaintiff, Pursuant to Notice, at MATTHEWS &
15  ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16  before Susan Campbell, Certified Shorthand Reporter
17  for Alaska Stenotype Reporters and Notary Public for
18  the State of Alaska.
19
20
21
22
23
24
25

Page 4

1              I N D E X
2  EXAMINATION BY:                         PAGE
3    Mr. Matthews                            5
4
5              E X H I B I T S
6  NUMBER                                  PAGE
7   1  Affidavit - 5 pages                  16
8   2  Vital Signs Flow Sheet - 1 page      20
9   3  Health Care Progress Notes - 12 pages  22
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           A-P-P-E-A-R-A-N-C-E-S
2
3  For Plaintiff:   MATTHEWS & ZAHARE
                    BY: THOMAS A. MATTHEWS
4                   431 West Seventh Avenue
                    Suite 207
5                   Anchorage, AK 99501
6
   For Defendants:  STATE OF ALASKA
7                   ATTORNEY GENERAL'S OFFICE
                    Department of Law
8                   Criminal Division
                    BY: MARILYN J. KAMM
9                   P.O. Box 110300
                    Juneau, AK 99811
10
   Reported By:     Susan Campbell
11                  Certified Shorthand Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1  ANCHORAGE, AK, THURSDAY, APRIL 27, 2006, 2;02 p.m.
2              HENRY LUBAN, M.D.,
3      called as a witness on behalf of the
4      Plaintiff, having been duly sworn upon
5      oath by Susan Campbell, Notary Public,
6      was examined and testified as follows:
7              EXAMINATION
8  BY MS. KAMM:
9   Q.  Could you state your name for the record,
10  please?
11  A.  Henry Luban.
12  Q.  Spell your last.
13  A.  L-u-b-a-n.
14  Q.  And you are a medical doctor?
15  A.  Correct.
16  Q.  Can you give us an address where the court
17  reporter can reach you?
18  A.  I gave her my card.
19  Q.  Oh, okay.
20  A.  4500 Diplomacy, Suite 207, 99508.  Thanks.
21  Q.  Ever had a deposition taken before?
22  A.  Yes.
23  Q.  Few in your profession survive many years
24  without it, I'm afraid.
25  A.  Quite a few, yes.

Exhibit 1
Page 2 of 14

Page 6

1   Q.  I'll try to make it as painless as possible.
2   I don't expect to be here all that long, but I do have
3   a number of questions for you today.
4   A.  Sure.
5   Q.  So could you give me just a thumbnail sketch
6   of your basic background, training, just so I
7   understand?
8   A.  I'm a Board certified internist. And
9   started practicing medicine in 1985. And have had a
10  variety of positions, both clinical and administrative
11  since then.
12  Q.  As I understand it, you came to Alaska first
13  in 2004?
14  A.  Correct.
15  Q.  July or something like that?
16  A.  Yeah.
17  Q.  What brought you north?
18  A.  Well, we moved here from upstate New York.
19  Alaska was a place we'd talked about living,
20  periodically. And actually, this job came available.
21  So I expressed an interest, and one thing led to
22  another.
23  Q.  Had you had any experience with treating
24  patients on either a temporary or occasional basis
25  prior to 2004?

Page 7

1   A.  Treating patients?
2   Q.  Yes.
3   A.  I'm not sure what you mean.
4   Q.  Any medical practice that you'd done in
5   Alaska --
6   A.  Oh, in Alaska?
7   Q.  Yes. (Continuing) -- prior to 2004.
8   A.  Not in Alaska, no.
9   Q.  Sorry. My question wasn't very clear. You
10  had treated many patients prior to 2004.
11  A.  Oh, yeah.
12  Q.  Your current position then is what
13  specifically?
14  A.  Medical Director, Health Services
15  Administrator. It's kind of two positions combined
16  into one.
17  Q.  And that's for the Department of
18  Corrections?
19  A.  Yes.
20  Q.  Is there a split in your duties between the
21  two positions?
22  A.  I don't look at it like that. At one time
23  it was two separate positions. And I believe a year
24  or two before I got here, it was combined into one.
25  And so since I've been here, it's just been one

Page 8

1   position.
2   Q.  So you got two jobs for the price of one?
3   A.  I guess you could look at it that way.
4   Q.  Is it fair for me to conclude that you are
5   the chief medical person for the Department of
6   Corrections?
7   A.  Yes.
8   Q.  And that's the position you've held
9   basically for the last two years?
10  A.  Yes.
11  Q.  And others who have medical issues to
12  address all report to you?
13  A.  Well, yes. We do have some contract
14  positions. They're not part of the hierarchy. But in
15  a sense, they do report to me, yeah.
16  Q.  Okay. Since 2000 and -- well, strike that.
17      Since you began in 2004, have you made
18  changes to the hierarchy that was then in place?
19  A.  Yeah. There have been some personnel
20  changes and reporting changes, yes.
21  Q.  Okay. I want to focus specifically on an
22  institution, the Palmer Correctional Center, that I'm
23  focussed on in this case.
24  A.  Okay.
25  Q.  And have there been changes in the medical

Page 9

1   hierarchy in Palmer since you arrived?
2   A.  No.
3   Q.  Okay. Are you the sort of physician in
4   charge, if you will, for the Palmer Correctional
5   Center at this point?
6   A.  Well, we have a clinical director,
7   Dr. Bingham, who clinically oversees our mid-level
8   providers.
9   Q.  When you say "mid-level provider," what does
10  that mean?
11  A.  PAs, physician's assistant. For clinical
12  issues, she's really the person that has more
13  day-to-day contact with them than I do.
14  Q.  Yours would be more of a supervisory role?
15  A.  Well, I supervise her. But I usually --
16  it's -- it's not that clearcut. The way we've set it
17  up, I take care more of the administrative issues, but
18  I get involved in the clinical issues also. There's
19  no exact line of demarcation.
20  Q.  Is there currently a medical doctor on staff
21  at Palmer Correctional Center?
22  A.  Well, I wouldn't use the term "on staff."
23  We have a contract physician who goes out there three
24  times a month. And then, of course, Dr. Bingham goes
25  out there once a month and consults. So we provide

Exhibit 11   Page 3 of 14

### Page 10

1  physician oversight four -- basically four times a
2  month.
3      Q.  And who's the contract doctor?
4      A.  Dr. Billman, Jim Billman.
5      Q.  Just so I can understand, what type of a
6  doctor is Dr. Billman?
7      A.  He's an internist.
8      Q.  And Dr. Bingham?
9      A.  Family practitioner.
10     Q.  Are you familiar with the medical care that
11 was provided at Palmer prior to 2004?
12     A.  I'm not sure I understand your question.
13     Q.  I just want to make sure I understand what
14 you can and cannot talk about, really, as a witness.
15 So I'm just trying to understand, have you as part of
16 your job as the current medical director gone back to
17 review medical care that was provided during the
18 past --
19     A.  Only on a case-by-case basis, if a case like
20 this comes up.
21     Q.  Where you might be asked to review --
22     A.  Right.
23     Q.  -- the specific care that was given to an
24 inmate --
25     A.  Right.

### Page 11

1      Q.  -- or patient?  But other than that --
2      A.  No.
3      Q.  -- you haven't been through a systemic
4  review?
5      A.  No, I haven't.
6      Q.  Is it still the case today that day-to-day
7  medical care for inmates in Palmer is provided
8  primarily by PAs?
9      A.  Yes.  Nurses and PAs.
10     Q.  Can you tell me what the hierarchy is out
11 there?
12     A.  Well, that's an interesting question.  The
13 PAs are the -- well, we have -- at Palmer, we have --
14 one of the PAs is called the institutional health care
15 officer.  And he provides clinical oversight and also
16 direct clinical care to the staff and patient
17 population, inmate population.  So he's the
18 supervising medical person.
19     Q.  And who is that person currently?
20     A.  Roger Hale.
21     Q.  Okay.  And then there's another PA?
22     A.  He's -- they rotate clinical duties.  But
23 the other PA is the institutional health care officer
24 at Mat-Su and, I believe, Point MacKenzie.  They've
25 kind of split up their administrative assignments.

### Page 12

1      Q.  Who is that person?
2      A.  Roger Hughes.
3      Q.  Same two PAs that we had in 2002 then.
4      A.  Yes.
5      Q.  Do you happen to know, was Mr. Hughes the
6  institutional health care officer for Mat-Su and
7  Point MacKenzie back in 2002?
8      A.  Don't know.
9      Q.  And in addition to the PAs, you also have
10 nurses on staff, correct?
11     A.  Yes.
12     Q.  And how many are out there now?
13     A.  I don't remember.
14     Q.  Do you know whether it's increased since
15 2002?
16     A.  I don't think it's changed.
17     Q.  Is it fair to say that Roger Hale is the
18 senior-most medical officer on full-time staff at
19 Palmer?
20     A.  You mean he's been there the longest or
21 he's -- administratively he's in charge?
22     Q.  I was thinking of the latter,
23 administratively he's in charge.
24     A.  Yeah, yeah.
25     Q.  Is there currently a period of time during

### Page 13

1  the day, 24-hour day, at Palmer Correctional Center
2  where there is no medical staff at Palmer?
3      A.  Yes.
4      Q.  And what are those hours, do you know?
5      A.  I think the nurse -- I'm just guessing,
6  10:00 -- 10:00 or 11:00 at night, perhaps, somewhere
7  around there.  Maybe a little earlier.  I don't know
8  exact hours.  But they work until sometime in the
9  evening and then come back the next morning.
10     Q.  So during the sleeping hours, if I can call
11 it that, there may be no medical staff there.
12     A.  There is no medical staff.
13     Q.  Is that true throughout the correctional
14 system?
15     A.  No.
16     Q.  Are there other centers where there is
17 full-time medical staff?
18     A.  Yes.
19     Q.  And what other places have full-time medical
20 staff?
21     A.  Well, the Anchorage Correctional Complex
22 does.  Our Hiland facility does.  I think that's it.
23 That's it.  Just those two facilities.  Oh, Fairbanks
24 sometimes does, not always.
25     Q.  And how about Juneau?

Page 14

1  A. No, they don't.
2  Q. Can you explain for me why certain
3  facilities have full-time coverage and others do not?
4  A. Well, certainly, the ones that are -- that
5  are busier at night, a lot of times we -- the
6  Anchorage Correctional Complex is the -- is our big
7  remand facility so, of course, we have a lot of people
8  coming in at all hours. Hiland tends to have a -- I
9  would say a sicker clientele, perhaps, than Palmer.
10 And Fairbanks is a big remand facility as well.
11 Q. You're familiar with Mr. Davis' medical
12 care?
13 A. Yes.
14 Q. When did you first become familiar with
15 that?
16 A. I don't remember.
17 Q. You were asked at some point in time as part
18 of this litigation, I take it --
19 A. Yes.
20 Q. -- to review the care that he received?
21 A. Yes.
22 Q. And you did that?
23 A. Yes.
24 Q. Can you tell me what you did?
25 A. I reviewed the chart.

Page 15

1  Q. Okay. Do you have the chart there in front
2  of you? Is that what you brought?
3  A. Yes.
4  Q. Mind if I take a quick look?
5  A. Help yourself.
6  MR. MATTHEWS: Is this the numbered set, do
7  we know?
8  MS. KAMM: Doesn't look like it.
9  MR. MATTHEWS: I'm assuming it's the same
10 set that I got.
11 MS. KAMM: I'm assuming it is, too. I
12 brought the numbered set with me. So I'm hoping it's
13 the same set.
14 MR. MATTHEWS: The little details that we
15 lawyers get to worry about. Looks like the same set.
16 Q. You've never met Mr. Davis, right?
17 A. No.
18 Q. Never had any contact with him?
19 A. No.
20 Q. Never examined him in any clinical setting,
21 right?
22 A. No.
23 Q. And your purpose in reviewing this chart was
24 simply to ascertain whether his care was good, bad or
25 otherwise?

Page 16

1  A. I think I was asked to do an affidavit, if
2  I'm not mistaken, regarding his medical care.
3  Q. You did submit an affidavit. And I'm happy
4  to show you that.
5  A. I believe I did, yes. When did I write
6  that?
7  MR. MATTHEWS: I'll ask you that. It says
8  October of 2004, which I think is -- let's mark it.
9  (Exhibit 1 was marked.)
10 MR. MATTHEWS: Take a look at Exhibit 1.
11 (Discussion off the record.)
12 BY MR. MATTHEWS:
13 Q. Is that a copy of an affidavit which you
14 signed in this case?
15 A. That I signed?
16 Q. On the last page.
17 A. Yes.
18 Q. Is that your signature?
19 A. Yes.
20 Q. It says that it was dated October the 4th,
21 2004. Does that jog your memory as to when you might
22 have prepared it?
23 A. No.
24 Q. Do you recall that you prepared this
25 affidavit a year and a half or so ago?

Page 17

1  A. I have -- I have no recollection of when I
2  did it. Obviously, it's been a while since I don't
3  remember.
4  Q. Okay. Do you have any memory of this
5  affidavit at all?
6  A. Little bit, yeah. I mean, I do now that I
7  read it, yeah.
8  Q. If I can draw your attention to page three,
9  beginning of your narrative summary, will you take a
10 look at that for me, please?
11 A. I don't have a summary -- oh, yes. Okay.
12 Q. Do you see that section, paragraph five?
13 A. Uh-huh, yes.
14 Q. Beginning on page four about midway through
15 that paragraph at the line marked number two, it says
16 while at Palmer, do you see that?
17 A. Yes.
18 Q. Sentence reads "While he was at Palmer,
19 there were no reports he suffered from chest pain,
20 dizziness or other cardiovascular symptoms."
21 A. Uh-huh.
22 Q. And that was your opinion based upon your
23 review of Mr. Davis' chart?
24 A. Yes.
25 Q. Do you know whether there were reports of

Page 18

1  chest pain, dizziness or other cardiovascular symptoms
2  prior to Mr. Davis' arrival at Palmer?
3     A.  I think on one or two occasions when he was
4  in Juneau, he complained of dizziness.
5     Q.  And you didn't see any reports of dizziness
6  in the Palmer records.
7     A.  No.
8     Q.  Did you see any reports of high blood
9  pressure in the Palmer records?
10    A.  Any reports of high blood --
11    Q.  Yes.
12    A.  He had a few readings that were mildly
13 elevated.
14    Q.  And do you recall -- when you say "mildly
15 elevated," what do you mean?
16    A.  That's a good question.  I think he had a
17 couple of readings, 150 systolic, perhaps, maybe as
18 high as 160 systolic.
19    Q.  So we're clear for everybody reading this
20 later, when you say "systolic," which part --
21    A.  Systolic blood pressure, the upper number.
22    Q.  Diastolic is the lower number.
23    A.  Correct.
24    Q.  So something 150 or higher would be an
25 elevated number on the systolic?

Page 19

1     A.  That's not an easy question to answer.  It
2  depends on the particular patient, what their other
3  medical problems are.  I think in this fellow, 150 was
4  mildly elevated, yes.
5     Q.  How about a blood pressure, a systolic
6  number in the 190s?
7     A.  That's high.
8     Q.  That would be dangerously high?
9     A.  Long term, yes.
10    Q.  Okay.
11    A.  Short term, I don't know.
12    Q.  Do you recall seeing in the records that you
13 were provided a blood pressure chart --
14    A.  Yes.
15    Q.  -- for Mr. Davis?
16    A.  Yes.
17    Q.  Was one kept while he was at Palmer?
18    A.  Yes.  Would you like to see it?
19    Q.  Maybe you could point it out to me.
20    A.  I put a paperclip on it.  I'll find it.
21       MS. KAMM:  If we could go off the record for
22 a moment.
23       THE WITNESS:  Here.
24       MS. KAMM:  Or maybe you want this on the
25 record.  I think these are what I gave him yesterday,

Page 20

1  not what he had when he did the affidavit.
2       MR. MATTHEWS:  Oh, okay.  Okay.  Hold on to
3  that page for just a minute.
4       (Exhibit 2 was marked.)
5  BY MR. MATTHEWS:
6     Q.  Let me ask you, if I can, Dr. Luban, is the
7  document we've now marked as Exhibit 2 the blood
8  pressure sheet that you were referring to?
9     A.  Yes.
10    Q.  That's the only one you've seen, correct?
11    A.  Yes.
12    Q.  It's the only one I had seen, so I just
13 wanted to make sure we were clear.
14    A.  Yeah.
15    Q.  This shows blood pressure -- actually, Vital
16 Sign Flow Sheet for Mr. Davis from the dates April 25,
17 2002 through June 11, 2002, right?
18    A.  Yes.
19    Q.  Are you aware of any vital sign flow sheet
20 after June 11, 2002?
21    A.  No, I'm not.
22    Q.  Does that surprise you?
23    A.  No.
24    Q.  Should there be one?
25    A.  I don't know that they need to have a flow

Page 21

1  sheet.  They could put the blood pressure in the chart
2  with the progress notes.  That's what I would do.  I
3  don't believe a flow sheet's necessary.
4     Q.  Having started a flow sheet like this,
5  wouldn't it be easier to locate blood pressure
6  readings on a continuity basis if they were all kept
7  in one place?
8     A.  Might be.
9     Q.  Did you see regular checks of Mr. Davis'
10 blood pressure after June 11th, 2002 in the records
11 that you were provided?
12    A.  I don't recall how many there were after
13 June, to be honest with you.
14    Q.  In the blood pressure readings that you have
15 in front of you, Exhibit 2, there are some systolic
16 readings that are at least mildly elevated, correct?
17    A.  Yes.
18    Q.  Mr. Davis was taking medication for --
19 taking a bunch of medication -- but blood pressure
20 medication?
21    A.  Yes.
22    Q.  So these would be controlled readings of his
23 blood pressure; is that true?
24    A.  Well, there's a couple that are a little
25 higher than you'd like to see.  But in general, I

Page 22

1  wouldn't say it's too bad. Could be a little better.
2          MR. MATTHEWS: Let's mark that as the next
3  one.
4          (Exhibit 3 was marked.)
5  BY MR. MATTHEWS:
6      Q. If you'd take a look at Exhibit 3, as well.
7      A. Yeah.
8      Q. Initially, my question to you, you mentioned
9  that you could put the blood pressure readings in
10 either a flow sheet, such as Exhibit 2, or in the
11 progress reports, right?
12     A. Yes.
13     Q. Is what we've marked here the progress
14 reports for Mr. Davis?
15     A. Yes.
16     Q. Does it appear to be a complete copy of the
17 progress reports that you're aware of?
18     A. Yes.
19     Q. Is it fair for me to conclude that any
20 readings of Mr. Davis' blood pressure while he was at
21 Palmer should have been listed in one or the other of
22 these two documents?
23     A. Well, they may have another place they put
24 blood pressure readings that I'm not aware of.
25     Q. These are the two places you would be aware

Page 23

1  of?
2      A. Yeah. I think sometimes in some facilities,
3  they put them on the medication log. But I would say
4  these are the two main places.
5      Q. As the physician in charge of medical care,
6  these are the two places you would expect to find
7  them, true?
8      A. I suppose.
9      Q. If I can draw your attention to the sixth
10 page of that exhibit --
11     A. Okay.
12     Q. -- specifically the entries that begin
13 "5/8/02."
14     A. Yes.
15     Q. And there's a reference about midway through
16 the page, it says "5/8/02," I think it's "addendum."
17 And "BP, 148/90," and it's circled.
18     A. Yes.
19     Q. Do you see that?
20     A. Yes.
21     Q. And the note immediately below that appears
22 to read "Recommend tightening BP control"?
23     A. Yeah.
24     Q. Is the note that follows an expression of
25 concern about Mr. Davis' elevated blood pressure?

Page 24

1      A. He's recommending it be tightened. I
2  don't -- he says need to be concerned about decreased
3  blood pressure and light-headedness. So he's
4  actually -- I'm not sure exactly what he's saying
5  there. He's recommending a range of blood pressure, I
6  think is what he's doing.
7      Q. He'd like to see the blood pressure go down
8  into that range.
9      A. That's what he's saying, yes.
10     Q. Is it fair to conclude that at least as of
11 May 8th, 2002, Mr. Davis was reporting
12 light-headedness to the physician's assistant in
13 Palmer?
14     A. I don't believe he was -- I don't believe
15 it's fair to say that, no.
16     Q. Well, then why does it say need to be
17 concerned about lowering BP, light-headedness?
18     A. I don't know why he says that. He may have
19 noticed in Juneau that the patient had had some
20 light-headedness.
21     Q. Is light-headedness a potential symptom of
22 cardiac trouble?
23     A. It's possible.
24     Q. Is dizziness a potential symptom of cardiac
25 trouble?

Page 25

1      A. It's possible.
2      Q. Elevated blood pressure a potential
3  symptom of cardiac trouble?
4      A. Elevated blood pressure is not a symptom.
5      Q. What would you describe it?
6      A. It's a sign.
7      Q. A sign. Okay. How do you distinguish
8  between a sign and a symptom?
9      A. A symptom is something the patient reports.
10 A sign is some objective data.
11     Q. Okay. And since you can't measure
12 objectively light-headedness, you don't consider that
13 to be a sign?
14     A. Correct.
15     Q. You call it a symptom.
16     A. (Witness nods head.)
17     Q. So the report of light-headedness here, does
18 that indicate to you that Mr. Davis was reporting
19 light-headedness?
20     A. What Dr. Billman wrote?
21     Q. Is that Dr. Billman's writing?
22     A. Yes. I don't know why he wrote that. He's
23 not stating the patient has light-headedness. He's
24 just saying he's concerned about decreased blood
25 pressure, and he puts an arrow to light-headedness.

Exhibit 1
Page 7 of 14

Page 26

1  But I'm not sure what he means by that.
2    Q.  Dr. Billman is an internist like yourself?
3    A.  Correct, correct.
4    Q.  Do you think that's a term he would use
5  lightly?
6    A.  I don't think he'd put anything in the chart
7  that he would use lightly.
8    Q.  So if Dr. Billman, in your experience, would
9  have made a note about light-headedness in the chart
10  at this point, it was significant to him, at least.
11    A.  Perhaps.
12    Q.  In your experience since coming to Alaska,
13  is Dr. Billman a careful practitioner?
14    A.  Yes.
15    Q.  Is he given to making inaccurate notes in
16  medical charts?
17    A.  Not that I'm aware of.
18    Q.  In your experience with Dr. Billman, if he
19  were recommending a tightening of Mr. Davis' blood
20  pressure control, is that a recommendation to take
21  seriously?
22    A.  Yes.
23    Q.  Between Exhibits 2 and 3, it appears that
24  Mr. Davis' blood pressure was checked again in Palmer
25  up through June 11th, 2002.

Page 27

1    A.  Yes.
2    Q.  Correct?  And it was monitored fairly
3  regularly during that period of time?
4        You need to answer out loud.  Sorry.
5    A.  I forgot the question.
6        (Record read.)
7        THE WITNESS:  Yes.
8  BY MR. MATTHEWS:
9    Q.  And fluctuated somewhat?
10    A.  Fluctuated mildly.
11    Q.  It looked like the systolic number actually
12  was a little higher, a little lower, depending upon
13  when it was measured?
14    A.  Blood pressure will change quite often.
15    Q.  Daily, right?
16    A.  Correct.
17    Q.  Do you see any indication in the charts that
18  you have between Exhibits 2 and 3 that Mr. Davis'
19  blood pressure was measured again after June 11th,
20  2002?
21    A.  In Palmer or at another place?
22    Q.  In Palmer.  I'm sorry.
23    A.  I don't -- I don't see anything in the
24  chart, no.
25    Q.  Mr. Davis remained in Palmer until the

Page 28

1  latter part of October of 2002, right?
2    A.  He was transferred in October, yes.
3    Q.  Is it fair to say, then, for a period of
4  four months, there's no indication that Mr. Davis'
5  blood pressure was checked in Palmer, at least in the
6  chart?
7    A.  In the chart that we have, no.
8    Q.  Do you think that's good care?
9    A.  I think he received essential health care.
10    Q.  Do you think it would be good care for a
11  70-year-old man with an implanted defibrillator to go
12  four months without having his blood pressure checked?
13    A.  I would say the average 70-year-old man
14  would be at home and might get his blood pressure
15  checked every three to four months at a doctor's
16  office, perhaps.  So it's certainly within reason.
17    Q.  If you were treating a 70-year-old patient
18  with an implanted defibrillator, Dr. Luban, who was
19  not at home but was institutionalized, would you check
20  his blood pressure more than every four months?
21    A.  I might.  I think it all depends how he was
22  doing, how it's been up to then.
23    Q.  There were expressions in the chart of
24  concern about his blood pressure, right?
25    A.  There was one expression that we just went

Page 29

1  over, yes.  But subsequent readings were pretty close
2  to that target level for the next month.
3    Q.  Are COs in Palmer trained to measure blood
4  pressure?
5    A.  I don't know.
6    Q.  Are they allowed to measure blood pressure?
7    A.  I don't know.
8    Q.  Is there anybody other than medical staff at
9  Palmer who is authorized to make notes in a medical
10  chart?
11    A.  Anybody other than who?
12    Q.  Medical staff.
13    A.  I don't believe so.
14    Q.  Which would include the PAs and the nurses
15  or a visiting M.D., correct?
16    A.  Correct, yeah.
17    Q.  In your experience, Dr. Luban, is dizziness
18  a common symptom for somebody with elevated blood
19  pressure?
20    A.  No.
21    Q.  Is it a symptom which would concern you for
22  somebody with elevated blood pressure?
23    A.  All symptoms need to be -- need to be looked
24  into.
25    Q.  If a patient with a history of cardiac

## Page 30

1  trouble is showing elevated blood pressure in excess
2  of systolic 150 and reporting dizziness and feeling of
3  light-headedness, is that of concern to you as a
4  physician?
5      A.  All symptoms are of concern to me as a
6  physician.
7      Q.  Can dizziness be painful?
8      A.  Dizziness is a symptom. It's not pain.
9  It's a particular symptom. It has a particular
10 description.
11     Q.  If a patient were reporting to you daily
12 nose bleeds with a history of cardiac troubles such as
13 Mr. Davis, would that be of concern to you as a
14 physician?
15     A.  All signs and symptoms are of concern to me
16 as a physician.
17     Q.  Is daily nose bleed a symptom or a sign?
18     A.  It could be either.
19     Q.  Which would you call it?
20     A.  If I saw it, it would be both.
21     Q.  If a patient reported to you daily nose
22 bleed, feelings of dizziness and light-headedness,
23 blood pressure with a systolic number in excess of
24 150, in your professional opinion, are those potential
25 problems for somebody with a heart condition?

## Page 31

1      A.  Sure. High blood pressure, heart disease,
2  they are all potential problems. They're all
3  problems. They're not potential problems. They're
4  problems.
5      Q.  That's somebody who needs to get those
6  symptoms under control.
7      A.  I didn't say that.
8      Q.  You don't think those symptoms need to be
9  controlled?
10     A.  Which symptoms are you referring to?
11     Q.  Well, we listed off a bunch of them so --
12     A.  You listed some signs and symptoms and some
13 illnesses.
14     Q.  Okay.
15     A.  And you asked me which symptoms need to be
16 under control.
17     Q.  I'm not trying to play games with you,
18 doctor, and I'm not --
19     A.  Well, it's just not that simple.
20     Q.  Okay. If a patient reports to you blood
21 pressure in excess of 150 systolic number, that is a
22 sign which you would like to see controlled?
23     A.  If a patient reports to me or I take their
24 blood pressure and it's high?
25     Q.  Well, let's start with if the patient

## Page 32

1  reports to you.
2      A.  If the patient took a blood pressure at
3  home?
4      Q.  A patient had a blood pressure reading taken
5  and it was out of your presence --
6      A.  Okay.
7      Q.  -- somebody else took it --
8      A.  Okay.
9      Q.  -- and reports to you that the reading
10 showed it was in excess of 150 on the systolic
11 number --
12     A.  Okay.
13     Q.  -- that would concern you as a physician?
14     A.  Everything the patient tells me concerns me
15 as a physician.
16     Q.  Is that a reading with somebody such as
17 Mr. Davis that would cause you to want to give him
18 some different care?
19     A.  No. I would give the same care to everybody
20 I see.
21     Q.  Would that reading when reported to you by a
22 patient cause you to adjust a medication level?
23     A.  No.
24     Q.  Would it cause you to do anything different
25 in the care of that patient?

## Page 33

1      A.  Different than what? You mean, what would
2  my plan be?
3      Q.  Sure.
4      A.  I would interview the patient. I would do a
5  physical examination. I would make a plan. I would
6  not make any decisions based on that one piece of
7  information.
8      Q.  In the interview, what would you be hoping
9  to learn?
10     A.  Oh, I would be asking all kinds of questions
11 about -- depending on how well I knew the patient, if
12 it was a regular patient or a new patient. I mean,
13 there's a lot of factors involved.
14     Q.  A patient reporting blood pressure in excess
15 of 150, reporting dizzy spells and light-headedness,
16 reporting daily nose bleeds --
17     A.  Uh-huh.
18     Q.  -- would you as a physician want to be sure
19 that that patient got a good thorough exam?
20     A.  If the patient came to see me in an office
21 setting, I would do a thorough exam, depending on when
22 the last time I saw them. If I just saw them the day
23 before, I might not repeat the same thing.
24     Q.  Okay. What if it had been three months
25 since the last exam?

Page 34

1  A. I would do a -- I would -- if it had been
2  three months from the last exam, I would do a basic
3  physical exam focusing on the important issues.
4  Q. And what would those issues be in that case?
5  A. I would take the patient's blood pressure.
6  I would examine the patient's nose. I would probably
7  listen to the patient's heart and lungs.
8  Q. Do you see any record, Dr. Luban, that
9  Mr. Davis was seen by a medical doctor while at
10 Palmer?
11 A. No.
12 Q. Is that something you looked for in your
13 review of the records?
14 A. I -- I didn't look for that in particular.
15 Q. Help me understand the way the chart is
16 done, if you can. Medical chart, to my way of
17 understanding, is a living document where all
18 information about a patient is typically kept. Do you
19 agree with that?
20 A. I suppose.
21 Q. So all people who have reason to examine or
22 treat or observe the patient for medical purposes
23 would typically put a record of their --
24 A. Yes.
25 Q. -- findings, their exams, whatever it is

Page 35

1  that they were doing, correct?
2  A. Yes.
3  Q. And the purpose of that is to make sure that
4  others who are treating that particular patient have
5  full information, right?
6  A. Yes.
7  Q. You want to get a complete history as a
8  doctor or a PA, whatever the person is, of what other
9  treatment has occurred, right?
10 A. Yes.
11 Q. Gives you a good idea about continuity of
12 care, right?
13 A. Yes.
14 Q. So what we should see in these progress
15 notes for Mr. Davis is a statement of all of the care
16 that he received while he was in Department of
17 Correction's custody, true?
18 A. Ideally.
19 Q. And I take it from your answer that that
20 doesn't always happen as a matter of practice.
21 A. Doesn't always happen anywhere.
22 Q. If it doesn't get into the chart, somebody
23 else can't see that something was done, though, right?
24 A. They might be able to infer certain things.
25 But generally, you like to document everything that

Page 36

1  was done.
2  Q. So, for example, when we're talking about
3  blood pressure readings -- which is something that you
4  as a physician can look at objectively, right?
5  A. Right.
6  Q. (Continuing) -- that's the type of thing
7  that you would typically like to see in a medical
8  chart, right?
9  A. Right.
10 Q. So that you can assure continuity of care
11 for the patient, right?
12 A. Right.
13 Q. Is there any good reason you can think of,
14 Dr. Luban, if a blood pressure reading was taken that
15 it would not be put in the chart?
16 A. No.
17 Q. Are medical charts for patients periodically
18 reviewed off-site by a physician in charge?
19 A. No. On a routine basis?
20 Q. Yes.
21 A. No.
22 Q. You mentioned early in your testimony there
23 are what, four days a month, I think you said, where
24 there's a physician who comes --
25 A. Right.

Page 37

1  Q. -- on-site?
2  A. Right.
3  Q. And is part of the purpose of that visit to
4  go over charts?
5  A. They go over particular inmates that the
6  mid-levels have questions about or the supervising
7  physicians might have questions about, having seen
8  them before, perhaps.
9  Q. And do they also see inmates while they're
10 there?
11 A. Yes.
12 Q. Do you know in 2002 how often Dr. Billman
13 was visiting Palmer?
14 A. No, I don't.
15 Q. You said currently it's three days a month?
16 A. Correct.
17 Q. Do you know how often in 2002 Dr. Bingham
18 was visiting?
19 A. No, I don't.
20 Q. And currently, it's one day a month?
21 A. Approximately.
22 Q. You use a term in your affidavit, you refer
23 to "one uncomplicated episode of epistaxis."
24 A. Correct.
25 Q. Can you explain what that is?

Page 38

1  A. Nose bleed.
2  Q. Can you explain what Coumadin is?
3  A. Anticoagulant.
4  Q. Is that a prescription that you use in your
5  practice?
6  A. Correct.
7  Q. Is it a common prescription?
8  A. Correct.
9  Q. And what is an anti-coagulant to the layman,
10 to those of us who are not --
11 A. Inhibits blood clotting.
12 Q. Is it something that is typically used with
13 somebody who has an implanted defibrillator?
14 A. Not always.
15 Q. Is it common?
16 A. Is it commonly used?
17 Q. Yes.
18 A. That's hard to say. I don't know what you
19 mean.
20 Q. Is it something that you use on a regular
21 basis in your practice?
22 A. I had a significant number of patients
23 taking Coumadin, if that's what you mean. I don't
24 have a practice now.
25 Q. Forgive me. I appreciate the correction.

Page 39

1      Coumadin requires monitoring of medication
2  levels in the blood; is that true?
3  A. Requires the monitoring of a particular
4  clotting blood test.
5  Q. And what is that test?
6  A. Well, right now, it's called the INR test,
7  internal normalized ratio.
8  Q. I've also heard a term called a PT INR test.
9  A. Well, the PT is not really used anymore.
10 It's the INR. That's the most accurate test.
11 Q. You say that's internal normalizing --
12 A. I believe that's what it stands for,
13 internal normalized ratio.
14 Q. In layman's terms, what does that mean?
15 A. I don't know.
16 Q. Is it a test for determining the therapeutic
17 level of a particular drug in the bloodstream?
18 A. No. It's a test that monitors the
19 effectiveness of a particular medication, degree of
20 effectiveness.
21 Q. How is it typically reported?
22 A. It's a number.
23 Q. Is there a scale or a range that is
24 considered to be effective?
25 A. There's a therapeutic range, depending on

Page 40

1  what you're treating.
2  Q. Is the goal typically to keep the level,
3  the number, if you will, within that therapeutic
4  range?
5  A. Yes.
6  Q. And regular testing allows you to do that?
7  A. Yes.
8  Q. You can adjust the level of the medication,
9  if you will, prescription level?
10 A. Usually you can, yes.
11 Q. Was an INR test done regularly on Mr. Davis?
12 A. Yes.
13 Q. Once a month while he was at PCC?
14 A. I think sometimes he had them more than one
15 a month. I don't remember exactly. But my opinion,
16 it was regular.
17 Q. It was adequate, in any event --
18 A. Yes.
19 Q. -- as far as you're concerned.
20 A. Right.
21 Q. Were there instances where the measured
22 level of Coumadin in Mr. Davis' blood by the INR test
23 were out of the therapeutic range?
24 A. Minimally. I didn't notice anything that
25 was significant.

Page 41

1  Q. Did you notice instances where it
2  was outside the range?
3  A. Minimally.
4  Q. What do you mean by minimally?
5  A. Well, I think there was one reading, it was
6  1.9 instead of two. And there might have been another
7  one that was 3.5 instead of three. Not what I call
8  clinically significant.
9  Q. Ten percent or so out of the range, but not
10 clinically significant; is that your term?
11 A. Correct.
12     MS. KAMM: I think 1.9 instead of two is
13 not -- it's five percent.
14     THE WITNESS: About five percent.
15 BY MR. MATTHEWS:
16 Q. Right you are. 3.5 instead of two --
17 A. A little over ten percent.
18 Q. -- is a little over ten percent, right?
19     MS. KAMM: I'm sorry. What was your last
20 question?
21     (Record read.)
22     THE WITNESS: Instead of three.
23     MR. MATTHEWS: I'm sorry. Instead of three.
24 I misspoke.
25     MS. KAMM: I wasn't sure.

Page 42

1  BY MR. MATTHEWS:
2      Q. The range is two to three, right?
3      A. **In this particular patient, the goal was two**
4  **to three, correct.**
5      Q. I've messed up that whole area. Let me just
6  see if I can straighten this out.
7      A. **Yeah.**
8      Q. The therapeutic goal for this particular
9  patient was a range of 2.0 to 3.0, correct?
10     A. **Correct.**
11     Q. And there were instances where the measured
12 level of Coumadin was below 2.0, 1.9 in at least one
13 instance, right?
14     A. **Yes.**
15     Q. And there were also at least one instance
16 where it was high --
17     A. **3.5.**
18     Q. -- 3.5, correct?
19     A. **Right.**
20     Q. Those two numbers, 1.9 and 3.5,
21 respectively, in your medical opinion, were still
22 within close enough range.
23     A. **As long as you're monitoring regularly, I**
24 **think they're okay, yes.**
25     Q. Were you aware, Dr. Luban, that when

Page 43

1  Mr. Davis was first taken into State custody his
2  private physician had recommended monitoring tests be
3  done every two weeks?
4      A. **Was I aware or am I aware now?**
5      Q. Well, you weren't here at the time. So are
6  you aware now?
7      A. **I'm not aware, no.**
8      Q. Do you know whether or not medical records
9  were collected from Mr. Davis' private physicians --
10     A. **I think they were.**
11     Q. -- private physicians and hospitals?
12     A. **Yes, I believe they were.**
13     Q. Including records relating to his implanted
14 defibrillator?
15     A. **Yes.**
16     Q. From Virginia Mason?
17     A. **Yes, I believe so.**
18     Q. And also from his private physician in
19 Haines?
20     A. **I believe so.**
21     Q. Is it fair to say, Dr. Luban, that Mr. Davis
22 was not your typical patient -- excuse me -- typical
23 inmate?
24     A. **That's not fair to say. You don't have a**
25 **typical inmate.**

Page 44

1      Q. Is it fair to say that he came to State
2  custody with more than a typical level of medical
3  problems?
4      A. **More than -- yes, that's fair to say.**
5      Q. Not common to have somebody arrive in State
6  custody with an implanted defibrillator, is it?
7      A. **Not common, no.**
8      Q. In the almost two years that you have been
9  the medical director, can you think of any other
10 prisoners who have arrived in State custody with an
11 implanted defibrillator?
12     A. **I honestly don't keep track of that. So I**
13 **don't know. I can't answer that question.**
14     Q. As you sit here today, can you think of
15 anybody else?
16     A. **No, I can't.**
17     Q. As a medical practitioner, would you agree
18 with me that the medical needs of a 70-year-old man
19 with an implanted defibrillator are different than
20 that of the average population?
21     A. **Yes.**
22     Q. Greater medical needs?
23     A. **Usually.**
24     Q. Requires greater medical monitoring?
25     A. **Usually.**

Page 45

1      Q. Mr. Davis had quite a number of
2  prescriptions that he was taking while he was in State
3  custody, correct?
4      A. **Yes.**
5      Q. The Coumadin was dispensed to him, correct?
6      A. **Coumadin was what?**
7      Q. Dispensed to him. It wasn't something --
8      A. **I believe it was called keep-on-person, yes.**
9      Q. That was going to be my question. There
10 were a number of mediciations that he had on a
11 keep-on-person basis.
12     A. **I'm not positive about that, but I believe**
13 **it was.**
14        **No. I could be wrong. I honestly -- to be**
15 **honest with you, I don't know how the Coumadin was**
16 **handled. It may not have been KOP.**
17     Q. As an acronym, I've seem SM-ML.
18     A. **That would be the med line, the**
19 **Self-Medication - Med Line. I believe that's what**
20 **that stands for.**
21     Q. So if Coumadin were given to him on an SM-ML
22 basis, according to the medical records, then he would
23 have to come to the med line?
24     A. **Yes.**
25     Q. What's your understanding of how the med

Page 46

1  line works at Palmer?
2  A. I don't have any understanding of how it
3  works.
4  Q. Is -- strike that.
5  Does the med line come under your
6  supervisory control in any way?
7  A. Everything in inmate health comes under my
8  supervision.
9  Q. Is the med line part of inmate health?
10  A. Yes.
11  Q. You don't know how -- physically how it
12  works --
13  A. No.
14  Q. -- in Palmer?
15  A. No.
16  Q. If an inmate is told med line is over for
17  the day, you lose, you don't get your meds today,
18  would that be acceptable medical treatment, as far as
19  you're concerned?
20  A. I'd have to know more about the
21  circumstances. I can't answer that.
22  Q. As a physician, would that be the type of
23  medical treatment you would condone?
24  A. I'm not going to answer that question. I
25  don't know the circumstances. That's a blanket

Page 47

1  statement that's obviously got -- has a lot more to it
2  than that. I'm not going to answer that.
3  Q. Do you understand the question?
4  A. I do, but --
5  Q. You just don't want to answer?
6  A. I don't think you've given enough
7  information for me to answer that question.
8  Q. Let me give you the hypothetical this way:
9  Med line in the evening has a number of inmates lined
10  up. Time comes for lockdown. And the CO who's
11  dispensing meds at that time says med line is over
12  now. Those of you that don't have your meds don't get
13  your meds today, and cuts the line behind a specific
14  inmate. Everybody else goes back to their cells.
15  Would that be acceptable medical treatment?
16  A. From what you're describing, it does not
17  sound acceptable.
18  Q. Have you ever heard such a complaint?
19  A. No.
20  Q. Are there any instances that you can think
21  of, Dr. Luban, where that would be an acceptable
22  practice?
23  A. There might be a security issue. Like I
24  say, this is very complicated.
25  Q. Sure. I understand security. I mean, if

Page 48

1  you've got a crisis --
2  A. I mean, these are prisoners we're talking
3  about. And they have difficult situations. So who
4  knows what could be happening at that time.
5  Q. Absent a security issue with the prisoners,
6  can you see any medical justification for that?
7  A. Doesn't sound like it.
8  Q. In the med line medications are given out by
9  COs; is that right?
10  A. At some of our facilities when there's no
11  nurse around, I believe that's the case.
12  Q. Including Palmer?
13  A. I don't know how they do it there.
14  Q. Do you know whether the COs that are
15  actually giving out medications in the med line are
16  given any special training?
17  A. Yes. I believe there is -- there is med
18  line training.
19  Q. Do you know what's entailed in that?
20  A. Well, we have a nurse from our Central
21  Office that goes out to the facilities and gives
22  training, but I'm not sure exactly what it involves.
23  Q. Do you know who that nurse is?
24  A. Joyce DeGroot.
25  Q. Last name?

Page 49

1  A. Joyce DeGroot, D-e, capital G-r-o-o-t.
2  Q. Do you know if she was the person who was
3  doing med line training in 2002?
4  A. I don't know.
5  Q. Do you know if there had been any changes to
6  the way med lines were run since 2002?
7  A. I have no idea.
8  Q. Have you instituted any changes to the way
9  med lines are run since you came onboard?
10  A. No.
11  Q. Have you instituted any changes to the way
12  prescriptions are given out at all since you came
13  onboard?
14  A. The way prescriptions are given out or
15  medications are administered? I'm not sure what your
16  question is.
17  Q. The way medications are administered.
18  A. Have I instituted any changes? Not that I'm
19  aware of.
20  Q. Would you agree with me, Dr. Luban, that
21  Mr. Davis was a prisoner who had significant medical
22  needs?
23  A. Yes.
24  Q. Serious medical needs?
25  A. He had serious medical problems.

Exhibit 11
Page 13 of 14

13 (Pages 46 to 49)

Page 50

1  Q. He had serious medical problems when he came
2  into State custody, right?
3  A. **He had a history of serious medical illness,**
4  **yes.**
5  Q. And if not properly monitored, he was at
6  significant risk, wasn't he?
7  A. **Correct.**
8  Q. In fact, life-threatening?
9  A. **Could be.**
10 Q. He had a serious heart condition, right?
11 A. **Correct.**
12 Q. And if not properly monitored, he could die,
13 right?
14 A. **That would be a stretch, but yes.**
15 Q. He had suffered cardiac arrests before?
16 A. **Yes.**
17 Q. And was at significant risk for further
18 cardiac problems?
19 A. **I would say so.**
20 Q. That's why he had an implanted
21 defibrillator, right?
22 A. **I believe so.**
23 Q. And you don't get those unless you've got a
24 serious heart condition, right?
25 A. **I believe so.**

Page 51

1      MR. MATTHEWS: Okay. Thank you, doctor. I
2  appreciate it.
3      MS. KAMM: Thank you.
4          (Whereupon, the deposition was
5          concluded at 3:09 p.m.)
6  (Signature pending.)

Page 52

1              CERTIFICATE
2
3      I, SUSAN CAMPBELL, Certified Shorthand
4  Reporter and Notary Public in and for the State of
5  Alaska, do hereby certify that the witness in the
6  foregoing proceedings was duly sworn; that the
7  proceedings were then taken before me at the time
8  and place herein set forth; that the testimony
9  and proceedings were reported stenographically by
10 me and later transcribed by computer transcription;
11 that the foregoing is a true record of the
12 testimony and proceedings taken at that time;
13 and that I am not a party to nor have I any
14 interest in the outcome of the action herein
15 contained.
16     IN WITNESS WHEREOF, I have hereunto set
17 my hand and affixed my seal this _____ day
18 of _____ 2006.
19
20
21     _____
22     SUSAN CAMPBELL, CSR
       My Commission Expires 4/26/08

Page 53

1              WITNESS CERTIFICATE
2  RE: Davis vs. Hyden, et al.
   CASE NO.: A02-0214 CV (JKS)
3  DEPOSITION: Henry Luban, M.D.
   DATE TAKEN: April 27, 2006
4
   I hereby certify that I have read the foregoing
5  deposition and accept it as true and correct, with
   the following exceptions:
6
   Page  Line    Description/Reason for Change
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21
22     SIGNATURE        DATE
23 Please sign your name and date it on the above line.
   (As needed, use additional paper to note corrections,
24 dating and signing each page.)    (SC)
25