Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)

DEPOSITION OF ZELMER HYDEN

THURSDAY, APRIL 27, 2006, 9:28 a.m.

Anchorage, Alaska

Exhibit 12
Page 1 of 12

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF ALASKA
 3
 4   CHARLIE J. DAVIS, JR.,
 5        Plaintiff,
 6   vs.
 7   ZELMER HYDEN, et al.,
 8        Defendants.
     _____)
 9
     NO: A02-0214 CV (JKS)
10
11
12
13        DEPOSITION OF ZELMER HYDEN, taken on behalf
14   of Plaintiff, Pursuant to Notice, at MATTHEWS &
15   ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16   before Susan Campbell, Certified Shorthand Reporter
17   for Alaska Stenotype Reporters and Notary Public for
18   the State of Alaska.
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2   EXAMINATION BY:                          PAGE
 3     Mr. Matthews                            5
 4
 5              E X H I B I T S
 6   NUMBER                                   PAGE
 7   1  Palmer Correctional Center Staffing -   17
        1 page
 8
     2  Responses to Discovery Requests - 16    27
 9      pages
10   3  Verification - 1 page                   29
11   4  Prisoner Grievance - 4 pages            47
12
```

Page 3

```
 1           A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:   MATTHEWS & ZAHARE
                      BY: THOMAS A. MATTHEWS
 4                    431 West Seventh Avenue
                      Suite 207
 5                    Anchorage, AK  99501
 6
     For Defendants:  STATE OF ALASKA
 7                    ATTORNEY GENERAL'S OFFICE
                      Department of Law
 8                    Criminal Division
                      BY: MARILYN J. KAMM
 9                    P.O. Box 110300
                      Juneau, AK  99811
10
     Reported By:     Susan Campbell
11                    Certified Shorthand Reporter
```

Page 5

```
 1   ANCHORAGE, AK, THURSDAY, APRIL 27, 2006, 9:28 a.m.
 2                    ZELMER HYDEN,
 3        called as a witness on behalf of the
 4        Plaintiff, having been duly sworn upon
 5        oath by Susan Campbell, Notary Public,
 6        was examined and testified as follows:
 7                    EXAMINATION
 8   BY MR. MATTHEWS:
 9        Q.  Would you state your name for the record,
10   please?
11        A.  Okay.  First name is Zelmer, Z-e-l-m-e-r.
12   Last name is Hyden, H-y-d-e-n.
13        Q.  Could you give us an address, please?
14        A.  P. O. Box 536, Sutton, Alaska 99674.
15        Q.  Do you have telephone number out there?
16        A.  746-0336.
17        Q.  How long have you lived in Sutton?
18        A.  Oh, about seven, eight years.
19        Q.  Ever had a deposition taken before?
20        A.  Negative.
21        Q.  Let me tell you briefly then just a couple
22   of the ground rules.  I'm going to try and ask
23   questions clearly and intelligently.  Sometimes I do.
24   Sometimes I don't.  If you don't understand my
25   question for any reason, please let me know and I'll
```

Page 30

1  individual who would be in charge?
2     A.  I really don't know how to answer that.  I
3  know that Hughes and Hale were the two PAs.  I would
4  have to say those two.  Now, they work a week on and a
5  week off, because they cover 12 hours.  And so I
6  couldn't answer specifically.  Maybe Mel Henry or the
7  people -- but I would say if I had to give you an
8  answer, it would be Hale and Hughes and not one or the
9  other.  They were equals, as I understood.
10    Q.  They didn't work at the same time, right?
11    A.  No.
12    Q.  So Hale and Hughes were working 12-hour
13 shifts what, seven days a week?
14    A.  Yes.
15    Q.  And that shift would have run during the
16 daytime?
17    A.  They would have been there daytime hours,
18 correct.  And I don't know what the specific hours
19 were.
20    Q.  7:00 to 7:00 or something like that?
21    A.  Yeah, something like that.
22    Q.  And how about the nurses that are listed
23 underneath there, do you know what kind of shifts they
24 would have run?
25    A.  You know, medical staff changed a couple of

Page 31

1  times.  And I'm not sure.  But as what I remember is
2  they also worked a week on and a week off.  So there
3  was a nurse there for 12 hours.  And then there was --
4  there were -- and I don't know exactly what their
5  hours were.
6     Q.  During 2002 can you tell me how many medical
7  staff would typically be on duty during the daytime?
8     A.  During the daytime?  That building was a
9  good ways from my office.  Usually when I would go
10 over there, you would always see a PA during the day,
11 at least one nurse.  And, of course, the dental people
12 was right adjacent to them.  There would usually be
13 two dental people there.
14    Q.  So a PA and a nurse --
15    A.  So you'd see -- as a rule, you'd see a nurse
16 and a PA.
17    Q.  How about during the nighttime hours?
18    A.  During the nighttime hours, it was my
19 understanding that they had their shifts set to where
20 they could do the last med pass; however, there were
21 some inmates that might have had meds later in the
22 evening.  And it's my understanding that in some
23 cases, inmates were allowed to carry these meds and do
24 self-administration of their own drugs.
25        And probably in some cases -- and I don't

Page 32

1  know which ones -- the officers might pass out already
2  packaged and -- you know, this inmate gets this out of
3  this packet at this time.  And those officers had some
4  training to do that.  Every officers didn't do it.
5  There was only a few that had that specific training
6  to handle that in the times when medical wasn't there.
7     Q.  Are you talking about correctional officers?
8     A.  Correct.
9     Q.  Do you know who the correctional officers
10 were that had that training during 2002?
11    A.  I wouldn't try to guess.  It's too far.
12    Q.  Were those officers who reported to you?
13    A.  They reported to their shift supervisor who
14 reported to the assistant superintendent who reported
15 to me.
16    Q.  So typically, then, during 2002, was there a
17 medical person on duty during the evening hours,
18 nighttime hours?
19        MS. KAMM:  And what are the nighttime hours?
20 BY MR. MATTHEWS:
21    Q.  7:00 p.m. to 7:00 a.m.
22    A.  There was a period of time when there was
23 not medical people on-site.  Okay.  I don't know what
24 time that was.  I don't know what their hours were.
25 Couldn't even begin to guess.  But there was a period

Page 33

1  of time where if there's an emergency, you need to
2  call the ambulance or the PAs were on-call, you know,
3  they -- they had a State car and were to, boom, here
4  we come.  So that was how it was done.
5     Q.  Who set those shifts?
6     A.  I'm -- I have to assume.  And I do not know
7  the answer to that.  I assume Mel Henry.  It certainly
8  wasn't me.
9     Q.  Is it fair to say then that during a 24-hour
10 day, typically, during 2002, there was a period of
11 time where there was no medical person physically
12 on-site?
13    A.  Physically on-site?
14    Q.  Physically on-site.
15    A.  That is probably correct.
16    Q.  The daytime hours would be predominantly
17 covered, but not the night?
18    A.  The daytime hours, there would be somebody
19 there, yes.
20    Q.  But during the nighttime hours --
21    A.  And I do know that even through that last
22 pill pass at like 6:00, you know, around meal time,
23 they were there.  What time that they left, I do not
24 know.
25    Q.  And that was -- that would be a better

Exhibit 10
Page 3 of 10

Page 34

1  question for Mel Henry?
2     A.  Exactly.  Because I could try to answer
3  something regarding their staffing and stuff, it would
4  be in error.  I really -- because they didn't work for
5  me specifically, there was a lot I did not know.
6     Q.  And that's fair enough.  I'm not looking for
7  your guess.  Just if you know the answer, please tell
8  me.
9        You mentioned that there were some of the
10 COs who were trained to give out medication.
11    A.  Yes.
12    Q.  And you don't know the names, offhand?
13    A.  I don't have a clue.
14    Q.  Do you know what training they had?
15    A.  The -- I believe they got the training from
16 the people at Central, the pharmacists, et cetera,
17 et cetera, who would actually know how to do this.
18 And that's an assumption on my part.  But I do know
19 they received training.  And I'd have to say I don't
20 know who did it, who did the training.  I would assume
21 it was the Central people.
22    Q.  Or what it consisted of?
23    A.  Or -- I don't know what it consisted of.  I
24 have no idea.
25    Q.  Again, do you think that's a better question

Page 35

1  to ask Mel Henry?
2     A.  Absolutely.
3     Q.  Let me ask you about Charlie Davis.  Do you
4  remember Mr. Davis?
5     A.  I remember Mr. Davis.
6     Q.  Do you remember what contact you
7  individually had with Mr. Davis?
8     A.  I remember seeing him on the grounds.  And
9  the reason I remember him -- and I could be in error.
10 It could be someone else.  But I remember an
11 individual who had a cane.  And never had a problem
12 with him or anything of that nature.  But an inmate
13 with a cane kind of sticks out in my mind.
14    Q.  And you're assuming that that's Mr. Davis?
15    A.  I have to assume that, yes.
16    Q.  Why is it that you make that assumption?
17    A.  Because that's -- that's in my memory as of
18 four years ago.  And you have to remember, you know, I
19 got 500 inmates there.  Does this one have a hangnail?
20 Does this one have this?  Does this one have that?
21 When you go around inspections on Friday, that's when
22 you actually get to see the prisoners and have
23 interactions with them.  The rest of the time, the
24 administration building is, you know, a couple blocks
25 away from the facility.

Page 36

1        So a superintendent's contact, actual
2  contact with a prisoner, you would have to actually go
3  to, whether it be medium facility or minimum facility,
4  to have contact.  And usually, I would have some
5  contact with different prisoners on Friday.  And that
6  was during the inspection.
7     Q.  Just so that I'm clear in understanding, you
8  said that there's medium facility and a minimum
9  facility.
10    A.  Right.
11    Q.  I take it Palmer is structured -- there are
12 physically different buildings on the grounds, right?
13    A.  Yes, yes.
14    Q.  And what are those different buildings
15 called?
16    A.  Okay.  There's the administration building.
17 And it is -- is by itself.  Then there's Palmer
18 Minimum, which consists of a number of buildings.
19 It's an area that is not fenced.  There are minimum
20 custody inmates.  And there's -- with minimum comes
21 several shops, you know, for prisoners to work in,
22 auto shops, the ACI shop that we talked about up here
23 in this org chart, the living -- big living unit.  And
24 then there was what we called the program building
25 where the cafeteria, education, medical, all these

Page 37

1  different areas was.
2        And then within the confines of the fence
3  was the medium facility.  And there were -- it was --
4  it was made up of seven houses.  And in the main
5  building, which had the gym, the dining room,
6  et cetera, medical and so -- there was numerous
7  buildings.  I'd have to sit here and -- there's a lot
8  of them.
9     Q.  Your office was in a separate administration
10 building, right?
11    A.  I was in the administration building, yes.
12    Q.  Was that inside or outside the fence?
13    A.  Outside the medium fence.  Minimum doesn't
14 have a fence.
15    Q.  Where was Mr. Davis housed?
16    A.  They all go to medium when they first
17 arrive.  And once again, I may not be sure who
18 Mr. Davis is.  I believe -- and you can't hold me to
19 this -- I believe he also went to minimum as well --
20    Q.  Okay.
21    A.  -- from medium, which would be a
22 progression, you know, if your custody allows it.  You
23 always go to medium until we get to know a little bit
24 about the prisoner and make sure he's not the new
25 Charles Manson or something.  And then if they are

Exhibit 4 of 10
Page 4 of 10

Page 38

1  doing fine, then as the classification merits, they
2  can go on across the street.
3      Q. So your memory of Mr. Davis, if it's the
4  person you're thinking of, is seeing him out in the
5  yard walking with a cane.
6      A. That's the memory that I have of Mr. Davis,
7  if I'm correct.
8      Q. The individual that you are picturing, can
9  you describe him other than a cane?
10     A. Sandy hair, if I remember correctly.
11 Probably about my height. Wasn't a very large fellow.
12     Q. How tall are you, just so we're clear?
13     A. Five seven and a half, maybe, five eight.
14 Seems like he might have walked with a limp. That's
15 about the best I can do for you.
16     Q. Beard, facial hair?
17     A. Don't know. Don't know.
18     Q. Other than the observation of an individual
19 with a cane, do you remember any individual contact
20 that you had with Mr. Davis?
21     A. I don't recall any contact with Mr. Davis
22 other than just seeing him in the yard and when he
23 filled out the grievance, you know, and --
24     Q. Which we'll get to in a moment.
25     A. That's probably about it. We could have had

Page 39

1  some contact. Because, usually, when you're doing
2  your inspections, you know, all the inmates -- they
3  call it leg time, you know, that they -- it's, you
4  know, how about my furlough? How about this? How
5  about that, you know? It's not uncommon to be
6  approached by an inmate. And I like to talk to
7  inmates and hear their side of things. So whether I
8  did with him, I do not know.
9      Q. Explain the inspections to me then, so I
10 understand that.
11     A. An inspection, on Friday, to maintain
12 cleanliness in the facility, the superintendent would
13 go throughout the entire facility, each and every
14 room, and make sure that the cleanliness standards
15 were being adhered to.
16        And we kind of made a contest out of it. So
17 the house that wins gets whatever, you know, ice cream
18 or something like this. And it kind of became a
19 competitive thing with the inmates, you know, to keep
20 their house clean. But an inspection was to go
21 throughout the whole facility.
22     Q. And I take it there are records kept of
23 those inspections. Do you make notes as you're going
24 through, anything like that?
25     A. Yes. You make notes as you're going

Page 40

1  through. Each room is graded. And how long they
2  would keep those, I don't know.
3      Q. If you had contact with an inmate during
4  that inspection process --
5      A. Would it be written down?
6      Q. Yes.
7      A. No.
8      Q. If an inmate raised questions or problems
9  with you during that inspection, would that be written
10 down?
11     A. No.
12     Q. And I take it as you sit here today, you
13 don't have any specific memory of talking with Charlie
14 Davis during an inspection.
15     A. I do not have a specific memory of talking
16 to Mr. Davis, no.
17     Q. You mentioned earlier that you have roughly
18 500 inmates at Palmer.
19     A. Uh-huh.
20     Q. Is that a pretty steady population number?
21     A. Let's see. Let's get the actual number,
22 since we want to be accurate here. There was 176 and,
23 oh, around 250 to 270. What's those two numbers add
24 up to? Some math wizzard here.
25     Q. Looks closer to four and a quarter to me.

Page 41

1      A. Okay. Let's say four and a quarter.
2      Q. Okay. And 176 and 250 to 270, explain what
3  those numbers are.
4      A. Okay. One seventy-six was the population at
5  the minimum facility. That was capacity. And the
6  medium facility could fluctuate.
7      Q. Between 250 and 270; is that correct?
8      A. That is correct.
9      Q. What was capacity for the medium facility?
10     A. About 270. That's a difficulty. Because,
11 you know, do you count the seg beds? Do you count
12 whatever? But actual housing unit beds, about 270.
13     Q. And when you say "seg beds," what is that?
14     A. Segregation unit, there was ten there. And
15 then there's another issue that was the medical
16 infirmary. And they had four beds. In Corrections,
17 we count beds.
18     Q. Okay. How many total beds did you have at
19 Palmer? Sounds like about 450.
20     A. Yeah, about 450.
21     Q. Okay. When an inmate first comes into
22 Palmer, do they have any kind of interaction directly
23 with you, an interview or anything like that?
24     A. No. That's not even real to think that.
25 There was a time -- in fact, about this time, the

Page 42

turnover was like -- the average stay was 15 days.
Q. At Palmer?
A. At Palmer at that particular time. It was -- it was really busy. And we'd receive 20, 30 inmates a day. And then -- and they'd be replacing inmates who had been furloughed or being released. And to see 30 inmates a day and be a superintendent, that's not real.
Q. Why was the turnover so high during that time period?
A. At that particular time, if I remember correctly, it's just before the Anchorage Jail opened. And we were kind of backed up. And as soon as the jail opened, that housing crisis subsided. But this is just before it was -- it was the population, the prison population was so large.
Q. Is it fair to say that Palmer at that time was being used as a pretrial facility?
A. There were pretrial inmates at Palmer, but we housed them separately. Remember, we had individual housing. We would have to house them separately.
Q. Okay.
A. But yes, we were accepting overflow from the pretrial facilities. And that would account for the

Page 43

high turnover.
Q. That was what I was wondering. I mean, when you were talking about 15 days, that doesn't seem --
A. It was just -- it was just wild.
Q. At some point Mr. Davis filed a grievance, correct?
A. Correct.
Q. And you were involved in that grievance process in some way?
A. I am the one, as the acting superintendent, who would look at the investigator's findings and then make my comments before it's returned to the inmate.
Q. Would that be true for all grievances?
A. Yes.
Q. How many grievances do you typically process?
A. Oh, there are some inmates that will file one every day. There's some inmates that will file three a day. And you take 400 inmates, you know, it's really -- two or three inmates can file 15 grievances a day.
    But as a rule, we didn't have that many. Probably -- seems like I'd probably look at ten, maybe ten a month.
Q. Okay. Does Mr. Davis' grievance stand out

Page 44

for you in any way --
A. (Witness shakes head.)
Q. -- other than the fact that you're here today?
A. Other than that I'm here today, had to get up early, no.
Q. Explain the grievance process from your perspective then to me.
A. Okay. A prisoner who has a grievance, the first thing he does is he files a cop-out, which is an informal grievance or an informal request. He has a problem. You know, his food wasn't hot enough or whatever. So he fills this out. And it goes to the staff, who would -- it would be, you know, their issue. And they will write on their cop-out and return it to him. Okay?
    If he's not satisfied with that, then his next step would be a grievance. And he would complete the grievance. The grievance monitor or compliance sergeant would pick up this grievance. The grievance is logged. And then the compliance sergeant would assign an investigator to the grievance.
    In a case of a medical grievance, it would go to medical staff. None of the COs could address these medical issues. So it would go to the medical

Page 45

staff. They would address the grievance. And there's a time frame in here. And I couldn't recall what these time frames are. But there's time frames that we have to respond and get the grievance back to the prisoner.
    Then the grievance goes -- after the investigation, the compliance sergeant picks it up. He brings it to me. And then from there, the prisoner will look at the grievance and he's satisfied -- you know, it may be something that -- you know, a lot of them are frivolous, you know, and it doesn't go anywhere. But there's some that, well, maybe we should look at this. So changes would be made or whatever. Or a particular inmate's issue is addressed.
    The inmate will review the grievance after everyone has done their thing. And he will either, I'm satisfied, or he wishes to appeal what we have stated. And if he wishes to appeal, then an appeal statement is filed to the director, or in the case of medical, to the medical people at Central Office. And then they would make their ruling or investigation, whatever you choose to call it. And then it would come back to the prisoner.
    If the prisoner is still unhappy with this,

Page 46

1  thus we're here. It goes to court. He can go to
2  court with it.
3      Q. So your involvement in the process would be
4  after the grievance is filed, beyond the cop-out
5  stage, right?
6      A. Uh-huh.
7      Q. So if the cop-out resolves it, you don't get
8  involved at all.
9      A. Exactly. If the prisoner is happy and
10 something was wrong, it's fixed, all is good.
11     Q. If it goes to the grievance, you review
12 every grievance that's filed.
13     A. I review every grievance that's filed, yes.
14     Q. And the compliance officer would be the one
15 who would assign it in the initial instance for
16 investigation.
17     A. Right.
18     Q. Right? Do you remember, as you sit here
19 today, your involvement in Mr. Davis' grievance?
20     A. I -- I -- I remember, you know, when I seen
21 the grievance, I -- I remember the grievance. And,
22 you know, a lot of times, you'll deal with the
23 grievance or whatever, the responses are made, it's
24 all resolved and you've never seen the inmate. You're
25 dealing with a piece of paper.

Page 47

1      Q. So in terms of your specific memory today,
2  you remember that there was a grievance. Do you
3  remember the specifics of it at all?
4      A. Well, I've looked at the grievance recently.
5  That could cloud my -- but I think I do remember the
6  grievance.
7      Q. Okay. When did you look at the grievance
8  recently?
9      A. Actually, when I received this to sign, I
10 started looking to find out what in the world have I
11 done, you know. And I probably looked at it then.
12 And then -- and then I thought this was resolved. And
13 so then I've looked at it again recently in the last
14 couple days, because we're here.
15     Q. Just so that I'm clear, you were pointing at
16 some papers. So you looked at the grievance, it looks
17 like, around the time that you signed the
18 interrogatory responses in January of 2005.
19     A. Correct.
20     Q. And then more recently, just in getting
21 ready for the deposition.
22     A. Uh-huh.
23     Q. Is that right?
24     A. That is correct.
25        (Exhibit 4 was marked.)

Page 48

1        MR. MATTHEWS: Let me show you what we've
2  marked as Exhibit 4.
3        THE WITNESS: Can we take a short break
4  before we go on to Exhibit 4?
5        MR. MATTHEWS: Sure. Off record.
6        MS. KAMM: I could use a break, too.
7        (Brief recess.)
8  BY MR. MATTHEWS:
9      Q. We've put in front of you, Mr. Hyden,
10 Exhibit 4. Ask you if you recognize that document.
11     A. Okay. Yeah. Exhibit 4 is the grievance
12 filed by Charlie Davis.
13     Q. And this exhibit consists of four pages,
14 which I think is taken from the entire grievance
15 packet. What I want to see if I can understand is
16 what your part in that grievance was.
17     A. Okay. Briefly, the prisoner writes down his
18 grievance, which he -- he has done so. And then he
19 requests what his relief is. And he has done so.
20 It's dated and it's signed. And then Mr. -- or the
21 compliance sergeant would assign it to someone to
22 investigate.
23        In this case, it appears it had been
24 assigned to Mr. Hale. And Roger Hale had -- what it
25 states is "The issue of manning/staffing cannot be

Page 49

1  addressed at this level. I spent about 20 minutes
2  explaining how he can access medical (that is not
3  (sic) available at PCC)." And that was Mr. Hale's
4  response.
5        After Mr. Hale would have responded, the
6  compliance sergeant would get the grievance and bring
7  it to me for my review. And I would review the
8  grievance, look at Mr. Hale's response and then write
9  down my findings.
10       I'm not a medical person. I have to depend
11 heavily on what medical tells me. So thus, I wrote
12 "The above investigation does not address the
13 prisoner's grievance. Perhaps prisoner should be
14 transferred to facility with full time medical staff
15 to accommodate 'life threatening' condition." That
16 was my response.
17       And then after that, the prisoner would
18 review it. Now, this grievance has some alter- -- is
19 altered to the one that I had. Whether he was
20 satisfied, et cetera, is not on the one I have. And
21 the last block where it says I am satisfied with
22 response or not, this one is not completed at all.
23     Q. And you're looking at the second page of
24 Exhibit --
25     A. The second page, right.

Page 50

1  Q. -- of Exhibit 4, the bottom block that says
2  "Prisoner's Response"?
3  A. Right.
4     MR. MATTHEWS: I don't have the original of
5  this, so --
6     MS. KAMM: I think I've got the original.
7  I'll take a look at it when I get back to the office.
8     MR. MATTHEWS: Okay.
9     MS. KAMM: I'll fax it to you if we've
10 got --
11    THE WITNESS: And I would have to assume the
12 original is going to be checked, I do intend to appeal
13 to the Director of Institutions or Medical Director,
14 which that was done. And then page three of what
15 we're looking at here is the Prisoner Grievance Appeal
16 Statement. And this would be what the prisoner wrote
17 to the medical director. And then the medical
18 director's response is the last page.
19 BY MR. MATTHEWS:
20 Q. Okay. Is it fair for me to conclude that
21 your involvement, your specific involvement in this
22 grievance, would have been to review Mr. Hale's
23 findings and determination and to sign off on the
24 grievance as you did on the second page?
25 A. That is correct.

Page 51

1  Q. You made the comments that the investigation
2  did not address the grievance and perhaps he should be
3  transferred to a different facility, right?
4  A. Correct.
5  Q. Beyond that, did you have any involvement in
6  this grievance?
7  A. None. Now, there could have been a time
8  when in one of these meetings, Mr. Davis' issues, I
9  would have been made aware of his issues. Probably --
10 I don't know when the time frame was when I was made
11 aware of his -- if I receive a prisoner at medium, I'm
12 not aware that he has a bypass or a defibrillator or
13 anything of this nature until someone makes me aware
14 of it. And I would assume that probably about the
15 time this grievance was filed is when I would have
16 been made aware of Mr. Davis' issues with medical.
17 Q. Is it fair to say that Mr. Davis' grievance
18 was for inadequate medical care?
19 A. I -- I disagree with that.
20 Q. You disagree that that's what he was
21 complaining about?
22 A. Say the question again. Maybe I
23 misunderstood you.
24 Q. Is it fair to say that Mr. Davis' grievance
25 was essentially that he didn't like the medical care

Page 52

1  he was getting at Palmer, didn't think it was
2  adequate?
3  A. He -- he probably thought that, yes.
4  Q. Okay. I'm not asking whether you agree that
5  the care --
6  A. Okay. Yes.
7  Q. -- was inadequate.
8  A. Because in my opinion, the grievance is very
9  confusing. Okay?
10 Q. All right. Let me ask you this then: How
11 did you interpret Mr. Davis' grievance when you
12 received it?
13 A. Well, I read it and I was like -- I
14 really -- you know, because there's a number of things
15 you could read into this. And I read it. And then I
16 read what Mr. Hale had -- you know, who had talked to
17 him for several minutes. And I -- I thought -- I
18 thought Mr. Hale should have been a little more
19 specific in these times, actually put something
20 specific down here. This is the reason that I wrote
21 what I wrote.
22    To me as a superintendent, to say I spent 20
23 minutes how he could access medical in a document like
24 this, I would like to see written out, you do this,
25 you do this, you do this and you do this. Okay? And

Page 53

1  that wasn't done. So that was thus part of my
2  response.
3  Q. Your conclusion was that the -- that
4  Mr. Hale's response was inadequate.
5  A. Yes. I wanted him to give -- because if a
6  prisoner files a grievance -- and I might add here, I
7  was the compliance sergeant at Mat-Su Pretrial and
8  dealt with these regularly. So I'm very familiar with
9  the grievance process.
10    I just really like -- when an inmate is
11 upset enough to file a grievance, address his issues.
12 If they're frivolous, they're frivolous. But address
13 his issues in that grievance. And I just would like
14 to have seen specific things written out, you know,
15 rather than I spent 20 minutes talking to him.
16 Q. You didn't feel Mr. Hale's response
17 addressed the grievance; is that true?
18 A. That's what I felt at the time, yes.
19 Q. And your suggestion was that perhaps
20 Mr. Davis should be transferred to a different
21 facility that had full-time medical care to
22 accommodate his life-threatening condition.
23 A. Possibly. And I put life-threatening
24 because -- and I'm going to assume here that at that
25 time I wasn't totally aware of Mr. Davis' issue,

Page 54

1  because I put life-threatening in parentheses -- or
2  quotation marks.
3     But actually, basically, I'm probably
4  inviting medical to look at this. And if this inmate
5  really feels this strongly, does he need to go to the
6  Anc Jail where there's a medical unit or something.
7  And if they feel he does not, they're the medical
8  staff. I'm not. It's their call.
9     Q. So once you make the suggestion that the
10 investigation that had been done to that point was
11 inadequate, does it go back to Mr. Hale for further
12 findings?
13    A. No.
14    Q. Why not?
15    A. Because in the process, it goes to
16 Mr. Hale's boss, the medical director. If what you
17 just asked, grievances would be bouncing around all
18 the time and we'd never get anywhere. So there has to
19 be a click, click, click, you know, the grievance
20 process is this. So, you know, it goes to Mr. Mel
21 Henry in this particular case. And then he gets the
22 final medical word on it.
23    Q. So whose decision is it to -- as to whether
24 or not Mr. Davis stays at Palmer or is transferred to
25 another facility?

Page 55

1     A. Okay. It would be my decision if it was a
2  security issue. Okay? If -- for example, if
3  Mr. Davis is beating up other inmates or doing
4  whatever and we find that in that particular
5  environment he cannot be controlled adequately, that
6  would be a security issue. And that would -- I
7  would -- you know, we need to look at classifying him
8  to a more secure setting.
9     In an issue with medical, I'm not a medical
10 person. I can't set here and say, well, I think his
11 medical issues are whatever. Transfer him. He would
12 be transferred by the medical people and it would be a
13 medical transfer.
14    Q. So essentially, once you're done with this
15 grievance, you're done.
16    A. I'm done.
17    Q. Because it's a medical grievance.
18    A. I'm done. And I wanted them to look at it
19 carefully. Make sure you make the right decision.
20 And I'm done.
21    Q. Did you ever follow up to see what action
22 had been taken?
23    A. I was too busy.
24    Q. So I take it that's a no.
25    A. That's a no.

Page 56

1     Q. Did you know what response was made to
2  Mr. Davis' grievance after you signed off on it on
3  June 27th, '02?
4     A. To be honest with you, I can't tell you
5  whether I reviewed this when it came back or not. I
6  do not know.
7     Q. And you're talking about the appeal portion.
8     A. The appeal from Mr. Mel Henry.
9     Q. So once Mr. Davis files his grievance, you
10 make your findings and recommendation, off it goes to
11 medical and you're done with it; is that fair?
12    A. In a medical situation, yes.
13    Q. You don't have any practice of following up
14 to see whether or not your recommendations or
15 suggestions were followed.
16    A. If I -- I would have a practice of doing so
17 if I felt it was warranted.
18    Q. Do you know --
19    A. If I feel medical has this under control --
20 because they're the medical professionals. I'm not.
21 I have to trust them. If they tell me everything is
22 okay, inmate's needs are being met, they are the
23 medical professionals. I'm not. I can't second guess
24 them.
25    Q. Did you get a report back from medical on

Page 57

1  Mr. Davis after that?
2     A. I don't recall.
3     Q. Do you know whether or not Mr. Davis felt
4  that his medical needs were being met after this
5  grievance was filed?
6     A. I didn't hear anything else about it, to my
7  recollection. So I have to assume that he was okay.
8     Q. Mr. Davis was 70 years old at the time this
9  grievance was filed?
10    A. Okay.
11    Q. Do you know?
12    A. I don't have a clue.
13    Q. Any idea how old he was?
14    A. I thought he was about 45.
15    Q. The individual that you described earlier
16 with the cane in the yard appeared to you to be about
17 45?
18    A. It's so long ago. He didn't seem to be 70
19 years old, if it's the person I'm thinking of.
20    Q. When Mr. Davis arrived in Palmer, at PCC, he
21 had an implanted defibrillator. Were you aware of
22 that?
23    A. No. There would be a point in time when I
24 would be aware, but it wouldn't be at his arrival, no.
25    Q. Were you aware of that at the time he filed

Page 58

1  his grievance?
2      A. Seems like it states so in the grievance.
3  And what kind of briefing I could have had from
4  medical regarding this, you know -- because I feel
5  certain that medical talked to someone, probably in
6  one of these meetings, about this individual and
7  closely monitoring him. But I can't -- it's been too
8  far back. I can't recall.
9      Q. When you say "these meetings," are you
10 talking about your daily briefings?
11     A. Correct.
12     Q. Prior to Mr. Davis' grievance, did you know
13 what an implanted defibrillator was?
14     A. Uh-huh.
15     Q. And how did you have that knowledge?
16     A. My ex-wife was a nurse. I knew quite a bit
17 about that.
18     Q. Did you understand that a person with an
19 implanted defibrillator by definition had a serious
20 heart condition?
21     A. Well, I would say my medical knowledge, I
22 have no formal training in medical. I -- I can't say
23 that I would understand anything about medical. I
24 haven't been trained in any medical other than CPR and
25 whatever. But vaguely, yeah, you'd have to assume if

Page 59

1  someone has something placed in their chest, yeah,
2  it's serious.
3      Q. Fair to say they would not have had the
4  implant if it weren't serious?
5      A. But also, I know people that have implants
6  and they're out working jobs and stuff and everything
7  is hunkey dorey. And they're doing whatever. So once
8  again, I'm not a medical staff. I don't know what
9  limitations a defibrillator could have. There's --
10 because I know a couple people with these kind of
11 things and they're living pretty much normal lives.
12 So I can't second guess that, no.
13     Q. Let me ask you this: At the time Mr. Davis
14 filed his grievance, did you have any personal
15 knowledge of what his medical condition was?
16     A. At the time he filed the grievance, probably
17 not.
18     Q. In your response to his grievance, did you
19 review any of his medical records to see what his
20 condition was?
21     A. I did not look at a medical record. What I
22 would probably do if I did so, something of that
23 nature, would be to call a PA, ask specific questions
24 for specific answers, you know. And I would be much
25 clearer on what I understood rather than go look at a

Page 60

1  medical record.
2      Q. Do you know whether or not you called PA
3  Hale --
4      A. Don't recall.
5      Q. -- in response to this greivance?
6      A. I feel that we probably had some
7  conversations regarding this individual, strictly
8  because of the grievance and it's medical. But I
9  can't recall those. It's been too long and too many
10 inmates. And I mean, I can't -- I can't specifically
11 remember.
12     Q. Would your actions or conversations with
13 Mr. Hale have been documented in any way?
14     A. Probably the only documented thing would be
15 the morning meetings. I can't -- every time I talk to
16 someone about an inmate's hangnail, I don't go
17 document that. That's just not real. I know what
18 you're asking, you know, but it's -- no, it wouldn't
19 have been documented other than what I would have
20 wrote here. You know, if I called him prior to
21 writing this -- and I don't remember a conversation.
22 I'm sure there probably could have been one, but it's
23 just too long ago and too much has happened.
24     Q. So you just don't remember at this point.
25     A. I don't remember at this point.

Page 61

1      Q. Is it fair to say, Mr. Hyden, that after
2  your written response to this grievance, you don't
3  have any memory of taking any other action with regard
4  to Charlie Davis?
5      A. None.
6      Q. Do you remember having any further contact
7  with a PA to inquire about Mr. Davis' status?
8      A. I don't recall anything.
9      Q. Do you remember contacting anyone else on
10 the medical staff to find out how Mr. Davis was doing?
11     A. No. That's something that if there's a
12 problem, they would come to me, you know. I can't --
13     Q. Is it fair to say that unless a problem is
14 brought to your attention, it's not something you're
15 going to go seek out?
16     A. Exactly.
17     Q. So follow-up would not have been part of
18 your routine.
19     A. No. If they was having a problem or
20 something, they would probably get ahold of me,
21 et cetera. But to sit there and think, I wonder if
22 this is working out, I should go check on this, you
23 know, you may have all kinds of things going. No, I
24 don't think I would have -- I would have waited for
25 them, you know, to give me some kind of indication

### Page 70

1  you know at 10:00 o'clock, I have to get my meds,
2  there's also what we call the boombox where master
3  control, you get on the big speaker and you go, you
4  know, meds are being passed at this time. And I mean,
5  everybody can hear it.
6        Now, if the prisoner doesn't show up, he
7  doesn't get his meds. Now, if it's something that's
8  life-threatening that he needs to have -- and I have
9  seen this happen -- medical would put him into medical
10 seg to assure that they could monitor him and he'd get
11 his meds.
12    Q. Okay.
13    A. Now, if you -- you know, if it was your
14 stomach medicine or something, you know, whatever -- I
15 mean, this would be something, you know, it's
16 important you get this. This is life-threatening.
17 And they would take those steps to make sure he got
18 his meds. And I would sign off on the seg admission
19 as superintendent.
20    Q. And just so that I'm clear, when you're
21 talking about a seg admission, segregation?
22    A. Yes. And that's not the proper term. It
23 would be actually placed in the infirmary. You know,
24 it's just old habit. You'd call it medical seg.
25        And to my knowledge, Mr. Davis was never

### Page 71

1  placed in medical seg. So I was not aware that there
2  was any issues beyond these.
3     Q. And I take it you're not aware of any
4  situation where Mr. Davis showed up for med line and
5  was denied his medication.
6     A. I would fire the officer. Or if I couldn't
7  fire him, I'd do my best.
8     Q. That would be a very serious issue to you?
9     A. Absolutely.
10    Q. Do you know how long Mr. Davis was actually
11 at Palmer?
12    A. Haven't got a clue.
13    Q. Do you know whether or not Mr. Davis'
14 medical condition was ever mentioned in one of your
15 daily briefings?
16    A. I would -- I would assume and feel certain
17 that it would be mentioned. You know, staff need to
18 be made aware -- if you have a prisoner like this in
19 the population, there needs to be an awareness that
20 that person exists. And I feel certain that if you
21 look at those records, you'll see that somewhere.
22    Q. When you say "a person like this," a person
23 with Mr. Davis' medical condition, is that what you
24 mean?
25    A. Somebody with a defibrillator, yes.

### Page 72

1     Q. That's a unique situation, right?
2     A. Yes, that's unique.
3     Q. You'd want to make sure --
4     A. We've had -- I mean, it's not the first one.
5  There's been people through there with pacemakers,
6  et cetera. So -- but, you know, the staff need to be
7  aware there's special needs here.
8        And I can't recall specifics, but I do
9  recall that in these morning meetings, medical -- I do
10 recall them, you know, frequently telling us about,
11 you know, specific inmates and specific problems,
12 et cetera. The exact context regarding Mr. Davis, I
13 can't recall.
14    Q. You would agree, Mr. Hyden, that an inmate
15 that comes into your facility with an implanted
16 defibrillator has special needs?
17    A. Uh-huh.
18    Q. That's what you just said, right? I need
19 you to answer out loud. Sorry.
20    A. Oh, yes. It's unusual and it should -- it's
21 special, yes.
22    Q. You would also agree, I take it, that PCC
23 had an obligation to make sure his necessary medical
24 care was taken care of.
25    A. Oh, I don't know that it wasn't. He feels

### Page 73

1  it wasn't. Mr. Davis -- you know, I'm not being smart
2  here. He's still doing fine, to my knowledge. I
3  don't know that anything was done there that was
4  detriment to his health. I don't know that as a
5  non-medical person.
6     Q. You would agree that he -- his medical care
7  needed to be attended to while he was at Palmer,
8  correct?
9     A. Yes.
10    Q. And because of the fact that he had an
11 implanted defibrillator, his medical needs were
12 different than the average population up there, true?
13    A. Absolutely.
14    Q. It would be essential to make sure that any
15 prescribed medications were given to him, right?
16 Correct? You need to answer out loud.
17    A. Once again, that depends on the medicine. I
18 have inmates that come in, hey, I had a doctor that
19 ordered me OxyContin ten years ago. And the thing
20 still goes. I want this. Then the inmate files a
21 grievance, I'm not getting my OxyContin. And the
22 medical staff we had, no, you don't need that. You're
23 not getting that.
24       So it's not an exact answer. You'd have to
25 be more specific. Which medications, you know? And

### Page 74

```
 1  once again, I'm not that familiar with medications,
 2  because I'm not a medical person.
 3      Q.  Are you familiar with a medication called
 4  Coumadin?
 5      A.  Explain it to me.  Make me familiar with it.
 6  I'm not -- I'm not that clear on it, no.
 7      Q.  I'm just asking what knowledge you have.
 8      A.  No.  I have to trust my medical staff.
 9  That's all I have.
10      Q.  Okay.  Is the medication Coumadin something
11  that your medical staff had made you aware of prior to
12  Mr. Davis?
13      A.  I can't recall that specifically.
14      Q.  You would agree with me, Mr. Hyden, that if
15  Mr. Davis was prescribed Coumadin in order to make
16  sure that his heart condition was kept under control,
17  that PCC should make sure he got his Coumadin?
18      A.  I would say so, yes.
19      Q.  Your staff and the medical staff, right?
20      A.  I -- I would say so.
21      Q.  Would you also agree that if there were
22  testing that were prescribed for Mr. Davis, medical
23  testing while he was at PCC, that he should get that?
24      A.  Who prescribed it, the medical staff at
25  Palmer or a doctor two or three years ago?  I mean --
```

### Page 75

```
 1      Q.  Let's talk about -- how about if it's a
 2  doctor who gave a prescription for medical testing
 3  immediately before he was taken into State custody?
 4      A.  I would say that there's a need for
 5  monitoring.  Okay?  How much and when, I'm not a
 6  medical person.  I don't know the answer to that.
 7      Q.  If that situation were presented to you
 8  where an inmate has a prescription for certain testing
 9  that's to be done on a regular basis and he provides
10  that prescription to correctional personnel, do you
11  think that prescription should be taken into account?
12      A.  I'm not a medical person.  I can't
13  accurately answer that.  There's no way.
14      Q.  That's a better question for Mr. Henry?
15      A.  Exactly.  I mean, I could spout off the top
16  of my head.  That don't make it so.
17      Q.  From what I hear you saying this morning,
18  medical decisions really were out of your area; is
19  that true?
20      A.  Largely, yes.  They're within the confines
21  of the medical expertise.  For me to go dabbling in
22  medical's affairs and tell them to do this and do
23  that, I have no formal training.  That's a lawsuit
24  waiting to happen, so no.
25      Q.  So you stay out of it.
```

### Page 76

```
 1      A.  I -- I -- well, you know, you monitor to a
 2  degree, as we have here, but you have to depend on the
 3  experts, which I was doing.  And based on what I had,
 4  you know, I felt everything was -- aware of his
 5  situation, but I felt everything was under control.
 6      Q.  Do you know whether Mr. Davis was given any
 7  different treatment than anyone -- than the typical
 8  prisoner because of his heart condition?
 9      A.  I -- I would say that he probably had way
10  more treatment than the average prisoner because of
11  this situation.  And -- but once again, I don't know
12  that for a fact.
13      Q.  Is it correct to say that it's -- at least
14  in your eyes, it's really the prisoner's
15  responsibility to go ask for medical care as opposed
16  to the other way around?
17      A.  In some cases.  Not in all.
18      Q.  How about in Mr. Davis' case?
19      A.  To go ask for care?
20      Q.  Yes.
21      A.  He can ask for anything.  I think the State
22  bears some responsibility to Mr. Davis to follow up
23  and make sure that he maintains, you know, his health.
24  What that -- what that would incur, you know, that's
25  medical personnel that have to do that.  But I feel,
```

### Page 77

```
 1  yes, they need to maintain his health.
 2          When he comes to us, you know, I think in
 3  his case, what usually happened -- and I'm not going
 4  to be specific to Mr. Davis, because I can't recall
 5  specific issues.  But if you had a special needs
 6  inmate, he would be seen more by medical.  He would be
 7  seeing these contract physicians that came in.  He
 8  would be taken on medical transportation to see
 9  medical doctors in different places.  He would be
10  paged to report to medical for different things.
11          If he wasn't receiving medication, like
12  apparently that's what this is saying, I feel
13  certain -- or as a rule, medical would page him and,
14  you know, what's the problem here, et cetera.  But
15  specifically, I can't say in Mr. Davis' case how
16  much -- where he went or how many doctors seen him.
17  You know, I don't know.
18      Q.  Do you know whether or not any medical
19  doctors saw Mr. Davis while he was incarcerated at
20  Palmer?
21      A.  I'd bet everything on it, but I don't know.
22      Q.  Given what you know about it, you would
23  expect that he would have seen a medical doctor --
24      A.  Right.
25      Q.  -- while he was at Palmer.
```

Exhibit 12
Page 12 of 12