IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

CHARLIE J. DAVIS, JR.,

    Plaintiff,

vs.

ZELMER HYDEN, et al.,

    Defendants.
_____)

NO: A02-0214 CV (JKS)

DEPOSITION OF MELBOURNE HENRY

FRIDAY, APRIL 28, 2006, 10:27 a.m.

Anchorage, Alaska



Page 1

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF ALASKA
 3
 4   CHARLIE J. DAVIS, JR.,
 5         Plaintiff,
 6   vs.
 7   ZELMER HYDEN, et al.,
 8         Defendants.
     _____)
 9
     NO: A02-0214 CV (JKS)
10
11
12
13       DEPOSITION OF MELBOURNE HENRY, taken on
14   behalf of Plaintiff, Pursuant to Notice, at MATTHEWS &
15   ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16   before Susan Campbell, Certified Shorthand Reporter
17   for Alaska Stenotype Reporters and Notary Public for
18   the State of Alaska.
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2   EXAMINATION BY:                             PAGE
 3       Mr. Matthews                              5
 4
 5                  E X H I B I T S
 6   NUMBER                                      PAGE
 7   1   Memorandum and Prisoner Grievance -      20
         4 pages
 8
     2   Memo and attachments - 6 pages            52
 9
     3   Document entitled "Access to Health       53
10       Care Services" - 6 pages
11   4   Document entitled "Health Care            55
         Organization and Administration" -
12       5 pages
13   5   Excerpt from DOC Policies and             55
         Procedures - 32 pages
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           A-P-P-E-A-R-A-N-C-E-S
 2
 3   For Plaintiff:   MATTHEWS & ZAHARE
                 BY: THOMAS A. MATTHEWS
 4               431 West Seventh Avenue
                 Suite 207
 5               Anchorage, AK  99501
 6
     For Defendants:  STATE OF ALASKA
 7                    ATTORNEY GENERAL'S OFFICE
                      Department of Law
 8                    Criminal Division
                  BY: MARILYN J. KAMM
 9                P.O. Box 110300
                  Juneau, AK  99811
10
     Reported By:     Susan Campbell
11                    Certified Shorthand Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1   ANCHORAGE, AK, FRIDAY, APRIL 28, 2006, 10:27 a.m.
 2                  MELBOURNE HENRY,
 3       called as a witness on behalf of the
 4       Plaintiff, having been duly sworn upon
 5       oath by Susan Campbell, Notary Public,
 6       was examined and testified as follows:
 7                    EXAMINATION
 8   BY MR. MATTHEWS:
 9       Q.  Would you state your name for the record,
10   sir?
11       A.  Melbourne Walder Henry.
12       Q.  If you'd spell all of them for me.
13       A.  M-e-l-b-o-u-r-n-e, W-a-l-d-e-r, H-e-n-r-y.
14       Q.  Do you use the title of doctor?
15       A.  No.
16       Q.  Are you a doctor by training?
17       A.  I am.
18       Q.  A medical doctor?
19       A.  No.
20       Q.  Let me tell you right to begin with, I ask
21   questions sometimes simply because we need to get
22   answers in a written form that we can use later for
23   trial.
24       A.  Yeah.
25       Q.  Sometimes I ask questions because I simply
```

Page 6

1  don't know the answer.
2      A.  Yes.
3      Q.  And I will ask you to help me through the
4  process.
5      A.  And I'll be happy to do that.
6      Q.  If I ask questions which you don't
7  understand for any reason, please let me know and I'll
8  be happy to rephrase them.
9      A.  I will.
10     Q.  Okay. Have you ever had a deposition taken
11 before?
12     A.  Once before.
13     Q.  In what kind of a context?
14     A.  Within the context of the Department of
15 Corrections.
16     Q.  Okay. Some years ago?
17     A.  Yes, some years ago. We -- oh, we were
18 being sued by a physician who stated that we had
19 breached his contract.
20     Q.  A contracted physician with the
21 Department --
22     A.  With the Department --
23     Q.  -- of Corrections?
24     A.  -- of Corrections, yes.
25     Q.  Let me ask you one favor, if I can, as we're

Page 7

1  going through. You're going to be very good, I can
2  tell, at anticipating my question. But if you'd let
3  me get it out, it will make it much easier on our
4  court reporter, so we're not talking over the top of
5  each other. Okay?
6      A.  Excellent.
7      Q.  What is an address where we can reach you?
8      A.  8651 Kushtaka, K-u-s-h-t-a-k-a, Circle,
9  Anchorage, 99504.
10     Q.  And a good telephone number?
11     A.  (907) 333-2835.
12     Q.  Are you currently employed?
13     A.  I am.
14     Q.  By whom?
15     A.  University of Alaska Anchorage.
16     Q.  What is your position there?
17     A.  I'm a professor of social work.
18     Q.  How long have you held that position?
19     A.  One year.
20     Q.  Is that a full-time position?
21     A.  It is.
22     Q.  How long have you been with the university
23 total?
24     A.  One year.
25     Q.  Prior to your work at the university, where

Page 8

1  did you work?
2      A.  For the Department of Corrections.
3      Q.  How long did you work for Department of
4  Corrections?
5      A.  From '98 to '03, about five years.
6      Q.  What was your position with Department of
7  Corrections?
8      A.  Health care administrator.
9      Q.  Maybe you could help me work our way back
10 just through your basic educational training,
11 background, that kind of thing, kind of a resume
12 format. Employment history first.
13     A.  I mentioned Department of Corrections.
14     Q.  Yes, sir.
15     A.  Prior to that, I was a professor of social
16 work at Alabama Agricultural and Mechanical University
17 in Huntsville, Alabama. I was there for five years.
18 Before that, the University of Nevada at Reno for
19 three years. Prior to that, the Department of Health
20 and Social Services as director of mental health and
21 developmental disabilities.
22     Q.  Is that the Alaska Department of Health and
23 Social Services?
24     A.  Yes, the Alaska Department.
25     Q.  And before that?

Page 9

1      A.  Before that, I was health care administrator
2  for the Hargraves Memorial Hospital,
3  H-a-r-g-r-a-v-e-s, in Mandeville, Jamaica. And before
4  that, I was medical social worker and an associate
5  hospital administrator for the Appalachian Regional
6  Hospital, A-p-p-a-l-a-c-h-i-a-n, in Beckley,
7  West Virginia.
8          And before that -- oh, I think I just got
9  one out of sequence. I was director of community
10 health services for the Department of Health in West
11 Virginia, and then the Appalachian Regional Hospital.
12 Yes. I'm sorry about that.
13     Q.  That's all right.
14     A.  All right. And I was, I guess, a social
15 worker, child welfare worker for the Welfare
16 Commission for the State of Oregon. And I think
17 that's about it.
18     Q.  Where did you attend university?
19     A.  I have a Bachelor's degree in Economics and
20 Sociology from Warner Pacific College in Portland,
21 Oregon. I have a Master's in Social Work, MSW, from
22 Portland State University, Portland, Oregon. I have a
23 Master's in Public Administration, MPA, from the
24 University of Southern California. And I have a
25 doctorate in the field of social work and social

Page 10

1  gerontology from the University of Southern
2  California.
3     Q.  What year did you get your Ph.D.?
4     A.  In 1975.
5     Q.  Okay. Let me see if I can put a few years
6  with some of the rest of this.
7     A.  Yes.
8     Q.  Your work at Alabama Agricultural
9  University --
10    A.  Yes.
11    Q.  -- five years, that would have been
12 approximately '93 to '97, '98?
13    A.  '98. I left there directly and came up here
14 in '98.
15    Q.  Okay. And then the University of Nevada at
16 Reno was the three years before that?
17    A.  Yes.
18    Q.  Which would have been '90 to '92?
19    A.  I started there in -- it's '89 to '92.
20    Q.  So your work for the Alaska Department of
21 Health and Social Services would have been what years?
22    A.  From '84 to '88. And I was a consultant
23 just on my own for -- until '89 for about a year.
24 Then I left -- I left in '89 to go to Nevada.
25    Q.  Your work at Hargraves then would have been

Page 11

1  what years?
2     A.  Hargraves would be '80 -- let's see. '80 --
3  well, let me --
4     Q.  Just approximately.
5     A.  Yeah. Approximately '80, '81. And the work
6  with the State of West Virginia with the Health
7  Department there would be from '78 to '80, right.
8  Because I left there and went to Jamaica. So reverse
9  those.
10    Q.  And the Appalachian Regional Hospital would
11 have been --
12    A.  '68 to '72.
13    Q.  Okay. You got your Ph.D. at USC in 1975?
14    A.  Yes.
15    Q.  And your Master's also from USC?
16    A.  Yes.
17    Q.  What year was that?
18    A.  The same year.
19    Q.  1975?
20    A.  Yes.
21    Q.  And the MSW from Portland?
22    A.  '66.
23    Q.  And the Bachelor's also in Oregon?
24    A.  '64.
25    Q.  '64. Quite an illustrious career.

Page 12

1     A.  Thank you.
2     Q.  Let me focus you, if I can, on your work
3  with the Department of Corrections in Alaska, 1998 to
4  2003. That's really the focus of my inquiry today.
5  You were the health care administrator?
6     A.  I was.
7     Q.  Tell me in your words, what does that job
8  entail?
9     A.  The job entails reporting to the
10 Commissioner. I was responsible to the Commissioner
11 for the health, physical health and mental health, of
12 the prisoners within the system. I did planning,
13 organizing, coordinating, the budgeting, hiring,
14 reporting and decision-making in that area.
15    Q.  Are you -- strike that.
16        Were you involved as health care
17 administrator in the supervision of health care at
18 individual prison facilities within the State of
19 Alaska?
20    A.  No.
21    Q.  Did you have any oversight responsibilities
22 for the Palmer Correctional Center?
23    A.  Yes.
24    Q.  Explain, please.
25    A.  The health personnel at Palmer ultimately

Page 13

1  reported to me.
2     Q.  Could you explain the chain of command to
3  me?
4     A.  Each facility --
5     Q.  Focussing just on the medical side.
6     A.  On the medical side of it.
7     Q.  Right.
8     A.  We had a medical director. The medical
9  director reported to me. The medical director was
10 responsible for the medical staff in each facility.
11 At Palmer, we would have physician assistants, nurses,
12 aides and so on. And the PA was in charge. And the
13 PA reported to the physician, medical director. And
14 that person reported to me.
15    Q.  Okay. During the years that you were
16 health care administrator, who was the medical
17 director?
18    A.  Oh, what's his name? I can't think of it
19 now.
20    Q.  Was there more than one medical director
21 during that time period?
22    A.  Yes. One was Robertson. And before
23 Robertson, there was another. I -- I can't recall his
24 name. I'm getting old. I'm sorry.
25        MS. KAMM: I can't either.

Page 14

BY MR. MATTHEWS:
Q. I should have asked you this at the outset, and I apologize. What is your date of birth?
A. April 2nd, 1938. That makes me 68 years old.
Q. Do you know whether or not -- is it Dr. Robertson?
A. Yes. Dr. Robertson.
Q. Was he the medical director in 2002?
A. I think so.
Q. And is Dr. Robertson an M.D.?
A. He is. His first name is John.
Q. If I understand the chain of command then from Palmer, there would have been a PA in charge for medical services reporting to Dr. John Robertson, an M.D., who would then report directly to you as the health care administrator.
A. Yes.
Q. That's basically the levels of command, if you will?
A. And I reported to the Commissioner.
Q. And was that chain of command true in 2002?
A. Yes. But I cannot be certain if John Robertson was the person at the time.
Q. If it wasn't Dr. Robertson, it would have

Page 15

been another M.D.?
A. It would have been another M.D., yes. And if we were between M.D.s, that is, we're recruiting or hiring a new M.D., we had two M.D.s who were consultants. And they were always there.
Q. When you say always there, meaning always at Palmer?
A. No. Always on contract with us and were available for services. And, in fact, they were on the payroll on a monthly basis.
Q. In interrogatory responses that I understand you signed this morning, we asked for a number of names about medical personnel involved at Palmer. And several names were provided. Dr. Scott Kiester?
A. Yes.
Q. Is that a name that's familiar to you?
A. He was one of the consultants.
Q. And Dr. Jim Billman?
A. Yes.
Q. Also a consultant?
A. He was a consultant.
Q. Dr. David Holladay?
A. Yes.
Q. Also a consultant?
A. Yes.

Page 16

Q. And Dr. Ron Christensen?
A. Yes.
Q. Also a consultant.
A. (Witness nods head.)
Q. Happy to show you this question and the answer, if it helps you. Really, what I want to get at is whether any of those individuals was in the position of medical director during that time period or whether they were just consultants.
A. All those persons were seen as consultants, yeah.
Q. Okay. Is it fair to say that for medical staff at Palmer, you had final oversight responsibility?
A. Yes.
Q. I assume -- tell me if I'm wrong -- that in your position as health care administrator, you had final oversight authority over medical staff at all Department of Corrections' institutions; is that true?
A. Not exactly, in the sense that I had oversight, but since I was not an M.D., I couldn't really have oversight for clinical work.
Q. Okay. The medical director then reporting to you --
A. Yes.

Page 17

Q. -- would that person have oversight for clinical work?
A. Yes. That would be the person responsible for clinical work.
Q. Was there a single medical director, say, during 2002?
A. As I said, I can't recall. But we -- I know John -- we'll have to get back to the records to see when John Robertson was hired. But he was medical director.
Q. Let me see if I can try it this way: Just in terms of the chain of command, you as the health care administrator would have had oversight responsibility for all institutions within the State.
A. Yes.
Q. Was there a single medical director who then reported to you having oversight responsibility from a clinical standpoint over all institutions within the State?
A. That's correct.
Q. So whoever that medical director was --
A. Yes.
Q. -- if the position was filled at the time --
A. Yes.
Q. -- it would have been a single individual

Page 18

```
 1  with oversight responsibility?
 2     A.  It would have been a single individual.
 3     Q.  Okay.
 4     A.  And if the position were not filled, we
 5  would have used any of those consultants to be the
 6  medical -- to make the medical decisions that had to
 7  be made.
 8     Q.  What involvement would you have had directly
 9  in making medical decisions?
10     A.  None.
11     Q.  I mean no disrespect by this question.  But
12  do you have the training or the ability from a medical
13  standpoint to make medical decisions?
14     A.  Absolutely not.
15     Q.  So that wasn't part of your responsibility.
16     A.  It was not.
17     Q.  It was not something you undertook.
18     A.  No.
19     Q.  If there were a question about the medical
20  care of an inmate at one of the institutions, how
21  would you as the health care administrator address
22  that?
23     A.  We would -- if I were not satisfied that the
24  prisoner was getting services, although a medical
25  person said he was, we would use one of our
```

Page 19

```
 1  consultants as a referee.  And usually, that worked
 2  through the Medical Advisory Committee.
 3     Q.  And explain for me, if you would, what the
 4  Medical Advisory Committee was.
 5     A.  Medical Advisory Committee comprised a group
 6  of medical persons, including two contract physicians
 7  and physician assistants, nurses, who met once weekly
 8  to go over cases that were not resolved at the local
 9  level.
10     Q.  Was that a clinical meeting, so to speak?
11     A.  It was a clinical meeting.
12     Q.  Are there records kept of the Medical
13  Advisory Committee?
14     A.  Oh, yes.
15     Q.  Are they kept in the form of minutes?
16     A.  Yes.  And usually whatever decisions were
17  made there, I would -- I acted as sort of secretary to
18  this thing.  I signed off on them.  So a prisoner
19  would get a response from -- from the Medical Advisory
20  council through my signature.
21     Q.  Okay.  That helps.  Let me focus you, if I
22  can, on an inmate at Palmer, Charlie Davis.  Is that a
23  name that's known to you?
24     A.  No.
25     Q.  Do you know who he is?
```

Page 20

```
 1     A.  No.
 2     Q.  Know anything about him?
 3     A.  No.
 4     Q.  Know anything about his medical condition?
 5     A.  Well, just what I've read.
 6     Q.  And that would include materials that you've
 7  been provided in this case?
 8     A.  Yes.  That was provided to me in this case.
 9  That's the first time I heard about him.
10        MR. MATTHEWS:  Mark that as number 1,
11  please.
12        (Exhibit 1 was marked.)
13  BY MR. MATTHEWS:
14     Q.  Take a look at the documents that we have
15  marked as Exhibit 1, if you would, please.
16     A.  Yes.
17     Q.  Do you recognize that packet of materials?
18     A.  Yes.  I recognize this as coming from the
19  Department.
20     Q.  You recognize the cover sheet?
21     A.  I recognize my signature.
22     Q.  Okay.  Tell us what this is, to the extent
23  you remember it.
24     A.  This would have come before the Medical
25  Advisory Committee meeting on -- its regular weekly
```

Page 21

```
 1  meeting, in which the medical staff would go over the
 2  grievance and would make a decision.  And this
 3  decision was conveyed back to the grievant.
 4     Q.  This cover sheet is dated September 5th,
 5  2002, correct?
 6     A.  Yes, it is.
 7     Q.  And that bears your signature on the left
 8  next to your name?
 9     A.  It does.
10     Q.  You mentioned a little while ago in your
11  testimony about the Medical Advisory Committee --
12     A.  Yes.
13     Q.  -- that you would act as secretary for the
14  group --
15     A.  Yes.
16     Q.  -- convey the decision, if you will, of the
17  Advisory Committee back to the grievant.
18     A.  Yes.
19     Q.  Is what we're looking at in Exhibit 1, this
20  top page, is that what you were talking about earlier?
21     A.  Yes.
22     Q.  So this page, if you will, represents the
23  decision of the Medical Advisory Committee concerning
24  a particular grievance.
25     A.  Yes.
```

Page 22

1  Q. Not just your individual decision; is that
2  true?
3  A. Oh, absolutely true, yes. And when you say
4  my decision, this is the medical staff decision. And
5  this response was prepared by a medical person. But
6  matters going out of the Department would go under my
7  signature, the administrator.
8  Q. Can you tell me then what involvement you
9  had specifically in the decision to deny this
10 grievance?
11 A. The only decision I would have in these is
12 to determine whether or not agency policy was being
13 followed. But in terms of the medical aspect of the
14 decision-making, I would have no say so.
15 Q. Let me make sure I understand this cover
16 sheet, at least.
17 A. Yes.
18 Q. Is it fair to say that this is a document
19 which is prepared by medical staff simply for your
20 signature?
21 A. Yes.
22 Q. In effect, you are simply the scrivener?
23 A. Except if there were some matters that would
24 be contrary to policy, then I would say something
25 about that.

Page 23

1  Q. Was a portion of this particular grievance
2  directed to medical policy, in your view?
3  A. I imagine all grievances would pertain to
4  medical policy, one way or the other.
5  Q. I guess what I'm trying to figure out is
6  whether you had a specific role in the denial of this
7  grievance or were simply signing off on the medical
8  decision.
9  A. I was simply signing off on this.
10 Q. Do you have any memory as you sit here today
11 of this particular grievance?
12 A. No, sir.
13 Q. Any idea what the underlying beef was?
14 A. No. I -- as I said, I didn't even know this
15 guy. I never -- you know, in any given meeting, we
16 probably look at 20 of these things. And probably
17 some outstanding one would jump out at you. But
18 ordinarily, no.
19 Q. Do you know, for instance, how old Mr. Davis
20 was?
21 A. No, sir.
22 Q. Do you know what his medical condition was?
23 A. No, sir.
24 Q. Do you know why he was complaining about his
25 medical care?

Page 24

1  A. No, sir.
2  Q. Do you know whether or not he had a serious
3  medical condition?
4  A. No, sir.
5  Q. Do you know whether or not Mr. Davis was
6  receiving adequate medical care at Palmer Correctional
7  Center?
8  A. I do not know that.
9  Q. Are you in a position to say one way or the
10 other whether or not the medical care Mr. Davis
11 received at Palmer was adequate?
12 A. No, sir.
13 Q. Are you in a position to say one way or the
14 other whether the medical care that Mr. Davis received
15 at Palmer was in compliance with Department
16 guidelines?
17 A. I'd say yes.
18 Q. How is it that you know that?
19 A. Because we hired qualified people to deliver
20 the services. And we assumed that if they are doing
21 their job -- but the medical director would be
22 supervising those people. And if they were not doing
23 their job, sooner or later, I would have heard of it.
24 And we have the grievance process. So if a person
25 believes he or she is not receiving services, then

Page 25

1  they would go up the chain of the grievance.
2  Q. Isn't that what happened here?
3  A. Yes. That's what -- I imagine that's what
4  he said. But the substance of that, I would not know
5  if he were or were not receiving, since I'm not a
6  physician. If some -- if a physician or medical
7  person told me that, I would then know.
8  Q. So you would have to rely upon a medical
9  person to tell you that Mr. Davis' care was adequate
10 or inadequate, true?
11 A. Yes.
12 Q. Do you know whether or not you did that in
13 this case?
14 A. No, sir. I don't. I don't know.
15 Q. In looking at this packet, the grievance
16 that was appealed was dated June the 27th, 2002, if
17 you look at the last page.
18 A. Yes.
19 Q. And the decision which you sent back is
20 dated September 5th, 2002, correct?
21 A. Yes.
22 Q. Are you able to tell me what happens to that
23 grievance in the intervening time?
24 A. The 6/27/02 decision?
25 Q. Yes.

Page 26

1  A. So June, July, August, September. So there
2  is probably like a three-month delay here you're
3  asking.
4  Q. That's -- that's what it appears from the
5  paperwork that I've seen. What I'm trying to
6  understand is what happens in that time period.
7  A. I -- I cannot say.
8  Q. Okay. Is there some record of decision
9  concerning a grievance appeal, like the first page,
10 other than this letter back to the inmate?
11 A. Yes. When -- when a decision comes in to my
12 office, it is recorded and the secretary sets a
13 meeting with this committee. And usually, it's done
14 within a certain number of days. So --
15 Q. In fact, the policy sets a certain number of
16 days for --
17 A. Indeed. So I cannot say what happened from
18 the 27th until, you know, my letter of this date. One
19 would have to go back and see when it was logged in
20 and when the decision was made.
21 Q. Would there be paperwork documenting the
22 steps along the way?
23 A. Yes. There would be.
24 Q. And what paperwork would we expect to see?
25 A. The grievance and the grievance response.

Page 27

1  And we have -- I believe there was a person who was in
2  charge of grievances. And that person would
3  prioritize these things or send them through the
4  system at -- to the appropriate persons within the
5  system. And I guess at each of those stages, it would
6  be documented.
7  Q. Would all of that documentation eventually
8  make its way to the Medical Advisory Committee for its
9  review in making a final determination?
10 A. Yes. There was a chart that we prepared
11 with all of this stuff.
12 Q. In this response to the grievance appeal
13 that you have in front of you, second sentence says
14 "Your grievance is for the facility where you are
15 housed not having adequate medical staff to meet your
16 medical needs," correct?
17 A. I didn't understand the question, please.
18 Q. I'm just trying to make sure -- the second
19 sentence of that letter --
20 A. Yes.
21 Q. -- it reads "Your grievance is for the
22 facility where you are housed not having adequate
23 medical staff to meet your medical needs," correct?
24 A. Yes. That's what it says.
25 Q. And the findings in the first sentence say

Page 28

1  "Your grievance states that you have a heart condition
2  and serious medical condition that the officers are
3  not trained to recognize and properly manage during
4  the hours that the medical department is not open."
5  A. Yes.
6  Q. Correct?
7  A. Yes.
8  Q. Do you know what medical staff there was
9  available to treat someone with a heart condition and
10 serious medical condition during the hours that the
11 medical department was not open?
12 A. I guess this individual -- this statement
13 refers to what was contained in the grievance. I
14 don't -- I don't know that this statement is saying
15 that we, the medical committee, have found that you
16 have a serious medical condition, et cetera. I don't
17 know that is what we're saying. We're responding to
18 his words in his grievance.
19 Q. You don't know whether he had a serious
20 medical condition or not?
21 A. I don't know, no.
22 Q. That's outside your area of expertise?
23 A. Yes, it is. I could have learned about it.
24 But in -- in this instance, if the medical folks had
25 determined that his condition were serious enough to

Page 29

1  warrant a higher level of care facility, he would have
2  been transferred to a place where there was 24-hour
3  care.
4  Q. Was such a facility available within the
5  Department of Corrections?
6  A. Yes. In Anchorage, you'd have 24-hour care.
7  Q. If we look at the third page of this
8  grievance, there's a section entitled Superintendent's
9  Findings and Determination.
10 A. Uh-huh.
11 Q. Is that a portion of the grievance that you
12 recognize?
13 A. It's here, but I don't recognize it as such.
14 Q. Does each grievance require the
15 superintendent of the facility to essentially sign off
16 on --
17 A. Yes.
18 Q. -- the grievance before it can get to your
19 level, correct?
20 A. Yes, yes.
21 Q. In this case, didn't the superintendent of
22 that facility suggest that Mr. Davis be transferred to
23 a facility with a full-time medical staff?
24 A. Yeah. He's saying that. But, you know, I
25 think this is an inappropriate response of the

Page 30

1  superintendent.
2      Q. Why?
3      A. Because he's not a medical person.
4      Q. So is it fair for me to assume that if the
5  superintendent makes a recommendation based upon a
6  perceived medical suggestion, that the Medical
7  Advisory Committee will ignore that?
8      A. Not necessarily. If a superintendent called
9  and said I have somebody here who is, quote, "in a
10 life-threatening condition," which he says here, then
11 probably the response would be has he seen the nurse
12 or the PA. What do they have to say about that? But
13 we would hear that. And if he said no, then we would
14 send somebody out to make the determination if indeed
15 this is a life-threatening situation and the person
16 needs to be in a different facility.
17     Q. Do you know whether or not the inmate, in
18 this case, Mr. Davis, was ever seen by a physician
19 while he was at Palmer Correctional Center?
20     A. I don't know. But I'd say that it would be
21 unusual if he did not.
22     Q. You would have expected --
23     A. I would have expected, yes.
24        On the -- on the other hand, we depend on
25 the PAs to make the referral. We expect everybody

Page 31

1  who's in the facility to be seen within a certain
2  period. And after seen, the PA determines through
3  whatever triage system they use if this person needs
4  to go on further. But --
5      Q. So you're going to rely upon the on-site
6  medical staff to make a recommendation.
7      A. Of course. Of course.
8      Q. When a prisoner makes a grievance such as
9  the one we have here stating that medical care has not
10 been adequate, is there a procedure within your office
11 to have that person examined by a medical doctor?
12     A. I can't quote chapter and verse, but I'd say
13 yes.
14     Q. That's what you would expect to happen.
15     A. Again, we would begin -- we have different
16 levels of care. And so if a person requests to be
17 seen, we would hope that the physician assistant --
18 the nurse or the physician assistant would make the
19 determination. And once the determination is made,
20 the person would be seen. If the person could not be
21 seen within our own system, we would refer the person
22 out to a contract facility.
23     Q. Do you know whether or not Mr. Davis was
24 ever seen by a medical doctor after filing this
25 grievance?

Page 32

1      A. I have no idea, sir. I don't know. But
2  based on this response, the last sentence said "At the
3  present time there is no indication that the medical
4  and security staff at Palmer Correctional Center can
5  not meet your essential health care needs per DOC
6  policy..."
7          So at this point, I think what they were
8  saying is that the level of care in the facility is
9  sufficient for your needs. And if the medical people
10 are saying that, then I would imagine that's so.
11     Q. This is the medical people on the Advisory
12 Committee.
13     A. On the Medical Advisory Committee.
14     Q. Do you know whether any of those medical
15 people on the Advisory Committee ever examined
16 Mr. Davis?
17     A. I do not know, but it's very possible.
18 Because usually, the physician assistants -- we have
19 at least one physician assistant in these meetings.
20     Q. Okay. Is that a rotating position,
21 physician's assistant?
22     A. Usually when someone has a patient that is
23 going to be seen, that person -- if he's out in the
24 Valley, the person is sure to come on in. Usually,
25 the physician assistants who are there are the ones

Page 33

1  from the Anchorage area. Because the meeting is held
2  in Anchorage and they just come on routine.
3      Q. Maybe I'm unclear about the process. So let
4  me make sure that --
5      A. Okay.
6      Q. -- we work it through. In a situation where
7  a medical grievance is filed from Palmer, you have a
8  PA who is in charge on a day-to-day basis out there.
9      A. Yes.
10     Q. Right? So the PA in charge in Palmer would
11 then be brought in as part of the medical review that
12 is done as part of the grievance appeal?
13     A. Yes.
14     Q. Okay.
15     A. And depending what is happening, the person
16 may or may not be there. But --
17     Q. In the ideal world --
18     A. In the ideal world, he's there.
19     Q. Okay. Is it fair to assume that the
20 identities of all people participating in the medical
21 appeal would be noted somewhere in the records?
22     A. Yes, it is.
23        (Discussion off the record.)
24        MR. MATTHEWS: If you don't mind, can we
25 take a two-minute break?

Page 34

1       THE WITNESS: All right.
2       (Brief recess.)
3  BY MR. MATTHEWS:
4     Q. Back on. While we were off the record,
5  Dr. Henry, you remembered the name of the other
6  medical director, as I understand it. Right?
7     A. Yes.
8     Q. And the name you just gave us was William
9  Herald?
10    A. Yes.
11    Q. And he was the other medical director in
12 addition to John Robertson?
13    A. Yes. Of course, at different times.
14    Q. Prior to --
15    A. Prior to, yes.
16    Q. Is it safe to say that you have no specific
17 memory at this point of Mr. Davis' grievance appeal?
18    A. That's correct.
19    Q. Or the underlying medical conditions?
20    A. That's correct.
21    Q. Or the reasons why his appeal was denied?
22    A. That's correct.
23    Q. Or the reasons why it took from June 27th
24 until September 5th to deny the appeal?
25    A. That's correct.

Page 35

1     Q. That time period, June 27th through
2  September 5th, is outside the parameters of your
3  Department policy, right?
4     A. It would be, yes.
5     Q. Thirty days is what's specified in the
6  policies?
7     A. Don't remember.
8     Q. Okay. But 60 plus would be outside?
9     A. On, yes, definitely.
10    Q. Does that give you any indication as to
11 whether Mr. Davis' appeal was complex? Or can you
12 give us any insight as to why there was a delay?
13    A. No, sir. I can't.
14    Q. Were some grievance appeals delayed simply
15 because of backlog?
16    A. Could have.
17    Q. Were some appeals delayed because they
18 presented complicated questions?
19    A. I -- I wouldn't say so, no.
20    Q. Mr. Davis had an implanted defibrillator.
21 Were you aware of that?
22    A. After reading this, I became aware of it,
23 yes.
24    Q. Do you know whether or not there were other
25 prisoners in the system with implanted defibrillators?

Page 36

1     A. No, I do not know, sir.
2     Q. Do you know whether or not that was a unique
3  situation for the Department --
4     A. It was.
5     Q. -- at the time?
6     A. At that time it was.
7     Q. Do you know whether or not Mr. Davis
8  required special care because of the fact that he had
9  an implanted defibrillator?
10    A. I do not know the medical care surrounding
11 the defibrillator. I don't know.
12    Q. Would you expect that he would have had
13 special needs?
14    A. I would say yes.
15    Q. Do you know whether or not there were any
16 steps taken at Palmer Correctional Center to assess
17 whether or not Mr. Davis had special needs because of
18 his implanted defibrillator?
19    A. Well, I would have expected that the staff,
20 the medical staff, knowing this would keep him on
21 their radar. On the other hand, I have known persons
22 with defibrillators. And they require whatever --
23 whatever service they require, they would make that
24 known. So again, if he made his needs known and the
25 staff determined that they could handle that situation

Page 37

1  within the context of Palmer, then I would have to go
2  along with the staff.
3     Q. Do you know whether or not the staff at
4  Palmer when Mr. Davis was there had any training to
5  know what special needs Mr. Davis might have because
6  of his implanted defibrillator?
7     A. I do not know the answer to that. But I
8  would say that any trained medical person should know.
9     Q. Including a PA?
10    A. Including the PA, yes.
11    Q. Do you know what medications Mr. Davis was
12 taking while he was at Palmer?
13    A. No, sir.
14    Q. Do you know anything about the medical --
15 strike that.
16       Do you know anything about the dispensing of
17 medications at Palmer while Mr. Davis was there?
18    A. Well, back in '02, the policy for dispensing
19 medication, it would be -- would be in place would be
20 the same.
21    Q. As I understand it, Mr. Davis had a number
22 of medications, some of which were listed as
23 keep-on-person or KOP.
24    A. Uh-huh.
25    Q. And that would be consistent with Department

Page 38

1  policy at that time?
2     A. It would be.
3     Q. And he had one medication which was listed
4  as SM-ML, which as I understand it, means Self
5  Medicate - Med Line.
6     A. Yes.
7     Q. And that would also be consistent with
8  Department policy at the time?
9     A. Yes.
10    Q. Mr. Davis would have to go and physically
11 collect the medication that was listed as SM-ML,
12 correct?
13    A. Yes.
14    Q. And it would have to be dispensed by
15 somebody at Palmer, right?
16    A. Yes.
17    Q. And those medications would be locked up and
18 kept away from the general prison population.
19    A. That's correct.
20    Q. If I were to tell you that Mr. Davis would
21 say there were instances where the med line for
22 dispensing of medications was cut before all
23 medications were dispensed, prisoners were not given
24 their medications because it was time for lockdown,
25 would that be consistent with Department policy?

Page 39

1     A. No.
2     Q. Would that be of concern to you as the
3  health care administrator?
4     A. Yes.
5     Q. Did you ever receive such reports?
6     A. No.
7     Q. Do you know what training the correctional
8  officers had to allow them to dispense medications at
9  Palmer?
10    A. Technically, they did not dispense
11 medication. Medication would be placed in individual
12 containers with names of person on it by the medical
13 personnel. And so their job would be to identify the
14 person and identify the package of medication and give
15 it to the person. So I do not call that dispensing.
16    Q. Okay. So the medical personnel, for
17 example, nurses or PAs, would be responsible for
18 actually collecting the medication, making sure that
19 it had the proper name on it --
20    A. Yes.
21    Q. -- in a packet, putting it into some kind of
22 a sort tray?
23    A. Yes.
24    Q. And then that tray would be passed on so
25 that it could be just handed out, if you will --

Page 40

1     A. Right.
2     Q. -- by the correctional officers after the
3  medical staff left for the day.
4     A. That's correct.
5     Q. So the correctional officers who were
6  actually handing out those medications, do they have
7  any training at all in dispensing of medications?
8     A. I don't know that they had any special,
9  quote, "training," unquote. I'm sure that they would
10 be told to be careful and not to mix up a name. And
11 that they should be sure to know the identity of the
12 person before the person was given the stuff. But I
13 don't know that they were trained in pharmacology.
14    Q. Do you know what first aid training the
15 correctional officers had at Palmer?
16    A. I think every correctional officer is
17 required to go through some first aid training before
18 they can be hired. And once they are on the job, I
19 guess they have some routine training.
20    Q. Is first aid training for correctional
21 officers part of what you oversaw as the health care
22 administrator?
23    A. No.
24    Q. Would that be part of the training -- strike
25 that.

Page 41

1       Who would oversee any first aid or life
2  support?
3     A. That training would take place in the
4  academy where they did their training by medical
5  personnel. And I had no oversight responsibility
6  there.
7     Q. Do you know whether or not any of the first
8  aid training that was provided to correctional
9  officers would have included how to take a blood
10 pressure reading?
11    A. I do not know for sure, but I would say yes.
12    Q. You would expect that?
13    A. I would expect that, yes.
14    Q. The medical charts that are maintained for
15 each prisoner, was that ultimately part of your
16 responsibility?
17    A. Yes.
18    Q. Who has access to those medical charts?
19    A. Any authorized personnel. Usually medical
20 personnel.
21    Q. Do correctional officers?
22    A. That's a good question. Ordinarily, the
23 correctional officers would not have access to medical
24 chart unless something was specifically indicated.
25    Q. Such as what?

Page 42

1    A.  Thinking further about it, I would say that
2  they do not have access to medical chart, yeah.
3    Q.  At Palmer during 2002, there was typically a
4  time of day when there was no medical personnel
5  on-site, correct?
6    A.  Yes.
7    Q.  There was no 24-hour coverage at Palmer,
8  right?
9    A.  At this particular time, I don't know.  At
10 some time we had 24-hour coverage.  I don't know
11 when -- when -- at what point it ceased, but --
12   Q.  Was that during your tenure as health care
13 administrator?
14   A.  It could have been.
15   Q.  Do you know whether it was --
16   A.  The reason why I'm saying it could have
17 been, I remember our going through a reorganization of
18 the Department.  We did a study.  And the study
19 indicated that some facilities did not need 24-hour
20 care, nursing care or medical care.  And so I -- I
21 can't recall if Palmer was one of those facilities,
22 but it could have been.
23   Q.  Do you remember when that study was done?
24   A.  I would say about 2001 or thereabout.
25   Q.  Do you remember what the study was called?

Page 43

1    A.  No, sir.
2    Q.  Do you remember who did it?
3    A.  It was done by an outside consultant, person
4  from the State of Washington.
5    Q.  Do you remember who the consultant was?
6    A.  No, I don't.
7    Q.  It was commissioned by the Department of
8  Corrections?
9    A.  Yes, indeed.
10   Q.  Up until the time of that study, is it
11 correct to say that there was 24-hour medical coverage
12 at Palmer?
13   A.  I don't know.  But I would guess that there
14 was.  I don't know.
15   Q.  There was a point in time where there was
16 24-hour coverage at Palmer; is that your memory?
17   A.  I can't say for certain that there was.
18   Q.  In any event, as a result of this study,
19 24-hour coverage was eliminated at some facilities?
20   A.  That's correct.
21   Q.  But you're not sure which ones.
22   A.  Not sure which one, off the top of my head.
23   Q.  As I understand it, Department policy
24 requires each inmate to get at least an initial
25 medical screen when they come into State custody.

Page 44

1    A.  Yes.
2    Q.  And that was true when you were health care
3  administrator?
4    A.  Yes.
5    Q.  Is there a policy that requires an inmate to
6  receive a medical screen when they are transferred
7  between facilities?
8    A.  I think if -- yes.  However, if one screen
9  was done just prior to the transfer being made, it
10 would not be necessary, if that makes sense.  I think
11 that's what it was.  But again, that's trusting my
12 memory here.
13   Q.  I understand it's some years ago.  We talked
14 earlier about COs and whether or not they have access
15 to medical charts.
16   A.  Yes.
17   Q.  Is it Department policy that all medical
18 examinations of an inmate would be recorded in the
19 chart?
20   A.  Oh, yes.
21   Q.  So any kind of lab work, measurements,
22 testing of that sort that would be done on an inmate
23 should be recorded in the chart?
24   A.  Yes.
25   Q.  So if blood pressure readings were taken,

Page 45

1  those should be recorded in an inmate's chart,
2  correct?
3    A.  Yes.
4    Q.  As health care administrator, you would
5  expect to see detailed records of all treatment by the
6  medical staff at Palmer for any inmate, right?
7    A.  Yes, sir.
8    Q.  If an inmate at Palmer was being treated for
9  high blood pressure with an implanted defibrillator,
10 would you expect to see regular blood pressure
11 measurements in the chart?
12   A.  I'm sorry.  Would you restate your question,
13 please?
14   Q.  If an inmate was being treated for high
15 blood pressure, medicated for high blood pressure and
16 had an implanted defibrillator, would you expect to
17 see regular measurements of that inmate's blood
18 pressure?
19   A.  Initially, I would expect to see regular
20 measurement.  And as the blood pressure stabilized, I
21 would see less and less frequent measurement.  That's
22 what I would expect.  But again, I don't look at those
23 things since I'm not the medical director or health
24 personnel.  But just a common sense approach would say
25 that to me.

Page 46

1  Q. With an inmate such as Mr. Davis who has
2  filed a grievance relating to his medical care, once
3  that grievance is filed -- sorry -- once that appeal
4  is filed on June 27th, is there any Department policy
5  that requires him to be examined medically?
6  A. No.
7  Q. If an inmate such as Mr. Davis has raised
8  questions about his -- the adequacy of his medical
9  care, would you expect to see follow-up?
10  A. I would expect to see that, yes. And based
11  on that follow-up, some decision would be made whether
12  or not there is any merit to his appeal. Or if
13  there's merit to it, then the follow-up would lead
14  into the right direction.
15  Q. When the response to the appeal is such as
16  we see in Exhibit 1 --
17  A. Yes.
18  Q. -- that medical staff at the facility is
19  adequate for your medical needs, would you expect to
20  see follow-up care at the facility to be certain that
21  his medical needs were being met?
22  A. Yeah. Consistent with this finding, I would
23  set them to have follow-up. But, you know, whether
24  the follow-up is a week or two weeks or whatever would
25  be determined by the medical staff, based on the

Page 47

1  person's need. I can't make a judgment to say whether
2  or not this follow-up was adequate or inadequate or
3  what.
4  Q. In any event, you would expect to see
5  follow-up.
6  A. Yes. If a person has a need in a facility,
7  I expect to see follow-up.
8  Q. Let me ask you this: Because I really don't
9  want to waste your time. If I were to ask you
10  individual questions about Mr. Davis' medical care,
11  I'm assuming you're going to tell me you don't know
12  anything about it.
13  A. And that will be correct, yes.
14  Q. So asking you to look at documents relating
15  to specific stages of his medical care, it's not
16  something that you could tell me anything about.
17  A. I could not.
18  Q. Are you familiar generally with the forms
19  that are used by the Department for medical care?
20  A. I used to be.
21  Q. Let me ask you this: Let me show you a
22  document which has been previously Bates numbered by
23  the Department with the numbers two, three and four.
24  And my question relates to really the form for the
25  physical examination that appears at page four. It

Page 48

1  says continuation on back. And I don't have a back.
2  Do you know what would appear?
3  MS. KAMM: Oh.
4  THE WITNESS: It says continuation what?
5  BY MR. MATTHEWS:
6  Q. Continuation on the back.
7  A. Oh, continuation on back. Oh, I'd say that
8  if it said that, then there was a back side to this
9  form which wasn't copied.
10  Q. Do you know what the back side --
11  A. No, sir.
12  Q. -- would contain?
13  MS. KAMM: I'm sorry. Which number are we
14  at? Which one are we looking at that says continued
15  on back?
16  MR. MATTHEWS: Four.
17  THE WITNESS: Number four.
18  MS. KAMM: Let me see.
19  MR. MATTHEWS: Incidentally, I go from page
20  four to page six in my copy.
21  MS. KAMM: So do I.
22  MR. MATTHEWS: Then we're all consistent.
23  THE WITNESS: What's page six? Is it more
24  of the same?
25  MS. KAMM: This is page six right here.

Page 49

1  THE WITNESS: Oh, yeah. So we -- no, this
2  is page four. Oh, this is six.
3  MS. KAMM: Yes.
4  THE WITNESS: This is the -- a different --
5  chest wall, hearing, lung, 23. Interesting.
6  MS. KAMM: You gave him four. Okay.
7  MR. MATTHEWS: Yes.
8  THE WITNESS: This is yours.
9  MS. KAMM: Thank you.
10  BY MR. MATTHEWS:
11  Q. Any memory of what would have been on the
12  back side of that form?
13  A. I know at one time we had a diagram of a
14  person. And a person could identify on this chart
15  what -- what areas of the anatomy was involved. So I
16  don't know if that was it. But I can't say.
17  Q. Was it part of your responsibility as health
18  care administrator to look at quality of care issues
19  from a medical standpoint within the system?
20  A. Yeah. I -- I would request such a thing to
21  be done. For example, with the medical director, we
22  would ask that from time to time a given facility or
23  given charts be pulled just to determine the quality
24  of care that had been delivered, the consistency of
25  care that was being done.

Page 50

1   Q. Like a peer review audit type thing?
2   A. Yes.
3   Q. Was there a regular time period for doing
4   that at each institution?
5   A. No. There was no regular time for it.
6   Q. Who would do those audits, if I can call
7   them that?
8   A. It would be done by the PA or the nurse
9   practitioner who worked out of my office.
10  Q. Somebody directly on your staff then?
11  A. Yes. And similarly, if there were
12  indication of a special problem at a facility, the
13  same staff would go to do the investigation, to
14  make -- see what was going on.
15  Q. Do you know whether there was ever an
16  investigation of that nature at Palmer?
17  A. I don't recall that.
18  Q. If an inmate such as Mr. Davis came into
19  State custody with a prescription from his private
20  physician for regular testing because of his health
21  care needs --
22  A. Yes.
23  Q. -- would Department policy be to follow that
24  prescription?
25  A. No.

Page 51

1   Q. Department policy would be to --
2   A. Once the person comes into our custody, our
3   system would take over. We would examine the
4   prescription. And if the person were currently taking
5   medication, we would take the medication and examine
6   that and then make a determination based on our own
7   assessment whether or not we should continue this
8   regimen or we should dispense with it and use a new
9   one. Because different practitioners see different
10  things. And they make their own assessments.
11  Q. Would it make any difference to your policy
12  whether the prescription that was made by the inmate's
13  private practitioner was done by an M.D. or not?
14  A. Well, certain people are licensed to write
15  prescriptions in the State. So if he came in with a
16  legit prescription, regardless if it's an M.D. or a PA
17  or a nurse practitioner, we would look at it. But
18  it -- sometimes the physician or the PA who was doing
19  the assessment will go along with what the
20  prescription requests. But other times, they'll just
21  discontinue it and do something else.
22  Q. Would you expect them to consider it?
23  A. They always consider it. They always
24  consider it.
25  Q. If they were to follow a different path --

Page 52

1   A. Yes.
2   Q. -- would you expect that to be recorded in
3   the medical charts?
4   A. Of course.
5   Q. Would you expect the reason for changing
6   course to be recorded?
7   A. Yes.
8   Q. Would you expect there to be reference to
9   the prior prescription?
10  A. Yes.
11     MR. MATTHEWS: Would you mark that, please?
12     (Exhibit 2 was marked.)
13  BY MR. MATTHEWS:
14  Q. If you would take a look at what we've
15  marked as Exhibit 2. I don't know that you've seen
16  this document or not. Really, what I wanted to ask
17  you about is whether you can clarify for me the -- who
18  it's from when it just says "Medical."
19  A. Yeah. This say "PCC Medium Medical." So
20  this is a shame that it has no signature. But I --
21  are you asking for the specific individual?
22  Q. I guess what I want to make sure is the way
23  I'm looking at this document, it appears to be
24  internal to PCC from somebody within the Medical
25  Department there --

Page 53

1   A. Yes. That's --
2   Q. -- which would have been a PA or a nurse
3   practitioner.
4   A. A nurse, yeah.
5   Q. Okay. Is that the way you read this as
6   well?
7   A. Yes.
8   Q. If this document had come from an M.D.,
9   would you expect that would have been listed?
10  A. Not necessarily.
11  Q. Have you ever seen this document before?
12  A. No, sir.
13     MR. MATTHEWS: Mark that as the next one.
14     (Exhibit 3 was marked.)
15  BY MR. MATTHEWS:
16  Q. If you'd take a look at Exhibit 3, please.
17  A. Yes. Is there a special section of it you
18  want --
19  Q. Actually, all I want to ask you is if this
20  is the policy for Health Care Services that was in
21  effect at Palmer Correctional Center in 2002, if you
22  know.
23  A. I would say it is.
24  Q. It's dated July -- appears to be July 7,
25  1995. It appeared to me to be the one that was in

Page 54

1  effect. But I just wanted to see if you could confirm
2  that for me.
3      A. Yeah. I think sometime -- '95. Yeah, I
4  would say it is. Looks like it.
5      MS. KAMM: Tom, I'll take a look, too, to
6  confirm that it was.
7      MR. MATTHEWS: And maybe -- all I really
8  want to make sure is that I know which policies were
9  in effect.
10     MS. KAMM: I understand.
11     MR. MATTHEWS: I know you produced several
12 different things, or your predecessor did.
13     MS. KAMM: Yes.
14     MR. MATTHEWS: So maybe we can take that up
15 separately.
16     MS. KAMM: Okay. Yes. Because I don't
17 know. I'll have to look at the computer and then look
18 at my old policies to see. I mean, I would assume
19 that this one was, because we produced it to you. But
20 we're human so --
21     MR. MATTHEWS: Right. Sure.
22     THE WITNESS: And I know before I left, we
23 were going through some policy revisions. And I know
24 we tried to update policies and make them current. So
25 if -- I can't say for an absolute certainty that this

Page 55

1  form was being used at the time.
2  BY MR. MATTHEWS:
3      Q. Do you know how often the policies were
4  updated?
5      A. Not very often, sir.
6      Q. So the fact that this one is dated in '95,
7  it may well have been the effective policy?
8      A. Easily could have been, yes. So I'd say
9  it's a good chance that's the same policy, but just
10 need to bear that in mind.
11     MR. MATTHEWS: Okay. Same question on this
12 one.
13     (Exhibit 4 was marked.)
14 BY MR. MATTHEWS:
15     Q. Exhibit 4. Let me ask it this way, if I
16 can, to make it easy: To the best of your knowledge,
17 Dr. Henry, is the document we've marked as Exhibit 4
18 the Health Care Organization and Administration policy
19 which would have been in effect for Palmer in 2002?
20     A. Yes, sir.
21     MR. MATTHEWS: And one more.
22     (Exhibit 5 was marked.)
23 BY MR. MATTHEWS:
24     Q. Same question for Exhibit 5. To the best of
25 your knowledge, Dr. Henry, is this the Policy and

Page 56

1  Procedure that would have been in effect for Palmer
2  regarding use of pharmaceutical products in 2002?
3      A. I'm looking through this and I do not see a
4  signature of the Commissioner on this form.
5      MS. KAMM: On page -- look at page 12.
6      THE WITNESS: Page 12, okay. That's a big
7  one, yeah?
8      MR. MATTHEWS: I assume this one is, because
9  it's the one you just faxed me.
10     MS. KAMM: Yes. The effective date is
11 January 2001, but I will check it. I will check all
12 of these.
13     THE WITNESS: Well, yes, sir.
14 BY MR. MATTHEWS:
15     Q. Okay. Are you able to tell me, Dr. Henry,
16 for any point in time what medical treatment Mr. Davis
17 received at Palmer?
18     A. No, sir.
19     Q. Are you able to tell me anything about his
20 medical treatment at all?
21     A. No, sir.
22     Q. Are you able to tell me anything about his
23 medical needs at all?
24     A. No, sir.
25     MR. MATTHEWS: Thank you, doctor. I

Page 57

1  appreciate your time. That's all the questions I
2  have.
3      THE WITNESS: Thank you very much.
4          (Whereupon, the deposition was
5          concluded at 12:15 p.m.)
6  (Signature pending.)

Page 58

```
 1              CERTIFICATE
 2
 3        I, SUSAN CAMPBELL, Certified Shorthand
 4   Reporter and Notary Public in and for the State of
 5   Alaska, do hereby certify that the witness in the
 6   foregoing proceedings was duly sworn; that the
 7   proceedings were then taken before me at the time
 8   and place herein set forth; that the testimony
 9   and proceedings were reported stenographically by
10   me and later transcribed by computer transcription;
11   that the foregoing is a true record of the
12   testimony and proceedings taken at that time;
13   and that I am not a party to nor have I any
14   interest in the outcome of the action herein
15   contained.
16        IN WITNESS WHEREOF, I have hereunto set
17   my hand and affixed my seal this _____ day
18   of _____ 2006.
19
20
21
            _____
            SUSAN CAMPBELL, CSR
22          My Commission Expires 4/26/08
23
24
25
```

Page 59

```
 1            WITNESS CERTIFICATE
 2   RE: Davis vs. Hyden, et al.
     CASE NO.: A02-0214 CV (JKS)
 3   DEPOSITION: Melbourne Henry
     DATE TAKEN: April 28, 2006
 4
       I hereby certify that I have read the foregoing
 5   deposition and accept it as true and correct, with
     the following exceptions:
 6   ====================================================
     Page  Line   Description/Reason for Change
 7   ====================================================
 8   ____ _____  _____
 9   ____ _____  _____
10   ____ _____  _____
11   ____ _____  _____
12   ____ _____  _____
13   ____ _____  _____
14   ____ _____  _____
15   ____ _____  _____
16   ____ _____  _____
17   ____ _____  _____
18   ____ _____  _____
19   ____ _____  _____
20   ____ _____  _____
21       _____
22         SIGNATURE        DATE
23   Please sign your name and date it on the above line.
     (As needed, use additional paper to note corrections,
24   dating and signing each page.)        (SC)
25
```