IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

CHARLES J. DAVIS, JR.

    Plaintiff,

vs.

ZELMAR HYDEN, ET AL.,

    Defendant.



Case No. A02-214 CV (JKS)

DEPOSITION OF ROGER HALE

Pages 1-130, inclusive

Commencing at 9:30 a.m.

Friday, August 25, 2006

Anchorage, Alaska

Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage, AK 99501-3520
Serving Alaska Since 1953

Rick D. McWilliams, RPR, Ret.   Telephone 907.276.1680
Fred M. Getty, RPR, Ret.        Email - AkSteno@aol.com
                                Fax 907.276.8016

Exhibit 21
Page 1 of 34

Page 1

Roger Hale                                                                                    August 25, 2006

---

**Page 2**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                    DISTRICT OF ALASKA
 3
 4   CHARLES J. DAVIS, JR.
 5        Plaintiff,
 6   vs.
 7   ZELMAR HYDEN, ET AL.,
 8        Defendant.
 9
         Case No. A02-214 CV (JKS)
10
11
         THE DEPOSITION OF ROGER HALE, taken on
12   behalf of Mr. Davis, pursuant to notice, at the law
     offices of Matthews & Zahare, P.C, 431 W. Seventh Avenue,
13   Anchorage, Alaska, before Susan J. Warnick, Registered
     Professional Reporter for Alaska Stenotype Reporters and
14   Notary Public for the State of Alaska.
15
```

---

**Page 3**

```
 1            A P P E A R A N C E S
 2
     For Charles Davis:
 3
        MATTHEWS & ZAHARE, P.C.
 4      BY: Thomas Matthews
        431 W. Seventh Ave., Suite 207
 5      Anchorage, AK  99501
 6   For Department of Corrections:
 7      DEPARTMENT OF LAW
        ASSISTANT ATTORNEY GENERAL
 8      By: Marilyn J. Kamm
        P.O. Box 110300
 9      Juneau, AK  99811
10   Reporter: Susan J. Warnick, RPR
11   Witness:  Roger Hales
           August 25, 2006
```

---

**Page 4**

```
 1             INDEX TO DEPOSITION
 2   WITNESS: ROGER HALE              PAGE
 3      Examination by Mr. Matthews:    5
 4
 5   EXHIBIT                           PAGE
 6   No. 1                              34
     No. 2                              38
 7   No. 3                              40
     No. 4                              49
 8   No. 5                              71
     No. 6                              78
 9   No. 7                              85
     No. 8                              86
10   No. 9                              91
     No. 10                             91
11   No. 11                            113
     No. 12                            119
```

---

**Page 5**

```
 1      Anchorage, Alaska, Friday, August 25, 2006, 9:30 a.m.
 2             ROGER HALE,
 3   called as a witness herein, being first duly sworn to
 4   state the truth, the whole truth and nothing but the truth
 5   by the Notary, testified under oath as follows:
 6             EXAMINATION
 7   BY MR. MATTHEWS:
 8   Q   Would you please state your name for the record.
 9   A   William Roger Hale.
10   Q   Spell the last name for me.
11   A   H-a-l-e.
12   Q   What's a good address for me to reach you,
13   Mr. Hale?
14   A   Probably home.  P.O. Box 494, Palmer, Alaska
15   99645.
16   Q   And a good telephone number?
17   A   I'll give you home:  745-0357.
18   Q   Mr. Hale, have you ever had a deposition taken
19   before?
20   A   Yes.
21   Q   More than once?
22   A   I don't remember.
23   Q   Okay.
24   A   At least once.  But I --
25   Q   Okay.
```

---

## Page 6

1   A   It may have been more.
2   Q   Let me give you just a few of the ground rules.
3   I'm going to try and ask questions in a manner that you
4   can understand them. I don't always succeed at that, so
5   please let me know if you don't understand my questions
6   for any reason. Okay?
7   A   Okay.
8   Q   Not a test of your endurance.
9   A   Okay.
10  Q   If you want a break for any reason, coffee,
11  cigarette, go to the bathroom, just let us know; we're
12  happy to accommodate that as well.
13  A   Okay.
14  Q   If you don't know the answer to a question,
15  please tell me you don't know.
16  A   Okay.
17  Q   I don't want you guessing unless you're telling
18  me you're guessing. Okay?
19  A   Okay.
20  Q   We want to try and get as nice -- clear a record
21  as we probably can. Okay?
22  A   Okay.
23  Q   Who do you work for?
24  A   Department of Corrections, State of Alaska.
25  Q   And how long have you worked for the Department

## Page 7

1   of Corrections?
2   A   Twenty-one years.
3   Q   What do you do for them?
4   A   I'm a physician's assistant.
5   Q   So that we can understand each other, what is a
6   physician's assistant?
7   A   It's its own medical profession. They're state
8   licensed. And we're medical providers. We provide about
9   80 percent, 85 perfect of what a family practice physician
10  would provide in the general public as far as medical
11  care. We take histories, do physicals, make assessments,
12  make treatment plans, prescribe medications, order --
13  Q   Okay.
14  A   -- X-rays, blood work, whatever.
15  Q   Your position with DOC has been as a physician's
16  assistant then for 21 years?
17  A   Correct.
18  Q   And you've been licensed in the state of Alaska
19  that entire time?
20  A   Even before that. Since 1981, I believe.
21  Q   Are you licensed anywhere else?
22  A   No. I was in Washington, prior.
23  Q   You've given that up --
24  A   Yes.
25  Q   -- at this point?

## Page 8

1   A   Yeah, when I moved to Alaska in '81.
2   Q   And Palmer is your home?
3   A   Correct.
4   Q   How long have you lived out there?
5   A   Twenty years.
6   Q   As a physician's assistant for the Department of
7   Corrections, are you assigned to a specific facility?
8   A   I work multiple facilities. I'm the
9   institutional health care officer for Palmer Correctional
10  Center. I also work at Mat-Su Pretrial and Point McKenzie
11  work farm.
12  Q   What is the institutional health care officer?
13  What do you do?
14  A   As much as anything, it's a title. But I
15  oversee the medical/dental/psychiatric care specific to
16  Palmer Correctional Center. I'm kind of a mid-manager at
17  that level and report to the bosses in the health care
18  administration, if there's a problem or a question.
19  Q   Does that mean you're basically the senior most
20  medical officer out at Palmer?
21  A   I don't know if I'd put it that way, but each --
22  there's, I think, 13 PAs or nurse practitioners that work
23  for the Department of Corrections. Each one -- I think
24  all of them -- at least 10 of the physicians are assigned
25  a facility at kind of be the overseer of that facility.

## Page 9

1       So I work a week on/week off. And my
2   counterpart, Roger Hughes, he oversees Mat-Su Pretrial and
3   Point McKenzie, and I oversee Palmer Correctional. And so
4   if there are issues that the superintendent or what have
5   you wants to bring to the medical department, or one of
6   the supervisors in security, they would come to me to talk
7   to the medical staff in that facility.
8   Q   So you become, in essence, a liaison between the
9   superintendent's office and the medical staff?
10  A   Pretty much, yes.
11  Q   One other thing I'll tell you, just because I
12  noticed: If you nod your head, I understand what you're
13  saying, but she doesn't pick it up on the record. So if
14  you could try to give me an audible answer at the same
15  time, that will help. Okay?
16  A   Just remind me. Okay?
17  Q   I may jump in and do that from time to time.
18  A   That's okay.
19  Q   You work a week on/week off shift at Palmer,
20  right?
21  A   At the four facilities, yes. Palmer is two
22  facilities, medically speaking.
23  Q   Okay. And explain that for me.
24  A   There's a medium facility and a minimum
25  facility. And there are two separate medical offices

## Page 10

1 because they don't want to mix minimum inmates with medium
2 inmates. So there's a fence around one and there's not on
3 the other side. And so I go to both facilities, seven
4 days a week.
5    Q  And then you also spend some time in Mat-Su?
6    A  Correct. I start my work day at Mat-Su Pretrial
7 and I'll spend anywhere from one to three hours there
8 seven days a week.
9    Q  And then you also do some work at Point
10 McKenzie?
11    A  One day a week, in the afternoon or later in the
12 day, I will go to Point McKenzie, which is a work farm.
13    Q  So if I look at a typical day, then, setting
14 aside Point McKenzie --
15    A  Uh-huh.
16    Q  -- okay -- you're going to start your day what
17 time of day?
18    A  Six in the morning.
19    Q  And that's going to be at Mat-Su?
20    A  Mat-Su Pretrial.
21    Q  And then you'll spend several hours there?
22    A  Like one to three hours.
23    Q  Then go to directly in to Palmer?
24    A  To Palmer, usually minimum, and there until 12,
25 one o'clock; and the rest of the day I'll spend in medium.

## Page 11

1    Q  And then you're there until what, six?
2    A  4:30, five.
3    Q  So if I'm getting the numbers right, you're
4 spending roughly four hours a day at Palmer medium
5 facility?
6    A  Approximately.
7    Q  On the weeks that you're on?
8    A  Right.
9    Q  Does Roger Hughes have the identical schedule
10 when you're off?
11    A  Pretty much, except he will spend more time at
12 Mat-Su Pretrial than me, dealing with the management
13 issues of that facility, where -- if there's staff
14 meetings or other things. His liaison is with the
15 superintendent at Mat-Su Pretrial.
16    Q  How much of your time do you spend actually on
17 those management functions at Palmer?
18    A  It varies. I mean, there are time where I can
19 go almost no hours in a week dealing with them. And other
20 times where I have to spend, you know, many, many hours,
21 depending on the issue coming up. It's -- I will spend
22 probably at least one hour every week, but there are times
23 when issues come up that the superintendent needs
24 addressed.
25    Q  What types of issues are you talking about?

## Page 12

1    A  Well, the latest one was OSHA standards and what
2 does medical need to do to help the superintendent make
3 sure that we meet OSHA standards medically.
4    Q  Okay. And then one day a week you said you're
5 at Point McKenzie, right?
6    A  Part of a day, yes.
7    Q  And that's how long?
8    A  Well, it's a 65-mile drive from Palmer to Point
9 McKenzie. And I'll be there and see whatever the nurse
10 has set up for me, do medications, reviews, chart
11 sign-offs, anything that's happened in the previous week.
12 There's a single nurse out there Monday through Friday,
13 seven-and-a-half-hour work day. And it's a work camp, so
14 they try to send, in essence, healthy young folks out
15 there. So I'll oversee that. And then if the site
16 manager wants to speak or have lunch or whatever, I'll
17 meet up with him.
18    Q  And then will you actually get time to go back
19 to Palmer at that point?
20    A  Sometimes I do. It depends on what time of day
21 I'm going. It might end my day; it may be in the
22 beginning of the day. I have a very flexible schedule,
23 depending on what their needs are at Point McKenzie. So
24 if I went out there, you know, at seven o'clock in the
25 morning, I could be back to Palmer in the afternoon.

## Page 13

1    Q  So if I'm getting the numbers straight then, it
2 sounds like you spend roughly half a day at Palmer medium
3 six days a week, sometimes more?
4    A  Yeah. That's about right. I'll spend probably
5 a little more time on medium than I do on minimum on a
6 typical work day. There are more inmates on that side.
7    Q  On the medium side?
8    A  Yes.
9    Q  How many inmates are you dealing with on the
10 medium side?
11    A  I think there's like 250 -- 240, 250 -- 240,
12 250. And about 200 on minimum -- 175 to 200.
13    Q  You mentioned you've been with the department
14 for 21 years, right?
15    A  Yes.
16    Q  Has all of that time been assigned to Palmer?
17    A  Yes. I've been assigned there. I've had other
18 times where they've pulled me out of there to do other
19 things for short periods of time, but...
20    Q  Most of your career has been out at the Palmer
21 center?
22    A  Yes. Originally started with Goose Bay, which
23 no longer exists, three days a week, and two days a week
24 at Palmer, my first year. And then at the end of the
25 first year, then I became seven on, seven off -- the

Page 14

1  schedule I pretty much worked. They closed Goose Bay down
2  and opened Mat-Su Pretrial up, and then later opened Point
3  McKenzie.
4     Q  So pretty much for the last 20 years, then,
5  you've been dealing with Palmer?
6     A  Correct.
7     Q  Have you been the institutional health care
8  officer out there the whole time?
9     A  No. First five years was a different PA, who's
10 now deceased.
11    Q  So roughly 16 years?
12    A  Sixteen years.
13    Q  Let me understand, then, from your standpoint,
14 how the hierarchy works on the medical side. You're the
15 institutional health care officer; does everybody else on
16 medical staff at Palmer report to you?
17    A  The nursing staff does. The only time dental
18 and psych would report to me is if they thought I could
19 help them with a specific issue, but they tend to go
20 straight to administration.
21    Q  What does that mean, "they go straight to the
22 administration"?
23    A  Anchorage central office, the health care
24 administration.
25    Q  Is that who you report to as well?

Page 15

1     A  Correct.
2     Q  Do you have a boss there now?
3     A  Yes.
4     Q  Who is that?
5     A  The health care administrator is Dr. Henry
6  Luben. And the physician I deal with the most, but also
7  out of there, is Dr. Rebecca Bingham.
8     Q  So you report to the health care administrator
9  in Anchorage?
10    A  Correct.
11    Q  And how long has that been the case?
12    A  Since I've been hired.
13    Q  You mentioned that you oversee the nursing staff
14 at Palmer?
15    A  At Palmer, I am the supervisor of the nurses
16 there.
17    Q  And how many nurses are on staff currently?
18    A  Four. Four registered nurses.
19    Q  And do those registered nurses also work a week
20 on/week off shift?
21    A  Correct.
22    Q  So at any given time how many registered nurses
23 are on duty at Palmer?
24    A  Two, approximately six in the morning until
25 midnight. So they overlap.

Page 16

1     Q  How long has that been the schedule?
2     A  I don't know. It's -- the nursing schedule has
3  changed so many times over the last 21 years. I would say
4  at least five years, but I'm not the person to ask that.
5  Probably Dr. Luben would have that knowledge better.
6     Q  When did Dr. Luben come in as the health care
7  administrator?
8     A  Oh, gosh. I want to say three years ago, but
9  again, I just -- I don't know exact. I've had a number of
10 different HCOs that I've reported to in 21 years.
11    Q  Has the six A.M. to midnight nursing shift been
12 in place since Dr. Luben arrived?
13    A  I believe so, yes. Prior to him coming on.
14    Q  And what it was before that, you're not sure?
15    A  Well, like I said, we've gone through a variety
16 of different things, from 24-hour nursing care to very
17 minimal hours to where we're at now.
18    Q  When did you have 24-hour nursing care?
19    A  I want to say about 15 years ago -- 12, 15
20 years.
21    Q  Do you remember what it was in 2002?
22    A  Not off the top.
23    Q  It wasn't 24 hours, though, was it?
24    A  No. It hasn't been 24 for quite a while.
25    Q  Do you know why it was changed from 24-hour

Page 17

1  nursing care?
2     A  I was not brought in on the decision-making
3  process of that. It was done through there, but my
4  understanding was it was very inefficient; it was not cost
5  effective.
6     Q  Not economical to do it?
7     A  Correct.
8     Q  Basically, cost too much?
9     A  I don't know that.
10    Q  But it wasn't cost effective, to use your term?
11    A  To my understanding. Again, I wasn't brought in
12 on the decision-making process. But when inmates are in
13 lock-down status for sleep -- on medium I think it's
14 somewhere between 10 and midnight, depending on the day of
15 week, till six in the morning -- they're not allowed out
16 of their rooms; there's not much a nurse can do in those
17 hours.
18    Q  Except in an emergency?
19    A  Correct.
20    Q  You mentioned that you supervise four registered
21 nurses. Are there other nurses on staff as well?
22    A  Not at this time.
23    Q  Are there rotating physicians who come into the
24 facility as well?
25    A  I guess -- "rotating." What do you mean?

Page 18

1  Q  Let's see if I can --
2  A  There are physicians that come to the facility.
3  Q  Okay.
4  A  Back at this time, in 2002 I believe it was,
5  there was -- I want to say it was Dr. -- was it Dr.
6  Kiester and Dr. Christensen.
7  Q  And Dr. Billman?
8  A  Dr. Billman was just coming in around that time.
9  I'm sorry about my dates --
10 Q  That's all right.
11 A  -- but for most of my career, I worked with Dr.
12 Christensen and Dr. Kiester. And each quarter they would
13 come out, either would be Dr. Christensen for three months
14 or Dr. Kiester for three months, and they had a specific
15 day that they would come to the facility. And the
16 majority of my career, that's who I worked with: Three
17 months Dr. Christensen, the next three months Dr. Kiester,
18 the next three months -- and they would come one day every
19 week.
20     Around this time things started to change -- and
21 Dr. Luben would probably have that information on when it
22 was -- and then they started bringing in Dr. Billman,
23 who's an internal medicine doctor. And then at one stage
24 he was the only one coming to the facility. But right now
25 I have Dr. Bingham, Dr. Luben, are the two that come to

Page 19

1  the facility at this stage.
2  Q  And do they still come one day a week?
3  A  They're trying to.
4  Q  Not as regular as it used to be?
5  A  Not like it was back when Dr. Christensen and
6  Dr. Kiester was on board. They were contracted strictly
7  to do that for the state at that stage and that was what
8  they did.
9     Dr. Luben and Dr. Bingham work for the state,
10 they don't contract for the state, and so they have
11 multiple facilities, including Arizona. So if there's an
12 issue that comes up that I don't necessarily need them
13 that week or something that I don't have to have them deal
14 with, if they have other priorities they'll go other
15 places. Am I making sense?
16 Q  Yup.
17 A  Right now Dr. Luben is scheduled to come to
18 Palmer Correctional Center every Thursday through the end
19 of the year.
20 Q  Okay.
21 A  And that's subject to change, but that's what he
22 is.
23 Q  You mentioned that Dr. Billman was just
24 starting, you thought, around the time --
25 A  With PCC. He had been working contract for the

Page 20

1  Department of Corrections, my understanding, for a number
2  of years prior to that.
3  Q  Okay. Focusing on PCC -- Palmer Correctional
4  Center, so we understand what we're talking about, right?
5  A  Correct.
6  Q  Dr. Billman was just starting as a physician
7  coming in there on a weekly or semi-regular basis?
8  A  Semi-regular.
9  Q  When he started, did Dr. Kiester and/or Dr.
10 Christensen stop coming out on a scheduled basis?
11 A  If I remember right, no. Sometimes I would have
12 two physicians in a week. The dates -- I'd have to really
13 go back and do some research to know exactly, but no, we
14 would start getting -- Dr. Christensen was a family
15 practice physician; Dr. Kiester was a DO. And so the
16 department decided that an internal medical doctor was a
17 nice addition. I believe he was working Cook Inlet -- Dr.
18 Billman was working Cook Inlet and Spring Creek, which is
19 our maximum security unit in Seward. And possibly Hiland
20 Mountain.
21 Q  Dr. Billman was working on contract?
22 A  Yes.
23 Q  To your knowledge, anyway?
24 A  Yes. He was -- like Dr. Kiester and Dr.
25 Christensen -- was not a state employee.

Page 21

1  Q  We talked briefly about what it is that a PA
2  does. Let me ask you, if I can, specifically what
3  training you have as a PA. What goes into that? I know
4  it's been a while, but...
5  A  When I went through the PA program, physician
6  assistants started during the Vietnam era, where you had
7  corpsmen coming back from battlefield conditions with no
8  place to go in society as far as a job was concerned. And
9  the United States decided that rural America was in need
10 of highly trained medical providers and couldn't afford
11 economically to place doctors in every little community in
12 the U.S., and so PAs were created -- I want to say it was
13 like '73, '74, somewhere in that range. So they took
14 Vietnam corpsmen -- Duke University was the first one --
15 and added training to their military training and
16 developed the physician assistant thing.
17    I went in in 1979, the University of Washington.
18 I was a Vietnam era veteran. I'd been independent duty,
19 so I had my military corpsman experience, which put me
20 into the program. And there was a set didactic phase at
21 the University of Washington where they teach you anatomy
22 and physiology, emergency medicine, pharmacology,
23 radiology, pediatrics, the whole line.
24    And then you go through a series of many
25 residencies, anything from a few days -- I think I had

**Page 22**

1  three days in Harborview's sexually transmitted disease
2  clinic -- up to six months in a family practice, where I
3  did a residency with three family practice physicians.
4  It's typically -- it's based on the medical model,
5  University of Washington medical school. So we're taught
6  along the lines -- most of the people we had teaching us
7  were instructors for the medical school at the University
8  of Washington. We would have a condensed form of what
9  they teach in the family practice physicians.
10     Q   How long did the program take?
11     A   Took me 12 months.
12     Q   Do you have to have a bachelor's degree in order
13  to enter that program?
14     A   No.
15     Q   Can it be obtained as part of a bachelor's
16  degree?
17     A   Yes.
18     Q   Do you have to have a bachelor's degree to get
19  out of the program?
20     A   No. It may be now. But when I went through,
21  there were programs that offered certificates, there were
22  programs that offered bachelor's, and there were programs
23  that offered master's, depending on which school. I
24  believe I was one of the very first who went through the
25  University of Washington that obtained a bachelor's degree

**Page 23**

1  after the program. And I think they offer it regularly
2  now. School philosophies have changed.
3     Q   When did you obtain the bachelor's degree?
4     A   I think it was '82, '83 -- '82 or '3.
5     Q   Is it a bachelor of science?
6     A   Correct. Public health.
7     Q   Any formal education since then?
8     A   No. I've not returned to college, no.
9     Q   Do you have to do continuing education or
10  something like that --
11     A   Correct.
12     Q   -- to maintain your license?
13     A   Yes.
14     Q   When you got out of school in '82 --
15     A   Actually, I started to work in '81. I finished
16  my schooling while I was working.
17     Q   And where were you working?
18     A   First in eastern Washington, then here in
19  Alaska, Fort Yukon, where I finished it -- my final paper.
20     Q   Thesis paper?
21     A   In essence, yes.
22     Q   What was it in?
23     A   It was traditional medicine in the Athabascan
24  Nitsikuchian (ph) Native population.
25     Q   Can you spell "Nitsikuchian" for our court

**Page 24**

1  reporter? Because I can't even begin to try.
2     A   I can't either. I'm sorry. I could look it up.
3  Athabascan -- interior Athabascan Indians. It was on
4  medicine women and shamans of the area and what plants
5  they used. It was a fun paper.
6     Q   So when you first came to Alaska you started in
7  Fort Yukon?
8     A   Correct.
9     Q   What year was that?
10     A   '81.
11     Q   And what year did you actually start with
12  Department of Corrections?
13     A   April Fool's, '85.
14     Q   Okay. Fill in the time period for me between
15  '81 and '85. What else did you do?
16     A   I worked in Fort Yukon.
17     Q   The whole time?
18     A   Yes. I'm sorry.
19     Q   That's okay.
20     A   I worked for Tanana Chiefs Corporation.
21     Q   You mentioned that, as part of your PA program
22  at University of Washington, you go through a series of
23  mini-residencies, if you will.
24     A   Correct.
25     Q   Was any of those in cardiac care?

**Page 25**

1     A   Part of the training was specifically cardiac
2  care.
3     Q   Explain that for me.
4     A   The didactic phase, as well as -- how the
5  program was set up is, you would go through body systems.
6  And when it came to cardiac, cardiac would be -- that
7  period of time set up for cardiac, would be everything
8  from emergency care to pediatric to pharmacology to -- you
9  know, anything associated with cardiac. And then during
10  that time phase, as you were taught cardiac, you could be
11  sent to, like, a nursing home or an emergency room or
12  whatever to apply the things that you've learned during
13  that phase of training to the real world.
14         Does that make sense?
15     Q   Yeah.
16     A   Okay. So each body system was dealt with that
17  way in the program we were in. It was very direct for
18  that body system when you went through that phase of
19  training.
20         I think it was -- at that time was the first
21  time I became ACLS, advanced cardiac life support
22  certified. It was around '80 -- between '80 and '82.
23     Q   What did you have to do to get that
24  certification?
25     A   It's a specific program that is generally -- I

**Page 26**

1   believe it's 16 hours long, where physicians, nurses, PAs,
2   MPs, a variety of different medical providers, are taught
3   advanced cardiac life support, what to do in case somebody
4   has a heart attack, has a stroke, has complications
5   cardiac in nature, emergency life-saving techniques. It's
6   above and beyond CPR and it's geared toward medical
7   providers.
8       Q   That's what I was going to ask you. I mean, for
9   those who have taken a standard CPR class, how does it
10  differ?
11      A   It's significantly different. Your taught how
12  to inject -- what drugs to inject, either endotracheal,
13  IV, straight into the heart, you know, whatever it takes,
14  all of the different cardiac emergencies that can happen.
15  And you're taught what to do.
16          And because I was independent duty, remote out
17  in Fort Yukon, I had the potential of frequently having to
18  do those types of things that, if there's not a provider
19  there, they're going to die. I mean, it doesn't amount
20  that all of ACLS works a hundred percent of the time, but
21  at least you can give it a shot. I moonlighted up on the
22  Slope for a number of years in my off time, and -- the
23  same thing there, where you potentially are -- you're it.
24  Same thing in rural Alaska.
25      Q   Given the nature of cardiac problems, if they

**Page 27**

1   don't get care, immediately somebody could die?
2       A   Exactly.
3       Q   And that's why you have that kind of training?
4       A   Uh-huh. I don't think I've had any jobs that
5   have required that I have that as part of my basic job
6   requirement, certainly not with DOC, but I've tried to
7   maintain it every two years, and I don't think I've had
8   any lapse time.
9       Q   Have you had to put it into use?
10      A   Oh, sure.
11      Q   Frequently?
12      A   I wouldn't say frequently, no. There -- oh, how
13  do I explain it? When somebody comes into your office
14  with chest pain, no matter what the cause of that chest
15  pain, whether it's they've been playing baseball and
16  they've hurt their ribs from swinging a bat too hard to
17  having a heart attack to anything in between, you use the
18  basic fundamentals -- at least I do -- of ACLS in
19  determining what's going on with that person. So in that
20  aspect, yes. Most of the time chest pain is not a heart
21  attack.
22      Q   Could be anything from heartburn to injured ribs
23  to --
24      A   Correct.
25      Q   So when you're treating somebody who comes in

**Page 28**

1   complaining of chest pain, you start with the assumption
2   this may be more serious --
3       A   Always.
4       Q   -- and work your way backwards?
5       A   Always. That starts with the history.
6       Q   Essential to get an accurate history?
7       A   Yes, for any condition.
8       Q   As part of your ACLS training, were you given
9   training in defibrillators?
10      A   Yes.
11      Q   Explain that for me.
12      A   It's part of the training. I mean,
13  defibrillators, since they were first brought out, has
14  been part of ACLS from the beginning.
15      Q   Explain for us what a defibrillator does.
16      A   A defibrillator is a mechanical device that
17  will, in essence, use electricity to try and convert a
18  specific rhythm to a normal rhythm. It deals with
19  ventricular fibrillation.
20      Q   Okay.
21      A   That's the only thing it does. What you see on
22  TV, what they use them for, has nothing to do with
23  reality.
24      Q   No great surprise there.
25      A   No. Movies have done a great disservice.

**Page 29**

1   That's one of the things they talk about in ACLS classes,
2   of how many nutsy things are being defibrillated for.
3   It's just -- anyway.
4       Q   When you're talking about a defibrillator in
5   that sense, you're talking about an external
6   defibrillator, correct?
7       A   Correct.
8       Q   How does that differ -- strike that.
9           Let's move forward, if we can, to 2002. Okay?
10      A   Okay.
11      Q   You remember Charlie Davis?
12      A   Somewhat. I mean, he wasn't there very long, so
13  I had very little contact with him. So I just minimally
14  remember him.
15      Q   What do you remember about him? Do you remember
16  anything about his medical condition?
17      A   Not a lot. I mean, he had an implanted
18  defibrillator, and I saw him once for some leg pain,
19  musculoskeletal. And then I saw him then -- I think the
20  only other time I saw him was when he wrote a grievance,
21  and I investigated that, which is one of the things
22  institutional health care officers do. I get to
23  investigate all the original grievances there.
24      Q   That just came with the territory?
25      A   Yes, part of the administrative duties.

Page 30

1  Q  You mentioned that Charlie Davis had an
2  implanted defibrillator.
3  A  Correct.
4  Q  Was that something that you had dealt with at
5  PAC [sic] much before?
6  A  I'd had dealings with them. As we progress
7  forward, they're more and more common. They weren't -- 15
8  years ago, there weren't very many of them out there. A
9  lot more pacemakers have been installed in that time
10 frame.
11 Q  How does a defibrillator -- implanted
12 defibrillator differ from a pacemaker?
13 A  A pacemaker -- my understanding, it's a much
14 more complicated device. It will automatically send an
15 electrical impulse to the heart, specific area of the
16 heart, and tell the heart to contract. The heart is a
17 two-stage pump, the top part and the bottom part. And a
18 pacemaker will tell the top part to squeeze, then the
19 bottom part to squeeze in a set time frame. It
20 mechanically tells the heart when to beat.
21 Q  Okay.
22 A  And an automatic defibrillator only has one
23 function, and that is to monitor to see if the heart goes
24 into fibrillation and, if it does, to send a mild direct
25 shock to the heart to knock it out of fibrillation, which

Page 31

1  is just quivering, into two-stage pump working. That's
2  all it does.
3  Q  And it's automatic in the sense that it's
4  designed to work continuously?
5  A  Correct.
6  Q  And to monitor that rhythm continuously?
7  A  Correct.
8  Q  And to make sure that it stays out of
9  fibrillation?
10 A  Correct.
11 Q  Can you give me some estimate of the number of
12 inmates you had seen with implanted defibrillators prior
13 to Charlie Davis?
14 A  Wouldn't have a clue. I mean, I don't know. I
15 kind of think of them along the lines of the pacemakers as
16 well, because it's an implanted device, and how that might
17 affect security; everything is security-oriented there.
18 It wasn't a lot. You know, maybe a dozen. I don't know.
19 Q  Okay.
20 A  This last -- couple weeks ago, I had, I believe,
21 three in the institution at one time.
22 Q  With implanted defibrillators?
23 A  Yeah. It's becoming more and more common.
24 Q  So as of 2002, you might have had up to a dozen?
25 A  That's a guess.

Page 32

1  Q  Okay.
2  A  I really -- I've never tried to keep numbers.
3  Q  Do you deal with inmates with an implanted
4  defibrillator any differently than you do anybody else?
5  A  Not particularly. I guess I'm not sure what
6  you're asking there.
7  Q  Well, because an inmate has an implanted
8  defibrillator, do they have special needs?
9  A  Well, I guess it depends on the other things
10 surrounding them: Why they have it, what medications
11 they're on, any complications they're having. It's -- it
12 can be a very complicated issue and it can be very
13 routine.
14 Q  Would you agree with me that nobody gets an
15 implanted defibrillator without a serious heart condition?
16 A  Fibrillation is a serious cardiac condition and
17 that's what you're trying to prevent, so yes.
18 Q  So yes, somebody would not get an implanted
19 defibrillator unless they had an underlying serious heart
20 condition?
21 A  Correct. Once that's rectified, might -- well,
22 it would influence how I would view them.
23 Q  Rectified in the sense that once the implant is
24 put in?
25 A  Uh-huh. It is a very specific function. People

Page 33

1  that have implanted defibrillators can function normal,
2  day-to-day activities. The vice president of the United
3  States has one in there. And so -- the goal in medicine,
4  as I understand it, is to try and return these individuals
5  to a normal as possible function in society to have a
6  quality of life.
7  Q  Do you know, when Charlie Davis arrived at
8  Palmer Correctional Center, how many medications he was
9  taking?
10 A  I'd have to look. I'm going to say half a
11 dozen. It's in his record there. Do you want me to look
12 it up?
13 Q  Well, let me ask you about records while we're
14 on that subject. It looks like you've got some paper that
15 you brought with you.
16 A  Yeah.
17 Q  What do you have?
18 A  I have the -- some of the lab tests here. I
19 have some of the medical record entries. I have the
20 grievance and a grievance appeal, the affidavit I'd
21 previously done. I think that's about it. Chart notes.
22   MS. KAMM: Tom, are you looking for the
23 documents in response to the subpoena?
24   MR. MATTHEWS: Well, I will be, but that wasn't
25 what I was asking him.

Page 34

1  MS. KAMM: Okay.
2  MR. MATTHEWS: I didn't understand his answer to
3  be related to the subpoena.
4  MS. KAMM: Okay
5  THE WITNESS: Okay.
6  So did I answer what you needed?
7  MR. MATTHEWS: Yeah.
8  THE WITNESS: Okay.
9  (Exhibit 1 marked.)
10 BY MR. MATTHEWS:
11 Q  Let me show you what we've marked as Exhibit 1,
12 Mr. Hale. Ask you if you recognize that document.
13 A  Yes.
14 Q  I take it that's an affidavit that you have
15 given in this case?
16 A  Yes.
17 Q  Approximately on May 12, 2006?
18 A  Yes.
19 Q  Let me ask you a few questions, if I can, about
20 this affidavit. In paragraph two on the second page, you
21 go through a bit of your background, training, and that
22 type of thing, in the use of automated defibrillators,
23 right?
24 A  Yes.
25 Q  At the end you talk about that you were very

Page 35

1  familiar with implantable defibrillators and, "there have
2  been other inmates at PCC that I have seen at the medical
3  clinic with these implants," right?
4  A  Yes.
5  Q  Can you recall another inmate other than Charlie
6  Davis at PCC who had an implanted defibrillator -- well,
7  let me stop there.
8  A  Okay.
9  Q  Can you recall another specific inmate --
10 A  By name, no, but yes, I've had a handful.
11 Q  At the time that you were seeing Charlie Davis
12 in 2002, you had had a handful?
13 A  Yes.
14 Q  And you've had a handful since?
15 A  Yeah. There are times I can go months and
16 months and months without any. Like I said, three weeks
17 ago when I was last at work, I had three.
18 Q  Do you tend to see inmates with implanted
19 defibrillators more than you do other prisoners?
20 A  No. What do you mean? Do they come to the
21 medical office to --
22 Q  Yeah. Sorry. That was a terrible question.
23 Okay.
24 A  Yeah? No. Very -- just the opposite.
25 Q  Explain.

Page 36

1  A  I don't have a lot of problems with people that
2  have defibrillators, implanted defibrillators, unless
3  there's other comorbidities going on.
4  Q  I'm sorry. I didn't -- co- --
5  A  Comorbidities. They have other conditions going
6  on that have nothing to do with their heart going into
7  fibrillation. They have COPD, chronic obstructive airway
8  disease; they have congestive heart failure; they have
9  other comorbidities.
10 Q  When Mr. Davis came to Palmer, do you know how
11 long he had had the defibrillator?
12 A  No. Not off the top, no.
13 Q  Would it make any --
14 A  I never saw him for a defibrillator issue. He
15 never came and talked to me about what he had or any of
16 that, which is not uncommon. There are multiple people
17 that come in -- it was the third institution he was at.
18 Q  Where else had he been before you?
19 A  I believe Cook Inlet; it was someplace in
20 Anchorage. He was at Mat-Su Pretrial and then came to
21 Palmer Correctional.
22 Q  So is it fair to say that, when Mr. Davis came
23 to you, he was basically just another prisoner?
24 A  Well, yes.
25 Q  Was there anything unique about his medical

Page 37

1  condition that brought him to your attention?
2  A  Unique, individualized, no.
3  Q  When Mr. Davis came to Palmer, was he given a
4  physical exam?
5  A  I don't know.
6  Q  Would that normally be something that would be
7  done when an inmate transfers in?
8  A  No.
9  Q  Why not?
10 A  It's not something the department normally does.
11 When somebody is first incarcerated, they are offered,
12 within the first 14 days of incarceration, an intake
13 history and physical. They can choose to accept it or
14 reject it. He was in another facility during that time.
15    When they're transferred to another facility,
16 they are screened in by the nursing staff, and they are
17 asked specific questions: Do you have any pressing
18 medical needs; do you need to be seen. And if they do,
19 they are told how to obtain that.
20 Q  And that's a screening that would occur at
21 Palmer since he was transferred in --
22 A  At Mat-su Pretrial. He was incarcerated, what,
23 six, seven months and had been in three different
24 facilities. And to do three different physicals is not
25 something the department has thought was appropriate.

Page 38

1  Q  What's involved in the nurse screen when he
2  transfers in?
3  A  It would be best to ask the nurses but --
4  because I rarely ever do any of that. But they have a
5  specific form that they follow through, and they want to
6  know what medications they're on, if they have any
7  psychiatric needs, are they suicidal, do they have any
8  dental needs, do they have any pending appointments with
9  an outside referral agency. If they are supposed to be
10 getting some X-rays or lab work or whatever else, they
11 would ask them at that time. And in each facility, they
12 are told, you know, what to do to access medical care,
13 filling in a COP-OUT, putting it in writing so we know
14 what it is that they're requesting.
15        (Exhibit 2 marked.)
16 BY MR. MATTHEWS:
17 Q  Take a look at what we've marked as Exhibit 2.
18 A  Okay.
19 Q  Is this an example, Mr. Hale, of the nurse
20 screening that you were just talking about?
21 A  No.
22 Q  This is different?
23 A  Correct.
24 Q  What's the nurse screening form look like?
25 A  It's three pages. I don't know if I've got one

Page 39

1  in here. Let me see if I have one. This is a problem
2  list and the physical that was offered within the first
3  few weeks of incarceration; and an old physical from '98,
4  from a previous incarceration, I'm assuming.
5  Q  I don't think I've seen an intake screening form
6  in this collection.
7  A  One side of the intake screening form is
8  strictly psychiatric questions: How the person appears
9  from a psychiatric standpoint; are they agitated; are they
10 hallucinating; are they suicidal; have they tried to
11 commit suicide in the past.
12        And the other side of it is the direct
13 presentation when they're remanded in. It's also called a
14 remand screen.
15 Q  Okay.
16 A  And that side has specifics, what it is when
17 they first show up. The original one will say what
18 medications they are on, again if they have impending
19 medicine things: I'm due to have an ultrasound on my
20 gallbladder, for an example.
21        And then each time they go to a new facility,
22 the nursing staff at the incoming facility -- the outgoing
23 facility will send a piece of paper stating they're on
24 this medication, whether they're cleared for air travel,
25 whether they need a wheelchair, whether they have -- you

Page 40

1  know, all these different things are on there.
2        And then the receiving institution again goes
3  through with the patient, the inmate, when they come into
4  the facility. Sometimes they -- well, they screen them
5  in.
6  Q  Okay.
7  A  They -- the issues that the department is
8  concerned with, number one, are they suicidal. That's of
9  paramount importance. Corrections across America has an
10 extremely high suicide rate. And Alaska has one of the
11 lowest, which we're fairly proud of.
12       And two, do you have any pending pressing
13 emergency medicine, dental, psychiatric needs. And three,
14 do you think you're supposed to be getting something that
15 you're not getting.
16 Q  Okay.
17    MR. MATTHEWS: Let's go off record for a minute.
18       (Off record.)
19       (Exhibit 3 marked.)
20 BY MR. MATTHEWS:
21 Q  While we were off the record, Mr. Hale, we've
22 located and now provided for you a document marked as
23 Exhibit 3. Is that an example of the remand screen that
24 you were talking about a moment ago?
25 A  The remand screen, correct.

Page 41

1  Q  This is the type of form that should have been
2  filled out each time Mr. Davis was transferred from
3  facility to facility?
4  A  No.
5  Q  Then I misunderstood what you said earlier.
6  A  The first page here --
7  Q  Okay.
8  A  -- is when the person is arrested. And it says
9  Lemon Creek, not Cook Inlet, so --
10 Q  Right.
11 A  -- it wasn't my facility. Okay.
12       The booking officer fills this first page in at
13 that facility, in most instances. I don't think the
14 nursing staff or medical staff ever fills this first page
15 in. They can sign off on it -- they have a place to sign
16 off on it. But it's basically filled in -- it's called a
17 pre-remand screening there at the very top.
18 Q  Okay. And that's the first page of the form?
19 A  Correct.
20 Q  Okay.
21 A  Then the second page here is almost always
22 filled in by the nursing staff. And this is again, what's
23 their physical condition, their vital signs, any
24 particular medications that they're on, drug and alcohol
25 use, those sort of things. And then the second page there

Case 3:02-cv-00214-JKS   Document 99-8   Filed 10/13/2006   Page 12 of 16

Roger Hale                                                                                      August 25, 2006

Page 42

1 is the psychiatric screen.
2    Q   When you say "second page," meaning the third
3 page --
4    A   The third page. I'm sorry.
5    Q   -- of the exhibit. Right?
6    A   Exhibit 3. And that again -- what do they look
7 like, at the top part. You know, are they coherent; are
8 they hallucinating; is there a breakdown; are they
9 suicidal; have they attempted suicide in the past.
10       Sometimes page one ends up coming back on an
11 subsequent intake screening. There's a back page to this,
12 though, that the nursing staff -- actually, there's two
13 separate pages. I don't remember when that came into
14 existence, that screening form. It wasn't always used by
15 the department. But they now have a very good form that
16 the nurses fill in; they have a format to follow through.
17 And I have no recollection of when that started.
18    Q   Do you know whether it was before or after April
19 of 2002?
20    A   I don't remember. I believe it's been in
21 existence longer than that, before.
22    Q   Let me make sure that I'm clear, then. The form
23 that we're looking at, Exhibit 3 --
24    A   Uh-huh.
25    Q   -- is this all one form or have we combined two

Page 43

1 forms?
2    A   No. No, it's just a three-part. This is
3 correct. This is the remand -- three-stage remand form.
4    Q   And this is different than the form that you
5 were describing earlier that would typically be filled out
6 by the nursing staff when a new prisoner is transferred to
7 your facility?
8    A   A transfer. There's a transfer form and there's
9 a new remand. Every time somebody is brought in off the
10 street -- so if they're in but released on their own
11 recognizance or whatever else, they're out, they return
12 back in, each time they're supposed to have this done
13 again.
14    Q   And that's called the remand screen?
15    A   Yes, each remand.
16    Q   And then each time a prisoner is transferred
17 from facility to facility there should be another --
18    A   A transfer sheet, yeah, another form.
19    Q   And it's called a transfer form?
20    A   I would have to look it up, but I believe
21 that's --
22    Q   Okay.
23    A   Again, I don't see it in any of the paperwork
24 here.
25    Q   That's why I asked, because I haven't seen it

Page 44

1 either.
2    A   It may have come into existence afterwards.
3    Q   Okay. In any event, to the best of your
4 knowledge, an exam should be done for each new transfer
5 when they arrive at Palmer?
6    A   No.
7    Q   No?
8    A   No. Not an exam.
9    Q   Sorry. I'm using the wrong word.
10    A   Okay.
11    Q   An intake --
12    A   A screening.
13    Q   Okay.
14    A   A transfer screening should be done.
15    Q   And how do you distinguish, then, between an
16 exam and a screening?
17    A   Exam is where you have hands-on: I'm listening
18 to heart; I'm listening to bowel sounds. I'm physically
19 doing an exam. That's how I look at it. I don't know if
20 you're meaning something different.
21    Q   Well, that's why I asked the question. I want
22 to make sure we're on the same page here.
23    A   Okay.
24    Q   So a screen, then, simply means, I'm going to
25 eyeball this person, I'm going to ask them how they're

Page 45

1 feeling, I'm going to go through my form to see what
2 problems there may be?
3    A   Yes.
4    Q   It doesn't involve hands-on?
5    A   Not necessarily. If it's appropriate, vital
6 signs are taken, weights are taken. The nursing staff
7 have a lot of flexibility. They can determine if
8 something needs to be done.
9    Q   For example, on the second page of this form,
10 recognizing --
11    A   This one (indicating)?
12    Q   Sorry, Exhibit 3. It's not the transfer form.
13 Vital signs are one of the first things listed under
14 Health Care Screening, right?
15    A   Right. When somebody comes in off the street
16 into Corrections, the vast majority of them are doing
17 drugs or alcohol or a combination of that. Most people
18 come to jail intoxicated. And vital signs are important.
19    Q   Okay.
20    A   That's why, each time they're remanded, we have
21 to make sure that they're not suicidal; they're not going
22 to go into DTs or alcohol withdrawals or whatever.
23    Q   When they're transferred from facility to
24 facility, presumably they don't have those same
25 problems --

Page 46

1  A  Correct.
2  Q  -- so you don't have to do the same level of
3  screening, if you will, when it's a transfer?
4  A  I would say yes, that's correct.
5  Q  The assumption is they're not actively using
6  drugs or alcohol --
7  A  Correct.
8  Q  -- while they're in a facility?
9  A  And depending on how long it's been since their
10 transfer.  Did they lie when they come in.  Are they
11 now -- you know, they're four or five days into the
12 incarceration, and their alcohol level has dropped down
13 and they're going to go into DTs, delirium, tremors.  So
14 it's individualized.
15      The nurses physically look at the person to see
16 if they look like they're detoxing or acting out in some
17 way.  And as I say, they have a lot of flexibility in what
18 it is that they can do.
19 Q  So there should be at least a health care screen
20 done by a nurse whenever a prisoner comes into a facility?
21 A  A transfer screening, yes.
22 Q  A transfer.  Okay.
23 A  There was a stage where it was just a chart
24 entry in the progress notes when he may -- when he
25 transferred in.  I apologize.  I just don't remember when

Page 47

1  that specific form that we use now came into existence.
2  Q  You don't need to apologize.  I'm just asking
3  for your best memory, so.
4  A  All right.
5  Q  We looked at your affidavit a moment ago.  It
6  appears, in going through that affidavit, that you were
7  going through the chart at the time it was prepared or at
8  least you had the chart accessible to you, because there's
9  a number of different dates and treatment events that are
10 mentioned in there, right?
11 A  Yes.
12 Q  As you went through that chart, do you recall
13 seeing a transfer screen form at any point?
14 A  No.
15 Q  Do you know if you've ever seen a transfer
16 screen form for Charlie Davis?
17 A  I don't remember.
18 Q  Is that the type of form that should also be
19 filled out before a prisoner is transferred to another
20 facility?
21 A  There's a pre-transfer screening form, correct.
22 Q  So if Palmer was the third facility that
23 Mr. Davis was at, you would typically expect to find a
24 pre-transfer screen from the last facility that he had
25 been at and then a new transfer screen from the next

Page 48

1  facility?
2  A  Correct.
3  Q  So there might have been as many as --
4  A  Two.  From Lemon Creek to Mat-Su and Mat-Su to
5  PCC.  If I have -- I'm just looking at signatures, trying
6  to remember who writes -- some signatures I recognize and
7  some I don't.
8  Q  Assuming that he went straight from Lemon Creek
9  to PCC --
10 A  There would be one.
11 Q  There would be one transfer form?
12 A  Correct.
13 Q  And then, if he was transferred back to Lemon
14 Creek from PCC, you would expect to find again a transfer
15 form?
16 A  Correct, and/or a chart entry that says that
17 they're transferred.
18      THE WITNESS:  Can I ask you a question?
19      MR. MATTHEWS:  Well, you're not supposed to,
20 but...
21      THE WITNESS:  Okay.  Never mind then.
22      MR. MATTHEWS:  Do you want to break?
23      THE WITNESS:  Well, I just -- it was along this
24 line, but I don't know if it's appropriate for me to say
25 it or not.

Page 49

1       MS. KAMM:  Let's take a break.
2       (Recess taken.)
3       MR. MATTHEWS:  Mr. Hale, let me ask you this:
4  Is there anything you need to correct about your prior
5  testimony or anything you need to clarify given the break
6  that we just had
7       THE WITNESS:  No.
8       (Exhibit 4 marked.)
9  BY MR. MATTHEWS:
10 Q  Are you ready?
11 A  I'm sorry.
12 Q  Do you recognize this document?
13 A  Yes.
14 Q  Can you tell us what it is.
15 A  It's health care progress notes from the medical
16 record -- photocopies.
17 Q  And these are the health care progress notes
18 relating to Charlie Davis?
19 A  Charlie Davis.
20 Q  For the time period April 3, 2002 through -- is
21 it December -- well, through December.
22 A  January 6, '03.  It's wiped out.
23 Q  The last entry?
24 A  Yeah.
25 Q  And there are Bates numbers -- forget the Bates

Page 50

1  numbers.
2       As far as you can tell, does this appear to be a
3  complete copy of the progress notes relating to Charlie
4  Davis?
5     A   Yes.
6     Q   If you would take a look at the fourth page of
7  the exhibit, the bottom note, starting at 4/22/02; do you
8  see that?
9     A   Yes.
10    Q   It says, "I am cleared for transport/transfer to
11 PCC"?
12    A   Yes.
13    Q   Does that appear to be a transfer note such as
14 we were discussing earlier?
15    A   Yes.
16    Q   And that was prepared by Shirley Hawkins, it
17 appears?
18    A   Yes.
19    Q   Do you know Ms. Hawkins?
20    A   No.
21    Q   Does this appear to you to be a note relating to
22 Mr. Davis's transfer screen prepared at Lemon Creek --
23    A   Yes.
24    Q   -- before being sent to Palmer?
25    A   Yes.

Page 51

1     Q   You see on the third line it says, "See transfer
2  sheet." Right there (indicating).
3     Q   Okay.
4     A   And the fourth line says, "Requires PT and INR
5  approximately every two weeks."
6     A   In two weeks, yeah.
7     Q   Is it correct that the entries starting on the
8  following page, page five of the exhibit, through page
9  nine were all prepared at Palmer?
10    A   Okay. Let's see. Yes.
11    Q   Is there any indication that a health screen was
12 done on Mr. Davis when he arrived in Palmer?
13    A   I don't see that that's documented in this.
14    Q   Would you expect to see it documented in here?
15    A   Not necessarily, no.
16    Q   Would you expect to see it documented either in
17 this progress notes or in a separate intake sheet?
18    A   In the intake sheet, I would expect to see it
19 there. The transfer sheet -- not this intake, but the
20 transfer sheet referred to in the previous paragraph.
21 Sometimes you see both.
22    Q   Is it correct we should see one or the other at
23 least?
24    A   I would hope so.
25    Q   Can you tell from these notes -- strike that.

Page 52

1         Do you remember when you first came into contact
2  with Mr. Davis?
3     A   As best as anything, my note is what I remember
4  more than him.
5     Q   And can you help us out in terms of the notes,
6  then?
7     A   Okay.
8     Q   According to the progress notes, when was the
9  first time you saw Mr. Davis?
10    A   5/2/02.
11    Q   On what page does that appear on?
12    A   It's on page 6 of 12.
13    Q   The top part, top note?
14    A   Yeah. And this is the only time I saw him as a
15 patient.
16    Q   And this is when he came in complaining of leg
17 pain, right?
18    A   Correct, hip and leg.
19    Q   And you filled out, in typical SOAP format --
20    A   Correct.
21    Q   -- your assessment.
22        If we could go back one page, to page five, I
23 want to see if you can help me with some of the
24 handwriting here.
25    A   I'll try.

Page 53

1     Q   Okay. The first entry, 4/24/02, does that
2  appear to have been done by Roger Hughes?
3     A   Yes.
4     Q   And the signature that appears below that
5  appears to be Mr. Hughes?
6     A   Correct.
7     Q   There is a handwritten note on the second line
8  that appears to say, "Noted 9/24/02," and then has another
9  signature on the left-hand side; do you see that? This
10 one right here (indicating).
11    A   Oh, okay. Yeah. That's the nurse, Norma Tyler,
12 noted that she took off the order that Roger Hughes had
13 wrote.
14    Q   Okay.
15    A   As a matter of our policy, when I write an order
16 or any provider writes an order, the nurse that takes that
17 order off signs off on that order indicating, to the other
18 nurses and other providers that look at that, that they've
19 done everything necessary to make sure that order is --
20 happens: That they've got the paperwork for blood draws,
21 they sent the prescription on to the pharmacy, they've
22 sent whatever paperwork -- they've taken care of that
23 order.
24    Q   So when we see a note here from Mr. Hughes that
25 says, "Please draw for PT and INR," that's actually on

Page 54

1  order to the nursing staff --
2     A   Correct.
3     Q   -- to go do that?
4     A   Correct.
5     Q   And so the note that we see right below that is
6  simply the acknowledgment from Norma Tyler that, yes, it's
7  been done?
8     A   Well, that she's noted and has done what's
9  necessary to make that event happen.  There's only certain
10 days of the week that we can send PTs and INRs out.
11    Q   What days of the week are those?
12    A   I believe in those days it was, like, Monday,
13 Wednesday, and Friday.
14    Q   Why is that?
15    A   It requires special handling, and we have to
16 have a driver come in within a specific amount of time
17 from when we draw those to when it goes to the hospital to
18 be read by the lab.  There's some blood work that you can
19 draw and put in the refrigerator and it can stay there for
20 six months before they run the test.  This is one that's
21 critical in a time frame.  I don't know the exact hours it
22 takes, but it needs to be done that day; it can't sit and
23 wait.
24    Q   What is a PT and INR?
25    A   Protine (ph) is the PT.  INR is the ratio -- I

Page 55

1  don't remember the exact wording on that, but it is a
2  clotting factor.
3     Q   There are two different tests that relate to
4  that?
5     A   Well, there's a number of tests.  These are just
6  two of the tests that are available.
7     Q   Strike that.  What I meant to say is:  Both of
8  those are tests which relate to a clotting factor,
9  correct?
10    A   Correct.
11    Q   What's the purposes of those tests?
12    A   In this scenario, when somebody is on a blood
13 thinner for a period of time, you want to make sure that
14 you're in a therapeutic range for the blood thinner.  It
15 needs to adjusted up and down, depending on whether it's
16 too strong or too weak.
17    Q   Do you know what the PT or the Protine test is
18 -- what's that actually testing then?
19    A   Prothomaton, the clotting time.  The time it
20 takes for a clot.
21    Q   Okay.
22    A   INR is probably more indicative of how we treat
23 than the PT.
24    Q   Why?
25    A   It's a more accurate test and most of the

Page 56

1  experts are saying it has greater value.  Typically they
2  draw both.  Sometimes they do a PTT.  There's a lot of
3  tests.
4     Q   The next note we see then is on 4/26 --
5     A   Lab's drawn.
6     Q   Labs were drawn again by Norma Tyler?
7     A   Norma Tyler.
8     Q   Then on 4/26 it appears that Mr. Hughes actually
9  saw Mr. Davis?
10    A   Correct.
11    Q   Then on 4/28, again, continuing that page, it
12 also looks like Mr. Hughes again is now looking at the
13 labs?
14    A   Yeah.  He's written down what the lab results
15 were from the 26th.
16    Q   It looks like again, in the 4/26 note, on the
17 left-hand column, there's a --
18    A   Noted.
19    Q   -- noted.
20    A   Jan Riggins.
21    Q   Who's Jan Riggins?
22    A   She was a registered nurse that worked with us
23 for years.  Retired and living in the Lower 48 somewhere.
24    Q   And once again, she's noting that there's an
25 order being given there by Mr. Hughes?

Page 57

1     A   Correct.
2     Q   On the bottom of that page, underneath the
3  number three, the last line, again there appears to be a
4  different handwriting?
5     A   Correct.  It's a, "Noted," I can read, and I
6  have no idea whose signature that is.
7     Q   Doesn't appear to be either of the previous two,
8  though?
9     A   No.  It's an LPN.
10    Q   So we're --
11    A   I believe that's "LPN" that I read after the
12 name, 4/28/02.
13    Q   And just so we're clear, what is an LPN?
14    A   Licensed practical nurse.
15    Q   So you see Mr. Davis, then, on May the 2nd --
16    A   Correct.
17    Q   -- for leg pain.  Was he complaining about
18 anything other than leg pain?
19    A   Not that I remember.
20    Q   His blood pressure was somewhat elevated?
21    A   Correct.  The systolic was up; diastolic was
22 fine.
23    Q   Systolic is the first number, correct?
24    A   First number.
25    Q   And again, we see a notation on the left column.

Roger Hale                                                                                             August 25, 2006

Page 58

```
 1  It says, "Noted in response to your order"?
 2     A   Yeah.
 3     Q   For Flexeril, I assume?
 4     A   Correct.
 5     Q   And do you recognize the writing?
 6     A   I don't recognize the initials. It's a pretty
 7  generic note. The signature initials, I just don't -- I
 8  don't get it. I don't know. I could think of three or
 9  four people it could be.
10     Q   Why don't you tell us who those three or four
11  are.
12     A   It could have been -- Norma Tyler writes similar
13  to that. Kim wasn't working for us then. Sometimes Cora
14  Benoit writes like that.
15         We had a contractor at that stage that was
16  providing some of our nursing care, and they sent a lot of
17  people out in those days, different ones. Some people
18  stayed there for long periods of time, and others, you
19  know, just one or two times. So I just -- I don't know
20  whose initial that is. Sorry.
21     Q   Kind of a revolving door on the nursing staff?
22     A   Some. Some of the positions. We had permanent
23  day nurses that were there for -- I think both about 15,
24  20 years. Both contract employees.
25         Most of the contractors that work for us work
```

Page 59

```
 1  long periods. But if someone called in sick for a
 2  specific day, we might get a replacement that day. But
 3  the vast majority were very long-term.
 4     Q   And the handwriting below yours on what appears
 5  to be 5/5/02 --
 6     A   Uh-huh.
 7     Q   -- any idea whose that is?
 8     A   LPN. I don't -- I don't recognize the
 9  signature.
10     Q   5/8/02, appears to be an order for PT and INR?
11     A   Correct.
12     Q   And was that given by Mr. Hughes?
13     A   That was from -- on 4/28 order.
14     Q   So is that an indication that that's when they
15  were actually drawn?
16     A   Correct.
17     Q   From the 4/28 order?
18     A   That's a lab sticker --
19     Q   Okay.
20     A   -- the typed thing there. And that would have
21  gone with -- a copy of that sticker goes on the chart and
22  a copy goes on the vial of blood.
23     Q   So each time I see a serial number like that, in
24  this case 690223498 --
25     A   Right.
```

Page 60

```
 1     Q   -- that's an indication of the -- it's a
 2  tracking number, right?
 3     A   Correct.
 4     Q   So same thing below that on 5/10?
 5     A   Correct. So if we don't get a lab result back,
 6  we can contact the lab and say, this is the tracking
 7  number; where are the results.
 8     Q   Do you know whose handwriting that was --
 9     A   No.
10     Q   -- for the lab draw?
11         Can you read the writing to the right of that,
12  same line?
13     A   Which line, the 5/8?
14     Q   Yes.
15     A   There isn't any writing on mine. To the right,
16  over here (indicating)?
17     Q   Well, not all the way -- yeah. Well, it says,
18  "PT/INR lab drawn," and then something --
19     A   "Without difficulty."
20     Q   Okay. Then just below that?
21     A   Is a signature.
22     Q   Then there's a 5/8/02 addendum right below that?
23     A   That's a blood pressure.
24     Q   Appears to have been done by same person who did
25  the lab draw?
```

Page 61

```
 1     A   Correct.
 2     Q   And the same signature?
 3     A   Probably did the blood pressure prior to drawing
 4  the blood.
 5     Q   Okay. And we don't know who that is?
 6     A   No.
 7     Q   And the blood pressure was elevated?
 8     A   Slightly.
 9     Q   The next note indicates -- looks like it was
10  from Dr. Billman?
11     A   Dr. Billman.
12     Q   And can you tell from this note whether Dr.
13  Billman actually saw --
14     A   I can't tell.
15     Q   -- Mr. Davis?
16         Do you know whether a physician ever saw
17  Mr. Davis while he was at Palmer?
18     A   Not with me there.
19     Q   If a physician saw Mr. Davis, would they
20  typically do it with you?
21     A   If I was on. I'm not there all the time.
22     Q   Would they typically do it with either you or
23  Mr. Hughes?
24     A   I don't know if he goes with the docs or not.
25  When the docs come to Palmer and I'm there, I try to be
```

16 (Pages 58 to 61)