Page 62

1  with them the whole time.
2     Q  Why is that?
3     A  I want to know what they think.
4     Q  Helps for continuity of care?
5     A  Continuity of care and for my learning.
6     Q  It appears from this note that Dr. Billman was
7  concerned about tightening up Mr. Davis's blood pressure
8  control?
9     A  Correct.
10    Q  He wanted to see it lowered?
11    A  Correct. He gave some parameters of where he
12 wanted to see it, as I read that.
13    Q  So then on the 10th, it looks like labs are
14 drawn again?
15    A  Correct.
16    Q  And can you tell who made that entry?
17    A  Norma Tyler.
18    Q  And on the 19th, it appears you did a review of
19 his medications?
20    A  Partial.
21    Q  Why do you say that?
22    A  We try to get all medications on the same
23 schedule. And this one was -- these two medications had
24 fallen out of the every 60- or 90-day parameters. And so
25 I did a temporary to get them back on schedule with the

Page 63

1  others.
2      I think I read there were seven different
3  medications he was on. And so, instead of renewing one
4  medicine today, another one tomorrow, two more in two
5  weeks, every 90 days, typically, is when we'll want to
6  renew them. So I put the Metoprolol and Coumadin back to
7  renewal on the same date as the others.
8     Q  Do you know why you were doing that review on
9  the 19th?
10    A  Because those two had run out.
11    Q  Is there any indication that you saw Mr. Davis
12 on the 19th?
13    A  No. Typically I wouldn't under this scenario.
14 The nurse would bring me the med sheet, saying that these
15 two medicines are due to expire in the next day or two; we
16 need enough to go until the next renewal date.
17    Q  Then you gave an order that the INR draw was to
18 be done again in 30 days?
19    A  30 days.
20    Q  And his blood pressure and weight were to be
21 checked again --
22    A  Every month.
23    Q  Why wait a month to check his blood pressure,
24 given Dr. Billman's recommendation 11 days before that?
25    A  I don't remember what I had in mind at that

Page 64

1  stage.
2     Q  There's a notation also to the left of your
3  handwriting. It appears to say, "Noted," and something
4  else.
5     A  Signature and a date, an LPN again. I think
6  it's the same as this other one I have not been able to
7  read.
8     Q  Same as the one on 5/5?
9     A  Yeah, and 5/19/02.
10    Q  If I'm reading this correctly, then, that's
11 simply a notation that --
12    A  They took the order. They continued the med
13 sheet so he could continue getting his two medications.
14    Q  And that an INR would be done in 30 days and
15 blood pressure and weight checked --
16    A  Uh-huh.
17    Q  -- again in 30 days? All right.
18     The next entry, 5/30/02, seems to refer to a fax
19 from the Haines clinic?
20    A  Correct.
21    Q  Do you know whose handwriting that is?
22    A  Cora Benoit.
23    Q  Do you know what the fax related to from Haines
24 clinic?
25    A  Off the top, no. I'm assuming that would have

Page 65

1  been his private physician.
2     Q  On the next page, it appears most of the
3  handwriting belongs to Mr. Hughes again?
4     A  Okay. Yes. Well --
5     Q  Actually, there's a lot of handwriting, but...
6     A  -- and Cora Benoit.
7     Q  Your handwriting appears next to the order for a
8  repeat INR in 30 days --
9     A  Right.
10    Q  -- on 7/12/02?
11    A  Correct.
12    Q  And also down on 8/16/02, at the bottom?
13    A  Correct.
14    Q  Is your handwriting anywhere else?
15    A  Not on that page.
16    Q  Going back for a moment, if we can, to page
17 four, the transfer note that was made by Ms. Hawkins
18 indicating that PT and INR should be done in about two
19 weeks --
20    A  Uh-huh.
21    Q  -- once Mr. Davis came to Palmer, you changed
22 that to every 30 days, right?
23    A  Well, eventually, yes.
24    Q  Why?
25    A  When somebody is stabilized on their Coumadin,

Roger Hale                                                      August 25, 2006

Page 66

1  our standard of care is every 30 days. If there's a
2  problem and we alter the medications, you know, increase
3  or decrease the amount of Coumadin, we can do that in a
4  shorter time frame, every 10 to 14 days.
5      Q   So is it fair to say that you concluded his
6  Coumadin was stabilized?
7      A   His INR.
8      Q   His INR was stabilized?
9      A   Yes.
10     Q   And you would not have waited 30 days?
11     A   Correct.
12     Q   Is it fair --
13     A   And then we have, like, Dr. Billman review that
14 to see if he wanted to make any changes. And he didn't on
15 the visit that he came in on.
16     Q   Is there any indication, in Dr. Billman's note
17 of 5/8, that he reviewed the lab work?
18     A   He didn't write it down. From my experience
19 working with him, he would do that.
20     Q   But any comments, then, that he had about the
21 lab work would not appear in here?
22     A   He didn't write anything down.
23     Q   Would Dr. Billman make notes anywhere other than
24 the progress notes?
25     A   No.

Page 67

1      Q   Progress notes is the location where everybody
2  involved in the inmates' care should be making notes,
3  right?
4      A   Correct. There's a separate section for dental
5  and psychiatric.
6      Q   Okay. In terms of the medical side, at least,
7  this is where they should appear?
8      A   Should be. Uh-huh.
9      Q   If we look at the note from April 28th, on page
10 five, that's Mr. Hughes's note?
11     A   Correct.
12     Q   And there's a report on the INR?
13     A   Correct.
14     Q   The INR at that point was 1.9 --
15     A   Correct.
16     Q   -- which was not considered a stabilized level,
17 right?
18     A   Wasn't therapeutic, correct.
19     Q   Was outside the therapeutic range?
20     A   Just a tad low.
21     Q   What was the therapeutic range for somebody with
22 an implanted defibrillator?
23     A   2 to 3.1, on Mr. Hughes's note. But it's not --
24 my understanding, the Coumadin is not because he had an
25 implanted defibrillator. The Coumadin was because he had

Page 68

1  a prior MI, myocardial infarction.
2      Q   Otherwise known as a heart attack?
3      A   A heart attack, in lay terms.
4      Q   Did the fact that he had an implanted
5  defibrillator make any difference to the Coumadin?
6      A   The dosage?
7      Q   Yeah.
8      A   Not to my knowledge.
9      Q   Did the therapeutic level of Coumadin vary
10 depending upon whether or not he had an implanted
11 defibrillator?
12     A   No. The implant doesn't change the lab value.
13     Q   Does somebody with an implanted defibrillator
14 need to have Coumadin?
15     A   I don't believe just the fact that they have the
16 implant in and of itself would be reason to be on
17 Coumadin. But the reason they have the implant, prior MI
18 or other, would be reason to put them on the Coumadin.
19     Q   So it goes hand in hand, but there's not a
20 causal connection, if you will?
21     A   As I understand it.
22     Q   Okay.
23     A   Typically you see them together, but they're
24 both treating the same condition but for different
25 reasons.

Page 69

1      Q   Do you know whether there's a different
2  therapeutic range for Coumadin depending upon whether
3  somebody has an implanted defibrillator or not?
4      A   I guess I'm not understanding.
5      Q   Well, when we're looking at a therapeutic range
6  that Mr. Hale [sic] has here for --
7      A   Hughes?
8      Q   -- sorry, Hughes -- on the 28th for the INR of
9  1.9, you said that was a tad low.
10     A   Well, 1.9. It should be at least 2. So I guess
11 "yes" is the answer to your question.
12     Q   Okay. So when somebody has an implanted
13 defibrillator, is there a different therapeutic range than
14 you would see if somebody doesn't have a implant?
15     A   Again, they kind of go hand in hand. So,
16 yeah -- it would be like -- there's a reference range on
17 the lab slip if they have a mechanical valve or, you know,
18 if they're being treated post MI, and that's what I'm
19 looking at.
20     Q   Okay. PT at 18.4, was that a therapeutic range?
21     A   I'd have to look back at the thing. I believe
22 that's just slightly low as well.
23     Q   In any event, you would agree that Mr. Davis's
24 condition was not stabilized enough for his PT/INR to run
25 30 days, at least as of April 28th?

Page 70

1   A   That's why he wrote the order to do it again.
2   And then my order was after that was done.
3      Q   And that order was consistent with what Shirley
4   Hawkins had written on the 22nd when he was transferred?
5      A   Correct. Correct.
6      Q   Is it fair for us to assume, then, that, when
7   you wrote the order on May 19th to draw the INR in 30
8   days, that you concluded he had stabilized by that point
9   in time?
10     A   That would be my assumption.
11     Q   Is it also fair for us to assume that you
12  concluded, on May 19th, that his blood pressure had
13  stabilized?
14     A   No, not necessarily.
15     Q   Why would you wait 30 days to recheck that,
16  then, if his blood pressure --
17     A   Because they were just starting to do some
18  changes on him. He wasn't severe hypertensive.
19     Q   Do you know how often Mr. Davis's blood pressure
20  was checked after Dr. Billman's recommendation to tighten
21  control on it?
22         Okay. And you're showing me a vital sign flow
23  sheet.
24     A   The order that I wrote was a minimal order. And
25  the nurses again have a lot of discretion and they do a

Page 71

1   lot more than necessarily what the minimal order is. And
2   this would have been made available to me on the 5/19
3   date, the vital signs flow sheet.
4         MR. MATTHEWS: Mark that as the next exhibit.
5         (Exhibit 5 marked.)
6   BY MR. MATTHEWS:
7      Q   Exhibit 5, the vital sign flow sheet, is the
8   same document you just pulled out of your working file,
9   right?
10     A   Correct.
11     Q   And that's what you just showed me a moment ago?
12     A   Correct.
13     Q   And this tells us that, after Dr. Billman's
14  order on the 8th of May, 2002 to tighten up control of his
15  blood pressure, that it was reviewed again through June
16  11th, 2002, right?
17     A   Right.
18     Q   And after that there's no further monitoring?
19     A   Not on this sheet. The nurses again would do
20  that. I don't know if they started another sheet or if
21  they felt it was in his parameters which he had written.
22     Q   Is there any indication in the records, that you
23  see, that Mr. Davis's blood pressure was checked again
24  after June 11th, 2002?
25     A   Not that I see.

Page 72

1      Q   If Mr. Davis's blood pressure had been checked
2   after June 11, 2002, would you agree with me that that
3   should appear either in the health care progress note that
4   we've had marked or in the vital sign flow sheet?
5      A   It could be in the progress notes. It could be
6   on the flow sheet. It could be on the medication
7   dispensing form. And it could be on transfer sheet.
8      Q   But it should be reported somewhere if it was
9   done?
10     A   You would hope somebody would write it down. It
11  happens where they don't write it down.
12     Q   From a medical standpoint, can you think of any
13  good reason to take a blood pressure and not write it
14  down?
15     A   No. Do I see that happen routinely? Yes.
16     Q   Why?
17     A   I don't know. I always write down when I take
18  them. Weights, blood pressures, all of that. I've
19  seen -- in all the years I've been working, people do it
20  and then don't document it.
21     Q   Makes it difficult to have accurate information
22  about a person's condition when people don't write it
23  down, right?
24     A   I would agree with that. How we take notes in
25  medicine has changed significantly from when I first got

Page 73

1   into medicine in 1974 until today. It's completely
2   changed. It used to be a record for myself on what I've
3   done. It's now become a legal document, you know.
4         Not everybody has progressed with the times,
5   especially some of the older physicians. You'll find they
6   don't write everything that I would write.
7      Q   You get no disagreement from me on that point.
8      A   You've seen some of the old -- but it's changed.
9   In my lifetime it's changed significantly, what a medical
10  record was in the old days to what I see it as today.
11     Q   So there's people writing down less information
12  today?
13     A   They shouldn't be.
14     Q   I agree.
15     A   But are there people out there that don't?
16  Correct.
17     Q   From your standpoint as the institutional health
18  care officer for PCC, you would expect everybody reporting
19  to you to write down vital signs if they took them, right?
20     A   I counsel that on a routine and regular basis.
21     Q   And despite your counseling, people don't always
22  follow that order; do they?
23     A   That's correct. They'll take a blood pressure
24  and then they don't write it down. And normally that's
25  when it's a completely normal value.

Page 74

1  Q  Are there also occasions where people take blood
2  pressure and it's not a normal value and it doesn't get
3  written down?
4  A  I've not caught them doing that; I've not seen
5  that.
6  Q  But then again, you can't tell when it isn't
7  written down?
8  A  Oh, if I'm not there and watching what's going
9  going on.
10 Q  Who has access to the medical chart?
11 A  Medical providers and the nursing staff.
12 Q  Do correctional officers have access to it?
13 A  No. They -- we'll seal them up to go to another
14 facility, but they are not to come in and read through the
15 chart. It's a confidential document. The superintendent
16 cannot do that. The dental, psychiatric, medical
17 providers, and nursing staff are the only ones that have
18 direct access to the medical file.
19 Q  And they're the only ones that are supposed to
20 be making notes in the medical file?
21 A  Correct. Now, I can receive a memo from
22 security about an inmate's involvement in whatever, and
23 that may go in the medical file. But they're not coming
24 in and writing in the medical file. Somebody gets in a
25 fight or, you know, they're found doing drugs or alcohol

Page 75

1  or whatever else, and security will send a memo to let us
2  know, that might go in the medical record.
3  Q  Are there indications -- strike that.
4     Are there times when security may find a medical
5  situation after medical staff has left for the day and
6  then send you a note about it?
7  A  Possibly. More often than not, they would call
8  me.
9  Q  And let you know?
10 A  Yeah.
11 Q  And should that appear in the medical file?
12 A  If I received a phone call, yeah, I would put it
13 in there.
14 Q  What documentation would there be in the medical
15 file if an inmate had a problem with dizziness after the
16 medical staff had gone home and he was taken out of his
17 cell to be checked?
18 A  What documentation would be available? If it
19 was a security officer, I would hope that they would
20 either call me, or whoever's on duty, and/or send like a
21 memo of what they found. And that would -- either I'd
22 have the memo in the chart and/or, the next day when I
23 come in, I would make the chart entry.
24 Q  About your phone call?
25 A  About the phone call.

Page 76

1  Q  Do you ever remember receiving a phone call
2  about Charlie Davis?
3  A  No. The only time I would be called is when I
4  was "on call."
5  Q  Let me make sure I understand the "on call"
6  then.
7  A  The seven days I work, I'm on call those seven
8  days. The next seven days, when Hughes is on call, he
9  does that. If one of us is on vacation, a third party may
10 be on call for that period of time.
11 Q  So if it was your week to be working, you're the
12 "on call" person?
13 A  Normally speaking. There are instances where I
14 don't pull call for specific reasons, and then it would be
15 -- we have an "on call" system. There's always a backup.
16 There's a statewide "on call." So if I'm someplace, like
17 in this building, and my cell phone didn't ring here, the
18 medical security staff could call the statewide "on call"
19 person to get orders. There's always a backup.
20 Q  As I understand it, you were the one that made
21 the decision to change Mr. Davis's INR draw to every 30
22 days, right?
23 A  At that stage, subject to change each time you
24 look at the lab test.
25 Q  You made that decision without examining him,

Page 77

1  true?
2  A  My guess is I probably just reviewed the lab
3  result.
4  Q  Is there any indication in the chart notes that
5  you examined Mr. Davis other than on May 2, 2002?
6  A  No.
7  Q  Is there any indication in the chart notes that
8  a physician ever examined Mr. Davis?
9  A  I have no idea, on the 10/28/02 entry, who that
10 is. I don't know if that was -- I have no idea.
11 Q  10/28 is on the Lemon Creek notes, right?
12 A  Correct.
13 Q  While he was at Palmer, is there any indication
14 that he was ever seen by a physician?
15 A  Not that I see in these notes.
16 Q  During that time period, from the end of April
17 until the end of October 2002, did you have a physician
18 coming through Palmer on a weekly basis?
19 A  I would think so. That was the routine at those
20 stages. Again, there were times when something would
21 happen that maybe one week here or there somebody didn't
22 show. But by and by, there should have been at least one
23 physician a week, and with Dr. Billman coming in sometimes
24 there, too.
25 Q  How often was Dr. Billman actually coming

Page 78

1  through?
2  A  I want to say at that time once or twice a
3  quarter. He wasn't coming very often.
4  Q  So is it possible that this entry by Dr. Billman
5  was the only time he came through while Mr. Davis was
6  there?
7  A  It's possible.
8        (Exhibit 6 marked.)
9  BY MR. MATTHEWS:
10 Q  Take a look at Exhibit 6, if you would.
11 A  Okay.
12 Q  Do you recognize those documents?
13 A  Yes.
14 Q  Is that a collection of the lab reports for
15 Mr. Davis's PT and INR tests that were done while he was
16 at Palmer?
17 A  It appears so.
18 Q  Are you aware of any other PT and INR test
19 reports for the time period that he was at Palmer?
20 A  No. Each one of these numbers should reflect --
21       (Off record.)
22       THE WITNESS: The number in the progress notes
23 should reflect down here on the requisition number.
24 BY MR. MATTHEWS:
25 Q  Okay. That's where that should appear, then?

Page 79

1  A  Right.
2  Q  And the requisition number appears down in the
3  lower left-hand corner of each of these sheets?
4  A  Correct.
5  Q  At least on the ones that were done by DynaCare,
6  that's true. Does that also appear to be the case on the
7  Quest Diagnostics?
8  A  It should be. I think that's the time we just
9  changed our lab provider. They're contracted.
10 Q  So I could just -- yeah, it looks like it's just
11 cut off here where it says, "Requisition," up in the upper
12 left, on the Quest sheet.
13 A  Yeah. It's the same idea.
14 Q  There's handwritten initials appearing on the
15 first page of this exhibit.
16 A  Roger Hughes, right.
17 Q  That's Roger Hughes in the circle? Same thing
18 on the second page?
19 A  Yes.
20 Q  And on the third page?
21 A  Mine.
22 Q  That's yours? Okay.
23       Fourth page, is that Roger Hughes again?
24 A  Hughes.
25 Q  Fifth page is yours?

Page 80

1  A  Correct.
2  Q  And sixth page?
3  A  Another facility. I think that's Juneau.
4  Q  And that's for the one on September 20 --
5  A  -- 3rd. It was initialed on 23 September '02.
6  Q  Okay. Would you agree with me, Mr. Hale, that,
7  on each of the reported lab results, the PT test portion
8  of the test was outside the reference range?
9  A  Yeah.
10 Q  Is it fair to conclude that, in ordering Mr.
11 Davis to continue with PT and INR tests on a 30-day basis,
12 that you essentially ignored the PT test?
13 A  Again, like I stated earlier, the INR is more
14 indicative of what it is that we're trying to treat. The
15 PT is always going to be off with the Coumadin. There's
16 no way to get it back into a normal range, that I'm aware
17 of, and provide the therapeutic effect that you need from
18 the INR. I'm not going to change the medication based on
19 a PT.
20 Q  Only based on the INR?
21 A  Well, not only, but that's where the key to the
22 treatment is, is in the INR. There are some folks that
23 recommend only an INR be drawn now.
24 Q  On the Quest report that appears on the --
25 appears to be the fourth page of the exhibit, it gives

Page 81

1  three different ranges for the INR -- reference ranges.
2  Do you see that?
3  A  Uh-huh.
4  Q  One is for somebody who's not on anticoagulant
5  therapy, meaning Coumadin, right?
6  A  Right.
7  Q  And then there's another range for routine
8  therapy?
9  A  Uh-huh.
10 Q  And a third range for somebody who's got a
11 mechanical prosthetic valve, right?
12 A  Correct.
13 Q  Is there a similar set of ranges for the PT
14 test?
15 A  Each lab will have its own reference ranges.
16 And if they have that, they're required now, under what I
17 believe is the CLIO (ph) rules, that they have to document
18 that on these forms.
19 Q  If we look at these lab reports together as a
20 progression, it appears that, on the initial report of
21 April 26, Mr. Davis's INR at least was on the low side,
22 right?
23 A  Right.
24 Q  And the PT test was high, but just barely --
25 A  Correct.

21 (Pages 78 to 81)

**Page 82**

1  Q  -- right?
2  Then we go to the May 10th report, the PT test
3  is higher again?
4  A  Right, as his Coumadin was increased.
5  Q  Okay. And the INR is higher --
6  A  Within the therapeutic range.
7  Q  -- and now within the therapeutic range. And
8  that stays consistent to the June 24 report?
9  A  Uh-huh.
10  Q  And once we get to the July reports, the INR is
11  higher again and so is the PT, right?
12  A  Right.
13  Q  And the INR is almost out of the therapeutic
14  range?
15  A  Right.
16  Q  And the INR is significantly higher, right?
17  Excuse me. The PT is significantly higher, right?
18  A  Right.
19  Q  The same thing is true again on the August 15th
20  test, right?
21  A  Right. Well, INR was the same. PT was just
22  slightly elevated on that one.
23  Q  Again, the INR almost out of the therapeutic
24  range, right?
25  A  Well, at the high end. Still in the range,

**Page 83**

1  but...
2  Q  Did that progression cause you any concern for
3  Mr. Davis at the time?
4  A  Not that I remember. Again, at that time I
5  would have the physician that came in reviewing along with
6  it.
7  Q  But we don't see any indication that a physician
8  looked at this other than Dr. Billman?
9  A  Yeah, they didn't necessarily make a note, but I
10  would -- that was my standard of practice then, was to
11  have them review.
12  Q  Is there any indication that you can show me in
13  the records we've looked at, either the vital sign sheets,
14  the progress notes or the lab reports, that a physician
15  other than Dr. Billman ever reviewed Charlie Davis's
16  medical file?
17  A  Not that they wrote down.
18  Q  Do you have a specific memory of having
19  discussed Charlie Davis with a physician?
20  A  Other than my standard of care that I provide.
21  I mean, I know what I do. I ask them to review -- PTs are
22  something they review every time they can come in, if
23  there's been one drawn. We now have a formalized way of
24  documenting that that we didn't have in the past.
25  Q  And what is that formalized way?

**Page 84**

1  A  It actually goes into both the pharmacist and
2  Dr. Luben. As an internal medicine doctor he's taken some
3  hands-on approach to things like Coumadin management.
4  Q  That were not present before he was there?
5  A  Correct.
6  Q  How is the documentation different?
7  A  Well, I mean, there's a formalized process that
8  they follow now, where the lab results are faxed to
9  central office, to the pharmacist and to Dr. Luben. And
10  if they have recommended changes, they send that to us in
11  writing.
12  Q  Okay. So in the old days, if I can call it
13  that, the lab results would be sent simply straight to
14  PCC?
15  A  Correct. We have a printer that goes from the
16  lab straight to my desk.
17  Q  And so the lab results would be available for a
18  physician coming through on a visit --
19  A  Correct.
20  Q  -- but they would not be sent directly to a
21  physician --
22  A  Unless there was a problem. A phone call might
23  be made.
24  I encourage my physicians at every opportunity
25  to make a note that they have reviewed whatever it is that

**Page 85**

1  I've presented to them, but unfortunately they don't
2  always document that.
3  Q  Was that something you were encouraging your
4  physicians to do back in 2002?
5  A  Always have.
6  (Exhibit 7 marked.)
7  BY MR. MATTHEWS:
8  Q  Do you recognize Exhibit 7 at all?
9  A  I recognize what it is.
10  Q  You don't remember seeing the document?
11  A  Not off the top, no.
12  Q  What it is -- appears to be an order from
13  Mr. Davis's private physician in Haines that he should
14  have an INR test done twice monthly, right?
15  A  It's a prescription.
16  Q  When an inmate comes into PCC, how do you deal
17  with the fact that they may have prescriptions from a
18  private physician?
19  A  I follow the policies and procedures of the
20  department. This provider has not requested practice
21  privileges in the Department of Corrections, so I can only
22  take this under advisement. Whether it's for a drug, a
23  lab test, surgery, whatever, we take it under advisement.
24  Then either myself or one of the other providers have to
25  write our own orders.

Page 86

1   Q   So as a matter of formal policy, you can't
2   follow this as an order --
3   A   Correct.
4   Q   -- but you can take it as a suggestion of a
5   treating physician --
6   A   Correct.
7   Q   -- and consider it for what it's worth?
8   A   Correct. It's the same with any prescription.
9       (Exhibit 8 marked.)
10  BY MR. MATTHEWS:
11  Q   Do you recognize Exhibit 8?
12  A   From the package I previously had, yes.
13  Q   Did you write that memo?
14  A   No.
15  Q   Do you know who did?
16  A   Nope.
17  Q   Is there any way to know who did?
18  A   No.
19  Q   But you know you didn't?
20  A   I do know that for a fact, because I always sign
21  my memos that I do. I don't have a secretary; I type all
22  my own. And you will see my initials and/or name on every
23  memo. I can't think of any time I have not put it down.
24  Q   So you know for certain that it wasn't you --
25  A   Correct.

Page 87

1   Q   -- but beyond that we can't tell?
2   A   No idea.
3   Q   Would it have been somebody on your medical
4   staff?
5   A   My guess would be one of the nurses.
6   Q   Do you know why this memo was written?
7   A   My guess is is that Mr. Davis said something to
8   one of the nurses about him being wanded by security. And
9   I'm guessing Mr. Davis provided the copies out of his book
10  that the state wanded him, which is a routine thing.
11  Sergeant Barnhart, who was a shift supervisor at that
12  stage, would be required, every time an inmate moved from
13  one place to another, would have to wand down as part of
14  their screening process.
15  Q   And somebody with an implanted defibrillator,
16  wanding them down, not necessarily a good idea?
17  A   Correct.
18  Q   Yeah.
19  A   And it explains it in the pamphlet.
20  Q   Right. So the purpose of this memo appears to
21  be fairly self-explanatory --
22  A   Yes.
23  Q   -- to alert the security staff that this guy has
24  got a special condition and you can't do things because of
25  his defibrillator?

Page 88

1   A   That is part of the screening intake when they
2   come in, the nurses. That's one of the things that they
3   try to elicit from the new inmate coming in, that they
4   have a special need. And they get transferred from place
5   to place and sometimes they don't remember to tell us, the
6   day they walk into the facility, that they have this type
7   of special need. And so a few days after they're in,
8   it's, oh, by the way.
9   Q   Were you aware of this memo at the time
10  Mr. Davis was there?
11  A   Not specifically. I certainly wouldn't have had
12  a problem with it. If it would have gone directly through
13  me, I would have signed off on it, but it's not something
14  that would require my signature on it. It's an
15  appropriate thing to do -- for the nurses.
16  Q   Correct me if I'm wrong, but it sounds like your
17  hands-on involvement with Charlie Davis was pretty
18  limited?
19  A   Correct.
20  Q   You had the one examination when he came in for
21  leg pain?
22  A   Correct.
23  Q   But other than that --
24  A   And his grievance.
25  Q   But from a medical standpoint, to coin a phrase,

Page 89

1   you pushed some paper about Mr. Davis, but you weren't
2   actually involved in the day-to-day care?
3   A   Pretty much.
4   Q   Mr. Hughes had more contact with him?
5   A   Yes.
6   Q   Would you and Mr. Hughes sit down and talk about
7   specific inmate cases at any given time?
8   A   Sometimes yes, sometimes no.
9   Q   If there was a particular problem, you might
10  discuss it?
11  A   Possibly, yeah. If somebody has died or, you
12  know, a catastrophic event or something, or if we want
13  somebody to follow something special from week to week.
14  We have -- we talked to each other at the end of our work
15  weeks.
16  Q   Kind of a shift change, if you will?
17  A   Uh-huh.
18  Q   Otherwise, the reason for having progress
19  reports, progress notes, is to make sure that you can have
20  continuity of care?
21  A   Oh, yeah. That's a given. The Department of
22  Corrections rotates people on a routine basis, and so we
23  have to be able to contact -- you know, let the next
24  facility know.
25      When I first started at PCC, the average stay

Roger Hale                                                                                          August 25, 2006

Page 90

1   was, I think, three and a half years on the medium side.
2   And now it's like 30 days. So it's changed significantly.
3       Q   Okay. So you've got people rotating in and out
4   of there on a regular basis?
5       A   And that's not special for PCC; that's
6   department-wide.
7       Q   Why so much movement?
8       A   You'd have to ask the administration. It has to
9   do with putting -- they're designated community custody,
10  minimum, medium, maximum, closed, what have you, and they
11  have to put people in beds that are available.
12          In the olden days, theoretically, when somebody
13  went to jail, they went to maximum security, progressed to
14  medium security, to minimum, to community. That was the
15  theoretical model. And now we get people coming into jail
16  that are community custody eligible from the get-go. It's
17  all changed. And I don't know all the details of why
18  they've done what they've done. We also send people to
19  Arizona. You know, just a variety of places they go.
20      Q   Does it make it more difficult for you to do
21  your job when you're getting people rotating in and out?
22      A   It's changed how I do my job. I don't know --
23  "difficult" is a relative term.
24      Q   More challenging?
25      A   It can be. When you have somebody three, five,

Page 91

1   ten years, it's a lot easier to do long-term maintenance
2   than somebody we've had for six months. You know, you're
3   just starting to get to know the person, then they're
4   gone. Just a different way of working.
5           MR. MATTHEWS: Let's go off record for a minute.
6           (Off record.)
7           (Exhibits 9 and 10 marked.)
8   BY MR. MATTHEWS:
9       Q   Mr. Hale, while we were off the record, we've
10  now marked as Exhibits 9 and 10 to your deposition some
11  documents relating to a prisoner grievance filed by
12  Charlie Davis; is that right?
13      A   Correct.
14      Q   Starting with Exhibit 10 first, the first page
15  of that exhibit appears to be Mr. Davis's grievance,
16  right?
17      A   Correct.
18      Q   And then you were tasked, in your position as
19  the institutional health care officer, with responding to
20  that grievance?
21      A   As well as investigating the grievance.
22      Q   And then the second page of Exhibit 10, is that
23  your investigation?
24      A   Yes.
25      Q   And it appears in the top portion of it,

Page 92

1   correct?
2       A   Correct.
3       Q   And your answer is, "The issue of
4   manning/staffing cannot be addressed at this level. I
5   spent about 20 minutes explaining how he can access
6   medical (that is available at PCC);" is that right?
7       A   Correct.
8       Q   So that was the sum and substance of your
9   investigation?
10      A   Correct.
11      Q   Mr. Hyden then reviewed your investigation,
12  right --
13      A   Right.
14      Q   -- and concluded that your investigation didn't
15  address the grievance?
16      A   Correct. What he's asking for is something that
17  I could not provide.
18      Q   "What he," meaning Charlie Davis?
19      A   Charlie Davis, correct.
20      Q   And what was it that he was asking that you
21  couldn't do?
22      A   He wanted to have Palmer Correctional Center
23  staffed 24 hours a day with nursing staff that he had
24  access to.
25      Q   And that wasn't something that you could help

Page 93

1   him with?
2       A   Absolutely not.
3       Q   Why not?
4       A   Well, first off, inmates don't set up staffing
5   levels. And second off, I don't establish staffing
6   levels. That's done through the department.
7       Q   Did Mr. Davis explain to you why he felt that
8   24-hour nursing care was needed at Palmer?
9       A   In a roundabout way, yes. What he -- what I
10  spent the majority of my time talking with him -- that's
11  the first thing I did. What do you mean in this
12  grievance. What is it -- let's get away from the legal
13  terms and all the rest. What is it that you want that's
14  not being met.
15          And what he had the biggest concern with is that
16  he didn't know -- he claimed he didn't have any knowledge
17  of how to contact me directly or PA Hughes or even one of
18  the physicians that come in.
19          And that's why I went through -- I spent a long
20  period of time on how he can access medical. If he feels
21  he needs something specific, he has to put it in writing.
22  If he catches one of the nurses out in the dining hall and
23  talks to them, she's probably had 10 other people say
24  something and the message may not get to me.
25          In the inmate handbook and in the orientation

Page 94

1  when screening in, it explained what it is they need to do
2  to access medical, and he claimed that he didn't
3  understand or didn't comprehend what it was that he was
4  told at Lemon Creek and then when he came to PCC. So I
5  spent 20 minutes explaining it to him.
6          So that part of his grievance I could address,
7  but the staffing...
8      Q   Did he explain to you why he thought 24-hour
9  staffing was important for PCC?
10     A   I believe he tried to, if i remember the
11 conversation. I don't remember the exact words; it was
12 some time ago. But I think, yeah, in essence he wanted it
13 to be a nursing facility, a nursing home, and the
14 Department of Corrections at PCC doesn't provide that.
15     Q   Did he explain to you that he was concerned
16 about the quality of care he was receiving?
17     A   I don't know if he used those terms, but he was
18 concerned that he didn't know how to contact me or the
19 other providers if he had a specific problem.
20     Q   Did he explain to you that he didn't feel that
21 the care he was receiving was adequate?
22     A   I believe so, but again, based on he didn't know
23 how to ask for it.
24     Q   And from your standpoint, it was his
25 responsibility to ask, not PCC's responsibility to --

Page 95

1      A   I can't be responsible for what it is that he
2  thinks he needs to have. That's why we have the process
3  of screening in, to have them tell me that something is
4  overdue or is needed. It's his responsibility to let us
5  know.
6          Because we have such an overturn of inmates,
7  it's impossible to track every little thing each person
8  wants. And just because I've ordered something at PCC
9  doesn't mean, when he gets to Lemon Creek, that they
10 necessarily have picked up that order.
11     Q   So that's why you do the transfer screens?
12     A   Correct. And that's why it's imperative that
13 these guys write a COP-OUT -- if they're having a heart
14 attack, they -- you know, they let the first person know
15 who implements the EMS systems. That's another issue.
16         If they have routine care, they need to let us
17 know, and he does that in a COP-OUT. And I explained that
18 to him. You've got to send it to me in writing. You
19 catch somebody out on the floor, if you complain to your
20 house officer, the shift sergeant or one of the nurses
21 verbally, they're not going to discuss it with you because
22 it's a violation of confidentiality and it may not get
23 back to me. And he seemed very pleased with my response
24 from that end.
25     Q   So basically your response to him was, put it in

Page 96

1  writing and it will get to me?
2      A   And I explained how he does that.
3      Q   Okay.
4      A   And to not just talk to anybody out in
5  population that -- you know, that works for the state.
6  Unless it's an emergency.
7      Q   And emergencies are dealt with differently,
8  obviously?
9      A   Correct. Correct.
10     Q   After your meeting with Mr. Davis, what further
11 involvement did you have with his grievance?
12     A   I don't think I had any further. I fill in my
13 section; it goes to the superintendent. He did his
14 response to that. And then Mr. Davis had the opportunity
15 to appeal that decision because I could not address what
16 it is that he wanted on this. I don't have the authority
17 at my level to say, yes, we need 24-hour nursing care at
18 PCC.
19     Q   Mr. Hyden, in his response to your
20 investigation, suggested that Mr. Davis perhaps should be
21 transferred to another facility?
22     A   And as a superintendent he has that right.
23     Q   Okay.
24     A   I don't remember him talking to me about that or
25 why he felt that way.

Page 97

1      Q   Typically, how does the grievance work? Once
2  you've done your investigation, the paperwork then goes to
3  the superintendent to review?
4      A   Right, and it's been called the facility
5  administrator, used to be the grievance officer.
6          And they have specific things that they say;
7  they agree with my findings or they disagree with my
8  findings. And in this case, it was I didn't -- I couldn't
9  address what it was that he was asking for.
10     Q   Is there some process in there where you and the
11 superintendent discuss the grievance?
12     A   Not necessarily. Very rarely. If they had a
13 question to me, they would ask. They'd call me up or, on
14 our Monday morning meeting, would ask something along the
15 lines. But chances are they'd just give me a phone call.
16     Q   In a situation like this, where the
17 superintendent has said, perhaps he ought to be
18 transferred to another facility --
19     A   Uh-huh.
20     Q   -- is that something that typically you would
21 have discussed with the superintendent?
22     A   Not necessarily. They're in change. If they
23 don't want somebody in their facility for whatever reason,
24 they get rid of them.
25     Q   Including if the reason happens to be medical?

Page 98

1  A  Possibly. He might have called me on this one.
2  I don't remember specifically on this. If he called, he
3  would ask something like, do I think he needs to be under
4  24-hour nursing care, and those sort of things. But
5  ultimately, he's in charge and he makes the decisions. I
6  can only make recommendations to the department.
7  Q  So ultimately, then, it would have been Mr.
8  Hyden's call?
9  A  Oh, yeah.
10  Q  He had the authority to make that transfer?
11  A  If he decided, yes; it's his institution. He
12  has the authority to override my recommendations. If I
13  had said, you know, he has to stay here for a specific
14  reason; it's his institution.
15  Q  Or if you had said, he hasn't come to me with a
16  complaint, I don't know what the problem is here, I don't
17  know why we need to transfer him --
18  A  That's a possibility.
19  Q  Mr. Hyden could have said, well, you're talking
20  about a 70-year-old guy with a defibrillator, let's get
21  him to another facility. He had that authority?
22  A  Oh, absolutely. I'd ask him why; what he felt
23  about that would be indicative of why he had to leave. If
24  he's uncomfortable with anybody, he can get rid of them
25  for any reason.

Page 99

1  Q  Did he need approval from anybody in the medical
2  department to do that, as far as you were concerned?
3  A  As far as I'm concerned, no. Again, my
4  experience -- I've had many superintendents I've worked
5  with over the years. Don't make me count how many I've
6  had. They typically would ask, you know, do you think
7  medically that they're unstable; is this somebody that's
8  going to die, going to have a serious medical problem
9  tonight.
10  Q  Would that conversation typically appear
11  anywhere in the record?
12  A  I don't -- I can't think. I don't know.
13  Q  Is there any documentation that we could look to
14  to see whether that occurred?
15  A  A telephone call to me or to central office? I
16  doubt it.
17  Q  It's not the type of thing that you would have
18  made a note in the chart about?
19  A  Depending on how much I thought -- I mean, if
20  the superintendent just asked me a question that I think
21  is just, you know, off the cuff, then probably I wouldn't.
22  If I thought it was something that was significant, it
23  probably would have been.
24  Q  What's the Monday morning meeting?
25  A  Monday morning meetings are managers meeting

Page 100

1  with the superintendent, where all the managers of the
2  different departments get together and discuss what's
3  going on in the facility. Everything from a maintenance
4  issue to problems that we're having.
5  Q  Including medical issues?
6  A  In a general sense. It's not we sit down and we
7  discuss X inmate with X problem. That's almost never
8  done. Typically would be somebody is handicapped and
9  needs special attention; they're wheelchair bound or they
10  need somebody to help them with their dinner trays or what
11  have you medically. I try to give a heads up; this person
12  needs to be on one floor. And staffing issues. You know,
13  if somebody is out sick, anybody that's in the hospital,
14  any ambulance runs we have, those sort of things.
15  Q  Would you typically attend that Monday morning
16  meeting?
17  A  I try to attend every one I can.
18  Q  If you're there on --
19  A  If I'm there and there's not something pressing
20  in the medical department.
21  Q  Are those meetings recorded?
22  A  Tape recorded tape recorded? I've never seen
23  that.
24  Q  Is there somebody who is tasked with writing
25  down what occurs at those meetings?

Page 101

1  A  I believe so, but I'm not involved in that.
2  Q  Do you ever get copies of minutes or anything
3  like that?
4  A  No, never. In 21 years, never seen minutes from
5  it.
6  Q  Is this memo talking about Mr. Davis's
7  defibrillator the type of thing that might come up at a
8  Monday morning meeting?
9  A  It might. I would assume, in that situation,
10  Sergeant Barnhart would have been the one that would have
11  brought that up. But chances are that would just stick in
12  the shift office on the side that he was at. And I
13  believe it's a clipboard that they have, special needs
14  type of thing, and they would pass it on to the next shift
15  that comes on.
16  Q  From a security standpoint?
17  A  Security. Because they're the ones that do the
18  wanding. No one else would do it, but the shift
19  supervisor or his or her designee.
20  Q  After your investigation of Mr. Davis's
21  grievance, he filed an appeal, right?
22  A  Right.
23  Q  Were you involved at all in that appeals
24  process?
25  A  No.

Page 102

1  Q  Were you made aware of the appeal?
2  A  At one point I was. I think it was long after
3  it had happened. I assumed he was going to appeal from
4  the get-go, though.
5  Q  Why is that?
6  A  Because I wasn't addressing what it was that he
7  wanted addressed.
8  Q  Did you tell him, during the course of your
9  meeting, he was wasting his time?
10  A  I don't know if I told him he was wasting his
11  time. Because what they need to do, which is what he did,
12  is write a grievance. I can't deal with it at my level;
13  then he appeals it up. And my assumption is, as I had
14  told him, you're going to have to appeal this, because I
15  can't address what it is you're asking.
16       That's why I spent the time on what it is that I
17  could help him with physically in that facility that he
18  was having difficulty with. If you feel you need a blood
19  test, if you feel you need to be put up on the
20  telephone -- some of the defibrillators have a telephone
21  that attaches to it -- if you feel you need this, you need
22  that, you have to put it in a COP-OUT so it gets to me.
23  I'm in four different facilities, and the word doesn't
24  always get back to me if you just verbalize to somebody.
25  To me, in managing the facility, that was how to best

Page 103

1  provide care for this inmate.
2       So, yes, I would expect him to appeal because
3  that's not what he was grieving. That was the issue that
4  I could assist with, but he was grieving that he wanted
5  24-hour nursing care. And he did not come from a 24-hour
6  nursing care prior to jail and he wasn't put in that in
7  jail.
8  Q  Did he tell you, in the course of that meeting,
9  that he thought the care he was receiving at Palmer was
10  inadequate?
11  A  I don't remember. That was so long ago. What I
12  remember was that he felt he didn't know how to ask for
13  care. Whether that's what he was meaning or not, that's
14  what I took out of that.
15  Q  Your conclusion was that he didn't know how to
16  access the system?
17  A  Correct. And it's a typical problem. I see
18  that routinely with inmates. It's not a unique situation.
19  I don't understand how it can happen, because they're told
20  repeatedly, and it's in writing and in the handbook. But
21  I see that on many of them.
22       So I re-explain and try and do it in a way that
23  they understand and try to get affirmation from them that
24  they understand.
25  Q  Do you know whether or not Mr. Davis has any

Page 104

1  difficulty with reading?
2  A  No, I have no idea. If he would have mentioned
3  something along those lines, difficulty with reading and
4  writing, I would always refer them to the inmate legal law
5  library, where they have a guy in there that will write
6  specific write-ups for them. Sometimes they type it;
7  sometime they write it. And any time I know that somebody
8  has a reading/writing disability, that's what I recommend.
9  Q  That they go talk to somebody in the law
10  library?
11  A  Correct. I have no idea if I said that to him
12  or if he even mentioned that. That's too long ago to
13  remember. But that's routinely what I would do.
14  Q  So you expected that Mr. Davis was going to
15  appeal?
16  A  I would have, yes.
17  Q  And he did. Do you remember having any
18  involvement whatsoever in the appeal process?
19  A  No.
20  Q  Were you consulted at all about the appeal?
21  A  No, because again, it was out of my realm.
22  There wouldn't have been any reason for them to contact
23  me.
24  Q  Take a look at the last page of Exhibit 10.
25  That's the response to the appeal.

Page 105

1  A  Uh-huh.
2  Q  Have you seen that before?
3  A  Recently I got a copy of that, yes.
4  Q  Do you remember receiving this at all at the
5  time?
6  A  No. Typically, if I would have received that,
7  my initials would be on it.
8  Q  Are you called upon, in your position as health
9  care admini- -- strike that -- as the institutional health
10  care officer, to assist in the appeal process in any way?
11  A  Not very often. They want an independent
12  investigation. They might call and ask my thought on a
13  particular issue. This instance was not anything I could
14  address. If they had questions on his access to medical
15  via the COP-OUT system, that would be a reason to call me.
16  But if he wants to be in a 24-hour nursing facility or
17  make PCC a 24-hour nursing facility, there's nothing that
18  I could think that they could glean from me.
19  Q  Second sentence of the letter from Mel Henry
20  says, "Your grievance is for the facility where you are
21  housed not having adequate medical staff to meet your
22  medical needs," correct?
23  A  Right.
24  Q  Do you know whether or not there was any review
25  done, as part of Mr. Davis's appeal, as to whether his

Page 106

1  medical needs were being adequately met at Palmer?
2      A   I assume there was, but they didn't go through
3  me again. Not that I remember.
4      Q   If you would have been involved in providing
5  information to respond to this appeal, would there be
6  documentation of that somewhere?
7      A   I would think they would do it in the grievance
8  process, the appeal process, that would have been
9  documented.
10     Q   Okay.
11     A   That's how I would do it if I was doing that.
12     Q   Exhibit 9 is a series of documents that also
13 apparently relate to the grievance appeal. Are you
14 familiar with any of those documents?
15     A   Other than what I was given here.
16     Q   Let me ask you this: The first page of that
17 exhibit just appears to be a transmittal to Mel Henry, the
18 health care administrator, from Mike McGinty in Palmer,
19 right?
20     A   Correct.
21     Q   And Sergeant McGinty was the grievance
22 coordinator for Palmer?
23     A   Now it's -- the title has changed now, but yes.
24 The made it a much more complicated title: Institution
25 facility operations something or other. Yeah, grievance

Page 107

1  coordinator is much easier.
2      Q   Okay.
3      A   How the process goes is the inmate writes a
4  grievance. It would go to Sergeant McGinty. Sergeant
5  McGinty would review the grievance to see if it was for
6  medical or security or parole or whatever else. And if it
7  was an appropriate type of write-up, would refer that to
8  that department, in this case Mr. Davis's grievance to me
9  as institutional health care officer. I investigate that
10 grievance and put my response on there.
11         It goes back to Sergeant McGinty, who then
12 contacts the superintendent, and they go through that
13 grievance process there, and they respond in writing to
14 the inmate, what the finding is. And the inmate gets a
15 copy of what I put down and what the superintendent put
16 down.
17     Q   Okay.
18     A   Then, if the inmate is unhappy, dissatisfied
19 with those responses, then they can appeal. The appeal
20 generally goes straight to central office for a higher
21 authority to look at the original grievance.
22         Does that make sense?
23     Q   Yup.
24     A   They do their investigation and contact whoever
25 they need to contact, possibly even the inmate depending

Page 108

1  on the scenario, and they have their conclusions.
2          And so this was the process of the appeal going
3  to central office.
4      Q   So as far as you remember, at least at this
5  point, once you were done with your investigation and it
6  went to Superintendent Hyden, you're done?
7      A   Correct.
8      Q   And you were not called upon to provide further
9  information by central office as part of the appeal?
10     A   Typically, no. Typically, no. It's so long ago
11 on this one, I don't remember anything else. But
12 typically, I'm not contacted any further. If I had made a
13 blanket statement about what it was that he was grieving
14 for, then yeah, they'd do that. But I can't do this at my
15 level.
16     Q   You may not know the answer to this, but I'll
17 ask it anyway because you're here. This packet that I
18 have given you, the pages 496 through 500, appears to be a
19 packet that went to central office from PCC relating to
20 this grievance.
21     A   I guess. I have no idea what Sergeant McGinty
22 would have sent or not.
23     Q   Okay.
24     A   It's unlikely that Sergeant McGinty -- I
25 wouldn't believe Sergeant McGinty had progress notes.

Page 109

1      Q   That was my question --
2      A   I would guess the investigating officer
3  contacted one of my nurses and said, would you photocopy
4  progress notes and fax them to me. That would be my
5  guess. And there's fax transmittals on the progress
6  notes, so yeah, that's how that happened.
7      Q   There is a fax transmittal, but it --
8      A   Right here. That indicates it was faxed.
9      Q   7/23/1995 looks to be a bit off.
10     A   Well, the fax machine, the power glitches.
11 We're on generator power about a third of the time up
12 there, and it writes out the date and time and it resets
13 to the original. The nurses -- no one can keep up with
14 resetting the date and time on that.
15     Q   Okay. So your expectation is that this was
16 simply faxed into central office?
17     A   That would be my -- yeah.
18     Q   Is that typically what would happen on an appeal
19 like this?
20     A   Oh, yeah, as part of the investigation. The
21 investigating officer would say, do you have progress
22 notes during a time frame, or whatever else. And then,
23 depending who was on, would depend on how much they were
24 faxed.
25     Q   And that's part of what I was trying to figure

Page 110

1  out here.
2  A  And there are other instances where the whole
3  medical file might be shipped off to Anchorage for their
4  investigation.
5  Q  Okay.
6  A  And that makes it hard on me as a practitioner,
7  when your file is gone for, you know, a month.
8  Q  Based on what you see here, it appears that it
9  was these two pages of the progress notes that were faxed?
10 A  Right. And I have no idea if there was more.
11 But that's all that's in my package and I didn't put it
12 together.
13 Q  Well, the last progress note that's in here is
14 8/26/02. So from that, we can fairly conclude that this
15 was faxed at least as of 8/26/02, right?
16 A  Correct.
17 Q  The page that has the number 502 on the bottom,
18 right after that --
19 A  Uh-huh.
20 Q  -- is that something you're familiar with at
21 all?
22 A  No, other than I just saw it here today. I'm
23 assuming that's part of Sergeant McGinty's log.
24 Q  Know anybody by the name of Paul that would be
25 involved in grievance research?

Page 111

1  A  My guess is that that would be Bonnie Paul, who
2  is now a different last name, but she was working for the
3  department in those days as, I believe, the health care
4  operations officer. I think that was her title. She's a
5  nurse practitioner that typically would have been assigned
6  it. Mel Henry was -- the administrator in those days was
7  a Ph.D., not a medical doctor. And so anything to do with
8  medical issues would go to -- most likely to Bonnie Paul
9  first to investigate any grievance appeals.
10 Q  Do you know anything about the last page of this
11 exhibit?
12 A  Never seen it before today. I'm guessing that,
13 again, that's central office grievance log because it has
14 every -- all the different facilities, whether it's an
15 appeal or institutional level.
16 Q  One of the things that I was curious about;
17 maybe you can help me with this. Under the column that
18 says Researcher --
19 A  Uh-huh.
20 Q  -- there are a number of different things that
21 are listed in here. Next to Charlie Davis it says,
22 "Paul," just like the previous page did, which you think
23 means Bonnie Paul, right?
24 A  Yeah. Part of the names are blocked out on
25 mine.

Page 112

1  Q  Right.
2  A  Oh, there at the bottom I see, yeah, he does
3  have that.
4  Q  And if you go over to the column that says
5  Researcher, at the top, it says, "Paul," there?
6  A  Again Bonnie.
7  Q  Okay.
8  A  That would be my assumption.
9  Q  Do you know, Mr. Hale, why there are other types
10 of researchers listed here for grievances? For instance,
11 the MAC committee, Paul, Luben, Smithson, those types of
12 things?
13 A  During this time frame, I believe more than one
14 person that would sit in that chair to be the person who
15 went in there. If the department decided that Bonnie Paul
16 was needed, like, in Nome for a week, somebody else would
17 be called in and would sit in and might be -- investigate
18 grievances. And I'm guessing there are certain grievance
19 appeals that the person investigating thought needed a
20 higher authority than them, so they'd take it to the
21 medical advisory committee.
22     The medical advisory committee in those days, I
23 believe, had Henry Lewgan (ph) -- I mean Henry -- Mel
24 Henry, I'm sorry -- Mel Henry and the pharmacist and
25 Bonnie Paul. They might ask one of us in the field to

Page 113

1  come in and sit on that. A psychiatrist was in there. I
2  think we had a state dentist who would sit in there. And
3  they would round table discuss certain items.
4  Q  And you have participated in that medical
5  advisory --
6  A  Over the years, I have.
7  Q  From time to time?
8  A  Uh-huh.
9  Q  Would you typically participate in that
10 committee if the appeal was from your facility?
11 A  Only if they requested I come in.
12 Q  Just so we're clear, MAC committee, you
13 interpret that to mean --
14 A  Medical advisory.
15 Q  Do you know what ACO staff refers to?
16 A  ACO staff. I don't. I'm sorry. ACO staff, no.
17 Anchorage Central Office is the only thing I could think
18 of. Normally "ACO" means Anchorage Central Office.
19 Q  I take it you don't have any specific memory of
20 participating in a medical advisory committee review of
21 Charlie Davis's appeal?
22 A  No.
23     (Exhibit 11 marked.)
24 BY MR. MATTHEWS:
25 Q  Do you recognize this document?

**Page 114**

1   A   I've never seen it before, that I know of.
2   Q   Does it appear to be a COP-OUT form that Charlie
3   Davis filled out --
4   A   Correct.
5   Q   -- complaining about the medical care that he'd
6   received in Palmer?
7   A   Correct.
8   Q   This was about the same time he filed his
9   grievance, wasn't it?
10  A   Yeah. Typically, the grievance officer will not
11  accept a grievance until they've tried to handle it
12  informally. And my guess would be Mr. Davis -- this was
13  his informal attempt to address the issue.
14  Q   There's a note under Final Action Taken, "Noted,
15  BP, 6/12/02." Do you see that?
16  A   Yes.
17  Q   How do you interpret that note?
18  A   Bonnie Paul. That would be my guess.
19  Q   Do you recognize that to be Bonnie Paul's
20  handwriting?
21  A   Not off the top. But I've no reason to think it
22  was anybody else.
23  Q   Were you aware of this COP-OUT at the time you
24  interviewed Mr. Davis as part of your investigation?
25  A   I may have been. I don't remember.

**Page 115**

1   Q   Did your office in Palmer have an EKG machine?
2   A   Yes.
3   Q   Is that something that you ever used for
4   Mr. Davis?
5   A   I don't remember.
6   Q   Would that be recorded in his chart if it was?
7   A   Should have been.
8   Q   Did you have an EKG available in 2002?
9   A   Yes.
10  Q   After Mr. Davis's grievance was filed in June of
11  2002, and this COP-OUT in earlier June, are you aware of
12  any medical exam that he was ever given at Palmer, by
13  either a nurse, a PA, or a physician?
14  A   Nothing off the top, but he was given the
15  notification by me on how to ask for anything he felt he
16  needed from that point. It's their responsibility to
17  contact us, the formal process, the COP-OUT if he felt he
18  needed something, wanted something, he had a complaint,
19  yeah. Playing ping-pong, hurt his wrist, whatever, he has
20  to ask for that.
21  Q   Is it fair to say that, from your standpoint
22  then, unless he asked you for some further specific care,
23  there was nothing further he needed?
24  A   From my discussion with him. You know, I
25  explained to him that, if you think you need to have a lab

**Page 116**

1   test, you think you need to have -- whatever it is, you
2   need to put that in writing. Going up to somebody out in
3   the dining hall and complaining about something doesn't
4   get back to me. The only way I can help him if is he
5   contacts me directly and his access to contact me directly
6   is the COP-OUT form. And if he had any pain, discomfort,
7   medication problems, anything at all, he has to contact
8   me. This is how you do it (indicating). That's why I
9   spent 20 minutes discussing that issue, the issue that I
10  could help him with.
11  Q   Which is how to fill out the paperwork?
12  A   How to contact us, how to let us know. I mean,
13  because -- you know, he's typical. He went three places,
14  Lemon Creek, Palmer, Lemon Creek, in a six-month period of
15  time. He has to be the one responsible for his care, in
16  letting us know what it is that he needs.
17  Q   Do you remember having any specific discussions
18  with Mr. Hyden about Charlie Davis?
19  A   No, I don't remember.
20  Q   Did you ever talk to Mr. Henry about Charlie
21  Davis?
22  A   Not that I remember.
23  Q   How about Dr. Luben?
24  A   He wasn't on. Never talked to him about it.
25  Q   Ever talk to Dr. Billman about Charlie Davis?

**Page 117**

1   A   That I may have.
2   Q   But not that appears in your notes anywhere?
3   A   I didn't make any notes on that.
4   Q   Any memory of ever talking to Dr. Kiester about
5   Charlie Davis?
6   A   Not specifically. I'd have to go back through
7   the old logs to see who was in, if it was written down.
8   The dates -- it's around the time where the physicians
9   were starting to change.
10  Q   In the logs that we've looked at this morning,
11  there's no indication that Dr. Kiester was ever involved
12  in Charlie Davis's treatment, is there?
13  A   None.
14  Q   Same thing with Dr. Christensen?
15  A   Correct.
16  Q   No indication whatsoever, right?
17  A   None.
18  Q   Mr. Davis ever complain to you that he was not
19  getting his medication?
20  A   Not to me, that I remember. I believe that's
21  one of the -- you know, that would have been an issue that
22  I would have discussed on how to access and let me know:
23  If you're not getting something you need, you've got to
24  put it down in writing so I know.
25  Q   Did Mr. Davis ever tell you that the COs were

### Page 118

1  cutting the med lines?
2     A  I don't understand.
3     Q  Were cutting off the medication line before
4  everybody got their medication.
5     A  I've not heard that before, that I can remember.
6  That would be something that I would be talking to the
7  superintendent about, if I -- even the allegation of that.
8     Q  Mr. Davis raise that at all during his meeting
9  with you?
10    A  Not that I remember. In that line of thought,
11 there's a set time frame for med passing. And they pass
12 the meds in that time frame, and then they close up shop,
13 and the last guy in line is the last guy in line. If
14 somebody comes up 10 minutes after the line is gone and
15 the med cart has gone to another part of the institution,
16 they might miss that way.
17    Q  Okay.
18    A  If that's answering your question.
19    Q  Well, I think so, but let me give you a
20 different example.
21    A  Okay.
22    Q  If the med -- if there's a set time frame for
23 passing out meds --
24    A  Right.
25    Q  -- and it's to run from eight to nine P.M., and

### Page 119

1  nine P.M. rolls along and there's still ten people in
2  line, have you ever heard of an instance where the COs
3  have said, you 10 are going to have to wait?
4     A  Not that's been brought to my attention. I
5  wouldn't stand for that.
6     Q  Is that the type of thing you would expect
7  somebody to put in writing if they had a complaint about
8  it?
9     A  Oh, I would expect a grievance, most likely. At
10 minimum, a COP-OUT, but I would expect somebody to
11 complain in a formal manner on that. To me, if I was an
12 inmate and that happened to me, I'd be very concerned.
13           (Exhibit 12 marked.)
14 BY MR. MATTHEWS:
15    Q  We're getting to the end here.
16       This may just be a formality, Mr. Hale, but let
17 me ask you whether you've seen Exhibit 12.
18    A  No.
19    Q  Well, let me ask it this way: Did you bring any
20 documents with you today in order to respond to a request
21 for documents?
22    A  No.
23    Q  Were you asked to provide any documentation for
24 purposes of this deposition?
25    A  No.

### Page 120

1     Q  Have you been asked to search the records of the
2  medical staff in Palmer for -- in response to this case?
3        MS. KAMM:  Could I say something too, Tom?
4        MR. MATTHEWS:  Sure.
5        MS. KAMM:  We brought that little packet to give
6  to you today. In fact, what you took and renumbered as
7  No. 9 -- as your Exhibit No. 9 -- these are copies of all
8  the documents that we have also given to you in response
9  to defendant's response to plaintiff's third set of
10 requests for production to defendants. But if you want to
11 go ahead and ask him questions, go ahead.
12       MR. MATTHEWS:  Well, all I want to -- all I
13 really want to do is to tie up this loose end and make
14 sure there's no other documents out there that anybody's
15 been able to find responsive to our request.
16       MS. KAMM:  He's not the document keeper.
17       THE WITNESS:  Correct.
18       MR. MATTHEWS:  And that's what I --
19       THE WITNESS:  I was asked questions on these and
20 I referred to the people that possibly could answer that.
21       MR. MATTHEWS:  Okay.
22       THE WITNESS:  When an inmate leaves the
23 facility, the only thing that I've ever had are the
24 medical records and that goes to the facility where they
25 were at, and then, when they're discharged, to a

### Page 121

1  centralized area. So the majority of that I wouldn't have
2  access to.
3  BY MR. MATTHEWS:
4     Q  So with an inmate gone from the facility now for
5  four years, those records would not be in Palmer anymore?
6     A  No. They would be archived in Anchorage, as
7  long as he's out of jail.
8        MS. KAMM:  If I might also say, Tom, I don't
9  think you've had time to respond to -- or not respond, but
10 to review our response because we faxed it when you were
11 out of town. The retention period is three years for a
12 lot of DOC records. So that's why there are no Palmer PCC
13 minutes on daily staff meetings.
14       MR. MATTHEWS:  Okay. You're quite right that I
15 have not had a chance to look at these and I appreciate
16 that you did fax them up earlier this week.
17 BY MR. MATTHEWS:
18    Q  So you're not the records guy and you didn't
19 bring any records in response to a subpoena?
20    A  No.
21    Q  And with that, we have a formal response from
22 you in terms of the records that are available. So that
23 should suffice.
24       MS. KAMM:  Right. You served with me that
25 subpoena, so I brought the records that I had, which are

Roger Hale                                                                August 25, 2006

**Page 122**

1  the same that we provided you.
2      MR. MATTHEWS: Okay. So there's nothing else
3  that can be provided at this point in time?
4      MS. KAMM: No.
5  BY MR. MATTHEWS:
6      Q  Let me ask you this, Mr. Hale: You referred to
7  a Monday meeting.
8      A  Correct.
9      Q  Is there a daily managers' meeting?
10     A  Not that I'm involved in.
11     Q  I may have misunderstood what Mr. Hyden said,
12  but there's a weekly managers' meeting.
13     A  Correct. And I believe the security officers
14  and parole officers and the unit team members -- I think
15  they meet daily. But it's not something I've ever been
16  involved with.
17     Q  So if there are daily meetings that occur, it
18  may be something that doesn't include medical
19  representatives?
20     A  Or managers. Floor workers, people that are
21  actually physically doing hands-on, day-to-day in
22  population.
23     Q  The times that you have participated in a
24  medical advisory committee, is there a write-up that's
25  typically done?

**Page 123**

1      A  Not that I've done. I mean, I would assume --
2  well, because I've seen write-ups from those, so somebody
3  has to do something along those lines.
4      Q  Are something like minutes kept of those
5  meetings?
6      A  I would guess, and/or -- you know, like the
7  appeals or -- what I see from the medical advisory
8  committee, when it was fully functioning back in those
9  days, would be a response to -- I've requested something;
10  I want somebody to have a procedure done. And they would
11  either approve it, deny it, or defer it. And I would get
12  something in writing back that I would generally put in
13  their medical records, on the status of a given test,
14  procedure, medication, whatever it is that I'm asking for.
15     Q  If there was --
16     A  Whether they keep a log of everything they
17  discuss or not, I've never seen that.
18     Q  Are those meetings recorded, to your knowledge?
19     A  I don't remember ever seeing a recorder. They
20  must have some way of doing it; I just -- I never paid
21  attention.
22     Q  There has to be a way of documenting what
23  occurs?
24     A  Yeah, I would think so.
25     Q  Do you remember having any contact with

**Page 124**

1  Mr. Davis after that grievance meeting on June 27th?
2      A  No, I can't remember any.
3      Q  In your orders in the medical chart, you ordered
4  that Mr. Davis have a PT/INR test done every 30 days,
5  correct?
6      A  I have those written orders, yes.
7      Q  If that test wasn't done for more than 30 days,
8  that would have been contrary to your order?
9      A  Correct.
10     Q  What's the ramification of that?
11     A  Well, if it's a long term, you know, you don't
12  have any idea of what their clotting factor is.
13  Potentially, they could get too high or too low.
14     Q  Was one of Mr. Davis's complaints, when you met
15  with him for his grievance, that he had not been given a
16  timely PT and INR test?
17     A  I don't remember him specifically saying that.
18  He may have, but I don't remember that.
19     Q  Did you have a process of going through medical
20  charts on a regular basis to make sure that your orders
21  were being complied with?
22     A  No.
23     Q  Was there any process for the medical staff to
24  review charts on a regular basis?
25     A  All charts, no. There's random reviews that are

**Page 125**

1  done.
2      Q  Is it the case that you would not review a
3  medical chart typically unless an inmate came in for a
4  request for medical services?
5      A  That's one of the times. In a situation like
6  him, he's on medication. So at minimum, every 90 days it
7  would be a review of what's gone on in the last 90 days,
8  making sure that, if something was ordered, that it was
9  done.
10     Q  Given the number of medical conditions that
11  Mr. Davis had and the number of medications that he was
12  taking, do you think reviewing his chart every 90 days was
13  appropriate?
14     A  Yes, at a minimum.
15     Q  You don't think it was necessary to do it more
16  than that?
17     A  Again, you have to individualize doing this. We
18  were doing other things, like the flow sheet of blood
19  pressures and the lab tests when they come in; you're
20  reviewing it each time they have that.
21     Q  Would you agree, Mr. Hale, that Mr. Davis, as a
22  prisoner with seven different medications and an implanted
23  defibrillator, was somewhat unique?
24     A  Slightly. I've had people on 23 different
25  medications and multiple prosthetic devices that are much

Page 126

1 more unique.
2    Q  Would it be fair to describe Mr. Davis, from
3 your perspective then, as just another prisoner?
4    A  Well, no, he wasn't typical, but I've seen many
5 similar over the years, or worse. Because of his age of
6 70 and the other issues, all things that have to be
7 incorporated into it, he was an individual.
8    Q  Did Mr. Davis get any special care because of
9 his medical conditions?
10    A  What do you mean "special care"?
11    Q  Anything out of the ordinary?
12    A  Well, he was getting his blood pressure check,
13 he was getting his blood levels check, medication reviews
14 and that. So, I mean, that's just part of the routine
15 job. I guess I'm not understanding the question.
16    Q  Do you think Mr. Davis needed to be seen on a
17 regular basis?
18    A  He was seen every day by the nursing staff,
19 multiple times a day.
20    Q  When they dispensed medications?
21    A  Correct.
22    Q  But if he made complaints to them about his
23 medical condition in the med line, that wasn't the
24 appropriate place to do it, from your perspective?
25    A  If it was a routine complaint, correct. If he

Page 127

1 had an emergency, they'd deal with it on the spot.
2    Q  If he was complaining of dizziness, nosebleeds,
3 fainting spells, things like that, is that an emergency?
4    A  It depends on what the nurse triage does.
5 That's why we have the nurses. They're taught how to
6 triage those situations. And it may be an emergency; it
7 may not.
8    Q  And if it's not considered an emergency at the
9 time, would he typically be told, put in a COP-OUT, come
10 to clinic?
11    A  Right, fill out a COP-OUT.
12    Q  So if you fill out the paperwork correctly, you
13 will get seen?
14    A  If necessary. You may not be seen if you fill
15 in a COP-OUT. Again, it goes back to the triage. The
16 nurses triage -- are supposed to triage any condition that
17 comes along.
18    Q  Any condition that comes along in a med line or
19 any condition --
20    A  At all.
21    Q  Any --
22    A  Because there was a process for them to access
23 medical. And the -- routinely -- I can't say specifically
24 on Mr. Davis; I wasn't there. But routinely, inmates come
25 up at med lines and they'll have a laundry list of

Page 128

1 problems that they've had for the last six months or year
2 or whatever and want them resolved there. And it's just
3 impossible to do that. And so they ask a series of
4 questions. Dizziness, in and of itself -- you know, it
5 can be something really minor; it could be something
6 significant. I would expect the nurses to try and get a
7 better idea of what's going on: Is this something that's
8 happened in the last five minutes, the last hour, has it
9 been going on for weeks, months, years, that sort of
10 thing. Same with nosebleeds: You got it one time, do you
11 have it now, that sort of thing.
12      So as a practitioner, I rely on the nurses daily
13 seeing these people: Is the person ashen, gray; do they
14 look on death's door; do they have other complaints,
15 versus somebody that comes up with a laundry list of
16 problems. Most of the time they're pretty good at it.
17      MR. MATTHEWS: Thank you, Mr. Hale. I
18 appreciate your time.
19      THE WITNESS: All right.
20      MR. MATTHEWS: That's all the questions I have.
21      MS. KAMM: No questions.
22      (Proceedings adjourned at 1:10 p.m.)

Page 129

C E R T I F I C A T E

I hereby certify that I have read the foregoing transcript and accept it as true and correct, with the following exceptions:

PAGE    LINE    CORRECTION

_____
Date: 8/25/06     Roger Hale

(Use additional paper to note corrections as needed, signing and dating each page.)    (SW)

33 (Pages 126 to 129)

Alaska Stenotype Reporters 907-276-1680

Exhibit 21
Page 33 of 34

Page 130

```
 1           REPORTER'S CERTIFICATE
 2      I, SUSAN J. WARNICK, RPR, and Notary Public in
 3  and for the State of Alaska do hereby certify:
 4      That the witness in the foregoing proceedings was
 5  duly sworn; that the proceedings were then taken before me
 6  at the time and place herein set forth; that the testimony
 7  and proceedings were reported stenographically by me and
 8  later transcribed under my direction by computer
 9  transcription; that the foregoing is a true record of the
10  testimony and proceedings taken at that time; and that I
11  am not a party to nor have I any interest in the outcome
12  of the action herein contained.
13      IN WITNESS WHEREOF, I have hereunto subscribed my
14  hand and affixed my seal this _____ day of _____,
15  2006.
16
17
                _____
18              SUSAN J. WARNICK,
                Registered Professional Reporter
19              Notary Public for Alaska
20
        My Commission Expires: April 8, 2010
21
22
23
24
25
```