IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


CHARLIE J. DAVIS, JR.,

          Plaintiff,

vs.

ZELMER HYDEN, et al.,

          Defendants.
_____)

NO: A02-0214 CV (JKS)


DEPOSITION OF ZELMER HYDEN

THURSDAY, APRIL 27, 2006, 9:28 a.m.

Anchorage, Alaska



Exhibit 15
Page 1 of 23

Page 1

Zelmer Hyden                              deposition                         April 27, 2006

---

**Page 2**

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF ALASKA
3
4    CHARLIE J. DAVIS, JR.,
5          Plaintiff,
6    vs.
7    ZELMER HYDEN, et al.,
8          Defendants.
                                              )
9
     NO: A02-0214 CV (JKS)
10
11
12
13          DEPOSITION OF ZELMER HYDEN, taken on behalf
14   of Plaintiff, Pursuant to Notice, at MATTHEWS &
15   ZAHARE, 431 West Seventh Avenue, Anchorage, Alaska,
16   before Susan Campbell, Certified Shorthand Reporter
17   for Alaska Stenotype Reporters and Notary Public for
18   the State of Alaska.
19
20
21
22
23
24
25

---

**Page 3**

1              A-P-P-E-A-R-A-N-C-E-S
2
3    For Plaintiff:   MATTHEWS & ZAHARE
4                     BY: THOMAS A. MATTHEWS
                      431 West Seventh Avenue
                      Suite 207
5                     Anchorage, AK  99501
6
     For Defendants:   STATE OF ALASKA
7                      ATTORNEY GENERAL'S OFFICE
                       Department of Law
8                      Criminal Division
                       BY: MARILYN J. KAMM
9                      P.O. Box 110300
                       Juneau, AK  99811
10
     Reported By:   Susan Campbell
11                  Certified Shorthand Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1               I N D E X
2    EXAMINATION BY:                     PAGE
3       Mr. Matthews                      5
4
5            E X H I B I T S
6    NUMBER                              PAGE
7    1  Palmer Correctional Center Staffing -   17
        1 page
8
     2  Responses to Discovery Requests - 16   27
9       pages
10   3  Verification - 1 page            29
11   4  Prisoner Grievance - 4 pages     47
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1    ANCHORAGE, AK, THURSDAY, APRIL 27, 2006, 9:28 a.m.
2          ZELMER HYDEN,
3       called as a witness on behalf of the
4       Plaintiff, having been duly sworn upon
5       oath by Susan Campbell, Notary Public,
6       was examined and testified as follows:
7          EXAMINATION
8    BY MR. MATTHEWS:
9       Q.  Would you state your name for the record,
10   please?
11      A.  Okay.  First name is Zelmer, Z-e-l-m-e-r.
12   Last name is Hyden, H-y-d-e-n.
13      Q.  Could you give us an address, please?
14      A.  P. O. Box 536, Sutton, Alaska 99674.
15      Q.  Do you have telephone number out there?
16      A.  746-0336.
17      Q.  How long have you lived in Sutton?
18      A.  Oh, about seven, eight years.
19      Q.  Ever had a deposition taken before?
20      A.  Negative.
21      Q.  Let me tell you briefly then just a couple
22   of the ground rules.  I'm going to try and ask
23   questions clearly and intelligently.  Sometimes I do.
24   Sometimes I don't.  If you don't understand my
25   question for any reason, please let me know and I'll

---

2 (Pages 2 to 5)

Exhibit 15
Page 2 of 23

Zelmer Hyden                          deposition                          April 27, 2006

Page 6

1  be happy to rephrase it.
2       It's not a test of your endurance, by any
3  means. If you needed a break, bathroom, coffee,
4  cigarette, walk around the block, anything like that,
5  just let me know and we'll be happy to accommodate
6  you. Hopefully, get you out of here before lunchtime
7  and back on your way to Sutton.
8       A.  Works for me.
9       Q.  Okay. In 2002 were you employed by the
10  State of Alaska?
11      A.  That is correct. I believe at that time I
12  was the acting superintendent, Palmer Correctional
13  Center.
14      Q.  Maybe you could give me, just to make it
15  easy on us, sort of a thumbnail sketch of your
16  employment history.
17      A.  History of my employment?
18      Q.  If you would.
19      A.  Okay. I started with the State in 1978 as a
20  psychiatric assistant at Alaska Psychiatric Institute.
21  Worked there for about five years. And then I moved
22  to the Department of Corrections, oh, probably about
23  '83, '82, something like that. Worked at Cook Inlet,
24  Mat-Su Pretrial, Third Avenue Jail and Palmer
25  Correctional Center.

Page 7

1       Q.  How long did you stay employed by the State?
2       A.  About 26 years all together.
3       Q.  So you left State employment in what, 2004?
4       A.  2004. I believe June of '04 for retirement.
5       Q.  And are you actively employed now?
6       A.  No. Except housecleaning and things like
7  that. You know how that goes.
8       Q.  Not working for pay, anyway.
9       A.  No. It's all free now. Slave labor.
10      Q.  And Sutton is where you make your home?
11      A.  Yes.
12      Q.  Tell me a little bit about your educational
13  background.
14      A.  I graduated from Roswell High School in
15  Roswell, New Mexico in 1970. Attended Eastern
16  New Mexico University for a couple of years. And then
17  continued with more education while I was in the
18  United States Air Force. Ended up with a total of
19  about 91 semester hours, no degree.
20      Q.  What years were you in the Air Force?
21      A.  1973 for five years.
22      Q.  Highest rank?
23      A.  E-4, sergeant.
24      Q.  Where were you stationed?
25      A.  Holloman Air Force Base -- that's in

Page 8

1  Alamogordo, New Mexico -- and Elmendorf Air Force
2  Base.
3       Q.  Is it fair to say the military brought you
4  up to Alaska?
5       A.  That is true.
6       Q.  And when you left the military in '78, you
7  had been stationed at Elmendorf?
8       A.  That's correct.
9       Q.  And went promptly to work for the State of
10  Alaska?
11      A.  That is correct.
12      Q.  What training did you have to be a
13  psychiatric assistant?
14      A.  At that particular time at API, it was all
15  on-the-job training.
16      Q.  How did you get into the field of
17  corrections?
18      A.  Briefly, it was after the Charles Meech
19  incident. And they kind of reshuffled everything at
20  API. And a lot of the -- and they moved a unit to
21  Hiland Mountain to do E&Os out there. And I went out
22  there. And then from that when they did move it back
23  to API, I went ahead and stayed with the Department.
24      Q.  I'm going to ask you to break down a couple
25  of things in that last answer for me.

Page 9

1       A.  That would be fine.
2       Q.  First of all, what was the Charles Meech
3  incident?
4       A.  The Charles Meech incident was an individual
5  who killed four teenagers in Russian Jack Park. No,
6  no. That was the other one. I'm getting them all
7  together.
8          Charles Meech killed two people. He killed
9  one one-armed kid. And that's the reason he was in
10  API. And then he was -- if I remember correctly, he
11  was on a pass from API working at Sears and he
12  killed -- I'm not sure. There's so many of those guys
13  right in there that we dealt with that it kind of runs
14  together.
15      Q.  Not looking to get you off on a long tangent
16  here. It's just when you use a term, I may ask you to
17  explain it, just so we understand.
18      A.  That's fine.
19      Q.  So Charles Meech, I take it, was a patient
20  at API.
21      A.  Yes. He was a Title 12.
22      Q.  And that means?
23      A.  He was incarcerated at API because he was
24  found to be incompetent.
25      Q.  And at some point then he went out and

3 (Pages 6 to 9)

Exhibit 15
Page 3 of 23

Zelmer Hyden                              deposition                              April 27, 2006

---

**Page 10**

1 killed somebody?
2     A. Yes. While he was on a pass.
3     Q. And that led to some changes in security?
4     A. And that led to some changes in security and
5 some changes in a number of things, thus me going to
6 Corrections.
7     Q. Okay. And so as part of that transition
8 then, you went out to Hiland Mountain for a time?
9     A. Yes.
10     Q. And you mentioned something about E&O.
11     A. Right. At that particular time, they
12 started doing the evaluations and observing behaviors
13 for new people who could be Title 12s.
14     Q. So E&O is an evaluation and observation?
15     A. Uh-huh, yes.
16     Q. So after a stint at Hiland Mountain, then
17 you moved full time into the field of corrections?
18     A. That's correct.
19     Q. And that would have been approximately what
20 year?
21     A. Let's add five years to 1978. What are we
22 looking at? About '83.
23     Q. Okay. When were you first assigned to
24 Palmer, if you remember?
25     A. Oh, probably around '85 or '6.

---

**Page 11**

1     Q. I asked you earlier about the different
2 places that you had worked at the Department of
3 Corrections. And you listed off a number of them. I
4 want to make sure I'm clear. Were you listing them in
5 chronological order?
6     A. Probably not.
7     Q. Okay. What years did you work at Palmer
8 then?
9     A. Okay. Palmer was from '86 to -- '86 to when
10 I retired, with an 18-month break when I went to
11 Mat-Su Pretrial and then returned to Palmer. And that
12 would have been, oh, roughly '99, that 18 months at
13 Mat-Su.
14     Q. So the great bulk of your career was at
15 Palmer.
16     A. That is correct.
17     Q. And tell me what positions you held while
18 you were at Palmer.
19     A. Well, I started at Palmer, I went there as a
20 Correctional Officer II. Worked security. And then
21 Palmer had a Unit Management Program going at that
22 time, which was a program that we had correctional
23 counselors to assist inmates with their living skills
24 and issues they may have while incarcerated. So I
25 became a correctional counselor. And was a

---

**Page 12**

1 correctional counselor there for, oh, probably six
2 years.
3         Left that and was promoted to sergeant to
4 Mat-Su. That's how I got to Mat-Su. And then from --
5 returned to Palmer as a security sergeant, oh, in
6 probably '01 sometime. Then was promoted to assistant
7 superintendent, and then finally superintendent.
8     Q. So you came back to Palmer as assistant
9 superintendent?
10     A. As a sergeant.
11     Q. As a sergeant.
12     A. Right.
13     Q. And that would have been in approximately
14 '01?
15     A. Approximately '01.
16     Q. Then what years -- strike that.
17         What year did you become assistant
18 superintendent? Best guess.
19     A. I think during the deal with Mr. Davis, I
20 was acting superintendent. So I would have been an
21 actual assistant at that time. And I was only
22 assistant superintendent for probably about 18, 19
23 months, not long.
24     Q. And then you were appointed full-time
25 superintendent?

---

**Page 13**

1     A. Right.
2     Q. And how long did you hold that position?
3     A. Oh, about two years.
4     Q. And that was the position you had when you
5 retired?
6     A. That's correct.
7     Q. During your work for -- strike that.
8         During your work at Palmer Correctional
9 Center, can you explain for me what medical training
10 you had?
11     A. We annually received CPR. And, of course,
12 we're talking about a vast period of time here. So I
13 can be -- I have to be very general. We did receive
14 annual CPR. And there was some emergency, you know,
15 first aid and stuff, things of that nature.
16         As for my part, that was the only medical
17 training that we had. We did have -- because I had
18 moved past shift status at the time of this incident.
19 So that's probably about it. I can't recall anything
20 else.
21     Q. Okay.
22     A. A little first aid and CPR.
23     Q. In 2002 when Mr. Davis was at PCC, you were
24 assistant superintendent?
25     A. And active superintendent.

---

Exhibit __15__

Page __4__ of __23__

Zelmer Hyden            deposition          April 27, 2006

Page 14

1    Q.  So there was no superintendent above you
2  during that time period?
3    A.  No.
4    Q.  During all of 2002?
5    A.  Probably during 2002 at some time I actually
6  became the -- the superintendent.
7    Q.  Okay.  Who did you report to then?
8    A.  The director, Central Office.  At that time
9  would have been Allen Cooper.
10    Q.  Is it fair to say, then, that during 2002
11  the rest of the staff at PCC all reported to you?
12    A.  No.
13    Q.  Okay.  Explain the chain of command for me.
14    A.  Chain of command, all security staff,
15  kitchen staff, all of the staff reported to me.
16  Medical staff was -- the medical staff, the nurses,
17  the PAs and the psychiatric people, mental health
18  conditions, et cetera, actually, they were assigned to
19  my building.  And, you know, of course, their offices
20  and everything was in my building.  But they actually
21  reported to the people in Central.  I didn't write
22  their evaluations or anything like that, no.  And if I
23  had an issue with these folks, I would go to Central
24  and talk to them about it.
25    Q.  And Central is located physically where?

Page 15

1    A.  Diplomacy Drive.
2    Q.  In Anchorage?
3    A.  Yeah, in Anchorage.
4    Q.  During the time that you were -- strike
5  that.
6        Let's talk about 2002.  It's a little bit
7  easier time period.  Who would the most senior medical
8  person have been who was assigned to PCC?
9    A.  That was actually assigned there?
10    Q.  Yes.
11    A.  Would probably have been Roger Hale.
12    Q.  And Mr. Hale was a PA?
13    A.  He was a PA.  And I think when you say
14  assigned there, there were medical doctors on
15  contract, but Mr. Hale actually worked there.
16    Q.  Okay.  And Mr. Hale, then, as a medical
17  person would not have reported directly to me.
18    A.  He would -- he would report to me.  And, for
19  example, we'd have a meeting.  And if there was
20  something significant, he would make the staff aware
21  at that particular time.  But other than that, as far
22  as him working for me, no, he did not.
23    Q.  Did you have regular meetings with the
24  medical staff?
25    A.  There were morning meetings at 9:30.  And --

Page 16

1  and all the staff would assemble at that time.
2    Q.  And that's a daily meeting?
3    A.  And it was daily meeting.  And medical would
4  be there most of the time, unless something was going
5  on in which they could not.
6    Q.  Were there records kept of those meetings --
7    A.  (Witness nods head.)
8    Q.  -- regular minutes or something like that?
9    A.  Yes, there was.
10    Q.  I should have told you at the beginning, the
11  nods of the head, the shaking the head doesn't work
12  very well.  We can't pick them up for the court
13  reporter.
14    A.  I'm old.  I'm tired.
15        MS. KAMM:  I hear you.
16  BY MR. MATTHEWS:
17    Q.  Occasionally, I may jump in and prod you for
18  a verbal answer.  So that's the reason.
19    A.  Okay.
20    Q.  So there were written minutes kept of each
21  of those daily meetings?
22    A.  Yes.
23    Q.  And what are those minutes called?
24    A.  Morning meeting minutes, I would assume.
25    Q.  Who was responsible for keeping those?

Page 17

1    A.  My -- my clerk.
2    Q.  Who would that person have been during 2002?
3    A.  I can't -- I don't know for sure, because
4  there was -- there was two or three clerks coming and
5  going.  And I'm not sure of the time frames that they
6  were actually there.  People that did keep the
7  meetings -- the minutes were Sharon Wesson (phonetic),
8  I believe was her name.
9    Q.  Spell the last name.
10    A.  I'm not sure.  What is her last name?
11  Sharon.  Starts with a W.  I'm not even going to try
12  to remember.  It's been too far back.
13        Melody Chowoniec was another one.
14    Q.  Can you spell that last name?
15    A.  Oh, wow.  C-h-o-w-o-n-i-a-c, I believe.
16    Q.  I wasn't going to come even close to that.
17    A.  And then there was one more.  I can't
18  remember her name.  And she's probably the one that
19  was there at that particular time.  It may come to me
20  later.
21    Q.  Would that help you?
22    A.  That might.
23        MR. MATTHEWS:  Would you mark that as
24  Exhibit 1?
25        (Exhibit 1 was marked.)

5 (Pages 14 to 17)

Exhibit  15
Page  5  of  23

Zelmer Hyden                    deposition                    April 27, 2006

---

Page 18

1  BY MR. MATTHEWS:
2      Q.  Let me trade you.
3      A.  That's pretty bad.
4      Q.  Because my eyes are old and tired, too. Try
5  a magnifying glass, if that helps.
6      A.  Kathy Perez was one. And the one I'm trying
7  to remember her name, Kathy Perez replaced. So Kathy
8  Perez would be my guess as the one that was there at
9  that particular time.
10     Q.  Okay.
11     A.  And she's in California.
12     Q.  I take it those minutes that were kept on a
13  daily basis, would they be typed up in some form?
14     A.  (Witness nods head.)
15     Q.  Is that a yes?
16     A.  That's correct.
17     Q.  And they would be kept then as part of your
18  regular records?
19     A.  Right.
20     Q.  When you left Palmer, were those minutes
21  intact?
22     A.  Yes.
23     Q.  And where were they kept, near your office?
24     A.  The Clerk III kept them in her file cabinet.
25     Q.  How long are those records typically kept,

---

Page 19

1  as far as you know?
2      A.  Either five or seven years.
3      Q.  So the minutes from 2002 should still be in
4  existence at this point?
5      A.  They should still be there.
6      Q.  Okay. We've marked as Exhibit 1 a document
7  that has been produced in this case. Can you tell me
8  what that is?
9      A.  This is the chain of command for Palmer
10  Correctional Center.
11     Q.  Sometimes called an organizational chart?
12     A.  That is correct.
13     Q.  There's a date on this one in the upper
14  left-hand corner, October 8th, 2002?
15     A.  Uh-huh.
16     Q.  Does that suggest to you that this was --
17  that the document we have as Exhibit 1 is current as
18  of that date?
19     A.  It should be.
20     Q.  Okay. How often were these revised, do you
21  know?
22     A.  Oh, it wasn't that large of a turnover.
23  Probably every six months or as the need arose, you
24  know. And usually, if there was revisements, it would
25  involve under the four shift supervisors, because that

---

Page 20

1  was our largest group of people that would change
2  positions or change jobs. And that would be the
3  correctional staff.
4      Q.  And you're kind of pointing over to the
5  left-hand side.
6      A.  And I am pointing to the left side, which
7  would be what we would call a shift. At the top you
8  have your Correctionl Officer III, who would be the
9  sergeant of that shift, and then the people who would
10  work for him. And there's four shifts.
11     Q.  So in looking at this chart, then -- hard to
12  read the names -- but it looks like Richard Chandler,
13  Dale Eberwein, Jay Barnhardt and Matty --
14     A.  Marty Steinriede.
15     Q.  -- Marty Steinriede. Those would be the
16  four shift supervisors?
17     A.  That would be the four shift supervisors.
18     Q.  And the people whose names appear below them
19  would have been all individual COs reporting to them?
20     A.  That is correct.
21     Q.  Help me understand this chain of command a
22  little bit better. The way it appears, at least in
23  this diagram, those four shift supervisors would have
24  reported to an assistant superintendent; is that
25  right?

---

Page 21

1      A.  That is correct.
2      Q.  And that position, at least as of October
3  8th, was vacant?
4      A.  That is correct.
5      Q.  So was everybody reporting, in effect, to
6  you?
7      A.  That is correct.
8      Q.  Each of the spots that are marked in this
9  organizational chart that say "vacant," what does that
10  mean? Those are positions that are authorized, but
11  not filled?
12     A.  Those are positions that are vacant for
13  budgetary issues.
14     Q.  Meaning the money hasn't been authorized to
15  pay for them?
16     A.  Well, with issues of overtime, et cetera,
17  sometimes I would have to hold two or three positions
18  vacant to make sure everybody got paid.
19     Q.  Okay. Does the medical staff appear on this
20  organizational chart anywhere?
21     A.  They are off to the left on top. You see
22  the little squiggly line going out from the
23  superintendent out toward them.
24     Q.  And that's where we see Medical PAs Hale and
25  Hughes?

---

Alaska Stenotype Reporters (907) 276-1680

Exhibit 15
Page 6 of 23

Zelmer Hyden                     deposition                     April 27, 2006

Page 22

1    A.  Hale and Hughes.  Nurses Norma Tyler,
2  Phyllis Pettigrew.  And I don't recall that other name
3  there.
4    Q.  Appears to be a vacant nursing position.
5    A.  Well, no.  There's a name there.  She must
6  not have been there very long.  Wachster (phonetic),
7  that name right there.  I probably knew her by her
8  first name, but not her last name.
9    Q.  And that's the -- the position you're
10  looking at is the one underneath Phyllis Pettigrew and
11  to the right?
12    A.  That is correct.
13    Q.  Where it says "LPN"?
14    A.  Uh-huh.
15    Q.  And LPN is a designation for licensed --
16    A.  Licensed practical nurse.
17    Q.  Immediately to the left of that box is the
18  name Tyler?
19    A.  Right.
20    Q.  And that person was a nurse, too?
21    A.  That -- yes.
22    Q.  And there was also a vacant position there;
23  is that right?
24    A.  I don't see a vacant position.
25    Q.  Maybe I'm just not reading it right.  Is

Page 23

1  that the first name?
2    A.  That's -- yes.  What they've done is they
3  did -- they put two PCNs in there.  PCN would be the
4  employee number.  So Norma Tyler is obviously one of
5  the PCNs.  And the other one is vacant, yes.  So
6  there's a vacant spot there.
7    Q.  What's a PCN number?
8    A.  A PCN number is a number that every State
9  employee has a PCN.  And it's basically their number.
10  And the -- like the 20 designates Department of
11  Corrections.  And 18 or something might be DOT or
12  something of that nature.
13    Q.  So each of these numbers then tells us an
14  individual employee.
15    A.  Right.
16    Q.  Is it fair to say in looking at this chart,
17  Exhibit 1, that the medical staff that actually working at
18  Palmer as of October 8th, 2002 are the seven boxes
19  that we see off to the left?
20    A.  I think that should be made a little
21  clearer.
22    Q.  Okay.  Help me out.
23    A.  These people worked at Palmer on a daily
24  basis.  But almost any given day, there was a doctor
25  or someone brought in to help do meds -- or not

Page 24

1  meds -- but sick call or maybe to see a particular
2  inmate about a particular issue that the PAs were
3  referred to.  So I don't know how you want to ask that
4  question.  But the ones that were actually assigned on
5  a daily basis to Palmer are these people in this
6  chart.
7    Q.  Okay.  And it looks like from this chart two
8  of the people that were assigned were mental health
9  clinicians, correct?
10    A.  That is correct.
11    Q.  Two were PAs, correct?
12    A.  Correct.
13    Q.  You have three nurses --
14    A.  Three nurses.
15    Q.  -- that were assigned on a daily basis, and
16  a fourth one vacant, right?
17    A.  I think we've got one, two -- yeah, three
18  nurses and a fourth one vacant is correct.
19    Q.  And then the far left box, Able and Huffman,
20  if I'm reading that --
21    A.  Yeah.  These individuals had nothing to do
22  with medical.  They're kind of shot out here on this
23  dotted line, because they didn't actually work for me.
24  This was the Alaska Correctional Industries people.
25  And so they're out there simply because they kind of

Page 25

1  fall under the same umbrella as medical.  I don't
2  really directly supervise them.
3    Q.  They weren't medical staff?
4    A.  They had nothing to do with medical, no.
5    Q.  All right.
6    A.  And they answer to somebody in Los Anchorage
7  here so --
8    Q.  So really, what we're looking at in terms of
9  the daily medical staff that was assigned to PCC are
10  those five boxes that we've just gone through,
11  right --
12    A.  Right.
13    Q.  -- two mental health clinicians and two PAs
14  and four nurse positions.
15    A.  Yeah.
16       MS. KAMM:  I think it's six boxes.
17  BY MR. MATTHEWS:
18    Q.  Six boxes.
19    A.  That's correct, assuming that this org chart
20  was accurate at that particular time, yes.
21    Q.  Do you have any reason to think it was not?
22    A.  Well, I told you a little bit ago, we change
23  them about every six months.  So it depends on the
24  lapse of time there.  And I couldn't even begin to
25  tell you how close we are to that.  It's conceivable

7 (Pages 22 to 25)

Exhibit  15
Page  7  of  23

Zelmer Hyden                     deposition                     April 27, 2006

**Page 26**

1  one of these nurses was gone and another one was
2  there, you know. I really couldn't tell you. It's
3  been too long.
4      Q.  Are these -- are the old org charts kept in
5  some fashion as part of the records?
6      A.  I don't know the answer to that. Possibly,
7  but I don't know for sure.
8      Q.  Okay. This is the only one I've seen.
9  That's why I asked the question.
10     Let me ask you this, if I can: During 2002,
11 during the time that Charlie Davis was at Palmer, are
12 you aware of any other medical personnel other than
13 those listed on this org chart who were assigned to
14 Palmer on a daily basis?
15     A.  Assigned on a daily basis?
16     Q.  Yes.
17     A.  Other than the doctors that come in two,
18 three times a week, no.
19     Q.  Do you know in 2002 who the doctors were
20 that were coming in on a regular basis?
21     A.  I'd have to look at -- I know Holloway.
22 There was a Lupan. There was -- I don't know. There
23 was like four or five different doctors. And then
24 another thing that would frequently occur -- and this
25 would happen several times a week -- inmates would be

**Page 27**

1  transferred -- or not transferred -- but taken to
2  doctors' offices.
3      So if an inmate had a particular issue, say
4  it's an ear, nose and throat issue, an appointment
5  will be made. The transportation staff will take him
6  to his appointment and bring him back. So in addition
7  to care at the facility and doctors coming into the
8  facility, it was not -- it was very common for inmates
9  to leave on a daily basis to go to medical
10 appointments all the way to Anchorage.
11     MS. KAMM:  Can you tell me who the doctors
12 are that he identified?
13     (Record read.)
14     THE WITNESS:  Kiester. There's a Kiester,
15 Dr. Kiester. K-e-i-s-t-e-r.
16     MR. MATTHEWS:  Try it this way. Mark that
17 the next one.
18     (Exhibit 2 was marked.)
19 BY MR. MATTHEWS:
20     Q.  If you would take a look at the second page
21 of what we've marked as Exhibit 2, there's an
22 interrogatory there, number three, asking about
23 doctors.
24     A.  Uh-huh.
25     Q.  And there's a list of names there --

**Page 28**

1      A.  Right.
2      Q.  -- including Scott Kiester.
3      A.  Yes. Billman.
4      Q.  Holladay?
5      A.  Holladay and Christensen, right.
6      Q.  Are you aware of any other physicians?
7      A.  There were, but I couldn't recall. It
8  was --
9      Q.  While we're on these discovery requests
10 we've marked as Exhibit 2, is that a document you're
11 familiar with?
12     A.  This document here?
13     Q.  Yes.
14     A.  Yes.
15     Q.  This is an unsigned copy that we were
16 provided. Housekeeping matter, have you signed --
17     A.  I believe I did some time back.
18     Q.  Did you? Maybe I just did not locate the
19 signature page when I was looking.
20     A.  My copy, is it signed? Was that a question?
21     Q.  My question is, did you ever sign that
22 document at any point?
23     You've got the signature page?
24     MS. KAMM:  Yes.
25     THE WITNESS:  You do have it?

**Page 29**

1      MR. MATTHEWS:  May I take a look at yours?
2      MS. KAMM:  Sure.
3      MR. MATTHEWS:  Why don't we just go off the
4  record for a minute?
5      (Brief recess.)
6      (Exhibit 3 was marked.)
7  BY MR. MATTHEWS:
8      Q.  While we were off the record, we've located
9  the signature page that appears to be for you. And
10 we've now marked that as Exhibit 3; is that right?
11     A.  That is correct.
12     Q.  And that bears your signature?
13     A.  That sure looks like it to me.
14     Q.  And it looks like you signed that page on
15 the 28th day of January 2005, right?
16     A.  Correct.
17     Q.  And to the best of your knowledge, does that
18 signature page go with the interrogatories which we've
19 marked as Exhibit 2?
20     A.  To the best of my knowledge, that is
21 correct.
22     Q.  Turning back to the org chart for just a
23 moment, in terms of the medical side of the staff, who
24 would be responsible on a daily basis for overall
25 medical care of the inmates? Is there any one

Zelmer Hyden                           deposition                        April 27, 2006

Page 30

1  individual who would be in charge?
2      A.  I really don't know how to answer that.  I
3  know that Hughes and Hale were the two PAs.  I would
4  have to say those two.  Now, they work a week on and a
5  week off, because they cover 12 hours.  And so I
6  couldn't answer specifically.  Maybe Mel Henry or the
7  people -- but I would say if I had to give you an
8  answer, it would be Hale and Hughes and not one or the
9  other.  They were equals, as I understood.
10     Q.  They didn't work at the same time, right?
11     A.  No.
12     Q.  So Hale and Hughes were working 12-hour
13  shifts what, seven days a week?
14     A.  Yes.
15     Q.  And that shift would have run during the
16  daytime?
17     A.  They would have been there daytime hours,
18  correct.  And I don't know what the specific hours
19  were.
20     Q.  7:00 to 7:00 or something like that?
21     A.  Yeah, something like that.
22     Q.  And how about the nurses that are listed
23  underneath there, do you know what kind of shifts they
24  would have run?
25     A.  You know, medical staff changed a couple of

Page 31

1  times.  And I'm not sure.  But as what I remember is
2  they also worked a week on and a week off.  So there
3  was a nurse there for 12 hours.  And then there was --
4  there were -- and I don't know exactly what their
5  hours were.
6      Q.  During 2002 can you tell me how many medical
7  staff would typically be on duty during the daytime?
8      A.  During the daytime?  That building was a
9  good ways from my office.  Usually when I would go
10  over there, you would always see a PA during the day,
11  at least one nurse.  And, of course, the dental people
12  was right adjacent to them.  There would usually be
13  two dental people there.
14     Q.  So a PA and a nurse --
15     A.  So you'd see -- as a rule, you'd see a nurse
16  and a PA.
17     Q.  How about during the nighttime hours?
18     A.  During the nighttime hours, it was my
19  understanding that they had their shifts set to where
20  they could do the last med pass; however, there were
21  some inmates that might have had meds later in the
22  evening.  And it's my understanding that in some
23  cases, inmates were allowed to carry these meds and do
24  self-administration of their own drugs.
25          And probably in some cases -- and I don't

Page 32

1  know which ones -- the officers might pass out already
2  packaged and -- you know, this inmate gets this out of
3  this packet at this time.  And those officers had some
4  training to do that.  Every officers didn't do it.
5  There was only a few that had that specific training
6  to handle that in the times when medical wasn't there.
7      Q.  Are you talking about correctional officers?
8      A.  Correct.
9      Q.  Do you know who the correctional officers
10  were that had that training during 2002?
11     A.  I wouldn't try to guess.  It's too far.
12     Q.  Were those officers who reported to you?
13     A.  They reported to their shift supervisor who
14  reported to the assistant superintendent who reported
15  to me.
16     Q.  So typically, then, during 2002, was there a
17  medical person on duty during the evening hours,
18  nighttime hours?
19          MS. KAMM:  And what are the nighttime hours?
20  BY MR. MATTHEWS:
21     Q.  7:00 p.m. to 7:00 a.m.
22     A.  There was a period of time when there was
23  not medical people on-site.  Okay.  I don't know what
24  time that was.  I don't know what their hours were.
25  Couldn't even begin to guess.  But there was a period

Page 33

1  of time where if there's an emergency, you need to
2  call the ambulance or the PAs were on-call, you know,
3  they -- they had a State car and were to, boom, here
4  we come.  So that was how it was done.
5      Q.  Who set those shifts?
6      A.  I'm -- I have to assume.  And I do not know
7  the answer to that.  I assume Mel Henry.  It certainly
8  wasn't me.
9      Q.  Is it fair to say then that during a 24-hour
10  day, typically, during 2002, there was a period of
11  time where there was no medical person physically
12  on-site?
13     A.  Physically on-site?
14     Q.  Physically on-site.
15     A.  That is probably correct.
16     Q.  The daytime hours would be predominantly
17  covered, but not the night?
18     A.  The daytime hours, there would be somebody
19  there, yes.
20     Q.  But during the nighttime hours --
21     A.  And I do know that even through that last
22  pill pass at like 6:00, you know, around meal time,
23  they were there.  What time that they left, I do not
24  know.
25     Q.  And that was -- that would be a better

9 (Pages 30 to 33)

Exhibit ___15___
Page ___9___ of _23_

Zelmer Hyden                    deposition                    April 27, 2006

Page 34

1   question for Mel Henry?
2      A.  Exactly.  Because I could try to answer
3   something regarding their staffing and stuff, it would
4   be in error.  I really -- because they didn't work for
5   me specifically, there was a lot I did not know.
6      Q.  And that's fair enough.  I'm not looking for
7   your guess.  Just if you know the answer, please tell
8   me.
9          You mentioned that there were some of the
10  COs who were trained to give out medication.
11     A.  Yes.
12     Q.  And you don't know the names, offhand?
13     A.  I don't have a clue.
14     Q.  Do you know what training they had?
15     A.  The -- I believe they got the training from
16  the people at Central, the pharmacists, et cetera,
17  et cetera, who would actually know how to do this.
18  And that's an assumption on my part.  But I do know
19  they received training.  And I'd have to say I don't
20  know who did it, who did the training.  I would assume
21  it was the Central people.
22     Q.  Or what it consisted of?
23     A.  Or -- I don't know what it consisted of.  I
24  have no idea.
25     Q.  Again, do you think that's a better question

Page 35

1   to ask Mel Henry?
2      A.  Absolutely.
3      Q.  Let me ask you about Charlie Davis.  Do you
4   remember Mr. Davis?
5      A.  I remember Mr. Davis.
6      Q.  Do you remember what contact you
7   individually had with Mr. Davis?
8      A.  I remember seeing him on the grounds.  And
9   the reason I remember him -- and I could be in error.
10  It could be someone else.  But I remember an
11  individual who had a cane.  And never had a problem
12  with him or anything of that nature.  But an inmate
13  with a cane kind of sticks out in my mind.
14     Q.  And you're assuming that that's Mr. Davis?
15     A.  I have to assume that, yes.
16     Q.  Why is it that you make that assumption?
17     A.  Because that's -- that's in my memory as of
18  four years ago.  And you have to remember, you know, I
19  got 500 inmates there.  Does this one have a hangnail?
20  Does this one have this?  Does this one have that?
21  When you go around inspections on Friday, that's when
22  you actually get to see the prisoners and have
23  interactions with them.  The rest of the time, the
24  administration building is, you know, a couple blocks
25  away from the facility.

Page 36

1          So a superintendent's contact, actual
2   contact with a prisoner, you would have to actually go
3   to, whether it be medium facility or minimum facility,
4   to have contact.  And usually, I would have some
5   contact with different prisoners on Friday.  And that
6   was during the inspection.
7      Q.  Just so that I'm clear in understanding, you
8   said that there's medium facility and a minimum
9   facility.
10     A.  Right.
11     Q.  I take it Palmer is structured -- there are
12  physically different buildings on the grounds, right?
13     A.  Yes, yes.
14     Q.  And what are those different buildings
15  called?
16     A.  Okay.  There's the administration building.
17  And it is -- is by itself.  Then there's Palmer
18  Minimum, which consists of a number of buildings.
19  It's an area that is not fenced.  There are minimum
20  custody inmates.  And there's -- with minimum comes
21  several shops, you know, for prisoners to work in,
22  auto shops, the ACI shop that we talked about up here
23  in this org chart, the living -- big living unit.  And
24  then there was what we called the program building
25  where the cafeteria, education, medical, all these

Page 37

1   different areas was.
2          And then within the confines of the fence
3   was the medium facility.  And there were -- it was --
4   it was made up of seven houses.  And in the main
5   building, which had the gym, the dining room,
6   et cetera, medical and so -- there was numerous
7   buildings.  I'd have to sit here and -- there's a lot
8   of them.
9      Q.  Your office was in a separate administration
10  building, right?
11     A.  I was in the administration building, yes.
12     Q.  Was that inside or outside the fence?
13     A.  Outside the medium fence.  Minimum doesn't
14  have a fence.
15     Q.  Where was Mr. Davis housed?
16     A.  They all go to medium when they first
17  arrive.  And once again, I may not be sure who
18  Mr. Davis is.  I believe -- and you can't hold me to
19  this -- I believe he also went to minimum as well --
20     Q.  Okay.
21     A.  -- from medium, which would be a
22  progression, you know, if your custody allows it.  You
23  always go to medium until we get to know a little bit
24  about the prisoner and make sure he's not the new
25  Charles Manson or something.  And then if they are

Zelmer Hyden                    deposition                    April 27, 2006

Page 38

1  doing fine, then as the classification merits, they
2  can go on across the street.
3      Q.  So your memory of Mr. Davis, if it's the
4  person you're thinking of, is seeing him out in the
5  yard walking with a cane.
6      A.  That's the memory that I have of Mr. Davis,
7  if I'm correct.
8      Q.  The individual that you are picturing, can
9  you describe him other than a cane?
10     A.  Sandy hair, if I remember correctly.
11 Probably about my height. Wasn't a very large fellow.
12     Q.  How tall are you, just so we're clear?
13     A.  Five seven and a half, maybe, five eight.
14 Seems like he might have walked with a limp. That's
15 about the best I can do for you.
16     Q.  Beard, facial hair?
17     A.  Don't know. Don't know.
18     Q.  Other than the observation of an individual
19 with a cane, do you remember any individual contact
20 that you had with Mr. Davis?
21     A.  I don't recall any contact with Mr. Davis
22 other than just seeing him in the yard and when he
23 filled out the grievance, you know, and --
24     Q.  Which we'll get to in a moment.
25     A.  That's probably about it. We could have had

Page 39

1  some contact. Because, usually, when you're doing
2  your inspections, you know, all the inmates -- they
3  call it leg time, you know, that they -- it's, you
4  know, how about my furlough? How about this? How
5  about that, you know?  It's not uncommon to be
6  approached by an inmate. And I like to talk to
7  inmates and hear their side of things. So whether I
8  did with him, I do not know.
9      Q.  Explain the inspections to me then, so I
10 understand that.
11     A.  An inspection, on Friday, to maintain
12 cleanliness in the facility, the superintendent would
13 go throughout the entire facility, each and every
14 room, and make sure that the cleanliness standards
15 were being adhered to.
16         And we kind of made a contest out of it. So
17 the house that wins gets whatever, you know, ice cream
18 or something like this. And it kind of became a
19 competitive thing with the inmates, you know, to keep
20 their house clean. But an inspection was to go
21 throughout the whole facility.
22     Q.  And I take it there are records kept of
23 those inspections. Do you make notes as you're going
24 through, anything like that?
25     A.  Yes. You make notes as you're going

Page 40

1  through. Each room is graded. And how long they
2  would keep those, I don't know.
3      Q.  If you had contact with an inmate during
4  that inspection process --
5      A.  Would it be written down?
6      Q.  Yes.
7      A.  No.
8      Q.  If an inmate raised questions or problems
9  with you during that inspection, would that be written
10 down?
11     A.  No.
12     Q.  And I take it as you sit here today, you
13 don't have any specific memory of talking with Charlie
14 Davis during an inspection.
15     A.  I do not have a specific memory of talking
16 to Mr. Davis, no.
17     Q.  You mentioned earlier that you have roughly
18 500 inmates at Palmer.
19     A.  Uh-huh.
20     Q.  Is that a pretty steady population number?
21     A.  Let's see. Let's get the actual number,
22 since we want to be accurate here. There was 176 and,
23 oh, around 250 to 270. What's those two numbers add
24 up to? Some math wizzard here.
25     Q.  Looks closer to four and a quarter to me.

Page 41

1      A.  Okay. Let's say four and a quarter.
2      Q.  Okay. And 176 and 250 to 270, explain what
3  those numbers are.
4      A.  Okay. One seventy-six was the population at
5  the minimum facility. That was capacity. And the
6  medium facility could fluctuate.
7      Q.  Between 250 and 270; is that correct?
8      A.  That is correct.
9      Q.  What was capacity for the medium facility?
10     A.  About 270. That's a difficulty. Because,
11 you know, do you count the seg beds? Do you count
12 whatever? But actual housing unit beds, about 270.
13     Q.  And when you say "seg beds," what is that?
14     A.  Segregation unit, there was ten there. And
15 then there's another issue that was the medical
16 infirmary. And they had four beds. In Corrections,
17 we count beds.
18     Q.  Okay. How many total beds did you have at
19 Palmer? Sounds like about 450.
20     A.  Yeah, about 450.
21     Q.  Okay. When an inmate first comes into
22 Palmer, do they have any kind of interaction directly
23 with you, an interview or anything like that?
24     A.  No. That's not even real to think that.
25 There was a time -- in fact, about this time, the

11 (Pages 38 to 41)

Exhibit  15
Page  11  of  23

Zelmer Hyden                     deposition                     April 27, 2006

---

Page 42

1  turnover was like -- the average stay was 15 days.
2      **Q.  At Palmer?**
3      A.  At Palmer at that particular time.  It
4  was -- it was really busy.  And we'd receive 20, 30
5  inmates a day.  And then -- and they'd be replacing
6  inmates who had been furloughed or being released.
7  And to see 30 inmates a day and be a superintendent,
8  that's not real.
9      **Q.  Why was the turnover so high during that**
10  **time period?**
11      A.  At that particular time, if I remember
12  correctly, it's just before the Anchorage Jail opened.
13  And we were kind of backed up.  And as soon as the
14  jail opened, that housing crisis subsided.  But this
15  is just before it was -- it was the population, the
16  prison population was so large.
17      **Q.  Is it fair to say that Palmer at that time**
18  **was being used as a pretrial facility?**
19      A.  There were pretrial inmates at Palmer, but
20  we housed them separately.  Remember, we had
21  individual housing.  We would have to house them
22  separately.
23      **Q.  Okay.**
24      A.  But yes, we were accepting overflow from the
25  pretrial facilities.  And that would account for the

Page 43

1  high turnover.
2      **Q.  That was what I was wondering.  I mean, when**
3  **you were talking about 15 days, that doesn't seem --**
4      A.  It was just -- it was just wild.
5      **Q.  At some point Mr. Davis filed a grievance,**
6  **correct?**
7      A.  Correct.
8      **Q.  And you were involved in that grievance**
9  **process in some way?**
10      A.  I am the one, as the acting superintendent,
11  who would look at the investigator's findings and then
12  make my comments before it's returned to the inmate.
13      **Q.  Would that be true for all grievances?**
14      A.  Yes.
15      **Q.  How many grievances do you typically**
16  **process?**
17      A.  Oh, there are some inmates that will file
18  one every day.  There's some inmates that will file
19  three a day.  And you take 400 inmates, you know, it's
20  really -- two or three inmates can file 15 grievances
21  a day.
22      But as a rule, we didn't have that many.
23  Probably -- seems like I'd probably look at ten, maybe
24  ten a month.
25      **Q.  Okay.  Does Mr. Davis' grievance stand out**

Page 44

1  for you in any way --
2      A.  (Witness shakes head.)
3      **Q.  -- other than the fact that you're here**
4  **today?**
5      A.  Other than that I'm here today, had to get
6  up early, no.
7      **Q.  Explain the grievance process from your**
8  **perspective then to me.**
9      A.  Okay.  A prisoner who has a grievance, the
10  first thing he does is he files a cop-out, which is an
11  informal grievance or an informal request.  He has a
12  problem.  You know, his food wasn't hot enough or
13  whatever.  So he fills this out.  And it goes to the
14  staff, who would -- it would be, you know, their
15  issue.  And they will write on their cop-out and
16  return it to him.  Okay?
17      If he's not satisfied with that, then his
18  next step would be a grievance.  And he would complete
19  the grievance.  The grievance monitor or compliance
20  sergeant would pick up this grievance.  The grievance
21  is logged.  And then the compliance sergeant would
22  assign an investigator to the grievance.
23      In a case of a medical grievance, it would
24  go to medical staff.  None of the COs could address
25  these medical issues.  So it would go to the medical

Page 45

1  staff.  They would address the grievance.  And there's
2  a time frame here.  And I couldn't recall what
3  these time frames are.  But there's time frames that
4  we have to respond and get the grievance back to the
5  prisoner.
6      Then the grievance goes -- after the
7  investigation, the compliance sergeant picks it up.
8  He brings it to me.  And then from there, the prisoner
9  will look at the grievance and he's satisfied -- you
10  know, it may be something that -- you know, a lot of
11  them are frivolous, you know, and it doesn't go
12  anywhere.  But there's some that, well, maybe we
13  should look at this.  So changes would be made or
14  whatever.  Or a particular inmate's issue is
15  addressed.
16      The inmate will review the grievance after
17  everyone has done their thing.  And he will either,
18  I'm satisfied, or he wishes to appeal what we have
19  stated.  And if he wishes to appeal, then an appeal
20  statement is filed to the director, or in the case of
21  medical, to the medical people at Central Office.  And
22  then they would make their ruling or investigation,
23  whatever you choose to call it.  And then it would
24  come back to the prisoner.
25      If the prisoner is still unhappy with this,

Alaska Stenotype Reporters (907) 276-1680

Exhibit  15
Page 12 of 23

Zelmer Hyden                              deposition                              April 27, 2006

Page 46

1  thus we're here.  It goes to court.  He can go to
2  court with it.
3      Q.  So your involvement in the process would be
4  after the grievance is filed, beyond the cop-out
5  stage, right?
6      A.  Uh-huh.
7      Q.  So if the cop-out resolves it, you don't get
8  involved at all.
9      A.  Exactly.  If the prisoner is happy and
10  something was wrong, it's fixed, all is good.
11      Q.  If it goes to the grievance, you review
12  every grievance that's filed.
13      A.  I review every grievance that's filed, yes.
14      Q.  And the compliance officer would be the one
15  who would assign it in the initial instance for
16  investigation.
17      A.  Right.
18      Q.  Right?  Do you remember, as you sit here
19  today, your involvement in Mr. Davis' grievance?
20      A.  I -- I -- I remember, you know, when I seen
21  the grievance, I -- I remember the grievance.  And,
22  you know, a lot of times, you'll deal with the
23  grievance or whatever, the responses are made, it's
24  all resolved and you've never seen the inmate.  You're
25  dealing with a piece of paper.

Page 47

1      Q.  So in terms of your specific memory today,
2  you remember that there was a grievance.  Do you
3  remember the specifics of it at all?
4      A.  Well, I've looked at the grievance recently.
5  That could cloud my -- but I think I do remember the
6  grievance.
7      Q.  Okay.  When did you look at the grievance
8  recently?
9      A.  Actually, when I received this to sign, I
10  started looking to find out what in the world have I
11  done, you know.  And I probably looked at it then.
12  And then -- and then I thought this was resolved.  And
13  so then I've looked at it again recently in the last
14  couple days, because we're here.
15      Q.  Just so that I'm clear, you were pointing at
16  some papers.  So you looked at the grievance, it looks
17  like, around the time that you signed the
18  interrogatory responses in January of 2005.
19      A.  Correct.
20      Q.  And then more recently, just in getting
21  ready for the deposition.
22      A.  Uh-huh.
23      Q.  Is that right?
24      A.  That is correct.
25          (Exhibit 4 was marked.)

Page 48

1          MR. MATTHEWS:  Let me show you what we've
2  marked as Exhibit 4.
3          THE WITNESS:  Can we take a short break
4  before we go on to Exhibit 4?
5          MR. MATTHEWS:  Sure.  Off record.
6          MS. KAMM:  I could use a break, too.
7          (Brief recess.)
8  BY MR. MATTHEWS:
9      Q.  We've put in front of you, Mr. Hyden,
10  Exhibit 4.  Ask you if you recognize that document.
11      A.  Okay.  Yeah.  Exhibit 4 is the grievance
12  filed by Charlie Davis.
13      Q.  And this exhibit consists of four pages,
14  which I think is taken from the entire grievance
15  packet.  What I want to see if I can understand is
16  what your part in that grievance was.
17      A.  Okay.  Briefly, the prisoner writes down his
18  grievance, which he -- he has done so.  And then he
19  requests what his relief is.  And he has done so.
20  It's dated and it's signed.  And then Mr. -- or the
21  compliance sergeant would assign it to someone to
22  investigate.
23          In this case, it appears it had been
24  assigned to Mr. Hale.  And Roger Hale had -- what it
25  states is "The issue of manning/staffing cannot be

Page 49

1  addressed at this level.  I spent about 20 minutes
2  explaining how he can access medical (that is not
3  (sic) available at PCC)."  And that was Mr. Hale's
4  response.
5          After Mr. Hale would have responded, the
6  compliance sergeant would get the grievance and bring
7  it to me for my review.  And I would review the
8  grievance, look at Mr. Hale's response and then write
9  down my findings.
10          I'm not a medical person.  I have to depend
11  heavily on what medical tells me.  So thus, I wrote
12  "The above investigation does not address the
13  prisoner's grievance.  Perhaps prisoner should be
14  transferred to facility with full time medical staff
15  to accommodate 'life threatening' condition."  That
16  was my response.
17          And then after that, the prisoner would
18  review it.  Now, this grievance has some alter- -- is
19  altered to the one that I had.  Whether he was
20  satisfied, et cetera, is not on the one I have.  And
21  the last block where it says I am satisfied with
22  response or not, this one is not completed at all.
23      Q.  And you're looking at the second page of
24  Exhibit --
25      A.  The second page, right.

13 (Pages 46 to 49)

Exhibit  15
Page  13  of  23

Zelmer Hyden                              deposition                              April 27, 2006

**Page 50**

1    Q.  -- of Exhibit 4, the bottom block that says
2  "Prisoner's Response"?
3    A.  Right.
4       MR. MATTHEWS: I don't have the original of
5  this, so --
6       MS. KAMM: I think I've got the original.
7  I'll take a look at it when I get back to the office.
8       MR. MATTHEWS: Okay.
9       MS. KAMM: I'll fax it to you if we've
10  got --
11       THE WITNESS: And I would have to assume the
12  original is going to be checked, I do intend to appeal
13  to the Director of Institutions or Medical Director,
14  which that was done. And then page three of what
15  we're looking at here is the Prisoner Grievance Appeal
16  Statement. And this would be what the prisoner wrote
17  to the medical director. And then the medical
18  director's response is the last page.
19  BY MR. MATTHEWS:
20    Q.  Okay. Is it fair for me to conclude that
21  your involvement, your specific involvement in this
22  grievance, would have been to review Mr. Hale's
23  findings and determination and to sign off on the
24  grievance as you did on the second page?
25    A.  That is correct.

**Page 51**

1    Q.  You made the comments that the investigation
2  did not address the grievance and perhaps he should be
3  transferred to a different facility, right?
4    A.  Correct.
5    Q.  Beyond that, did you have any involvement in
6  this grievance?
7    A.  None. Now, there could have been a time
8  when in one of these meetings, Mr. Davis' issues, I
9  would have been made aware of his issues. Probably --
10  I don't know when the time frame was when I was made
11  aware of his -- if I receive a prisoner at medium, I'm
12  not aware that he has a bypass or a defibrillator or
13  anything of this nature until someone makes me aware
14  of it. And I would assume that probably about the
15  time this grievance was filed is when I would have
16  been made aware of Mr. Davis' issues with medical.
17    Q.  Is it fair to say that Mr. Davis' grievance
18  was for inadequate medical care?
19    A.  I -- I disagree with that.
20    Q.  You disagree that that's what he was
21  complaining about?
22    A.  Say the question again. Maybe I
23  misunderstood you.
24    Q.  Is it fair to say that Mr. Davis' grievance
25  was essentially that he didn't like the medical care

**Page 52**

1  he was getting at Palmer, didn't think it was
2  adequate?
3    A.  He -- he probably thought that, yes.
4    Q.  Okay. I'm not asking whether you agree that
5  the care --
6    A.  Okay. Yes.
7    Q.  -- was inadequate.
8    A.  Because in my opinion, the grievance is very
9  confusing. Okay?
10    Q.  All right. Let me ask you this then: How
11  did you interpret Mr. Davis' grievance when you
12  received it?
13    A.  Well, I read it and I was like -- I
14  really -- you know, because there's a number of things
15  you could read into this. And I read it. And then I
16  read what Mr. Hale had -- you know, who had talked to
17  him for several minutes. And I -- I thought -- I
18  thought Mr. Hale should have been a little more
19  specific in these times, actually put something
20  specific down here. This is the reason that I wrote
21  what I wrote.
22       To me as a superintendent, to say I spent 20
23  minutes how he could access medical in a document like
24  this, I would like to see written out, you do this,
25  you do this, you do this and you do this. Okay? And

**Page 53**

1  that wasn't done. So that was thus part of my
2  response.
3    Q.  Your conclusion was that the -- that
4  Mr. Hale's response was inadequate.
5    A.  Yes. I wanted him to give -- because if a
6  prisoner files a grievance -- and I might add here, I
7  was the compliance sergeant at Mat-Su Pretrial and
8  dealt with these regularly. So I'm very familiar with
9  the grievance process.
10       I just really like -- when an inmate is
11  upset enough to file a grievance, address his issues.
12  If they're frivolous, they're frivolous. But address
13  his issues in that grievance. And I just would like
14  to have seen specific things written out, you know,
15  rather than I spent 20 minutes talking to him.
16    Q.  You didn't feel Mr. Hale's response
17  addressed the grievance; is that true?
18    A.  That's what I felt at the time, yes.
19    Q.  And your suggestion was that perhaps
20  Mr. Davis should be transferred to a different
21  facility that had full-time medical care to
22  accommodate his life-threatening condition.
23    A.  Possibly. And I put life-threatening
24  because -- and I'm going to assume here that at that
25  time I wasn't totally aware of Mr. Davis' issue,

Exhibit 15
Page 14 of 23

Zelmer Hyden                          deposition                          April 27, 2006

Page 54

1   because I put life-threatening in parentheses -- or
2   quotation marks.
3       But actually, basically, I'm probably
4   inviting medical to look at this. And if this inmate
5   really feels this strongly, does he need to go to the
6   Anc Jail where there's a medical unit or something.
7   And if they feel he does not, they're the medical
8   staff. I'm not. It's their call.
9       Q. So once you make the suggestion that the
10  investigation that had been done to that point was
11  inadequate, does it go back to Mr. Hale for further
12  findings?
13      A. No.
14      Q. Why not?
15      A. Because in the process, it goes to
16  Mr. Hale's boss, the medical director. If what you
17  just asked, grievances would be bouncing around all
18  the time and we'd never get anywhere. So there has to
19  be a click, click, click, you know, the grievance
20  process is this. So, you know, it goes to Mr. Mel
21  Henry in this particular case. And then he gets the
22  final medical word on it.
23      Q. So whose decision is it to -- as to whether
24  or not Mr. Davis stays at Palmer or is transferred to
25  another facility?

Page 55

1       A. Okay. It would be my decision if it was a
2   security issue. Okay? If -- for example, if
3   Mr. Davis is beating up other inmates or doing
4   whatever we find that in that particular
5   environment he cannot be controlled adequately, that
6   would be a security issue. And that would -- I
7   would -- you know, we need to look at classifying him
8   to a more secure setting.
9       In an issue with medical, I'm not a medical
10  person. I can't set here and say, well, I think his
11  medical issues are whatever. Transfer him. He would
12  be transferred by the medical people and it would be a
13  medical transfer.
14      Q. So essentially, once you're done with this
15  grievance, you're done.
16      A. I'm done.
17      Q. Because it's a medical grievance.
18      A. I'm done. And I wanted them to look at it
19  carefully. Make sure you make the right decision.
20  And I'm done.
21      Q. Did you ever follow up to see what action
22  had been taken?
23      A. I was too busy.
24      Q. So I take it that's a no.
25      A. That's a no.

Page 56

1       Q. Did you know what response was made to
2   Mr. Davis' grievance after you signed off on it on
3   June 27th, '02?
4       A. To be honest with you, I can't tell you
5   whether I reviewed this when it came back or not. I
6   do not know.
7       Q. And you're talking about the appeal portion.
8       A. The appeal from Mr. Mel Henry.
9       Q. So once Mr. Davis files his grievance, you
10  make your findings and recommendation, off it goes to
11  medical and you're done with it; is that fair?
12      A. In a medical situation, yes.
13      Q. You don't have any practice of following up
14  to see whether or not your recommendations or
15  suggestions were followed.
16      A. If I -- I would have a practice of doing so
17  if I felt it was warranted.
18      Q. Do you know --
19      A. If I feel medical has this under control --
20  because they're the medical professionals. I'm not.
21  I have to trust them. If they tell me everything is
22  okay, inmate's needs are being met, they are the
23  medical professionals. I'm not. I can't second guess
24  them.
25      Q. Did you get a report back from medical on

Page 57

1   Mr. Davis after that?
2       A. I don't recall.
3       Q. Do you know whether or not Mr. Davis felt
4   that his medical needs were being met after this
5   grievance was filed?
6       A. I didn't hear anything else about it, to my
7   recollection. So I have to assume that he was okay.
8       Q. Mr. Davis was 70 years old at the time this
9   grievance was filed?
10      A. Okay.
11      Q. Do you know?
12      A. I don't have a clue.
13      Q. Any idea how old he was?
14      A. I thought he was about 45.
15      Q. The individual that you described earlier
16  with the cane in the yard appeared to you to be about
17  45?
18      A. It's so long ago. He didn't seem to be 70
19  years old, if it's the person I'm thinking of.
20      Q. When Mr. Davis arrived in Palmer, at PCC, he
21  had an implanted defibrillator. Were you aware of
22  that?
23      A. No. There would be a point in time when I
24  would be aware, but it wouldn't be at his arrival, no.
25      Q. Were you aware of that at the time he filed

15 (Pages 54 to 57)

Exhibit 15
Page 15 of 23

Zelmer Hyden                         deposition                         April 27, 2006

**Page 58**

1  his grievance?
2      A.   Seems like it states so in the grievance.
3  And what kind of briefing I could have had from
4  medical regarding this, you know -- because I feel
5  certain that medical talked to someone, probably in
6  one of these meetings, about this individual and
7  closely monitoring him. But I can't -- it's been too
8  far back. I can't recall.
9      Q.   When you say "these meetings," are you
10 talking about your daily briefings?
11     A.   Correct.
12     Q.   Prior to Mr. Davis' grievance, did you know
13 what an implanted defibrillator was?
14     A.   Uh-huh.
15     Q.   And how did you have that knowledge?
16     A.   My ex-wife was a nurse. I knew quite a bit
17 about that.
18     Q.   Did you understand that a person with an
19 implanted defibrillator by definition had a serious
20 heart condition?
21     A.   Well, I would say my medical knowledge, I
22 have no formal training in medical. I -- I can't say
23 that I would understand anything about medical. I
24 haven't been trained in any medical other than CPR and
25 whatever. But vaguely, yeah, you'd have to assume if

**Page 59**

1  someone has something placed in their chest, yeah,
2  it's serious.
3      Q.   Fair to say they would not have had the
4  implant if it weren't serious?
5      A.   But also, I know people that have implants
6  and they're out working jobs and stuff and everything
7  is hunkey dorey. And they're doing whatever. So once
8  again, I'm not a medical staff. I don't know what
9  limitations a defibrillator could have. There's --
10 because I know a couple people with these kind of
11 things and they're living pretty much normal lives.
12 So I can't second guess that, no.
13     Q.   Let me ask you this:  At the time Mr. Davis
14 filed his grievance, did you have any personal
15 knowledge of what his medical condition was?
16     A.   At the time he filed the grievance, probably
17 not.
18     Q.   In your response to his grievance, did you
19 review any of his medical records to see what his
20 condition was?
21     A.   I did not look at a medical record. What I
22 would probably do if I did so, something of that
23 nature, would be to call a PA, ask specific questions
24 for specific answers, you know. And I would be much
25 clearer on what I understood rather than go look at a

**Page 60**

1  medical record.
2      Q.   Do you know whether or not you called PA
3  Hale --
4      A.   Don't recall.
5      Q.   -- in response to this greivance?
6      A.   I feel that we probably had some
7  conversations regarding this individual, strictly
8  because of the grievance and it's medical. But I
9  can't recall those. It's been too long and too many
10 inmates. And I mean, I can't -- I can't specifically
11 remember.
12     Q.   Would your actions or conversations with
13 Mr. Hale have been documented in any way?
14     A.   Probably the only documented thing would be
15 the morning meetings. I can't -- every time I talk to
16 someone about an inmate's hangnail, I don't go
17 document that. That's just not real. I know what
18 you're asking, you know, but it's -- no, it wouldn't
19 have been documented other than what I would have
20 wrote here. You know, if I called him prior to
21 writing this -- and I don't remember a conversation.
22 I'm sure there probably could have been one, but it's
23 just too long ago and too much has happened.
24     Q.   So you just don't remember at this point.
25     A.   I don't remember at this point.

**Page 61**

1      Q.   Is it fair to say, Mr. Hyden, that after
2  your written response to this grievance, you don't
3  have any memory of taking any other action with regard
4  to Charlie Davis?
5      A.   None.
6      Q.   Do you remember having any further contact
7  with a PA to inquire about Mr. Davis' status?
8      A.   I don't recall anything.
9      Q.   Do you remember contacting anyone else on
10 the medical staff to find out how Mr. Davis was doing?
11     A.   No. That's something that if there's a
12 problem, they would come to me, you know. I can't --
13     Q.   Is it fair to say that unless a problem is
14 brought to your attention, it's not something you're
15 going to go seek out?
16     A.   Exactly.
17     Q.   So follow-up would not have been part of
18 your routine.
19     A.   No. If they was having a problem or
20 something, they would probably get ahold of me,
21 et cetera. But to sit there and think, I wonder if
22 this is working out, I should go check on this, you
23 know, you may have all kinds of things going. No, I
24 don't think I would have -- I would have waited for
25 them, you know, to give me some kind of indication

16 (Pages 58 to 61)

Exhibit  15
Page  16  of  23

Zelmer Hyden                          deposition                          April 27, 2006

---

Page 62

1    that there is a problem.
2         Q.  And waiting for them, meaning the medical
3    staff?
4         A.  The medical staff, right.  They're
5    professionals, yes.
6         Q.  Do you know anything about the medical
7    monitoring that was done or not done, as the case may
8    be, of Charlie Davis while he was at Palmer?
9         A.  The medical monitoring what, of his --
10        Q.  Of his medical condition.  I don't mean this
11   to be a trick question.  All I'm asking is, do you
12   have any personal knowledge of what medical review,
13   medical monitoring, anything like that?
14        A.  I can only say -- I can answer in a very
15   general response.  I do know that they were seeing him
16   periodically for labs or different things of that
17   nature.  And I didn't hear that there was any
18   problems.  So -- but what specifically they done, what
19   days, how much, et cetera, I'm not aware.
20        Q.  And is that information that you have
21   learned because of this lawsuit or was it information
22   that you were aware of at the time?
23        A.  Ask that whole question again, please.
24        Q.  Is that information that you were aware of
25   at the time Mr. Davis was an inmate?

Page 63

1         A.  Yes.  I would have to say so.
2         Q.  You've talked a number of times about the
3    daily briefings, if I can call them that.  Did you
4    have any specific meetings just with medical staff?
5         A.  No.
6         Q.  So only as part of the daily --
7         A.  I mean, there might have been a -- something
8    special has arisen and you want to meet with medical
9    and you call them over to your office or something.
10   But that was pretty rare.  Usually, anything that we
11   had could be addressed in the open floor meetings.
12        Q.  Who participated in those daily briefings,
13   daily meetings?
14        A.  All the department heads, your medical
15   staff, the shift supervisor, the person in charge of
16   the kitchen.  Every single department had a
17   representative there.  Probation.
18        Q.  How long would the meetings last, typically?
19        A.  Thirty minutes, probably.  Sometimes longer.
20        Q.  Do you have any personal knowledge of what
21   medications Mr. Davis was taking while he was in
22   Palmer?
23        A.  Not at that time, I did not, no.
24        Q.  Do you know whether or not Mr. Davis was
25   given a physical exam when he first arrived at Palmer?

Page 64

1         A.  I -- I wouldn't know.  He could have.  He
2    could not have.  I can only speak as a rule when a
3    prisoner comes into the system, they're given a
4    complete physical exam.  And once again, at this
5    particular time where we're having movement every 15
6    days, you know, I would image -- they're interviewed
7    by medical, you know, and things of this nature.  But
8    whether he was actually given a physical, I do not
9    know.
10        Q.  When you say they're given a physical when
11   they come into the system, so that means if somebody
12   comes in at another facility, they might not
13   necessarily be given a physical when they got to your
14   facility if there's a transfer.
15        A.  Right.  It's an intake physical.  Make sure
16   they don't have lice or some -- whatever.  And that
17   is -- because you're getting someone off the street.
18   And so you need to really -- so a good physical is
19   done at their initial intake.  And then those medical
20   records and everything that was done goes with them to
21   wherever they would go.
22        Q.  Okay.  Is it fair to say that unless the
23   prisoner comes into PCC as their initial intake, they
24   are probably not going to get a physical when they
25   first arrive?

Page 65

1         A.  You know, once again, this is medical stuff.
2    I'm not familiar with how they do it.  I would
3    assume -- once again, I use the word "assume" -- if
4    someone shows up and they've got some serious
5    problems, I would assume there could be a physical to
6    some degree or some kind of follow-up.  Because what
7    they've received from the intake facility would alert
8    them to we need to take a look at this.  But I don't
9    know specifically, no.
10        Q.  But that's not -- as I understand it, that's
11   not your area.
12        A.  No.
13        Q.  So that's going to be medical staff that
14   would deal with that.  It's not something that you as
15   the superintendent are involved in; is that true?
16        A.  I'm not qualified to deal with that, no.
17        Q.  Okay.  We talked a little bit earlier about
18   dispensing of medications.  And what I want to ask you
19   about has to do with COs that are actually dispensing
20   medications.  Okay?  As I understand the process,
21   there are some instances where a prisoner is actually
22   responsible for keeping their own medications and
23   self-administering, if you will, true?
24        A.  True.
25        Q.  There are other medications which medical

17 (Pages 62 to 65)

Exhibit __15__
Page __17__ of __23__

Zelmer Hyden                          deposition                          April 27, 2006

**Page 66**

1  staff or someone else within PCC has to dispense,
2  correct?
3     A.  Correct.
4     Q.  What I want to focus on is that second part.
5  Okay?
6     A.  Okay.
7     Q.  As I understand it, there are some instances
8  where those medications are dispensed by PAs or
9  nurses, medical staff, true --
10    A.  True.
11    Q.  -- if there's somebody there?
12       But there are other instances where, for
13 instance, in the evening, medications have to be
14 dispensed to prisoners, but there's no medical staff
15 person there to do it; is that true?
16    A.  Correct.
17    Q.  In those latter instances, the correctional
18 officer with some training may dispense the
19 medications, true?
20    A.  True.
21    Q.  What records are kept, to your knowledge, of
22 who dispenses the medication when it's not done by the
23 medical staff?
24    A.  It should be on their med sheet any time any
25 meds -- meds are very strictly controlled,

**Page 67**

1  particularly in that atmosphere.  A lot of times you
2  may want the prisoner to have a medication, but if he
3  goes out in population with this, they are going to
4  take it away from him, and especially if they think
5  they can get high on it, particular certain inmates.
6       And so I feel strongly -- and once again,
7  I'm just -- this is conjecture.  I feel strongly if it
8  was some kind of very serious or life-threatening
9  drug, I don't see -- okay -- I don't see the medical
10 staff allowing it to be passed by correctional
11 officers.  I think they would have set that up to
12 where they actually do that.
13       But, you know, in answer to your question,
14 there is times when correctional staff with some
15 training would dispense the meds.  And it should be on
16 their med sheet.  Does that answer your question?
17    Q.  Yes.
18    A.  Okay.
19    Q.  Were correctional staff regularly dispensing
20 medications in the evening?
21    A.  To my recollection, for a period of time,
22 yes.  And once again, I don't know what time frames
23 that this actually started.
24    Q.  Do you know what --
25    A.  It was probably like 10:00 o'clock, just

**Page 68**

1  prior to bedtime, or something of this nature when the
2  medical staff has left.  So you would have like maybe
3  a handful of inmates, maybe two or three inmates, need
4  to get whatever.  Responsibility to report for your
5  medication is on the inmate.  There's a specific time.
6  And there is a page made.  And prisoners that need
7  their medications at that time, and they're aware of
8  this, then they would report for their medications.
9     Q.  Did you ever hear complaints from prisoners
10 or from your staff that prisoners were being denied
11 medication by COs?
12    A.  I never heard that.  If I did, I don't
13 recall it.
14    Q.  Would that be a serious problem to you if it
15 were true?
16    A.  Oh, yes, very serious.
17    Q.  Can you think of any justification for a CO
18 refusing to provide inmates with prescribed
19 medication?
20    A.  None whatsoever.
21    Q.  If the situation were presented to you where
22 a CO cut the med line and said everybody in front, you
23 get your meds, everybody behind, sorry, it's too late,
24 you got to come back tomorrow --
25    A.  I would do my best to see that he's fired.

**Page 69**

1     Q.  That would be a very serious transgression.
2     A.  Very.  I would try to get him fired.  That's
3  health and safety.  That's life-threatening.  That's
4  not okay.
5     Q.  But you never heard a complaint about that?
6     A.  I never heard anything like that.  Believe
7  me, you would know.
8        Now, there's times prisoners didn't get
9  medications, they didn't report and they don't show
10 up, you know.  And, of course, then medical would look
11 at that.  Well, this is important that he gets that.
12 They may even have to put him into the infirmary in a
13 controlled environment where they can assure that he
14 gets his medications.  I mean, there was things to do
15 to make sure that a prisoner took medications that he
16 really needed.
17    Q.  Let me make sure I understand the process.
18 If you're talking about a page that's -- you're
19 talking about a verbal page over a loud speaker
20 system, right, saying it's time for meds, if you have
21 a prescription you need to come get it?  Is that the
22 type of thing you're talking about?
23    A.  What I'm talking about is at a specific
24 time, let's say 10:00 o'clock, there is med pass.
25 Okay?  So there's also a page made.  So not only do

Exhibit  15

Zelmer Hyden                           deposition                    April 27, 2006

---

Page 70

1  you know at 10:00 o'clock, I have to get my meds,
2  there's also what we call the boombox where master
3  control, you get on the big speaker and you go, you
4  know, meds are being passed at this time. And I mean,
5  everybody can hear it.
6          Now, if the prisoner doesn't show up, he
7  doesn't get his meds. Now, if it's something that's
8  life-threatening that he needs to have -- and I have
9  seen this happen -- medical would put him into medical
10 seg to assure that they could monitor him and he'd get
11 his meds.
12     **Q. Okay.**
13     A. Now, if you -- you know, if it was your
14 stomach medicine or something, you know, whatever -- I
15 mean, this would be something, you know, it's
16 important you get this. This is life-threatening.
17 And they would take those steps to make sure he got
18 his meds. And I would sign off on the seg admission
19 as superintendent.
20     **Q. And just so that I'm clear, when you're**
21 **talking about a seg admission, segregation?**
22     A. Yes. And that's not the proper term. It
23 would be actually placed in the infirmary. You know,
24 it's just old habit. You'd call it medical seg.
25          And to my knowledge, Mr. Davis was never

Page 71

1  placed in medical seg. So I was not aware that there
2  was any issues beyond these.
3     **Q. And I take it you're not aware of any**
4  **situation where Mr. Davis showed up for med line and**
5  **was denied his medication.**
6     A. I would fire the officer. Or if I couldn't
7  fire him, I'd do my best.
8     **Q. That would be a very serious issue to you?**
9     A. Absolutely.
10     **Q. Do you know how long Mr. Davis was actually**
11 **at Palmer?**
12     A. Haven't got a clue.
13     **Q. Do you know whether or not Mr. Davis'**
14 **medical condition was ever mentioned in one of your**
15 **daily briefings?**
16     A. I would -- I would assume and feel certain
17 that it would be mentioned. You know, staff need to
18 be made aware -- if you have a prisoner like this in
19 the population, there needs to be an awareness that
20 that person exists. And I feel certain that if you
21 look at those records, you'll see that somewhere.
22     **Q. When you say "a person like this," a person**
23 **with Mr. Davis' medical condition, is that what you**
24 **mean?**
25     A. Somebody with a defibrillator, yes.

Page 72

1     **Q. That's a unique situation, right?**
2     A. Yes, that's unique.
3     **Q. You'd want to make sure --**
4     A. We've had -- I mean, it's not the first one.
5  There's been people through there with pacemakers,
6  et cetera. So -- but, you know, the staff need to be
7  aware there's special needs here.
8          And I can't recall specifics, but I do
9  recall that in these morning meetings, medical -- I do
10 recall them, you know, frequently telling us about,
11 you know, specific inmates and specific problems,
12 et cetera. The exact context regarding Mr. Davis, I
13 can't recall.
14     **Q. You would agree, Mr. Hyden, that an inmate**
15 **that comes into your facility with an implanted**
16 **defibrillator has special needs?**
17     A. Uh-huh.
18     **Q. That's what you just said, right? I need**
19 **you to answer out loud. Sorry.**
20     A. Oh, yes. It's unusual and it should -- it's
21 special, yes.
22     **Q. You would also agree, I take it, that PCC**
23 **had an obligation to make sure his necessary medical**
24 **care was taken care of.**
25     A. Oh, I don't know that it wasn't. He feels

Page 73

1  it wasn't. Mr. Davis -- you know, I'm not being smart
2  here. He's still doing fine, to my knowledge. I
3  don't know that anything was done there that was
4  detriment to his health. I don't know that as a
5  non-medical person.
6     **Q. You would agree that he -- his medical care**
7  **needed to be attended to while he was at Palmer,**
8  **correct?**
9     A. Yes.
10     **Q. And because of the fact that he had an**
11 **implanted defibrillator, his medical needs were**
12 **different than the average population up there, true?**
13     A. Absolutely.
14     **Q. It would be essential to make sure that any**
15 **prescribed medications were given to him, right?**
16 **Correct? You need to answer out loud.**
17     A. Once again, that depends on the medicine. I
18 have inmates that come in, hey, I had a doctor that
19 ordered me OxyContin ten years ago. And the thing
20 still goes. I want this. Then the inmate files a
21 grievance, I'm not getting my OxyContin. And the
22 medical staff we had, no, you don't need that. You're
23 not getting that.
24          So it's not an exact answer. You'd have to
25 be more specific. Which medications, you know? And

19 (Pages 70 to 73)

Zelmer Hyden                        deposition                        April 27, 2006

Page 74

1  once again, I'm not that familiar with medications,
2  because I'm not a medical person.
3      Q.  Are you familiar with a medication called
4  Coumadin?
5      A.  Explain it to me.  Make me familiar with it.
6  I'm not -- I'm not that clear on it, no.
7      Q.  I'm just asking what knowledge you have.
8      A.  No.  I have to trust my medical staff.
9  That's all I have.
10     Q.  Okay.  Is the medication Coumadin something
11 that your medical staff had made you aware of prior to
12 Mr. Davis?
13     A.  I can't recall that specifically.
14     Q.  You would agree with me, Mr. Hyden, that if
15 Mr. Davis was prescribed Coumadin in order to make
16 sure that his heart condition was kept under control,
17 that PCC should make sure he got his Coumadin?
18     A.  I would say so, yes.
19     Q.  Your staff and the medical staff, right?
20     A.  I -- I would say so.
21     Q.  Would you also agree that if there were
22 testing that were prescribed for Mr. Davis, medical
23 testing while he was at PCC, that he should get that?
24     A.  Who prescribed it, the medical staff at
25 Palmer or a doctor two or three years ago?  I mean --

Page 75

1      Q.  Let's talk about -- how about if it's a
2  doctor who gave a prescription for medical testing
3  immediately before he was taken into State custody?
4      A.  I would say that there's a need for
5  monitoring.  Okay?  How much and when, I'm not a
6  medical person.  I don't know the answer to that.
7      Q.  If that situation were presented to you
8  where an inmate has a prescription for certain testing
9  that's to be done on a regular basis and he provides
10 that prescription to correctional personnel, do you
11 think that prescription should be taken into account?
12     A.  I'm not a medical person.  I can't
13 accurately answer that.  There's no way.
14     Q.  That's a better question for Mr. Henry?
15     A.  Exactly.  I mean, I could spout off the top
16 of my head.  That don't make it so.
17     Q.  From what I hear you saying this morning,
18 medical decisions really were out of your area; is
19 that true?
20     A.  Largely, yes.  They're within the confines
21 of the medical expertise.  For me to go dabbling in
22 medical's affairs and tell them to do this and do
23 that, I have no formal training.  That's a lawsuit
24 waiting to happen, so no.
25     Q.  So you stay out of it.

Page 76

1      A.  I -- I -- well, you know, you monitor to a
2  degree, as we have here, but you have to depend on the
3  experts, which I was doing.  And based on what I had,
4  you know, I felt everything was -- aware of his
5  situation, but I felt everything was under control.
6      Q.  Do you know whether Mr. Davis was given any
7  different treatment than anyone -- than the typical
8  prisoner because of his heart condition?
9      A.  I -- I would say that he probably had way
10 more treatment than the average prisoner because of
11 this situation.  And -- but once again, I don't know
12 that for a fact.
13     Q.  Is it correct to say that it's -- at least
14 in your eyes, it's really the prisoner's
15 responsibility to go ask for medical care as opposed
16 to the other way around?
17     A.  In some cases.  Not in all.
18     Q.  How about in Mr. Davis' case?
19     A.  To go ask for care?
20     Q.  Yes.
21     A.  He can ask for anything.  I think the State
22 bears some responsibility to Mr. Davis to follow up
23 and make sure that he maintains, you know, his health.
24 What that -- what that would incur, you know, that's
25 medical personnel that have to do that.  But I feel,

Page 77

1  yes, they need to maintain his health.
2      When he comes to us, you know, I think in
3  his case, what usually happened -- and I'm not going
4  to be specific to Mr. Davis, because I can't recall
5  specific issues.  But if you had a special needs
6  inmate, he would be seen more by medical.  He would be
7  seeing these contract physicians that came in.  He
8  would be taken on medical transportation to see
9  medical doctors in different places.  He would be
10 paged to report to medical for different things.
11     If he wasn't receiving medication, like
12 apparently that's what this is saying, I feel
13 certain -- or as a rule, medical would page him and,
14 you know, what's the problem here, et cetera.  But
15 specifically, I can't say in Mr. Davis' case how
16 much -- where he went or how many doctors seen him.
17 You know, I don't know.
18     Q.  Do you know whether or not any medical
19 doctors saw Mr. Davis while he was incarcerated at
20 Palmer?
21     A.  I'd bet everything on it, but I don't know.
22     Q.  Given what you know about it, you would
23 expect that he would have seen a medical doctor --
24     A.  Right.
25     Q.  -- while he was at Palmer.

20 (Pages 74 to 77)

Exhibit _15_

Page _20_ of _23_

Zelmer Hyden                                deposition                                April 27, 2006

Page 78

1    A.  Uh-huh.  That would be my assumption.  Or at
2  least a -- what do you call it when one doctor calls
3  another and confers?  There's a word they use.  I'm
4  not familiar with it, but --
5    Q.  Consultation?
6    A.  Yeah, consultation.  There might have
7  been -- even that, I'm sure would probably be
8  something that would have been done.  But once again,
9  it's all conjecture.
10    One minute?
11    MR. MATTHEWS:  Absolutely.
12    (Brief recess.)
13  BY MR. MATTHEWS:
14    Q.  Back on.  As I understand what you just
15  said, you would have expected Mr. Davis to have been
16  seen by a medical doctor while he was at Palmer,
17  right, based on what you --
18    A.  That would be an expectation I would have,
19  yes.
20    Q.  Did you ever suggest that Mr. Davis be seen
21  by a medical doctor for any reason?
22    A.  No, I did not.
23    Q.  Do you know, Mr. Hyden, what risk Mr. Davis
24  faced if he didn't get his Coumadin medication?
25    A.  No way.

Page 79

1    Q.  Do you know what risk Mr. Davis faced
2  because of the fact that he was on Coumadin?
3    A.  This is all medical stuff.  I couldn't
4  answer that.  Unless I was made aware by medical staff
5  of something like this, I wouldn't know the answer.
6    Q.  As I understand it, Mr. Davis was
7  transferred to PCC from Lemon Creek in Juneau.  Were
8  you aware of that?
9    A.  I don't know where they come from.
10    Q.  My question to you was going to be, do you
11  have any idea why he was transferred up to you from
12  Juneau?
13    A.  Haven't a clue, unless it was population
14  management.  I don't know.
15    Q.  Not something that --
16    A.  I have 400 inmates.  The last thing I'm
17  going to do is go why is he here or where is he coming
18  from.  It's just not something that you do.
19    Q.  Okay.  Do you know whatever happened to your
20  suggestion that he be transferred to a different
21  facility?
22    A.  Well, if we look at the grievance and
23  Mr. Mel Henry's response, apparently the medical
24  professional did not agree with my findings.  So -- in
25  fact, his last sentence states that "At the present

Page 80

1  time there is no indication that the medical and
2  security staff at Palmer Correctional Center can not
3  meet your essential health care needs per" Department
4  Policy 807.02.  And, you know, when I look at that, I
5  have to assume everything's okay.  He's the health
6  care professional.
7    Q.  And you're looking at the fourth page of
8  Exhibit 4?
9    A.  I'm looking at the response by Mel Henry to
10  the appeal of the grievance.
11    Q.  And that response is dated September 5th,
12  2002, right?
13    A.  That is correct.
14    Q.  And your suggestion was made on June the
15  27th, 2002, right?
16    A.  June 27th, '02.
17    Q.  Do you know anything about what occurred
18  with Mr. Davis' grievance in the intervening two and a
19  half months?
20    A.  Repeat that, please.
21    Q.  Do you know anything about what occurred
22  with Mr. Davis' grievance in that two and a half
23  months between the time you signed off on June 27th
24  and Mr. Henry signed off on September 5th?
25    MS. KAMM:  I think two and a half months is

Page 81

1  a little bit extended.
2  BY MR. MATTHEWS:
3    Q.  Two plus months.
4    A.  Well, the director has 30 days to respond.
5  So whenever Mr. -- the sergeant would have sent this
6  to the director, which would have been sometime after
7  June 27th.  But I was not aware of any problems or
8  anything in this between time that you're referring
9  to.
10    Q.  Let me make sure I understand the process.
11  Is there -- I think you explained it earlier.  But once
12  the appeal is filed by Mr. Davis, which we see on page
13  three --
14    A.  Uh-huh.
15    Q.  -- the appeal statement on June 27th, it
16  then goes to the compliance officer again, right?
17    A.  That's correct.
18    Q.  And from there it goes on to the director?
19    A.  That's correct.
20    Q.  And the director under the policies and
21  procedures has 30 days to review the grievance.
22    A.  Thirty days to respond.
23    Q.  And from there if the prisoner still isn't
24  satisfied, it goes where?
25    A.  Court.

21 (Pages 78 to 81)

Exhibit ____15____
Page 21 of 23

Zelmer Hyden                               deposition                          April 27, 2006

---

**Page 82**

1    Q.  Is it your impression in looking at these
2  documents in Exhibit 4 that the director's response,
3  if you will, is what's made by Mel Henry?
4    A.  That is correct.
5    Q.  That's well more than 30 days afterwards,
6  right?
7    A.  That would appear so, yes.
8    Q.  Do you know why it took so long?
9    A.  Haven't a clue.
10    Q.  Do you know anything about Mr. Davis'
11  medical condition in that intervening time?
12    A.  None.  I was not made aware there was a
13  problem or I'd have done something.  In my case, doing
14  something would be talk to these people, Mr. Henry's
15  people, that I'm uncomfortable with whatever.
16    Q.  Is it fair to say that you personally didn't
17  take any action with respect to Mr. Davis' status at
18  PCC after June 27th in response to his grievance?
19    A.  None that I -- none that I recall.  I wasn't
20  aware that there was a problem.
21    Q.  In the time that Mr. Davis was at Palmer, do
22  you know if there was ever an effort to have him
23  examined by a medical doctor with cardiac training?
24    A.  Don't know.  It's all medical.
25    Q.  As to any specific questions about

**Page 83**

1  Mr. Davis' medical care while he was at Palmer, you're
2  not the person to ask those questions to.
3    A.  That's about the size of it.  I wouldn't --
4  once again, I have to listen to these people.  They're
5  the professionals.  And what they tell me, I have to
6  go with.
7      I may even go as far as say maybe, well, you
8  should look at transferring this guy if he feels this
9  uncomfortable here.  They disagreed with me.  They
10  felt as like on the last page, Mr. Henry's response,
11  there's no indication that his needs are not being
12  met.  And that's what I have to go with.
13    Q.  Do you have -- do you have any memory of
14  discussing Mr. Davis' grievance with Mel Henry at any
15  point in time?
16    A.  I have no recollection of that.
17    Q.  Is that something you would typically do
18  with a grievance if it were medical in nature?
19    A.  Not usually, no.  If -- if there was a
20  problem -- Mel Henry thought there was a problem or
21  something, you know, he might call.  But it never
22  happened, to my recollection.
23    Q.  Is it fair to say that once Mr. Davis'
24  grievance was signed off by you in June of 2002,
25  that's about the last that you heard of it until the

**Page 84**

1  lawsuit?
2    A.  That's about the last I heard of it, to my
3  recollection.
4    Q.  Did you personally take any steps after
5  June 27th, 2002 to make any changes in the medical
6  care that Mr. Davis received?
7    A.  It's not my -- I mean, I could make a
8  suggestion, but I don't recall the need to do so.
9    Q.  You don't have any memory of making
10  suggestions?
11    A.  No.
12    Q.  Do you have any memory of suggesting that
13  Mr. Davis' medical monitoring be changed in any way?
14    A.  No.  I mean these questions are like if
15  you're not aware there's a fire somewhere, you know,
16  you're not going to go put the fire out.  There is no
17  fire.  I did -- I wasn't aware there was a fire
18  anywhere.  So I'm not going to be standing there with
19  the hose ready to put the fire out, because I didn't
20  know there was a fire.
21    Q.  On June 27th, 2002 you were aware that
22  Mr. Davis had concerns about his medical care, right?
23    A.  Yes.
24      MR. MATTHEWS:  Mr. Hyden, thank you.  That's
25  all the questions I have.

**Page 85**

1      THE WITNESS:  That's it?  Okay.
2      MS. KAMM:  Thank you.
3      MR. MATTHEWS:  Thank you.
4          (Whereupon, the deposition was
5          concluded at 11:52 a.m.)
6  (Signature pending.)

---

Exhibit _15_
Page _22_ of _23_

Zelmer Hyden                              deposition                           April 27, 2006

Page 86

```
 1          CERTIFICATE
 2
 3      I, SUSAN CAMPBELL, Certified Shorthand
 4  Reporter and Notary Public in and for the State of
 5  Alaska, do hereby certify that the witness in the
 6  foregoing proceedings was duly sworn; that the
 7  proceedings were then taken before me at the time
 8  and place herein set forth; that the testimony
 9  and proceedings were reported stenographically by
10  me and later transcribed by computer transcription;
11  that the foregoing is a true record of the
12  testimony and proceedings taken at that time;
13  and that I am not a party to nor have I any
14  interest in the outcome of the action herein
15  contained.
16      IN WITNESS WHEREOF, I have hereunto set
17  my hand and affixed my seal this _____ day
18  of _____ 2006.
19
20
21          _____
            SUSAN CAMPBELL, CSR
22          My Commission Expires 4/26/08
23
24
25
```

Page 87

```
 1          WITNESS CERTIFICATE
 2  RE: Davis vs. Hyden, et al.
    CASE NO.:  A02-0214 CV (JKS)
 3  DEPOSITION: Zelmer Hyden
    DATE TAKEN:  April 27, 2006
 4
      I hereby certify that I have read the foregoing
 5  deposition and accept it as true and correct, with
    the following exceptions:
 6
    Page  Line    Description/Reason for Change
 7
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22      SIGNATURE        DATE
23  Please sign your name and date it on the above line.
    (As needed, use additional paper to note corrections,
24  dating and signing each page.)          (SC)
25
```

Alaska Stenotype Reporters (907) 276-1680

Exhibit ___15___
Page 23 of 23